IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: CERTAINTEED FIBER CEMENT          MDL DOCKET NO. 2270
SIDING LITIGATION

This pleading relates to:

**ALL CASES**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMBINED OBJECTIONS OF NAMED PLAINTIFF AND CLASS MEMBER, MICHAEL PATOTA; NAMED PLAINTIFF AND CLASS MEMBER, SHERMAN CREEK CONDOMINIUM ASSOCIATION; NAMED PLAINTIFF AND CLASS MEMBER, THOMAS FRANK; CLASS MEMBERS, THOMAS AND JUDY LIGOURI; AND, CLASS MEMBER, SCOTT ZEIGLER, TO PROPOSED SETTLEMENT CLASS CERTIFICATION, PROPOSED CLASS ACTION SETTLEMENT, AND NOTICE OF INTENT TO APPEAR AT FAIRNESS HEARING**

Named Plaintiff and Class Member, Michael Patota; Named Plaintiff and Class Member, Sherman Creek Condominium Association, through its Officer-at-Large, Jerome Kaphingst; Named Plaintiff and Class Member, Thomas Frank; Class Members, Thomas and Judy Ligouri; and Class Member, Scott Zeigler (hereafter and collectively "Objectors"), by and through their undersigned counsel (hereafter "Objectors' Counsel"), hereby object to the class action certification and the proposed class action settlement.

For the reasons discussed more fully below, the Objectors oppose and object to the proposed settlement class action certification and the proposed class action settlement. Consequently, the Objectors pray that this Honorable Court deny approval of the proposed certification and settlement. In the alternative, the Objectors pray that the Court delay final approval of the settlement and order class counsel and CertainTeed to meet and confer with the Objectors and Objectors' Counsel to address the questions raised herein to ensure that: ambiguities in the Settlement Agreement and the claims process are eliminated; the burden for class members who seek to file claims for benefits is less onerous; class members who do not

1

submit and/or have an eligible claim during the claims period will at least retain their existing warranty rights.

## I. __INTRODUCTION__

In 2010, numerous class action lawsuits were filed across the country against CertainTeed Corporation (hereinafter "CertainTeed") relating to premature degradation and failure of its siding. On August 8, 2011, the United States Judicial Panel on Multidistrict Litigation ("JPML") issued an Order transferring to this Court all of the federal court actions complaining about the siding. Specifically, the JPML transferred the following cases to this Court for coordinated pretrial treatment: 1) *John Robards, et al. v. CertainTeed Corporation*, No. 3:11-00141 (W.D. Ky.); 2) *Richard Tesoriero v. CertainTeed Corporation*, No. 5:11-00109 (N.D.N.Y.); 3) *Steve Clavette, et al. v. CertainTeed Corporation*, No. 2:10-06978 (E.D. Pa.); 4) *Monique Orieux v. CertainTeed Corporation*, No. 2:11-00234 (E.D. Pa.); 5) *Chad Epsen v. CertainTeed Corporation*, No. 2:11-00269 (E.D. Pa.); 6) *Steven Wiedmeyer v. CertainTeed Corporation*, No. 2:11-00317 (E.D. Pa.); and 7) *Koreen Grube v. CertainTeed Corporation*, No. 2:11-00396 (E.D. Wis.). The MDL Litigation is now under the caption *In Re CertainTeed Fiber Cement Siding Litigation*, MDL Docket No. 2270 (the "MDL Litigation").

Following the transfer of these cases, the JPML transferred additional cases to the Eastern District of Pennsylvania MDL Docket No. 2270, including: *Patota v. CertainTeed Corporation*, NO. 1:11-02701 (N.D. Ga.); *Juelich v. CertainTeed Corporation*, No. 4:12-00417 (E.D. Mo.); *Hocutt, et al. v. CertainTeed Corporation*, et al., No. 5:12-05010 (W.D. Ark.); *Hardig, et al. v. CertainTeed Corporation*, et al., No. 3:11-00535 (W.D.N.C.): *Frank v. CertainTeed*, No. 12-439 (W.D. Wis.); *Swanson v. CertainTeed*, No. 12-1189 (D. Minn.); *Dibley v. CertainTeed*, No. 12-1890 (D. Minn.); *Cheung v. CertainTeed Corporation*, No. 12-0557, (W.D.N.C.); *Sherman v.*

*CertainTeed Corporation*, No. 3:12-00614 (W.D.N.C.); *Saunders v. CertainTeed Corporation*, No. 3:12-00615 (W.D.N.C.); *Tai v. CertainTeed Corporation*, No. 3:12-00616 (W.D.N.C.); and *Ligouri, et al v. CertainTeed Corporation*, No. 13-00235 (S.D. Iowa). Objectors Patota, Frank, Sherman Creek Condominium Association (hereinafter "Sherman Creek"), and Thomas and Judy Ligouri are named plaintiffs in the cases with corresponding case captions listed above, and Objectors' Counsel is counsel of record in all of those suits. Objector Patota was included as a Plaintiff in the Second Consolidated Amended Complaint filed in MDL 2270 on June 19, 2012. *See* Doc. 13. Objector Scott Zeigler did not file suit against CertainTeed.

On September 30, 2013, class counsel and CertainTeed's counsel executed an Agreement of Compromise and Settlement (the "Settlement" or "Agreement" or "Settlement Agreement"), and filed it and various other documents into the record in conjunction with the proposed certification of a settlement class and settlement of the litigation. On October 3, 2013, the Court held a hearing on Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, and executed an Order on that same day preliminarily certifying the proposed class for settlement purposes and preliminarily approving the settlement. In that Order, the Court scheduled the Final Fairness Hearing for February 19, 2014, and also ordered that notice of the settlement be disseminated to the class members.

Subsequently, class counsel and CertainTeed's counsel executed a "Corrected Agreement of Compromise and Settlement" on November 1, 2013, and filed it into the record on that same date. Pursuant to the class notice, the deadline for class members to exclude themselves from the Settlement or to formally object to the Settlement is December 31, 2013. This document and the objections contained herein (hereinafter "Objections") are post-marked on or before December 31, 2013, and therefore, are timely submitted pursuant to the class notice.

## II.    FACTS REGARDING EACH OBJECTOR

### A.    Michael Patota

Objector Michael Patota is a resident of the State of Georgia and is domiciled at 5720 Upper Creek Court, Suwanee, Georgia 30024. His phone number is (770) 298-9986, and his email address is michaelpatota@bellshouth.net. His counsel for purposes of his Objections are Christopher L. Coffin, Esq., Stan P. Baudin, Esq., and Patrick W. Pendley, Esq., Pendley, Baudin & Coffin, LLP, 1515 Poydras Street, Suite 1400, New Orleans, LA 70118; (504) 355-0086; ccoffin@pbclawfirm.com; sbaudin@pbclawfirm.com; pwpendley@pbclawfirm.com.  Copies of documents that will be presented at the Final Fairness Hearing are attached herein, but Patota reserves the right to present any additional documents necessary prior to or at the Final Fairness Hearing to support his Objections. At this time, he intends to appear at the Fairness Hearing through his counsel; however, he reserves the right to appear at the Final Fairness Hearing.  His attorneys estimate that his Objections will take approximately two hours to present to the Court at the Final Fairness Hearing. The address of his property affected by the proposed settlement is 5720 Upper Creek Court, Suwanee, Georgia 30024.  He currently co-owns and co-owned this property on September 30, 2013. There is one structure on this property which contains the Siding.

In 2005, Patota built his home using CertainTeed WeatherBoards Fibercement Siding. Within six (6) years of installation, the Siding on Patota's home began to warp, crack, shrink and deteriorate.

In 2011, Patota contacted CertainTeed about the problems. A representative at CertainTeed instructed Patota to complete a CertainTeed "Fibercement Complaint Questionnaire" and submit the completed questionnaire and photos of the Siding on his home to

4

CertainTeed. Patota completed the "Fibercement Complaint Questionnaire" he received from CertainTeed and sent it to the company along with photos of his home showing some of the many cracks that had appeared in his Siding.

Responding to Patota's complaint, CertainTeed did not admit liability for the cracking of the boards but offered to provide him with replacement boards and paint. The company refused to provide him with any funds to cover labor for removal of the siding and installation of the new materials. CertainTeed also failed to offer Patota any compensation for the additional damages he has suffered as a result of the defective siding. Consequently, Patota refused CertainTeed's offer.

Patota also submitted a warranty claim to CertainTeed informing the company that a problem was taking place with his Siding, which was covered by the warranty. Nevertheless, CertainTeed sent Patota a letter denying his claim. As a result, Patota filed suit against CertainTeed.

Although neither Patota nor his counsel was ever consulted by class counsel about any settlement negotiations, mediations or anything at all whatsoever about any potential settlement with CertainTeed concerning his claims and the claims of the class he sought to represent, his name was included as a "Named Plaintiff" in the Settlement Agreement that was submitted to this Court for consideration and preliminary approval. The Court's October 3, 2013 Order, preliminarily approving of the class settlement, named Patota as a class representative. On November 1, 2013, class counsel and CertainTeed's counsel filed a Corrected Settlement Agreement into the record, which deleted Patota as a Named Plaintiff.

### B.      Sherman Creek Condominium Association

Objector Sherman Creek Condominium Association ("Sherman Creek") is an entity in the State of Wisconsin which is in charge of the maintenance of the CertainTeed Fibercement Siding installed on the condominiums located at N160 W18909 Oakland Drive, Jackson, Wisconsin, 53037.  Sherman Creek's Officer-at-Large is Jerome Kaphingst.  His phone number is (262) 677-3595, and his email address is rjkap@att.net. Sherman Creek's counsel for purposes of its Objections are: Christopher L. Coffin, Esq., Stan P.Baudin, Esq., and Patrick W. Pendley, Esq., Pendley, Baudin & Coffin, LLP, 1515 Poydras Street, Suite 1400, New Orleans, LA 70118; (504) 355-0086; ccoffin@pbclawfirm.com; sbaudin@pbclawfirm.com; pwpendley@pbclawfirm.com. Copies of documents that will be presented at the Final Fairness Hearing are attached herein, but Sherman Creek reserves the right to present any additional documents necessary prior to or at the Final Fairness Hearing to support its Objections. At this time, Sherman Creek intends to appear at the Fairness Hearing through its counsel; however, it reserves the right to appear at the Final Fairness Hearing.  Sherman Creek's attorneys estimate that its Objections will take approximately two hours to present to the Court at the Final Fairness Hearing. The addresses of Sherman Creek's properties affected by the proposed settlement are listed in attached Exhibit 1.  There are a total of 31 buildings at these addresses. All of the buildings listed in Exhibit 1 contain the Siding affected by the proposed settlement.

Construction began on the Sherman Creek Condominiums ("Condominiums") in 2003, and was completed in 2006.  The exteriors of all of the condominium buildings were sided with CertainTeed WeatherBoards Fibercement Siding. Within four (4) years of installation, the Siding on the buildings began to warp, buckle, shrink, deteriorate, and discolor.

In 2010, Sherman Creek contacted CertainTeed about the problems, and a representative of CertainTeed completed an inspection of all the Sherman Creek condominium buildings in 2010. Responding to Sherman Creek's complaint, CertainTeed did not admit liability for the warped, buckled, shrunken, deteriorated, and discolored Siding found on some of the buildings, but instead offered to provide Sherman Creek with some replacement Siding and monies for replacement paint, joint covers and/or caulk. CertainTeed refused to provide Sherman Creek with any funds to cover labor for removal and/or repair of the Siding and installation of the new materials. CertainTeed also failed to offer Sherman Creek any compensation for the additional damages it has suffered as a result of the defective Siding.  Sherman Creek accepted the partial payment made by CertainTeed for these defects in 2010. Since that time, some of the replacement Siding and the original Siding, not replaced, has warped, buckled, shrunken, deteriorated and discolored.  Sherman Creek filed suit against CertainTeed.

Although neither Sherman Creek, through Jerome Kaphingst, nor its counsel was ever consulted by class counsel about any settlement negotiations, mediations or anything at all whatsoever about any potential settlement with CertainTeed concerning its claims and the claims of the class it sought to represent, its name was included as a "Named Plaintiff" in the Settlement Agreement that was submitted to this Court for consideration and preliminary approval.  On November 1, 2013, class counsel and CertainTeed filed a Corrected Settlement Agreement, which deleted Sherman Creek as a Named Plaintiff.

C.     **Thomas Frank**

Objector Thomas Frank is a resident of the State of Wisconsin and is domiciled at W4655 Pebble Drive, Elkhorn, Wisconsin 53121. His phone number is (262) 745-9024, and his email address is tfrank@schoeneck.com. His counsel for purposes of his Objections are Christopher L.

Coffin, Esq., Stan P. Baudin, Esq., and Patrick W. Pendley, Esq., Pendley, Baudin & Coffin, LLP, 1515 Poydras Street, Suite 1400, New Orleans, LA 70118; (504) 355-0086; ccoffin@pbclawfirm.com; sbaudin@pbclawfirm.com; pwpendley@pbclawfirm.com. Copies of documents that will be presented at the Final Fairness Hearing are attached herein, but Frank reserves the right to present any additional documents necessary prior to or at the Final Fairness Hearing to support his Objections. At this time, he intends to appear at the Final Fairness Hearing through his counsel; however, he reserves the right to appear at the Final Fairness Hearing. His attorneys estimate that his Objections will take approximately two hours to present to the Court at the Final Fairness Hearing. The address of his property affected by the proposed settlement is W4655 Pebble Drive, Elkhorn, Wisconsin 53121. He currently co-owns and co-owned this property on September 30, 2013. There is one structure on this property which contains the Siding affected by the proposed Settlement.

In 2005, Frank purchased, applied or installed CertainTeed Siding on his home in Wisconsin. Within six (6) years of installation, the Siding on Frank's home began to warp, crack, gap, shrink and deteriorate.

In 2011, Frank contacted CertainTeed about the problems. CertainTeed stated that because his Siding was no longer covered by the two-year "SureStart Protection," his warranty would only cover the cost of materials on a prorated basis. The CertainTeed warranty does not cover the costs of labor for the installation of replacement Siding.

Frank, through the company he purchased the Siding from, submitted a warranty claim to Certain Teed informing the company that a problem was taking place with his Siding which was covered by the warranty. CertainTeed responded by offering to provide Frank with 584 pieces of Siding to replace the "affected walls" of his home (labor not included) because, "[w]hile the

8

problem of cracks in the siding you are experiencing has not been determined, we do value our customers."

Responding to Frank's complaint, CertainTeed did not admit liability for the cracking or gapping of the boards and refused to provide him with any funds to cover labor for removal of the Siding and installation of the new materials. CertainTeed also failed to offer Frank any compensation for the additional damages he has suffered as a result of the defective Siding. Consequently, Frank refused CertainTeed's offer and filed suit against CertainTeed.

Although neither Frank nor his counsel was ever consulted by class counsel about any settlement negotiations, mediations or anything at all whatsoever about any potential settlement with CertainTeed concerning his claims and the claims of the class he sought to represent, his name was included as a "Named Plaintiff" in the Settlement Agreement that was submitted to this Court for consideration and preliminary approval.  On November 1, 2013, class counsel and CertainTeed filed a Corrected Settlement Agreement, which deleted Frank as a Named Plaintiff.

### D.      Thomas and Judy Ligouri

Objectors Thomas Ligouri and Judy Ligouri are residents of the State of Iowa and are domiciled at 1154 Oklahoma Drive, Ames, Iowa 50014. Their phone number is (515) 296-2291, and their email address is Ligouri@mchsi.com. Their counsel for purposes of their Objections are Christopher L. Coffin, Esq., Stan P. Baudin, Esq., and Patrick W. Pendley, Esq., 1515 Poydras Street, Suite 1400, New Orleans, LA 70118; (504) 355-0086; ccoffin@pbclawfirm.com; sbaudin@pbclawfirm.com;  pwpendley@pbclawfirm.com.   Copies of documents that will be presented at the Final Fairness Hearing are attached herein, but they reserve the right to present any additional documents necessary prior to or at the Final Fairness Hearing to support their Objections. At this time, they intend to appear at the Final Fairness Hearing through their

9

counsel; however, they reserve the right to appear at the Final Fairness Hearing. Their attorneys estimate that their Objections will take approximately two hours to present to the Court at the Final Fairness Hearing. The address of their property affected by the proposed settlement is 1154 Oklahoma Drive, Ames, Iowa 50014. They currently co-own and co-owned this property on September 30, 2013. There is one structure on this property which contains the Siding affected by the proposed Settlement.

In 2003, the Ligouris purchased, applied or installed CertainTeed Siding on their home in Iowa. Within eight (8) years of installation, the Siding on the Ligouris' home began to delaminate, warp, crack, gap, shrink and deteriorate.

In 2011, Mr. Ligouri contacted CertainTeed about the problems and submitted a warranty claim to CertainTeed. In response, CertainTeed stated that because Mr. Ligouri's Siding was no longer covered by the two-year "SureStart Protection," his warranty would only cover the cost of materials on a prorated basis. The CertainTeed warranty does not cover the costs of the labor for the installation of replacement Siding.

CertainTeed offered to provide Mr. Ligouri with 368 pieces of Siding to replace the exterior walls of his home (labor not included). Responding to Mr. Ligouri's complaint, CertainTeed did not admit liability for the cracking or gapping of the boards, but offered to provide Mr. Ligouri with replacement boards. CertainTeed refused to provide Mr. Ligouri with any funds to cover labor for removal of the Siding and installation of the new materials. CertainTeed also failed to offer Mr. Ligouri any compensation for the additional damages he has suffered as a result of the defective Siding. Consequently, Mr. Ligouri refused CertainTeed's offer and filed suit against CertainTeed.

### E.    Scott Zeigler

Objector Scott Zeigler is a resident of the State of Colorado and is domiciled at 6851 County Road 500, Pagosa Springs, Colorado 81147. His phone number is (209) 338-7196, and his email address is marlenezeigler@gmail.com. His counsel for purposes of his Objections are Christopher L. Coffin, Esq., Stan P. Baudin, Esq., and Patrick W. Pendley, Esq., Pendley, Baudin & Coffin, LLP,1515 Poydras Street, Suite 1400, New Orleans, LA 70118; (504) 355-0086; ccoffin@pbclawfirm.com; sbaudin@pbclawfirm.com; pwpendley@pbclawfirm.com. Copies of documents that will be presented at the Final Fairness Hearing are attached herein, but Zeigler reserves the right to present any additional documents necessary prior to or at the Final Fairness Hearing to support his Objections. At this time, he intends to appear at the Final Fairness Hearing through his counsel; however, he reserves the right to appear at the Final Fairness Hearing. His attorneys estimate that their Objections will take approximately two hours to present to the Court at the Final Fairness Hearing. The address of his property affected by the proposed settlement is 6851 County Road 500, Pagosa Springs, Colorado 81147. He currently co-owns and co-owned this property on September 30, 2013 with his wife, son and daughter-in-law. There are three (3) structures on this property which contains the Siding affected by the proposed settlement.

In 2007, Scott Zeigler, in conjunction with his co-owners, purchased, applied or installed CertainTeed Siding on his home and two (2) other structures (his son's home and a "shop") in Colorado. Within five (5) years of installation, the Siding on all three (3) structures began to crack.

In 2012, Zeigler contacted CertainTeed about the problem and submitted warranty claims to CertainTeed. In response, CertainTeed stated that because Zeigler's Siding was no longer

covered by the two-year "SureStart Protection," the warranty would only cover the cost of materials on a prorated basis. The CertainTeed warranty does not cover the costs of the labor for the installation of replacement Siding.

CertainTeed offered to provide Zeigler with 530 pieces of Siding to replace the exterior walls of his home (labor not included) or a cash settlement in the amount of $5,665.70, which was equal to the original cost of material per the original invoice.[1]

Responding to Zeigler's complaint, CertainTeed did not admit liability for the cracking of the boards, but offered to provide Zeigler with replacement boards or the cash offer. CertainTeed refused to provide Zeigler with any funds to cover labor for removal of the Siding and installation of the new materials. CertainTeed also failed to offer Zeigler any compensation for the additional damages he has suffered as a result of the defective Siding. Consequently, Mr. Zeigler refused CertainTeed's offer.

III. **WITNESSES  WHO MAY BE   CALLED   BY OBJECTORS TO TESTIFY AT FINAL FAIRNESS  HEARING**

1.    The Objectors

2.    Counsel for CertainTeed

3.    Class counsel and/or Co-Lead counsel

4.    Experts

5.    Any witness called to testify by any other party. Objectors reserve the right to cross-examine any witnesses called by class counsel or CertainTeed to testify.

---

[1] CertainTeed also made an offer to Zeigler's son and daughter-in-law that was similar to the offer it made to Zeigler.

## IV.   OBJECTIONS TO CERTIFICATION OF THE SETTLEMENT CLASS

### A.   Proponents of Class Settlement Must Prove That the Proposed Class Is Certifiable for Settlement Purposes Under Rule 23

The Supreme Court held in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231 (1997) that, although certain Rule 23 considerations, such as "whether the case, if tried, would present intractable management problems," are not applicable in the settlement class context, the Rule's other requirements "demand undiluted, even heightened, attention" when class action representatives are seeking certification for the purpose of settlement. Thus, in addition to determining whether a proposed settlement is "fair, reasonable, and adequate," Fed.R.Civ.P. 23(e), district courts must ensure that each of Rule 23's requirements is satisfied before certifying a class and approving a class settlement agreement. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (*en banc*) ("[B]efore approving a class settlement agreement, a district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met." (internal quotation marks omitted)); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 300 (3d Cir. 2005) ("[R]egardless of whether a district court certifies a class for trial or for settlement, it must first find that the class satisfies all the requirements of Rule 23.") Whether class action representatives are seeking certification for the purpose of settlement or with the intent to litigate, the members of the proposed class must meet the threshold requirements of Rule 23, and the policy preference for voluntary settlement cannot and does not alter that demand. *See Rodriguez v. National City Bank*, 726 F.3d 372, 379 (3d Cir. 2013).

The Third Circuit recognized the constant applicability of Rule 23 in *Sullivan*. The Third Circuit held in *Sullivan* that, although settlement is clearly favored, "global settlements may nevertheless be rejected for failing to meet the requirements of Rule 23." *Sullivan v. DB Invs., Inc.*, 667 F.3d at 311 n. 40.  At the threshold, "[t]he party seeking certification bears the burden

of establishing each element of Rule 23 by a preponderance of the evidence," which requires demonstrating "actual, not presumed, conformance" with the Rule.  *Id.* (alterations and internal quotation marks omitted). The district court "must conduct a 'rigorous analysis' of the evidence and arguments put forth," *id.* (quoting *In re Hydrogen Peroxide,* 552 F.3d at 316), a task that sometimes involves "a preliminary inquiry into the merits" of the plaintiffs' claims to ensure they can be "properly resolved as a class action," *Newton,* 259 F.3d at 168; *see also Dukes,* 131 S.Ct. at 2551 ("Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim." (internal quotation marks omitted)). The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 320. "The Rule 23 inquiry is certainly not meant to discourage settlement, but it is more than a rubber stamp, and thus it will sometimes result in the undoing of a settlement." *Rodriguez,* 726 F.3d at 382.

### B.   The Settlement Class Should Not Be Certified Because the Class Representatives are Inadequate

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties [in a class action] ... fairly and adequately protect the interests of the class."  The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs. *In re Cmty. Bank of N. Va.,* 418 F.3d 277, 303 (3d Cir.2005). These objections focus on the second component.

As a substantive matter, Objectors oppose and object to the certification of the proposed settlement class because the proposed class representatives are not adequate representatives of

the class in that: they have interests which are antagonistic to some of the class members; they have conflicts of interest with some of the class members whom they purport to represent; they conducted little or no investigation into the claims that were asserted in the lawsuit and the impact to the class members of the overbroad releases being given to CertainTeed under the proposed Settlement; and, they entered into a proposed Settlement which woefully undervalues the claims of the class members.

First, at this stage of the proceedings, it is unknown whether the class representatives are members of the settlement class, much less adequate class representatives. Indeed, no evidence was offered by class counsel with Plaintiffs' Motion for Preliminary Approval indicating that any of the class representatives satisfy the requirements of the class definition. Unless class counsel offers such evidence, the proposed class representatives are not adequate representatives of the proposed class, and therefore, this proposed settlement should not be finally approved by the Court.

Second, the Objectors argue that a potential intra-class conflict may prevent the class representatives from adequately representing the entire class. To wit, although there were no sub-classes created by the Settlement Agreement, the "Remedy" section of the Settlement Agreement essentially creates three (3) groups of class members for compensation purposes.

The first group includes class members who have "Wall Sections"[2] on their home, buildings or other structures that meet the Qualifying Damage[3] requirements of Section 7.2(a) of the Settlement Agreement (hereinafter, the "Section 7.2(a) Group"). If a class member has one

---

[2] The Settlement Agreement, at Section 1, defines "Wall Section" as "that section of a wall on a Settlement Class Member's home or other structure on which the Siding is contiguous."

[3] The Settlement Agreement, at Section 1, defines "Qualifying Damage" to Siding as "damages caused by a defect in the Siding that is manifested as shrinkage between the ends of Siding in excess of 3/16" except that for Siding installed abutting windows, doors or trim, shrinkage must exceed 5/16". In addition, Siding with warping or bowing in excess of 1/2", field and edge cracking through the board, or delamination is also Qualifying Damage."

or more Wall Sections that meet the Section 7.2(a) criteria, then the class member is entitled to the maximum compensation allowed under the Settlement for each of those Wall Sections, *i.e.*, compensation for all boards on the entire affected Wall Sections.

The second group includes class members who do <u>not</u> meet the criteria under Section 7.2(a), but have boards or panels that meet the Qualifying Damage requirements (hereinafter, the "Section 7.2(b) Group").  If a class member meets the Qualifying Damage requirements under Section 7.2(b), then the class member is only entitled to compensation for the actual number of boards or panels with Qualifying Damage, plus any necessary boards immediately above or below the affected boards; however, the number of boards or panels to be compensated for is reduced based on the proration schedule contained in the original warranty.

The third group includes class members who have no Qualifying Damage to their Siding pursuant to Sections 7.2(a) or 7.2(b) (hereinafter, the "No Qualifying Damage Group"). Although the No Qualifying Damage Group class members may have damage to their Siding, *e.g.*, shrinkage between the ends of the Siding less than 3/16" or warping of less than 1/2", they are entitled to <u>no</u> compensation under the Settlement.  Moreover, as a result of the Settlement, all groups, including the No Qualifying Damage Group, are forfeiting the balance of the warranty that they received as part of their purchase of the Siding.[4]  This is quite shocking, and certainly unfair, especially to those class members in the No Qualifying Damage Group.

Objectors argue that the Court should determine whether intra-class conflicts were created between class members in the three Groups. The intra-class conflict raised by Objectors is allocative in nature and concerns the class representatives' potential incentive to define the lines between the groups in order to maximize their own recoveries, at the expense of other

---

[4] Objectors are aware of CertainTeed Siding coming with either a 25 or 50-year warranty upon purchase. *See, e.g.*, attached Exhibit 2.

members of the class who lacked a representative to protect their interests. This intra-class conflict is most apparent when comparing the interests of the Section 7.2(a) Group and the Section 7.2(b) Group with the interests of the No Qualifying Damage Group. As evidenced by the allegations made by the class representatives in the Second Amended Complaint, each and every class representative has experienced some damage to the Siding on the structure they own.[5]   Therefore, assuming that each class representative's damage rises to the level of Qualifying Damage, there is not a single class representative in the No Qualifying Damage Group. Consequently, prior to entering into the Settlement, the fairness of the Settlement was not considered by a single class member in the No Qualifying Damage Group. This creates a major intra-class conflict.

In addition, considering that those in the No Qualifying Damage Group are not entitled to any compensation and, through the "Release" contained in the Settlement, they forfeit the balance remaining on their warranty that accompanied the Siding, failure to ensure approval of the Settlement by class members in the No Qualifying Damage Group is unconscionable. This is precisely the type of allocative conflict of interest that exacerbated the misalignment of interests in *Amchem,* 521 U.S. at 626–27, 117 S.Ct. 2231. Based on this issue alone, the class should not be certified due to inadequate class representatives caused by the intra-class conflict.

Similarly, another potential problem created is that the interests of the class representatives in the Section 7.2(a) Group, and the interests of the class members in the other two Groups, may be in opposing directions. Assuming all the class representatives fall within the

---

[5] *See* Second Amended Complaint (Doc. 13): Para. 7 (Plaintiff Clavette noticed shrinkage and a cracked board); Para. 10 (Plaintiff Epsen's Siding began to warp and shrink – he saw cracking, gapping, paint chipping, delaminating, boards coming loose); Para. 17 (Plaintiff Orieux noticed shrinkage and discoloration in the Siding); Para. 20 (Plaintiffs Weithaus and Thames noticed large gaps, shrinkage, cracked boards and bowing between the Siding boards on their home); Para. 23 (Plaintiff Wiedmeyer noticed shrinkage and gaps in the seams of the Siding boards, and paint flaking); Paras. 28 and 29 (Plaintiff Tesoriero noticed discoloring, shrinkage, peeling, warping and chipping of his Siding).

Section 7.2(a) Group, they had an incentive to draw the line at the 5% or greater damage level to ensure they obtained the maximum benefits allowed under the Settlement (for the initial payment and for the second payment), and to relegate everyone below the 5% damage level to the remaining Groups. They also had an incentive to make the actual compensation under the Settlement to those remaining two Groups even lower by requiring proration for the boards under the terms of the original warranty.  Put simply, the class representatives  had an interest in excluding other class members from the Section 7.2(a) Group and maximizing their potential recoveries, while class members in the Section 7.2(b) Group and the No Qualifying Damage Group had an interest in being included in the Section 7.2(a) Group. This is another example of the type of allocative conflict of interest that exacerbated the misalignment of interests in *Amchem,* 521 U.S. at 626–27, 117 S.Ct. 2231.

If the facts reveal, and the Court finds, that all or most of the Wall Sections of all of the class representatives' homes, buildings or other structures fall under Section 7.2(a) for compensation purposes, and therefore, by definition, all or most of the class representatives' claims fall into the Section 7.2(a) Group, then the Court should find that the class representatives could not and cannot adequately represent class members in the other Groups.  If the Court's analysis reveals this result, the class should not be certified due to inadequate class representatives.

The potential problem with dividing the class without having adequate representation from one of the groups could have become untenable in this case because of who drew the line. The class representatives and their counsel could not adequately represent the entire class in determining where the line would lie, because the Settlement provided "no structural assurance" that the class representatives, all of whom are most likely in the Section 7.2(a) Group, could

adequately represent the interests of the class members in the other Groups. *See Amchem*, 521 U.S. at 627, 117 S.Ct. 2231. Thus, on these facts, there could be another fundamental intra-class conflict between the class representatives, if all of them are in the Section 7.2(a) Group, and those class members in the other two Groups. This Court should not certify the class if it finds that these intra-class conflicts exist and the class representatives fail to satisfy the adequacy requirement in Rule 23(a)(4).

Further, intra-class conflicts may occur between class members who have existing Qualifying Damage and are eligible to file a claim immediately, and those whose Siding does not exhibit Qualifying Damage until several years later. Section 4.1 of the Settlement Agreement dictates the funding schedule for the Settlement Fund. A cursory review of Section 4.1 indicates that funding is to take place over a period of four (4) years after the Effective Date. Even if the Settlement Fund is fully funded by CertainTeed under the funding schedule outlined in Section 4.1, there is no guarantee that only paying one-half of each class member's claim up-front (and potentially more later through a second payment)(*see* Section 7.3 of the Settlement Agreement) would not exhaust the entire $103.9M[6] fund before some class members even qualify to file a claim within the 6 year claims period. For example, the entire $103.9M is set to be fully funded by the end of Year 4 of the 6 year claims period. If paying one-half of all claims filed through Year 5 of the claims period exhausts that entire $103.9M minus costs, then there will be no funds remaining to pay claims of class members that are filed in Year 6 of the claims period. The fact that this possibility could occur is not speculative or hypothetical; rather, it is very real. The class representatives and CertainTeed have offered no evidence or assurances to the Court that this

---

[6] The Court should note that pursuant to the Settlement Agreement, all costs, including attorneys' fees, case costs, class notice costs, class representative incentive payments and claims administrator costs, are to be deducted from the $103.9M Settlement Fund. Consequently, the amount being paid to the class is less than $103.9M.

could not happen.  The Settlement Agreement negotiated by the class representatives does not contemplate this possibility or offer any solutions to address this possibility, and as a result, the class representatives have claims that are antagonistic to the class.

In addition, if CertainTeed Corporation files for bankruptcy at any time within this four year period or fails to completely fund the Settlement Fund for any other reason, the possibility exists that class members who are not eligible to file claims until late in the 6-year long claims period may not be paid any benefits under the Settlement because the earlier payments may exhaust the fund.

In sum, the class representatives have not adequately represented the interests of class members who may only be eligible to file a qualifying claim under the Settlement far into the future, by ensuring that those class members will receive the settlement benefits guaranteed under the Settlement when they do file their eligible claim.  The class representatives have negotiated no terms in the Settlement Agreement to protect these class members should this occur. If it does occur, the affected class members' due process rights will be violated.  Indeed, the class representatives cannot bargain away these class members' rights through a release of all claims in exchange for benefits from a settlement fund which may be exhausted before they even qualify to file a claim.   Notably, the Settlement Agreement could have provided for a back-end opt-out option for class members who may be affected by these possibilities should they occur; however, the class representatives failed to do so.

To further add credence to the Objectors' intra-class conflicts arguments, class counsel suggests in Plaintiffs' Memorandum in Support for Preliminary Approval that "the second payment will be made at the end of the claims period, *unless Class Counsel seeks approval from the Court to accelerate payments* based on the claims rate." Pls. Memo. in Support, pg. 8.  This

suggests that the class representatives, through class counsel, would consider paying additional monies in the Settlement Fund to class members who previously filed claims, which may exhaust or limit available funds to pay claims for class members who become eligible to file a claim for benefits at or near the end of the claims period. Of course, this ignores the possibility that a significant number of claims could be submitted to the claims administrator on the final days of the claims period.  If the class representatives and class counsel jump the gun and start to make second payments to class members prior to the end of the claims period, there is a serious likelihood that late-filing class members may not receive any settlement funds to which they are entitled to under the Settlement, much less the one-half that is "guaranteed."

The conflict is compounded by Section 7.3 of the Settlement Agreement which states, in pertinent part, that "[a]t the end of the claims period, *the Claimant will receive a second payment*, and depending on the claims rate may receive the full value of their claim with a reduction for usage."  Because the class representatives cannot guarantee that there will be sufficient funds to pay all claims even at one-half of their value, the class representatives were inadequate in suggesting in the Settlement Agreement and in the class notice that "the Claimant *will* receive a second payment."

Intra-class conflicts are also present under the Settlement Agreement because some class members will get nothing under the Settlement, but will give up all potential claims and warranty rights in the future.  Indeed, if a class member's Siding never exhibits "Qualifying Damage" during the 6 year class period, they cannot file a claim for settlement benefits.  Their Siding could have 2/16" gaps between boards and/or 1/2" or less of warping or bowing, which is still damage, but under these measurements, they are not entitled to recover anything under this Settlement.  This is not fair or reasonable. Including them in the class definition - individuals and

21

entities that may never qualify to file a claim for settlement benefits, but must waive their existing warranty rights anyway - clearly shows that the class representatives do not have the best interest of all of the class members at the forefront.

Finally, the class representatives are also inadequate because they entered into a proposed Settlement which woefully undervalues the claims of the class members. According to class counsel, there are approximately 300,000[7] class members in this case. *See* Michael McShane Declaration (Doc. 25-2). Taking the example contained in the Settlement Agreement and in the class notice as true, *i.e.*, that the average cost to re-side a home in the United States is $14,000, and there are 300,000 class members, then the total exposure for CertainTeed in this case was approximately $4,200,000,000. At the $103,900,000 capped settlement figure, this suggests that the class is recovering about 2.5% of CertainTeed's exposure. Although this estimation does not take into account statute of limitation issues, potential depreciation issues and warranty issues, the $103.9M settlement figure still appears to be extremely low. When viewed in this light, the Court could clearly find that the overall recovery, while significant, is still woefully inadequate, and as a result, the class representatives are inadequate for negotiating and accepting such a settlement.

The issues discussed above, regarding the inadequacy of the class representatives, also raises a serious question about the information the class representatives considered before entering into the Settlement Agreement:  Did any of the class representatives listed as the "Named Plaintiffs" in the Settlement Agreement participate in the settlement process at all? Although all the Objectors cannot answer these questions for all the Named Plaintiffs listed in the Settlement Agreement, Objectors Patota, Frank and Sherman Creek can answer this question

---

[7] It is unclear if class counsel meant there are 300,000 individuals and entities that are class members, or if class counsel meant that there are 300,000 homes, buildings or structures with Siding that would fall into the class.

for themselves: No.  These Objectors, Patota, Frank and Sherman Creek, who are also Named Plaintiffs as defined by the Settlement Agreement originally submitted to the Court: (1) were not invited by class counsel to participate in any settlement negotiations with CertainTeed; (2) were not involved in any settlement negotiations with class counsel and CertainTeed; and, (3) were not consulted by class counsel about any of the terms and provisions included in the Settlement Agreement before it was executed and filed into the record.  Query: Is this also true for the other Named Plaintiffs in the Settlement Agreement who are supposedly endorsing the Settlement as fair and reasonable?  Given that Patota, Frank and Sherman Creek were not informed about the Settlement in any way prior to the execution of the Settlement Agreement, Objectors encourage the Court to inquire about the analysis, if any, in which the other Named Plaintiffs engaged prior to its execution.

## V.   OBJECTIONS TO THE SETTLEMENT AS NOT BEING FAIR, REASONABLE AND ADEQUATE

### A.   Proponents of a Class Action Settlement Must Prove that the Settlement is Fair, Reasonable and Adequate under Rule 23(e)

The burden of proving the fairness of a settlement rests squarely on its proponents. *See 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions* Sec. 11.42 (3d ed. 1992);  *In re Matzo Food Prods. Litig.,* 156 F.R.D. 600, 605 (D. N.J. 1994); *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 151 (S.D. Ohio 1992); *see also* 3B Moore's *Federal Practice* Sec. 23.80 [4] (2d ed. 1987).  That burden is particularly high when, as here, settlement negotiations precede the certification of the class, and notice of the class action is sent simultaneously with the notice of the settlement itself. "The danger of a premature, even a collusive, settlement is increased when . . . the status of the action as a class action is not determined until a settlement has been negotiated, with all the momentum that a settlement agreement generates," and "class members

23

are presented with what looks like a *fait accompli.*" *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.,* 834 F.2d 677, 680-81 (7th Cir. 1987*); see, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (noting that class actions "demand undiluted, even heightened, attention in the settlement context"); *General Motors,* 55 F.3d at 805 ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified"); *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982) (demanding "a clearer showing of a settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it" in cases involving settlement classes); *Mars Steel,* 834 F.2d at 682 (requiring that the inquiry be "especially careful and penetrating" where class certification is deferred to the settlement stage").   The Court must determine whether the settlement is fair, reasonable and adequate. *See Officers for Justice v. Civil Serv. Comm'n*  (9th Cir. 1982) 688 F.2d 615, 625. The purpose of this requirement is "the protection of those class members including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." *Id.* at 624. *See also In re Oracles Securities Litig.* (N.D.Cal. 1993) 829 F. Supp. 1176.

In *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit articulated nine factors to be considered when determining the fairness of a proposed settlement:

> " '(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.' "

In *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 323 (3d Cir.1998), the Third Circuit held that depending on the facts of a given case, "it may be useful to expand the traditional *Girsh* factors to include, when appropriate," additional factors "that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages," as well as "the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable."

The Objectors suggest that based on the arguments and issues raised above and below, that the class action settlement proposed here cannot survive any meaningful review, let alone the heightened scrutiny that is required.  In the alternative, the Objectors pray that the Court delay final approval of the settlement and order class counsel and CertainTeed to meet and confer with the Objectors and Objectors' Counsel to address the questions raised herein to ensure that: ambiguities in the Settlement Agreement and the claims process are eliminated; the burden for class members who seek to file claims for benefits is less onerous; class members who do not submit and/or have an eligible claim during the claims period will at least retain their existing warranty rights.

**B.    Requiring Class Members to Object Before the Class Representatives, Class Counsel and CertainTeed Submit Their Papers and Evidence in Support of Final Approval Violates Objectors' Due Process Rights**

Objectors first wish to draw the Court's attention to the difficulty they have encountered in preparing their Objections. Under the Settlement Agreement, objections from class members

must be post-marked or submitted no later than December 31, 2013.  However, other than the pro forma submissions that class counsel and CertainTeed submitted in conjunction with the motion for preliminary certification and settlement approval, there is no provision for or deadline in the settlement documents for class counsel and CertainTeed to submit anything to the Court supporting the proposed settlement prior to the Final Fairness Hearing. Indeed, Plaintiffs have only been ordered to file a motion requesting that the Court grant final approval of the Settlement Agreement, approve the incentive awards, award attorneys' fees and costs and enter a final judgment *prior to the Final Approval Hearing. See Doc. 28.*

Therefore, Objectors have not had an adequate opportunity to examine the class representatives', class counsels' or CertainTeed's evidence or arguments before submitting these written objections. This order of presentation of evidence and arguments places Objectors in a particularly difficult position in preparing their objections and opposition to the proposed Settlement.  For these reasons, Objectors argue that their due process rights have been violated and that this Settlement should not be finally approved as a result.  In the alternative, Objectors reserve the right to file responsive papers after reviewing these submissions, and ask this Court to consider any further counter-evidence or arguments at that time.

C.     **The Settlement is Not Fair, Reasonable and Adequate Because the Class Definition is Vague and Ambiguous**

Objectors show that the class definition preliminarily approved by the Court is vague, ambiguous, and confusing, and as such, does not allow some individuals or entities to determine whether or not they are a member of the proposed settlement class whose rights are affected by this Settlement.

To wit, according to the Settlement Agreement, the "Settlement Class" definition "means all individuals and entities that, as of September 30, 2013, own homes, residences, buildings or

26

other structures located in the United States, on which the Siding was installed on or before September 30, 2013." Objectors posit that a reasonable person reading the class definition cannot definitively conclude whether individuals and entities must own 100% of the homes, residences, buildings or other structures, on which the Siding was installed, as of September 30, 2013, in order qualify as a class member, or whether the class is also inclusive of individuals and entities who have a *co-ownership* interest in a home, building or other structure on which the Siding was installed, as of September 30, 2013.

The class representatives and CertainTeed will likely argue that the Settlement Class includes individuals and entities who have a *co-ownership* interest in a home, residence, building or other structure on which the Siding was installed, as of September 30, 2013; however, this is far from clear by reading the plain language of the class definition. Other language found in the settlement documents could lead a reasonable person to conclude differently, *e.g.,* the claim form only requires the "Signature of Owner"; in the claim form, the Claimant "represents and warrants that ... Claimant is the rightful and *only owner* or assignee of the claim submitted..."; and, the "Release" language in the claim form applies only to an individual, *e.g.,* "*I* acknowledge the release set forth in the Settlement Agreement"; "*I* hereby warrant and represent that *I* have not assigned or transferred or purported to assign or transfer ... any matter released pursuant to this release..." Based on this information contained in the Settlement documents, Objectors argue that a reasonable person, or person(s) acting on behalf of an entity, could conclude that they are not class members because they own less than 100% or co-own homes and buildings upon which the Siding was installed during the class period.

If the Court agrees that such a basic ambiguity exists in the class definition, it should also find that the Settlement Agreement is not fair, reasonable and adequate because it violates the

affected class members' due process rights and does not meet the requirements for approval under Rule 23(e).

Even assuming that the Court finds that the class definition is not ambiguous, which the Objectors deny, and finds that it reasonably can be interpreted to include individuals and entities that are *co-owners* of homes, residences, buildings or other structures on which the Siding was installed, as of September 30, 2013: (1) can one or more co-owner(s) make decisions and take action regarding all co-owners' interests in the property with respect to the Settlement Agreement without all co-owners' consent, *e.g.*, file a claim, object or opt-out; or (2) is *each* co-owner of a property affected by the Settlement a separate and distinct class member who can individually and separately make decisions and take action regarding their separate ownership interest in the property with respect to the Settlement, *e.g.*, each separately decide to stay in the Settlement or opt-out with respect to a co-owned home or building, or file a claim or object or opt-out; or (3) do *all* co-owners of a home, residence, building or structure with the Siding have to act in *unison* with regard to the Settlement, *e.g.*, *all* stay in the Settlement; *all* file a claim; *all* object; or, *all* opt-out? There is nothing in the Settlement Agreement to suggest which of these options is correct, if any, for co-owners of affected properties. The Settlement does not adequately inform co-owning class members about their options and how their rights are affected based on their choices and their co-owners' choices made under the Settlement. As a result, the Settlement is not fair, reasonable or adequate, and it violates co-owners' due process rights, because co-owner class members cannot make important decisions about what to do in response to the Settlement.

For example, if the class representatives and CertainTeed argue that one or more co-owner(s) can make decisions and take action regarding all co-owners' interests in the property

with respect to the Settlement Agreement without all co-owners' consent, then clearly, the class representatives and CertainTeed would be advocating a position that violates the due process rights of the non-consenting co-owners of the property.  The Settlement Agreement does not suggest that one co-owner can act on behalf of all co-owners without their express consent.  If this is indeed the case, the Court should find that the class notice was woefully deficient because this was not explained to the class members in any form or fashion.  Surely, the Court cannot find that the Settlement is fair, reasonable and adequate if it allows claims to be processed or opt-outs to be honored if they are submitted by one or more co-owners of an affected property without the consent of the other co-owner or co-owners of the same property.

On the other hand, if the class representatives and CertainTeed argue that *each* co-owner is a separate and distinct class member who can individually and separately make decisions and take action regarding their separate ownership interest in the property with respect to the Settlement, then complicated and absurd scenarios enter the picture.

1.  Could some co-owners of an affected building stay in the Settlement and file claims for Qualifying Damages and receive settlement benefits, while other co-owners of the same building opt out and sue CertainTeed to recover for the same damage? There is nothing in the Settlement Agreement to prevent this from happening.

2.  Assuming co-owners of the same building can act separately and independently in this fashion under the terms of the Settlement, how would the claims administrator treat this situation? Would the claims administrator honor the claims that are filed? If so, how would the amount of the claim be determined for the co-owner(s) who filed claims? Would the claims administrator pay the co-owner's(s') claim based on his/her/their percentage ownership in the structure?

3.    If co-owners who file claims have an undivided interest in the entire structure, can they pick and choose which wall sections or boards they want to file a claim for, and direct that the others be subject to opt-outs filed by the other co-owner(s)?

4.    What would be the effect of the release given by a co-owner of a home who filed a claim under the Settlement for two Wall Sections with Qualifying Damage vis-à-vis a co-owner of the same home who filed an opt-out form for the entire home?

The proposed settlement agreement is not fair, reasonable or adequate because co-owners of affected properties cannot determine, by looking at the class definition or notice, whether they must all individually take any action and file separate claims to receive their share of Settlement benefits, or if only one co-owner is allowed to file a claim for a home, building or other structure.  Further, the Settlement Agreement does not address or inform co-owners how the decisions and actions of some co-owner class members under the Settlement may affect the rights of other co-owner class members of the same building or multiple buildings under the Settlement.  Without this information, co-owner class members cannot intelligently make critical decisions that affect their rights.  As a result, the Settlement is not fair, reasonable and adequate and is due to be overruled.

Finally, if the class representatives and CertainTeed argue that all co-owners of a home, residence, building or structure have to act in *unison* with respect to the Settlement with regard to filing claims, objecting or opting out, the Settlement is still not fair, reasonable or adequate because such requirement is not explained or mandated anywhere in the Settlement Agreement or in the class notice.  Additionally, even more complicated and absurd consequences arise if acting in unison is required by co-owners. For example:

1.     What if multiple co-owners own multiple buildings which are subject to the Settlement?  Do the co-owners have to act in unison, *i.e.*, stay in the Settlement for all of the buildings and/or file opt-out forms for each building, or can some co-owners file claims for some buildings and other co-owners file opt-out forms for the same buildings?

2.     What if all of these co-owners decided to stay in the Settlement with respect to the co-owned buildings, but one of the co-owners also owned another building separately and he wanted to opt-out that separately owned building?  Would his opt out necessarily have to include all buildings he has an ownership interest in because the opt-out is based on the Claimant and not on the buildings he owns or co-owns?  Would not such a mandate result in the violation of the due process rights of his co-owners in the other buildings?

The fact that many, many properties subject to this Settlement are co-owned, and the Settlement does not explicitly spell-out how co-owners' rights are affected individually and collectively with respect to decisions that must be made regarding staying in the Settlement or opting out of it, the Settlement is patently unfair and unreasonable and violates these individual's and entity's due process rights.  The scenarios noted above are real, yet remain unanswered in the Settlement Agreement, and could cause uncertainty in the minds of reasonable class members.

Indeed, the Objectors themselves face some of these very issues.  For example, Objectors Thomas and Judy Ligouri, husband and wife, co-own the house that is subject to this Settlement. (1) Assuming that each co-owner of a residence is a separate class members, and the Ligouris disagreed about what action to take with respect to the Settlement, could Mr. Ligouri stay in the Settlement and eventually file a claim, and Mrs. Ligouri file an opt-out form for their residence? (2) If only Mr. Ligouri completes a claim form for Qualifying Damage, signs it and submits it to

the claims administrator, will the claims administrator process that claim without Mrs. Ligouri's consent or signature and a release executed by her?  (3) How much will Mr. Ligouri be paid for his submitted claim – the entire calculated amount of the claim, or only the value of the claim based on his ownership interest in the home?  (4) Will the check be made payable to only Mr. Ligouri?  (5) Under the Settlement, can the claims administrator *require* that Mrs. Ligouri join in the filing of Mr. Ligouri's claim in order for the claim to be paid? If so, under which provision of the Agreement?  (6) What if Mrs. Ligouri refuses to join in Mr. Ligouri's claim? Can the claims administrator deny Mr. Ligouri's claim outright? If so, under what provision of the Settlement Agreement?  (7) If the claims administrator does not require Mrs. Ligouri's consent and pays Mr. Ligouri's claim in full, is the release agreed to by Mr. Ligouri when he signed his claim form effective as to Mrs. Ligouri?  (8) Is there any language in the Settlement which would prevent Mrs. Ligouri from filing a claim for the same Qualifying Damage and demand payment for same? (9) If any co-owner does not sign the claim form submitted by another co-owner for Qualifying Damage, can the release be effective as to them?

Objector Patota co-owns his home affected by the Settlement with his brother. Patota lives in this home and his brother does not.  They face the same issues and unaddressed questions as the Ligouris noted above.

Objector Sherman Creek also presents circumstances which are unaddressed by the Settlement Agreement, and likely affect thousands of condominium complexes throughout the United States. According to the Sherman Creek Condominium Association documents, each owner of a condominium in the complex owns an *undivided* interest in the outside walls of all of the buildings in the complex. *See* attached Exhibit 3, pg. 8-9. The Association is in charge of the management and control of all outside walls in the complex, and the condominium owner is

prohibited from making any changes or improvements to the exterior of any building without first obtaining written consent of the Association. *See* Exhibit 3, pg. 11-12. Under this set of facts, is the Association a class member, or is each condominium owner a separate and individual class member with respect to the Settlement? If some condominium owners stay in the Settlement, and others opt out, how would that affect the claims of those who decided to stay in the Settlement? If just one condominium owner files an opt out form, would that work to exclude all buildings in the entire complex from the Settlement because they own an undivided interest in the exterior walls of all of the buildings in the complex? Clearly, there are untold numbers of condominium owners and condominium associations across the country which may be affected by this Settlement and face these same unaddressed issues.

Objector Scott Zeigler also presents unique circumstances. Zeigler co-owns his home, another home and a shop on his property with his wife, son and daughter-in-law. All four of them are listed as mortgagors on the mortgage. Zeigler and his wife live in one home, while his son and daughter-in-law live in the other home. Both homes and the shop have Siding installed before September 30, 2013. Zeigler is obviously objecting to the Settlement, but his son and daughter-in-law are considering opting out of the Settlement. The opt-out form states: "I/we hereby request that I/we be excluded from the Settlement Class in In re: CertainTeed Fiber Cement Siding Litigation, MDL No. 2270. I understand that by excluding myself from the settlement, I will not receive any benefits from the settlement." This language appears to suggest that exclusion is made on a class member basis, and not on a building basis. In other words, if a class member opts out, they, by definition, opt out every home, building and structure they own or co-own from the Settlement. If this is indeed the case, then will the opt-out filed by Zeigler's son and daughter-in-law be effective as to Zeigler and his wife, co-owners of those same

buildings, without their consent?  If so, this would clearly violate the due process rights of Zeigler and his wife.  On the other hand, do the class representatives and CertainTeed argue that an opt-out is actually made on a building-by-building basis instead? If they do so argue, then the Settlement Agreement, class notice and opt-out form certainly does not make this an option for the class member.  Zeigler and his co-owner family members are understandably confused as to how they may proceed under the Settlement and what affect their individual actions with respect to the Settlement may have on each other's rights.

The Settlement Agreement does not address what would happen in any of these situations, and therefore, it is not fair, reasonable and adequate. Co-owners of homes and structures affected by the Settlement should be able to read the language of the Settlement Agreement and be able to determine their options and how they want to proceed with respect to the Settlement; however, this Settlement Agreement leaves too many vital and critical questions unanswered and too many pertinent issues completely unaddressed for them to make timely and intelligent decisions.  This alone is cause for disapproval of the Settlement.

**D.    The Settlement is Not Fair, Reasonable and Adequate Because the Remedy Provision is Vague and Ambiguous and Imposes Undue Burdens on the Class Members**

Plaintiffs' Memorandum in Support for Preliminary Approval suggests that the Settlement provides payment for the re-siding of an entire side or wall section of a house, but the Settlement Agreement only speaks to "Wall Sections."  "Side of a house" is not included in the damage criteria outlined under the Settlement Agreement. Pls. Memo. in Support, pg. 6.

Further, the Settlement clearly does not provide payment for the "*re-siding* of an entire side or wall section of a house."   Rather, the Settlement provides a *cash payment* to the class member which is reduced by a percentage of RS Means, or by proration under the original

warranty for the Siding and by a percentage of RS Means for the remaining costs.   Such deductions to the payments under the Settlement will not pay for the entire cost of "re-siding of an entire side or wall section of a house."

Section 7 of the Settlement Agreement also states that the amount of the cash payment is based on the quantity of affected Siding on the class members' house, but this is not accurate either. The definition of "Wall Section" in the Agreement does not account for Siding that appears on many dormers on homes which are affected by the Settlement. (*See* pictures of dormers on Objectors Thomas and Judy Ligouri's home, attached as Exhibit 4, *in globo*; *see also* pictures of other homes with dormers with siding for illustration purposes, attached as Exhibit 5, *in globo*.)   As can be seen from the photos, the Siding on the Ligouris' dormers (and the siding on the dormers shown in Exhibit 5) is not "contiguous" with the Siding found on the Wall Section located below the dormers. Thus, it is unclear if damage to Siding on dormers such as these is included in the Settlement or not.

It is also unclear if Siding on dormers should be included in calculations to determine if the 5% threshold is satisfied under Section 7.2(a) of the Agreement.   As noted above, dormers may appear on a "side" of a house, but they are typically not part of a "Wall Section" as defined under the Settlement Agreement.

The Preliminary Fiber Siding Replacement Calculator, found only on the settlement website under the "Frequently Asked Questions" section, and not mentioned whatsoever in the class notice, requests that the class member "enter the square feet (S.F.) ... affected by the deterioration." Upon information and belief and after visiting the RS Means website, RS Means figures are calculated on square footage basis, and not on "number of boards" basis. Therefore, is

the claims administrator going to count the number of boards to be compensated for, or convert the damage into a square footage calculation?

If the claims administrator utilizes square footage measurements, instead of number of boards, for the damage calculation, class members may be shorted settlement benefits. For example, imagine a window that is positioned 13 feet from the edge of a wall, and boards are manufactured in 8, 12 and 16 foot lengths. To cover one horizontal line of siding between the window and the side of the house, an installer could use: two (2) 8' boards; one (1) 12' board and one (1) 8' board; or, one (1) 16' board. Clearly, the same amount of square footage is at issue, but the number of boards utilized and the settlement benefits could vary significantly depending on how the area is covered with the boards. There is no provision in the Settlement Agreement directing the claims administrator to utilize the damage calculation which maximizes the settlement benefits to be paid to the class member.

Additionally, the size of the boards input into the RS Means system can or may affect the amount of cash benefits payable under the Settlement. For example, the RS Means website may include pricing for fiber cement boards that are 4, 6, 7 and 9 inches wide. These same boards may come in sizes of 8, 12 and 16 feet. The prices of these boards obviously vary. As a result, calculating damages utilizing 4" x 8' boards may result in a higher (or lower) damage calculation than using 9" x 12' boards. There is no provision in the Settlement Agreement directing the claims administrator to utilize the damage calculation which maximizes the settlement benefits to be paid to the class member.

The Settlement and class notice provides an example of claim value calculation based on the typical square footage of a side of a home; however, that is not how compensation is determined under the Settlement. Again, compensation is based on the number of boards.

Finally, with regard to the "second payment" or "two-payment schedule," the Settlement Agreement states that "the Claimant *will* receive a second payment, and depending on the claims rate *may* receive the *full value* of their claim *with a reduction for usage*." (emphasis added.)[8] This language is ambiguous and is in contrast to the class notice. The class notice states "the second payment *would be* made at the end of the claims period, unless Class Counsel seeks approval from the Court to accelerate payments based on the claims rate." (emphasis added.) Notably, there is no discussion anywhere in the class notice or the Settlement Agreement concerning how the "second payment", if any, will be calculated, and the documents conflict over whether a second payment will even be forthcoming.

Contrary to argument of class counsel, the Settlement does not provide class members with the ability to obtain predictable, certain or definite compensatory relief, promptly or otherwise, and contains ill-defined, confusing, conflicting and undefined administrative procedures which infringe on the due process rights of the class members. Without fixing these glaring problems in the Agreement, class members' due process rights will be violated.

**E.     The Settlement is Not Fair, Reasonable and Adequate Because the Procedure for Preparing and Processing Individual Claims Under the Settlement Is Onerous and is Not Fair, Reasonable and Adequate**

Pursuant to the Settlement Agreement, a class member with an Eligible Claim will receive cash compensation. "Eligible Claim" means "a claim by a Settlement Class Member for which the Settlement Class Member has demonstrated that Qualifying Damage exists and the claim is not deemed ineligible for any other reason as set forth" in the Settlement Agreement.

---

[8] Of course, the counter could also occur, and that possibility is not disclosed. For example, the class member could receive less than full value of their claim or may receive no second payment at all. The question is, what is the "full value" of the claim? Neither the class notice nor the Settlement Agreement explains what is meant by "full value" or "a reduction for usage" in this context. Moreover, the class notice actually states that a class member "could ultimately [receive] the full value of the claim without an adjustment." This is in clear contrast with the terms of the Settlement Agreement.

To recover under the Claims Program, a Settlement Class Member must properly complete a Claim Form … and provide all required supporting documentation. Settlement Agreement, Section 6.4.

Class members shall make their best effort to submit photographs of sufficient quality to establish the condition of the Siding in sufficient detail and quality that evaluation of the claim may be made and the nature of and extent of any affected areas can be determined. Settlement Agreement, Section 6.6. Claims will be evaluated based on photographs and information provided by the class member. Settlement Agreement, Section 6.14. When an evaluation is based on photographs, the claims administrator will make a good faith estimate of the number of boards (or panels) on the Wall Section that is subject to the claim. Class members shall cooperate with the claims administrator in order to reach agreement on the number of boards (or panels) on the Wall Section. Claimants may not utilize third party claim services or similar services to file claims in the claims program established by the Agreement, except that a class member may engage a bona fide contractor to assist with *necessary measurements* or product identification. Settlement Agreement, Section 6.9.

The class member *may* provide the claims administrator with detailed measurements on a *wall-by-wall basis*, at the class member's expense, and shall provide all relevant information in the class member's possession that may assist the claims administrator in his determination of the measurements. Class members who do not provide the claims administrator with the detailed measurements may not proceed to review by the Independent Claims Reviewer on the issue of measurement." Settlement Agreement, Section 6.15.

It is apparent from these provisions in the Settlement Agreement that the class members must submit detailed measurements to the claims administrator on a wall-by-wall basis, or

38

seriously risk having his or her claim denied. Yet, the claim form does not even request that the class member provide the *necessary* measurements on a Wall Section-by-Wall Section basis, nor does the claim form request that the class member provide information on a board-by-board basis. Instead, the claim form requests "square footage" information and measurements that have no bearing whatsoever to the Qualifying Damage criteria or the calculation of settlement benefits under the Settlement Agreement.[9] The cavalier treatment regarding the submission of this necessary information is unconscionable. The class representatives and CertainTeed cannot inform class members in passing in the claim form that such measurements for each wall *may* be submitted, but then state in the Settlement Agreement that these are *necessary* measurements.

The proposed Settlement also places an unreasonable burden on those class members opting to participate in the Settlement. According to the notice and the claim form, class members are required to submit all pertinent details concerning, *inter alia*: any relevant sale of the property; information about when the building was built; whether prior warranty claims were made; information regarding prior insurance claims regarding the Siding; when the Siding was installed and by whom; and repair and replacement information about the Siding. A class member may have little or no information about any of these things; yet, is required to provide this information to the claims administrator. In addition to completing a claim form, participating class members must also provide the claims administrator with: (1) proof of identity of the Siding, which would include "reliable and contemporaneous proof of purchase and installation of the Siding, an invoice from a third party, or maybe pictures; (2) documentation showing the date of installation, including a dated invoice, a certificate of occupancy for the building or a building

---

[9] The claim form requests measurements for: (1) total square feet of property; (2) total square feet of Siding on the property; (3) total square feet of Siding that is damaged; (4) total square feet of each structure on the property; (5) measurement of the footprint of the property; and (5) the number of stories the property has.

permit; (3) documentation of quantity of Siding panels, including original receipt or the contractor's invoice at the time of application of the Siding, or photographs of the Siding; and (4) documentation of the condition of the Siding. Again, the class member may have little or no information about any of these things and/or may have no access to this information. The class member must also submit multiple pictures sufficient to establish the condition of the Siding in detail, including pictures of the entire structure (front and back), a minimum of two pictures of each wall of Siding showing the condition of the Siding, which would include close-up pictures of the "problem", one picture showing the building number on the building or on a mailbox, and even more pictures of a close-up of the "problem."

Class members filing a claim form must also submit pictures of the "problem" Siding using the measurement scale attached to the claim form. This requirement may be the most onerous, and dangerous, as damage to a class member's Siding may be occurring near the roofline of the building, or on dormers located on the roof of the building, or on Siding located on the second or third story level of a building. *See* attached Exhibit 4, *in globo* (Ligouri home), and Exhibit 6, *in globo* (Patota home). Any of these would require the class member to climb a tall ladder, and attempt to operate a camera with one hand while accurately placing the measurement scale with the other hand. Of course, this may have to be done multiple times for each Wall Section to determine whether the 5% threshold is satisfied. But the process doesn't stop there. In addition to providing these pictures, the class member must also measure and calculate the square footage of each Wall Section and measure and calculate the square footage of the Siding with "problems" on each Wall Section and/or count the total number of boards an each Wall Section and count of the number of boards on each Wall Section with "problems." This is no small or easy task, especially if there are multiple Wall Sections on the side of the

building, or if there are multiple doors and windows on Wall Sections, or if the building is multiple stories or has Wall Sections of Siding that are not square or rectangular.

Assuming a class member can perform all of these required tasks, the time necessary to do so can be significant. Alternatively, if the class member chooses to hire a contractor to perform these required tasks (as suggested by class counsel), the cost of doing so can be significant.[10]  Class counsel argues in its Memorandum in Support that it is a "relatively minor matter" to determine "the size of a Class Member's wall and how long the wall has been on the structure," (Pl.'s Memo. in Support, pg. 23) however, as shown herein, reality belies class counsel's misplaced arguments. The requirements to file a claim under this Settlement are burdensome, unreasonable and potentially dangerous. The claims process should be considerably less onerous.

Moreover, as the class period runs from 1999 through six years beyond the Effective Date, the claims at issue may now be more than fourteen (14) years old, and thus, the corresponding documents and information may be difficult for class members to locate and/or obtain.  Placing such an onus on class members is unwarranted and further indicates that the instant settlement is not in class members' best interests.

Additionally, the Settlement is untenable, given the provision stating that those class members who are unable to provide the required information and documents may not receive payment for their claims at all.  Subjecting class members to these burdensome and intentional hurdles is unfair and unreasonable, and violates the class members' due process rights.

---

[10] Objectors Thomas and Judy Ligouri obtained an estimate from a reputable contractor in Ames, Iowa to complete these tasks.  The estimate for the Siding inspection was $300-$375. This is a considerable out-of-pocket cost for a class member to incur, just to determine whether or not they even have an eligible claim.

**F.  The Settlement is Not Fair, Reasonable and Adequate Because Class Members Cannot Adequately Determine What their Settlement Benefits May Be Prior to the Opt-Out and Objection Deadline**

The definition of "Siding", included in Section 1(ee) of the Settlement Agreement, "means CertainTeed WeatherBoards™ Fiber Cement Siding, Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling, and 7/16" Trim installed on or before September 30, 2013."

The definition of "Wall Section", included in Section 1(gg) of the Settlement Agreement, "means that section of a wall on a Settlement Class Member's home or other structure on which the Siding is contiguous."  There is no definition of "contiguous" in the Settlement Agreement.

The definition of "Qualifying Damage" to Siding, included at Section 1(y) of the Settlement Agreement, "means damage caused by a defect in the Siding that is manifested as shrinkage between the ends of Siding in excess of 3/16" except that for Siding installed abutting windows, doors or trim, shrinkage must exceed 5/16". In addition, Siding with warping or bowing in excess of 1/2", field and edge cracking through the board, or delamination is also Qualifying Damage."

Pursuant to Section 7.2 of the Settlement Agreement, "*the number of boards* for which a Claimant is entitled to compensation shall be calculated based on the size of the Wall Section with Qualifying Damage."  One major problem here is that the claim form does not request information about potential Qualifying Damage on a Wall Section basis. Nor does it request information about the total number of boards with Qualifying Damage (on a given Wall Section), or the total square footage of boards with Qualifying Damage on a Wall Section.

Additionally, because the term "board" or "boards" is not defined in the Settlement Agreement, it is unclear whether or not a class member should include any measurements of Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling, and 7/16" Trim in his or her Qualifying

42

Damage calculations, and it is unclear whether or not this "Siding" is being compensated for under the Settlement Agreement. Query: Does a single "Shape" qualify as a "board" for purposes of calculating Qualifying Damage? If the "boards" on a Wall Section are not "contiguous" with Soffit and/or Porch Ceiling and/or 7/16" Trim, does the class member include the square footage of that Soffit and/or Porch Ceiling and/or 7/16" Trim to determine the amount of Qualifying Damage for that Wall Section or not? There is no measurement of damages for these "non-board" materials.

If a class member's home or structure only includes CertainTeed Soffit and/or Porch Ceiling and/or 7/16" Trim, how does that affect the analysis under Section 7.2(a) of the Settlement Agreement? If a "side" of a home has multiple Wall Sections, how does this affect the measurements and calculation of Qualifying Damage for that "side" of the home? Is CertainTeed Soffit and/or Porch Ceiling and/or 7/16" Trim, which meets the Qualifying Damage definition, considered "a section of the wall" for compensation purposes?[11]

Under Section 7.2(a), the class member is eligible for compensation for the *number of boards* on the entire Wall Section if the Qualifying Damage measurements are satisfied. Query: Does the *number of boards* include CertainTeed Soffit and/or Porch Ceiling and/or 7/16" Trim? (Pl.s' Memo. in Supp., at Footnote 1, states that "a square consists of 100 square feet of siding, which comes in lengths usually ranging from 8 to 16 feet long and 7 to 9 inches wide." There is no indication in the Settlement Agreement about whether Shapes, Soffit, Porch Ceiling, and 7/16" Trim come in these measurements and/or are considered "boards" for which compensation is provided for under the Settlement Agreement.)

---

[11] Attached hereto as Exhibit 7, *in globo*, are multiple pictures illustrating homes containing siding in various locations. Based on the definitions contained in the Settlement documents, it is unclear which sections of siding on these homes would qualify as "Wall Sections." Query: Based on the definition of "Wall Section" in the Settlement Agreement, can the class representatives, or anyone, identify how many Wall Sections are shown in each picture?

43

If the class member is determined to be eligible for compensation for the number of "boards" on an entire Wall Section under Section 7.2(a), then: (1) is the class member also entitled to compensation for any and/or all Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling and 7/16" Trim that is on and/or contiguous to that Wall Section; and (2) if so, how is that compensation calculated - on a per "board" basis, or on a square footage basis?

Notably, class members are not entitled to compensation for *square footage* of boards, but rather, for a *number* of boards. Although this is clearly the measurement of damages outlined under the Settlement Agreement, the Preliminary Fiber Siding Replacement Calculator found on the settlement website refers to square footage amounts. It states: "On each side of the structure where qualifying damage effects 5% or more of that side, measure the *square feet* of deteriorated area and the number of stories affected by the deterioration. *Enter the square feet* (S.F.) and number of stories affected below for each side where qualifying damage effects 5% or more of that side." Additionally, the class member is not prompted by the Calculator to enter *any* information, including square footage information, regarding Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling, and 7/16" Trim. Thus, there is no way for the class member to calculate what his claim may be worth for the damage incurred to these types of Siding included in the Settlement.

Also, Section 7.2(a) dictates that Qualifying Damage must be calculated per "Wall Section", and not by "sides" of the home or structure. Indeed, one "side" of a home or structure could include multiple Wall Sections. The Settlement Agreement and the Preliminary Calculator are misleading because they don't take this likelihood and possibility into account.

The Settlement Agreement states that cash benefits will be based on RS Means values as of the Effective Date. This is a problem for several reasons. Query: How is RS Means

44

calculated? Does RS Means calculate costs on a square footage basis or on a per board basis? Even assuming class members can obtain accurate measurements, they still cannot estimate the cash value of their potential settlement benefits prior to deadline to object or opt out because the Effective Date is in the future and the RS Means values will be unknown until that time. Notably, the Preliminary Fiber Siding Replacement Calculator found on the settlement website includes multiple caveats which would cause the results provided to be unreliable because, *inter alia*, costs may increase, decrease, or remain the same when the settlement is finalized, and the actual payments will be ... based on additional factors and costs that this courtesy calculator does not analyze or estimate. If the Final Approval Order is appealed, this could affect the value of the claims tremendously. These variables and the "unknowns" weigh heavily against approval of the Settlement because class members cannot reasonable value their claims prior to making decisions about staying in the Settlement or opting out.

Further, by basing the compensation on the RS Means values at the Effective Date, class members whose damage to their Siding manifests late in the six year claims period will likely receive less valuable settlement benefits, due to inflation, because of Siding cost increases after the Effective Date. Presumably, the cost of Siding and replacement of Siding will continue to rise over the next six years. The Settlement does not account for this.

**G.     The Settlement is Not Fair, Reasonable and Adequate Because the Settlement Agreement Contains Conflicting Provisions Regarding Class Members' Rights to Assign Their Claim to Third Parties**

A settlement class member must look to three (3) different sections of the Settlement Agreement to attempt to determine if, and to whom, and under what circumstances, they may assign their claims to third parties under the Settlement. The provisions are vague and confusing and violate the class members' due process rights.

Under Section 6.27 of the Agreement, a class member may not assign their claim, except (a) that upon the sale of a property covered by the Agreement, there is an automatic assignment of rights under the Agreement to the buyer of the Property, and (b) that upon the sale of a property covered by the Agreement, the seller may retain, pursuant to a written assignment agreement executed by the buyer and seller contemporaneously with the sale of the property, all rights and obligation created by the Cash Settlement Option[12], as limited by the terms and conditions of the Agreement … The written assignment must be submitted with the Claims Package."

Section 6.9 of the Settlement Agreement states that "Claimants may not utilize third party claim services or similar services to file claims in the Claims Program established by this Agreement, except that a Settlement Class Member may engage a bona fide contractor to assist with necessary measurements or product identification. *Settlement Class Members shall not be permitted to assign claims under the Claims Program to any person who assists with their claim under this Section.*"

Section 16.5 of the Settlement Agreement states that "this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and to all members of the Settlement Class and their respective … *assigns*."

On the other hand, the "Release" language in the Claim Form states "…I, on behalf of myself and my agents … *and assigns*, fully and finally settle, release and discharge from the Settled Claims (defined below) each and all of the Released Persons …." Then, the same Release section states: "I hereby warrant and represent that *I have not assigned or transferred or*

---

[12] "Cash Settlement Option" is not a defined term in the Settlement Agreement.

*purported to assign or transfer*, voluntarily or involuntarily, *any matter released pursuant to this release or any part or portion thereof.*"

Query: When read together, do the provisions in the Settlement Agreement intend to limit the class members' voluntary assignment of rights under the Settlement to themselves in a sale of the property scenario? If the purchaser of the property also happens to be a third party claim service provider or bona fide contractor that assisted with the class member's claim, does Section 6.27(a) prevail to mandate the assignment or does Section 16.5 prevail to prohibit the assignment? Or, does Section 6.27 only pertain to assignments in a sale of the property scenario, and class members are free to assign their claims to any third parties, except to third parties as provided in Section 6.9? Under the Release language in the claim form, how can a class member release their claims and those of their assigns, without the assignee(s) also signing the claim form? Further, how can the class member warrant and represent that they have not assigned any matter released, when the Settlement Agreement appears to allow the assignment of claims in whole or in part?

As noted throughout these Objections, the claims process developed by class counsel, the representative plaintiffs and CertainTeed is extremely onerous and many class members will simply be unable to compile the measurements, pictures and other information necessary to navigate through the process. Additionally, although the class notice suggests that class members should simply have a contractor help them with measurements and product identification, most contractors will not do this without payment for their time and efforts. This leaves class members, more often than not, with having to pay for these costs out-of-pocket before they know if they even have a qualifying claim under the Settlement. Why not allow the class member the option to assign his claim, in whole or in part, to a third party claims service or contractor that is

willing and able to navigate through the claims process?  What is the harm with allowing a class member to enter into an assignment with anyone and accepting cash up-front, in exchange for the cash that they may or may not be entitled to receive under the Settlement?

Additionally, in partial assignment situations, getting these persons involved to assist class members in filing claims will be beneficial to the claims administrator through increased efficiencies, and the likelihood of a class member submitting an eligible claim and actually getting compensation under the Settlement, which is the main goal of the Settlement, will significantly increase.  The class representatives and CertainTeed certainly cannot suggest otherwise.

The ability of a class member to assign his, her or its rights under the Settlement to another party is a key component in a class member's decision making process about how to approach the Settlement. Failing to outline these assignment rights in clear and specific language in the Settlement Agreement, and thus not allowing class members to make informed and knowledgeable decisions, is unfair and unreasonable and violates the class members' due process rights.

**H.**     **The Settlement is Not Fair, Reasonable and Adequate Because the Claim Form is Deficient and Defective**

The "Release" language in the claim form does not track the "Release" language in the Settlement Agreement at Section 14, and the "Release" language in the claim form also defines a new term, "Settled Claim," that is not defined in the Settlement Agreement. Clearly, the claim form "Release" language should exactly track the "Release" language contained in the Settlement Agreement and the claim form should not include defined terms that do not appear in the Settlement Agreement.  Class members should be specifically informed about every claim they are releasing when prompted to sign an agreement to release those claims. Failing to include

48

all of the claims being released should not be tolerated and violates the class members' due process rights.

Additionally, the "Release" language in the Settlement Agreement, the claim form and in the class notice fails to inform the class members that if they stay in the Settlement, they are automatically waiving and releasing the remainder of their warranty from CertainTeed for their Siding. Objectors are aware of 25 and 50-year warranties issued by CertainTeed for Siding upon purchase. All of these documents fail to inform the class member that they are waiving their rights to this guaranteed warranty, even if they take no action, and that they must opt-out in order to retain their rights under their original warranty. This is unconscionable and violates the class members' due process rights. A class member should not be required to take action under a class settlement *to retain rights they already have* under an existing warranty – especially if the class member fails to receive notice of the settlement and/or does receive notice of the settlement, but is not specifically informed of this potential and significant waiver of their rights.

As mentioned previously, some class members' Siding will not meet the Qualifying Damage criteria under the Settlement during the 6 year claims period, and thus will receive no benefits under the Settlement; however, if they remain in the Settlement and their Siding exhibits Qualifying Damage in Year 7 or later, they are out of luck to receive anything at all because they will have waived the balance of their original warranty by staying in the class. This is neither fair nor reasonable. Class members with no Qualifying Damage prior to the opt-out deadline should not be required to "guess" or "gamble" on whether or not their Siding will meet the Qualifying Damage criteria within the claims period, when guessing wrong will result in a waiver of an otherwise valid warranty with many, many more years left on it before it expires. If they are required to guess or gamble, then the pros and cons of their decision should be totally

and completely explained in simple and plain language. The "Release" language found in the Settlement documents, including the claim form, does not come close to meeting that criteria for due process purposes. To make the Settlement more fair and reasonable, it should have at least retained the warranty rights for class members who do not file claims or have eligible claims under the Settlement during the claims period.

The claim form is also defective because it requests that class member provide "Total square feet of Siding on the property" and "Total square feet of Siding that is damaged." In addition to the fact that the amount of measurement of benefits under Section 7.2(a) is not based on square footage, the information requested is meaningless because Qualifying Damage and compensation is based on a Wall Section-by-Wall Section basis. Remarkably, the claim form does not even require that the class member provide such information on a Wall Section basis. Instead, it merely states: "You *may* submit measurements for each wall to assist the Claims Administrator's determination of the measurements. Claimants who do not provide such detailed measurements may not obtain review of the measurements by the Independent Claims Reviewer."

Given that the Qualifying Damage analysis is the most critical criteria in determining the value of settlement benefits under this Settlement, the claim form should specifically require, in detail, adequate information to make that determination on a Wall Section-by-Wall Section basis.

Additionally, a class member can qualify for Settlement Benefits under Section 7.2(a) if Qualifying Damage exists on 5% or greater of the *total number of boards on a Wall Section*; yet, the claim form does not ask the class member for a board count for any Wall Section or for the number of boards on any Wall Section with Qualifying Damage.

Suggesting that the class member "may" submit measurements for each wall, and failing to even disclose the other method of qualifying for benefits under Section 7.2(a) is unconscionable and borders on incompetence. The claim form does not require, much less ask for, information crucial for the claims administrator to make his benefit calculations. To add insult to injury, if the class member does not submit information that is not even specifically requested on the claim form, he forfeits his right to obtain review of his measurements by the Independent Claims Reviewer.

The claim form is also onerous and defective because it states that "all questions must be answered," but it requests information that the class member truly may not know. For example, the claim form asks if "you or any prior owner ever make a warranty claim to CertainTeed regarding the Siding, before making this claim." If the class member answers "yes" to this question, the claim form mandates that the class member include the warranty claim number. The class member may have no information at all about this if they purchased the home, residence or building from another party.  The claim form also asks "have you signed a release with CertainTeed regarding your current claim?" Of course, there is no explanation of what is meant by "current claim."  In the "Installation" section of the claim form, it asks "when was the Siding installed?" It also asks to "indicate whether the Siding was installed during original construction of the structure or later." Later in the claim form, it states that the class member "must provide credible evidence of, inter alia, the quantity of the Siding and the date of installation of the Siding. The claim form further asks for the name and address of the builder or contractor who installed the Siding. Again, the class member may have no information at all regarding any of these requests; yet, all of these questions must be answered, and credible

evidence must be provided for some of these requests, or the class member's claim is subject to being denied.

I.   **The Settlement is Not Fair, Reasonable or Adequate Because the Class Notice Is Deficient and Defective**

The Due Process Clause guarantees "that individuals whose property interests are at stake are entitled to 'notice and an opportunity to be heard.'" *Dusenbery v. United States,* -- S. Ct.--, 2002 WL 15403, at *4 (2002). Before a forum state, such as Pennsylvania, may bind absent plaintiffs to a judgment, "it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or though counsel." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985).

Notice of a proceeding which is to be accorded finality comports with due process if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950); *accord Shutts,* 472 U.S. at 812 ("The notice must be the best practicable . . . [and] should describe the action and the plaintiffs' rights in it."). Class counsel argues that the notice provides clear and accurate information as to the nature and principal terms of the Settlement. Pl.'s Memo. in Support, pg. 33. Class counsel is wrong.

First, the Long Form notice was to be mailed directly to each class member for which the parties have a valid mailing address. Pl.'s Memo. in Support, pg. 34. Notably, although most of the Objectors had a suit pending in the MDL, and all of them had made a warranty claim with CertainTeed in the past, and therefore, CertainTeed obviously had their mailing information, not one of them received a Long Form notice in the mail. The Settlement Agreement required

52

CertainTeed to provide the claims administrator with the identities of class members who have submitted a warranty claim for the Siding, so that a Long Form notice could be mailed to them, within ten (10) business days after issuance of the Preliminary Approval Order. Settlement Agreement, Section. 10.6.  The fact that all of the Objectors submitted a warranty claim in the past to CertainTeed, but did not receive a Long Form notice in the mail, should cause the Court grave concern about the notice process. Such a critical failure in providing notice to all class members, especially those who previously filed a warranty claim with CertainTeed and are easily identifiable, should not be tolerated.  All class members are entitled to not only know about this case, but also to participate by filing a claim, opting out, or objecting.  It would be interesting to compare CertainTeed's list of all warranty claims against the claims administrator's mailing list for Long Form notices to determine whether CertainTeed complied with the Settlement Agreement and this Court's Order regarding the Long Form notice.

Since the proposed settlement, if approved, stands to significantly limit class members' rights regarding current and unknown future claims, it is essential that all class members receive notice and have the opportunity to participate in this litigation.  Therefore, Objectors respectfully suggest that the Court thoroughly investigate how class counsel, the representative plaintiffs and CertainTeed went about identifying the class members, and whether the notification methods, as applied, were effective with regard to notifying the class.

Expanding the discussion and argument in Section "C" above, to whom did the claims administrator actually mail the class notices to? Did the claims administrator mail notice to all known co-owners of homes, residences and buildings affected by the Settlement, or to less than all of the co-owners?  If the settlement administrator only mailed a notice to some and not all co-owners of a home or structure, and each co-owner can act separately and individually with

respect to the Settlement, then mail notice to less than all co-owners is not adequate notice as it would violate the due process rights of the co-owners who did not receive notice. Objectors posit that the Court should demand answers to these questions and all others posed by Objectors herein, before making its determination as to whether this proposed settlement is fair, reasonable and adequate.

Further, the class notice was not adequate, and does not comport with the mandates of due process under the Pennsylvania Constitution and the United States Constitution because, upon information and belief, hundreds if not thousands of mailed class notices were likely returned to the settlement administrator as undeliverable, and, given the short time between the initial mailing, and the date that class members must take action to exclude themselves from the Settlement or object to the Settlement, many hundreds or thousands of class members will not have an opportunity to do any of the above. These class members will not have an opportunity to decide what to do with respect to this proposed Settlement, because they simply will not have knowledge of it. Nevertheless, their potential claims and the balance of their warranties will be released and waived under the proposed Settlement Agreement in exchange for settlement benefits that they may or may not qualify for during the claims period.

Further, according to class counsel, different aspects of the notice plan were scheduled to be rolled-out over a period of several weeks, including some online notice to commence by November 1, 2013; television notice to begin by November 6, 2013; and, magazine notice to specifically run on November 10 and 17, 2013. Pl.'s Memo. in Support, pg. 9. As this Court is aware, it ordered that class members shall be given 60 days from the date that the notice is disseminated in order to opt-out or to object. Obviously, under this schedule, a class member getting notice of the Settlement through a television ad or magazine publication would not be

getting the 60 day period ordered by the Court to make these critical decisions and to submit any documents and required forms by the December 31, 2013 deadline. As a result, the notice was defective in that it included a deadline to object or opt-out that was incorrect and premature. The defective notice thus violated the class members' due process rights.

### J.   The Settlement is Not Fair, Reasonable or Adequate Because Legal Representatives of a Class Member Cannot Act on the Class Members' Behalf to File a Claim, Opt-Out or Object.

This Court should note that the Settlement Agreement does not address whether or not the estate, heirs, or a legal representative of a class member may file a claim on behalf of the class member, opt-out of the litigation on behalf of a class member or object to the litigation on behalf of a class member. Indeed, all three of these actions require the signature of the class member. *See* Claim Form; Opt-Out Form; Settlement Agreement, Sections 11.1 and 11.6. Because the Settlement Agreement, claim form and opt-out form does not allow estates, heirs, or legal representatives of a class member to take any of these actions on behalf of a class member, the Settlement Agreement violates the due process rights of these class members, and is not fair, reasonable and adequate, and should be denied by the Court. Failure to address this issue in the class notice as well constitutes a defect in the class notice, which also violates the due process rights of the class members.

### K.   The Settlement is Not Fair, Reasonable and Adequate Because the Opt-Out Form is Defective and Deficient

The Objectors show that even the opt-out form is not fair, reasonable and adequate because it violates the class members' due process rights. First, the opt-out form requires information from the class member that is irrelevant and unnecessary in order for the class member to exercise their right to opt-out. For example, the opt-out form requires the class member to state when Siding was installed on each structure that the class member intends to

55

opt-out, and requires the class member to list: (1) the total square feet of the structure; (2) the stories of the structure; (3) the total square feet of the Siding installed; and (4) the total square feet of Siding damages, if any. Requiring this information from an opt-out is simply onerous. Class members intending to opt-out should not be required to provide this information.

Additionally, the opt-out form requires that the class member sign the form. It does not allow a legal representative of the class member to execute the form on behalf of the class member. Further, the opt-out form requires the class member to list their attorney, if any, and requires the class member's attorney to sign the form.  There is no valid reason or justification for mandating that a class member's attorney sign their opt-out form, except to make the opt-out option for class members more onerous. As a result, even the opt-out form violates the class members' due process rights.

## VI.  CONCLUSION

For the aforementioned reasons, Objectors respectfully pray that the proposed settlement class certification be denied and the proposed Settlement not be approved by the Court as they are not fair, reasonable and adequate.  In the alternative, the Objectors pray that the Court delay final approval of the settlement and order class counsel and CertainTeed to meet and confer with the Objectors and Objectors' Counsel to address the questions and issues raised herein.

_____          Michael Patota
**Date**


_12/28/13_                               _Jerome Kaphingst_
_____          _____
**Date**                                 **Sherman Creek Condominium Association**
                                         **By: Jerome Kaphingst**


_____          _____
**Date**                                 **Thomas Frank**


_____          _____
**Date**                                 **Thomas Ligouri**


_____          _____
**Date**                                 **Judy Ligouri**


_____          _____
**Date**                                 **Scott Zeigler**

_____          **Michael Patota**
**Date**


_____          **Sherman Creek Condominium Association**
**Date**                         **By: Jerome Kaphingst**


_____          **Thomas Frank**
**Date**

12/28/2013                       _Thomas Ligouri_
_____          _____
**Date**                         **Thomas Ligouri**

12/28/2013                       _Judy Ligouri_
_____          _____
**Date**                         **Judy Ligouri**


_____          **Scott Zeigler**
**Date**

58

_____          **Michael Patota**
**Date**

_____          **Sherman Creek Condominium Association**
**Date**                         **By: Jerome Kaphingst**

_____          **Thomas Frank**
**Date**

_____          **Thomas Ligouri**
**Date**

_____          **Judy Ligouri**
**Date**

12/28/2013                       _Scott Zigler_
**Date**                         **Scott Zeigler**

58

12/29/13                          *Michael Patota (signature)*
Date                              Michael Patota

_____                _____
Date                              Sherman Creek Condominium Association
                                  By: Jerome Kaphingst

_____                _____
Date                              Thomas Frank

_____                _____
Date                              Thomas Ligouri

_____                _____
Date                              Judy Ligouri

_____                _____
Date                              Scott Zeigler

_____         _____
**Date**                        **Michael Patota**


_____         _____
**Date**                        **Sherman Creek Condominium Association**
                                **By: Jerome Kaphingst**

12/30/13
_____         _____
**Date**                        **Thomas Frank**


_____         _____
**Date**                        **Thomas Ligouri**


_____         _____
**Date**                        **Judy Ligouri**


_____         _____
**Date**                        **Scott Zeigler**

Respectfully submitted,

Christopher L. Coffin – LSBA#27902
Stan P. Baudin - LSBA#22937
Patrick W. Pendley – LSBA#10421
Pendley, Baudin & Coffin, LLP
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 355-0086
Facsimile: (504) 523-0699


Counsel for Objectors

## CERTIFICATE OF SERVICE

I hereby certify that on this the 30th day of December, 2013, a copy of the above and foregoing Objections and attachments have been served upon the following counsel and the Court via the Court's ECF system and by placing same in the United States mail, properly addressed and first class postage prepaid as follows:

Clerk of Court
United States District Court for the
Eastern District of Pennsylvania
Byrne Federal Courthouse
601 Market Street
Philadelphia, PA 19106-1797

AUDET & PARTNERS, LLP
Michael McShane, Esq.
221 Main Street, Suite 1460
San Francisco, CA 94105

PEPPER HAMILTON LLP
Robert L. Hickock, Esq.
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19102

Christopher L. Coffin

59