## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: CERTAINTEED FIBER CEMENT SIDING LITIGATION. | MDL Docket No. 2270 |

---

## OBJECTION OF AMIRALI JABRANI, JANET JABRANI, AND REAL HOMES INC.

---

Christopher M. Arfaa
Hawke McKeon & Sniscak LLP
100 N. 10th Street
Harrisburg, PA 17101
cmarfaa@hmslegal.com
717-703-0802
717-236-4841 (fax)

Attorney for Objectors Amirali Jabrani, Janet Jabrani, and Real Homes Inc.

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................................1

I.       Objectors are class members. .....................................................................................3

II.      The court has a fiduciary duty to the absent members of the class. ..................................4

III.     The settlement is not worth $103.9 million, and may not be worth anything to the class; the parties have failed to demonstrate that class counsel has not obtained a disproportionate amount of the settlement proceeds. ........................................................6

IV.      Intra-class conflicts preclude settlement approval. ............................................................12

V.       In the alternative to denying settlement approval, the Court should limit counsel's fee award to a reasonable percentage of the amounts actually claimed; it should not base the award on a delusive 100% claims rate. ........................................................................14

VI.      The preliminary approval order violates Rule 23(h). ........................................................20

VII.     Notice of intent to appear and other reservations of rights. ............................................22

CONCLUSION ........................................................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Boeing v. Van Gemert,* 444 U.S. 572 (1980)..................................................................18-20

*Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261 (S.D. Ohio 1996) ..........................................18

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ...................................................5, 11

*Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012).................................................12-14

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375 (D. Mass. 1997)...........................18

*Ferrington v. McAfee, Inc.,* No. 10-cv-1455-LHK, 2012 U.S. Dist. LEXIS 49160 (N.D. Cal.
   Apr. 6, 2012) ....................................................................................................12

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ....................................*passim*

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir.2011)..........................5-6, 12, 16

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio. 2007)...............................15

*In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005). ...........................................21

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) .........................................*passim*

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) .....................................................................................*passim*

*In re High Sulfur Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008)..............................21-22

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013). ..........................................16

*In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010) .......................................20-22

*In re Prudential Ins. Co. Am. Sales Prac. Litig.,* 148 F.3d 283 (3d. Cir. 1998)...................................6

*Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000)...................................................19-20

*Kaufman v. Am. Express Travel Related Servs.*, 283 F.R.D. 404 (N.D. Ill. 2012)...........................12

*Kirchoff v. Flynn.*, 786 F.2d 320 (7th Cir. 1986) ......................................................15

*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004) ..........................................4

*Rawlings v. Prudential-Bache Properties*, 9 F.3d 513, 516 (6th Cir. 1993).................................15

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) ......................................7, 9

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992) .........................................................4

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)......................................................11

*Strong v. BellSouth Telcoms., Inc.*, 173 F.R.D. 167 (W.D. La. 1997)....................................12

*Strong v. Bellsouth Telecoms. Inc.*, 137 F.3d 844 (5th Cir. 1998) ..................................12, 14

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011).................................................7-8

*Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal.
   Nov. 3. 2009)...........................................................................................18

*Trombley v. Bank of Am. Corp.*, No. 08-cv-456-JD, 2012 U.S. Dist. LEXIS 63072 (D. R.I. May
   3, 2012) ................................................................................................12

*Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071 (C.D. Ill. 2012)..................................12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ...........................16

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)...................................................11

*Wise v. Popoff*, 835 F. Supp. 977 (E.D. Mich. 1993)..................................................19

## Rules and Statutes

28 U.S.C. §1712(a)..........................................................................................16, 19

Fed. R. App. Proc. 7 ......................................................................................23

Fed. R. App. Proc. 39 .....................................................................................23

Fed. R. Civ. P. 23(a)........................................................................................5

Fed. R. Civ. P. 23(a)(4) ................................................................................3, 12-13

Fed. R. Civ. P. 23(e)......................................................................................5, 14

Fed. R. Civ. P. 23(e)(3)....................................................................................22

Fed. R. Civ. P. 23(e)(5)....................................................................................22

Fed. R. Civ. P. 23(h)......................................................................3, 14, 16, 19-23

## Other Authorities

Advisory Committee Notes on 2003 Amendments to Rule 23 ...........................................14, 18

Am. Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*"). ....5

Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 Tul. L.
   Rev. 1809 (2000) ....................................................................................15

Federal Judicial Center, *Manual for Complex Litigation* § 21.612 (4th ed. 2004) ...........................6

Federal Judicial Center, *Manual for Complex Litigation* § 21.71 (4th ed. 2004)..............................19

Isaacharoff, Samuel, *The Governance Problem in Aggregate Litigation*, 81 FORDHAM L. REV. 3165

(2013) .........................................................................................................................................19

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Settlement fairness depends not just on the total value of the settlement, but on the allocation between the class and their attorneys. *See In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ("*Pampers*").

The settling parties attempt to portray this settlement as a $103.9 million settlement justifying a payment to the attorneys of $19 million. But this $103.9 million figure is entirely illusory for several separate reasons.

*First*, there is no provision in the settlement or notice for what happens to residual funds, money that could total in the tens of millions of dollars. (The filing papers declare it to be "non-reversionary," but nothing in the settlement prohibits the defendant from seeking to recover leftover funds.)

*Second*, the settlement does not actually **pay** class members anything: it merely gives them the right to participate in a new adversary proceeding to be paid for by the settlement fund. If the administrator decides to refuse to pay class members, class members have no recourse. If the claims administrator chooses to prefer to pay non-class members such as the Independent Claims Reviewer or third-party inspectors or to churn the file to receive more payment as the claims administrator, class members have no recourse. There is nothing in the settlement to prevent the claims administrator from overcharging the settlement fund. (Indeed, if the claims administrator is paid by the hour, it has the perverse incentive to arbitrarily deny claims and force class members to resubmit claims.) The millions of dollars that will not go to the class, but instead go to third parties, should not be counted as a settlement benefit, but, rather, as a component of the attorney-fee award. Under Third Circuit law, class counsel should not get a commission on the millions the claims

administrator and third parties will make from this settlement.

*Third*, the value of a settlement is the *incremental* value of what is provided, but the parties ignore this opportunity cost. Before this settlement was in effect, CertainTeed was already offering to provide replacement material to customers. See Declaration of Amarali Jabrani Exhibit 7. Under the settlement, CertainTeed is now providing a claims process for a yet-to-be-determined percentage of the cost of material, labor, and paint. Settlement ¶ 7.2. The incremental value of the settlement is not $103.9 million, but $103.9 million minus what CertainTeed would have paid class members anyway. Not only is there no evidence that this number is proportionate to what the class counsel and the claims administrator receives, there is no evidence that this number is even greater than zero and the class is not made worse off by this settlement.

*Fourth*, though the attorneys get paid immediately, the class will have to wait six years to receive at least half of its payment. Settlement ¶ 7.3. Money in six years is not worth the same as money today.

As in *Pampers,* this Court now confronts a classic question of fiction versus reality. As the Third Circuit has held, settlement fairness should be based on what the class actually receives. *In re Baby Prods. Antitrust Lit.*, 708 F.3d 170 (3d Cir. 2013). The parties have failed to present evidence as to what this will be. No fees should be awarded until the class's *actual* share of the settlement is known; the settlement should not be approved until the parties demonstrate the *incremental* value of the settlement over what class members already had available to them before there was a settlement.

But even beyond this, it would be reversible error to approve the settlement and the fee award.

The settlement unfairly treats class members such as the objectors. Though a class

member who has siding installed in 1999 can make claims for twenty years, the Jabranis, who had their siding installed in 2005, will not be allowed to make claims after 2019. Class members who had siding installed in 2013 but do not experience damage until 2020 will receive zero and have their claims extinguished. The failure of the settlement to provide for these latent claims violates Rule 23(a)(4).

Moreover, the fee approval process and preliminary approval order violates Rule 23(h): that rule requires notice of the fee application to be directed to the class in a reasonable manner with the opportunity to object, but the preliminary approval order requires objections to be filed before the fee application is due.

For these reasons, the settlement cannot be approved.

## I.      Objectors are class members.

As the attached declarations and their exhibits (which are incorporated into this objection) show, Amirali and Janet Jabrani and Real Homes Inc. (collectively "Jabrani" or "the Jabranis") between them own four properties with CertainTeed fibercement siding. They are collectively members of the class "All individuals and entities that owned, as of September 30, 2013, homes, residences, buildings, or other structures located in the United States, on which CertainTeed Weatherboards Fiber Cement Siding, Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling, and 7/16" Trim was installed on or before September 30, 2013." The objectors' address is 2038 Moondance Ct., O'Fallon, MO 63368, and the phone number is 636-379-0087. The properties are (a) 3317 N. Mester, St. Charles, MO 63301; (b) 3208 South Mester, St. Charles, MO 63301; (c) 3591 South New Town Ave., St. Charles, MO 63301; and (d) 3593 South New Town Avenue, St. Charles, MO 63301. Each of these four addresses has one unit with siding as described in the declarations and exhibits.

## II.   The court has a fiduciary duty to the absent members of the class.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Pampers*, 724 F.3d at 715. "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004); *Baby Prods.*, 708 F.3d at 175 (same). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992).

The Court's oversight role does not end at making sure that the settling parties engaged in properly adversarial arm's length settlement negotiations. "In class-action settlements, the adversarial process—or what the parties here refer to as their 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members. For the economic reality [is] that a settling defendant is concerned only with its total liability, and thus a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense… And that means the courts must carefully

scrutinize whether [class counsel's and the named representatives'] fiduciary obligations have been met." *Pampers*, 724 F.3d at 717-18 (internal quotations omitted).

While it is *necessary* that a settlement is at "arm's length" without express collusion between the settling parties, it is not *sufficient*. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (internal quotation omitted). Due to the defendant's indifference as to the allocation of funds between the class, the named representatives and class, it is enough that the settlement evinces "subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Pampers*, 724 F.3d at 718 (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)).

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*"). "The burden of proving the fairness of the settlement is on the proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities). The settling parties' claim that they are entitled to a presumption of fairness is simply legally incorrect: they have the burden, a burden they have failed to meet.

This is especially true in this case, because that burden is yet heightened because this settlement has been proposed before class certification. Delaying certification until settlement poses various problems, *see In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-800 (3d Cir. 1995) ("*GM Trucks*"), and calls for heightened judicial scrutiny of the certification and the accompanying settlement. *Id.* at 807; *Pampers,* 724

F.3d at 721; *Bluetooth*, 654 F.3d at 946-47 (9th Cir. 2011) (citing cases from Second, Third,

Seventh and Ninth Circuits); Federal Judicial Center, *Manual for Complex Litigation* § 21.612

(4th ed. 2004).

In their approval papers, the settling parties will doubtlessly focus on the multi-factor

test for settlement fairness discussed in *In re Prudential Ins. Co. Am. Sales Prac. Litig.,* 148 F.3d

283 (3d. Cir. 1998). It cannot be overemphasized that—like the factor test of other

circuits—the *Prudential* test is not exhaustive. *E.g., In re Baby Products Antitrust Litig.*, 708 F.3d

163 (3d Cir. 2013) (reversing settlement approval for reasons outside of balancing test).

## III. The settlement is not worth $103.9 million, and may not be worth anything to the class; the parties have failed to demonstrate that class counsel has not obtained a disproportionate amount of the settlement proceeds.

The settlement creates a $103.9 million fund. $19.1 million is earmarked for class

counsel and the class representatives. Millions more will pay the claims administrator and

third parties such as the Independent Claims Reviewer selected by class counsel. But the

class is not actually entitled to any payments: all they get under the settlement is the

***possibility*** of payments under a claims process. Settlement ¶ 6. And class counsel and

CertainTeed are released from liability for any negligence by the claims administrator. *Id.* ¶

6.24. There is no provision in the settlement if claims are low, and there is leftover money:

who gets it if not the class? (Nor is there any provision if settlement claims are high and the

fund is exhausted before 2019, though the parties apparently thought that so unlikely as to

not account for the possibility.) Even if the settlement does somehow pay $80 million to the

class, at least $40 million of that amount will be withheld from payment until 2019, even as

class counsel is paid immediately. Meanwhile, CertainTeed is released from all liability—even

if cracking or warping occurs in 2020, when class members are forbidden to make claims.

As such, the $103.9 million valuation of the settlement is illusory. Indeed, the settlement may possibly make class members worse off, because CertainTeed already offers to partially compensate class members before the settlement—and now will have no threat of legal liability encouraging them to do so. Class counsel cannot take credit for giving the class what they already had. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (settlement value calculated by "the *incremental* benefits", "not the total benefits" (emphasis in original)).

This is wrong. As the Third Circuit held in *Baby Products*, it is not enough to point to the size of the settlement fund, say that's fair and walk away. One must calculate the **actual** benefit to the class, what the class **actually** receives, and ensure that the class counsel has not received a disproportionate share of the settlement benefit. Class counsel points to the $103.9 million settlement fund, but the **actual incremental** benefit to the class is much less than that.

*First*, the settlement oddly fails to account for the possibility that there will not be a number of claims that exactly exhausts the settlement fund. Though the motion for preliminary approval alleges that the settlement is "non reversionary," nothing in the settlement itself says that. What happens if there are only $5 million in claims? The settlement does not say, other than to slightly bump up payments to class members in 2019 beyond the discounted amount provided by Section 7. What happens if there are $160 million in claims by 2015? Presumably, class members who are late to the claims table do not get paid. The settling parties have the burden of proving settlement fairness, but provide no data what the claims rate is expected to be. Empirical evidence reveals claims rates in these types of settlements are extremely low. *See, e.g., Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting evidence that "consumer claim filing rates rarely exceed

seven percent, even with the most extensive notice campaigns."). How do we know that the class counsel won't be paid more than the class?

*Second*, this problem is exacerbated because class members have to jump through hoops to get paid. A claims administrator adjudicates claims (on an eight-page claim form, plus much documentary evidence required) and decides both whether a claim is eligible and how much the claim will be. The settlement fund pays the claims administrator to do so, and pays for an independent claims reviewer; there is no provision in the settlement restricting how much the claims administrator will be paid or ensuring that the claims administrator or independent claims reviewer will not charge excessive rates or even that the claims administrator and independent claims reviewer have no separate financial relationship with class counsel. Nothing in the settlement precludes class counsel from collecting its $19 million, and then ignoring the claims procedure, or splitting the payments made to an overbilling claims reviewer. While class counsel implausibly claims a six-year claims process will only cost $521,000 (Docket No. 25-2 at ¶ 11), there is no penalty if that figure is greatly exceeded at the expense of the class.

Indeed, the fact that the elaborate claims process is estimated to cost only $521,000 suggests that the parties do not expect many claims. If we charitably and implausibly assume that the claims process only costs $200/claim (including communications with class members over multiple iterations of eight-page claim forms, dealing with address changes over six years, the occasional on-site inspection, mailing two sets of checks, and the pro-rated costs of administering a website and a $1.3 million notice program), that implies that there will only be 2,600 claims. If we further charitably and implausibly assume that no claims are denied and each class member will be paid in full an average of $9,000, that will be a total fund payout of less than $24 million—the vast majority of which will not be paid until

2019. But again, the parties have provided no data.[1]

*Third*, a settlement must be evaluated by the *incremental* benefits it provides to the class. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002). The Jabranis' personal situation is instructive. In 2011, the Jabranis complained to CertainTeed about gapped and cracking siding on one of their properties. CertainTeed offered to provide replacement siding. A. Jabrani Decl. Exh. 7. (Jabrani rejected the offer. *Id.* at 3.) According to the same R.S. Means data used to calculate settlement payouts, fibercement siding, materials cost is about 40% of the total cost of replacement (including materials, labor, and paint). If the Jabranis make a claim under the settlement, the settlement will pay them 48% of the total cost of replacement, 24% now, and 24% in 2019—assuming the claims administrator accepts their claim. The incremental benefit to the Jabranis of the settlement is only **eight percent** of replacement cost—and even that is swallowed up by the time value of having to wait an extra six years to be paid. Yet the settlement values that benefit to the Jabranis at about $4,000, when the incremental benefit is only one sixth of that (and less once the time-value of money is accounted for). The parties have provided no data as to what CertainTeed was already paying class members before there was a class action settlement, and doesn't even mention the problem of calculating marginal settlement benefit.

---

[1] Indeed, the settlement is ambiguous whether class members are *ever* entitled to 100% of their damages, even if there is residual money in the fund: though the motion for preliminary approval suggests that they are, the settlement says precisely the opposite: "At the end of the claims period, the Claimant will receive a second payment, and depending on the claims rate may receive the full value of their claim **with a reduction for usage**." Settlement ¶ 7.3 (emphasis added). But the settlement notice misleadingly states "In fact, the maximum amount payable could ultimately be the full value of the claim without an adjustment." Long Form Notice ¶ 10. The Jabranis object to any future attempt by the parties to interpret the ambiguous Section 7.3 to contradict the settlement notice; in the alternative, they object to the settlement notice as misleading.

The $24 million gross settlement value estimated above must be discounted: the **_marginal_** benefit to the class is likely between $4 million and $15 million. But because the parties have not disclosed any data what CertainTeed was paying class members before the settlement, it is possible that this settlement makes class members worse off on average.

_Fourth_, the settlement value must account for the time value of money. About three quarters of the $24 million discussed above will not be distributed until 2019. The time-value of money must be accounted for to fairly calculate the settlement benefit. At current mortgage rates of 4.63% for a home-equity loan used to pay for siding repairs, $1.00 paid in 2019 is worth only 75 cents today. In other words, the _gross_ value of the settlement isn't even $24 million, but less than $20 million—or, once the opportunity cost mentioned in the above paragraph is accounted for, between negative-$0.5 million and positive-$10.5 million.

Remember: we reached these numbers making generous estimates of data that the settling parties have failed to provide this court, though this data is in their possession, and they have the burden of proof of proving settlement value. (The court can also draw a negative inference from the hide-the-ball tactics of the parties of failing to disclose this information to the class or the court.) The settlement could be much worse than this (perhaps Jabrani got an especially bad replacement offer, and class members did better on average before the class settlement); there's a chance that it might be somewhat better. But two things are clear: there will be tens of millions of dollars unaccounted for in this settlement in 2019, and no provision for court oversight of what happens to that money; and the $19.1 million fee request is disproportionate to the incremental value of what the class will actually receive.

It matters because in analyzing the fairness of a proposed settlement under Rule 23(e), district courts must "insure that the interests of counsel and the named plaintiffs are

not unjustifiably advanced at the expense of unnamed class members." *Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983). Earlier this year, *Pampers* explained that one focus of evaluation is whether the settlement gives "preferential treatment" to the named plaintiffs or to class counsel. *Pampers*, 724 F.3d at 718 (quote and cite omitted). "Such inequities in treatment make a settlement unfair" for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718 (internal quotation omitted).

The most common settlement defects are ones of allocation. This is because "the adversarial process—or 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Id.* at 717 (emphasis in original). Adversarial negotiation does not ensure that class relief is "commensurate with [the] fee award." *Id.* at 720. "[I]f the 'fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.'" *Id.* at 718 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003)).

Here, class counsel reserves the right to seek $19 million for themselves, which we estimate will be the majority of the settlement benefit realized by the class rather than the 18% of the illusory settlement value they allege. This is nearly double the 38.9% figure that the Ninth Circuit recently referred to as "clearly excessive." *Dennis*, 697 F.3d at 868. There should be little doubt that over 50% qualifies as a "disproportionate distribution of the settlement" and as the first (and perhaps most important) warning sign of an inequitable settlement. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

With increasing frequency, especially after *Bluetooth*, courts around the country now make the proper comparison between the fee award and the amount actually claimed by class members. *Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071, 1092 (C.D. Ill. 2012) (emphasizing the "scant" 4.5% claims rate and result that $38,000 of $500,000 available would be paid out, ultimately denying approval of settlement); *Kaufman v. Am. Express Travel Related Servs.*, 283 F.R.D. 404, 407 (N.D. Ill. 2012) (finding a vast disparity between attorneys' fees and class claims' values to be "troubling and ultimately unacceptable."); *Trombley v. Bank of Am. Corp.*, No. 08-cv-456-JD, 2012 U.S. Dist. LEXIS 63072, at *8 (D. R.I. May 3, 2012) (finding an attorney award that consumed 66% of the settlement to be "excessive" and grounds for denying final approval); *Ferrington v. McAfee, Inc.*, No. 10-cv-1455-LHK, 2012 U.S. Dist. LEXIS 49160, at *36-*37 (N.D. Cal. Apr. 6, 2012) (finding an attorney award that constituted 83% of the settlement amount was disproportionate and grounds for denying final approval); *Strong v. BellSouth Telcoms., Inc.*, 173 F.R.D. 167, 172 (W.D. La. 1997), *aff'd* 137 F.3d 844 (5th Cir. 1998) ("A request for $ 6 million in attorneys' fees where counsel has provided no more than $ 2 million in benefits to the class is astonishing. It is a sad day when lawyers transmogrify from counselors into grifters.")

Naturally low claims rates are the "[t]he reality" here, and mean that "this settlement benefits class counsel vastly more than it does the consumers who comprise the class." *Pampers*, 724 F.3d at 721. This Court should deny final approval until class counsel are no longer "the foremost beneficiaries of the settlement." *Baby Prods.*, 708 F.3d at 179.

## IV.   Intra-class conflicts preclude settlement approval.

Unfortunately, the settlement structure violates Rule 23(a)(4) because of two intra-class conflicts of interest requiring separate representation. *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012), is directly on point.

In *Dewey*, there were two groups of automobile owners in a single class who could make claims on a fixed $8 million claim fund: the "reimbursement group," who could be paid immediately, and the "residual group" who would only be paid from leftover money after the reimbursement group was paid. *Id.* at 173. The Third Circuit held that these two groups were in conflict with each other, and could not be certified in the same class with the same representatives under Rule 23(a)(4).

This settlement has the same impermissible structure and violates *Dewey* in two separate ways.

*First,* as in *Dewey,* there is the "reimbursement group" of people who have past damage who make claims immediately, and immediately receive a portion of their claim. Then there is a "residual group" in the same single settlement class of people with latent injury and future damages, who get paid only after the reimbursement group gets paid. (In reality, there are an infinite number of residual groups: the people who make claims in 2014 are paid before those in 2015, and so on through 2019.) If the reimbursement group (or one of the earlier residual groups) exhausts the settlement fund, tough luck: the later residual groups do not get paid, and there is no provision to supplement the settlement fund.

Now, concededly, it is unlikely the settlement fund will be exhausted; as the objectors discuss in Section III, it is far more likely there will be tens of millions of dollars left over. But the same fact pattern was held irrelevant in *Dewey*: the "plaintiffs project that the $8 million reimbursement fund will be sufficient to satisfy the claims of those in the reimbursement group and the residual group." *Id.* at 189. No matter: where a certified class fails on a structural level, it must be vacated without regard to whether "the class members' interests were not actually damaged." *Id.* at 189 n.19.

*Second*, the settlement unfairly treats similarly situated class members differently. A

class member with siding installed in 1999 can make a claim in 2015 for 16-year-old siding. But if the Jabranis, whose siding was installed in 2005, try to make a claim in 2020 for cracks that occur in 15-year-old siding, they will be precluded from doing so—even if there are tens of millions of dollars left in the settlement fund. A class member with siding installed in 2013 is even worse off: they have waived their right to make claims about siding that is only seven years old in 2020. This is also impermissible under *Dewey*, and, unlike the previous intra-class-conflict, actually results in a subgroup of a single settlement class from being precluded from making damages claims at all.

Under *Dewey*, the class cannot be certified with the settlement's current structure.

## V.   In the alternative to denying settlement approval, the Court should limit counsel's fee award to a reasonable percentage of the amounts actually claimed; it should not base the award on a delusive 100% claims rate.

"Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23. As a fiduciary for the class, the Court maintains a duty of keen oversight of all settlement proceedings. *See supra* §II. "[R]eview of the attorneys' fees component of a settlement agreement is…an essential part of its role as guardian of the interests of class members. To properly fulfill its Rule 23(e)[2] duty, the district court must not cursorily approve the attorney's fees provision of a class settlement or delegate that duty to the parties." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998); *GM Trucks*, 55 F.3d 768, 819-20 (requiring "a thorough judicial review of fee applications . . . in all class action settlements" because "'a defendant is interested only in disposing of the total claim

---

[2] Rigorous oversight of fee awards is now also required by Rule 23(h).

asserted against it'" and "'the allocation between the class payment and the attorneys' fees is of little or no interest to the defense'").

Judicial involvement is all the more important "since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiff and class counsel." *Rawlings v. Prudential-Bache Properties*, 9 F.3d 513, 516 (6th Cir. 1993).

The fees should be awarded based on a percentage of the incremental benefit **actually** received by the class. As aptly described in *In re Cardinal Health Inc Secs. Litig.*,

> "the percentage approach encourages efficiency, judicial economy, and aligns the interests of the lawyers with the class in large securities cases. While the lodestar approach incentivizes attorneys to work more hours, without regard to the quality of the output or the class's needs, the percentage approach instead rewards counsel for success and penalizes it for failure. Not only is the Court spared from the costly task of scrutinizing counsel's billable hours, but attorneys are discouraged from padding hours and encouraged to work more efficiently. Furthermore, because the attorneys receive a higher fee if they obtain a higher settlement, the interests of the class and the attorneys are aligned. As Professor John C. Coffee concludes, the percentage approach 'relies on incentives rather than costly monitoring' to ensure that Lead Counsel is 'essentially self-policing.'" [528 F. Supp. 2d 752, 762 (S.D. Ohio 2007)]

"This interest-alignment device is not perfect. . . . But [an] imperfect alignment of interests is better than a conflict of interests, which hourly fees may create." *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986). *See generally* Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000) (citing authorities that show a "broad consensus that percentage-based formulas harmonize the interests of agents and principals better than time-based formulas like the lodestar approach.").

The percentage method "directly aligns the interests of the class and its counsel and

provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). In contrast, judicial reliance on the lodestar will "create an unanticipated disincentive to early settlements, tempt lawyers to run up their hours, and compel district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* Accord *GM Trucks*, 55 F.3d at 821 ("[T]he court should probably use the percentage of recovery rather than the lodestar method as the primary determinant….").

It goes without saying that a even a modest request relative to base lodestar cannot justify an unfair settlement in which class counsel obtains a disproportionate sum of the proceeds. *See Baby Prods.*, 708 F.3d at 180 n.14 (lodestar multiplier of .37 not "outcome determinative"); *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1177 (9th Cir. 2013) (same with multiplier of .32); *Bluetooth*, 654 F.3d 935 (reversing settlement approval notwithstanding district court's finding that the lodestar "substantially exceed[ed]" the fee requested and awarded). A lodestar award amounting to a majority of the proceeds actually received is not "reasonable" as mandated by Rule 23(h).

A fee award needs to be attuned to the result actually achieved for the class, to the money the settlement actually puts in class members' hands. *See, e.g., Baby Prods.*, 708 F.3d at 179; *cf.* 28 U.S.C. §1712(a). If this Court endorses a rule that class counsel should be indifferent between a settlement that awards cash directly to class members and a settlement with a claims process where only a tiny percentage of the class will successfully make claims, the parties will always agree to the more burdensome claims process that ensures class counsel extracts the maximum amount of fees and defendants pay the minimum amount of money to settle the case, and the unnamed class members will be left in the cold.

The claim that potential class benefits should be treated as identical to actual class

receipts leads to absurd results. Imagine two hypothetical settlements of the hypothetical class action *Coyote v. Acme Products*:

| Settlement One | Settlement Two |
|---|---|
| Acme Products mails a $50 check to each of one million class members who purchased their mail-order rocket roller skates. | One million members have the right to fill out a twelve-page claim form requesting detailed product and purchase information, with a notarized signature attesting to its accuracy under penalty of perjury. The claim form must be hand-delivered in person between the hours of 8:30 a.m. and 9:30 a.m., on July 4, 2014, at Acme's offices in Walla Walla, Washington. Class members with valid claim forms receive $100. |

It would be malpractice for a class attorney to refuse Settlement One and insist on Settlement Two. The overwhelming majority of class members, if polled, would prefer Settlement One to Settlement Two. A defendant would clearly prefer Settlement Two to Settlement One as substantially cheaper. But under the settling parties' apparent proposed legal rule for calculating settlement value, Settlement Two is worth twice as much as Settlement One, and would entitle the class attorneys to twice as much in attorneys' fees. This Court should reject a rule that creates such perverse incentives.

Maybe the plaintiffs will rejoin, "but wait this claims process is not bad as Settlement Two." True, but making that argument concedes the point that a claims process reduces the value of a settlement, and that valuing "potential" benefits is improper without taking into account the likelihood that a class member will *actually* obtain the benefit. There is no principled dividing line, other than to say that the way to judge the validity of a claims process—and to incentivize class counsel to maximize the result actually obtained by the class—is to consider the amount that the claims process will *actually* pay the class.

It is therefore not appropriate to award fees based on a speculative, maximized estimate of potential claims. Absent class members can only be protected if class counsel negotiates for a process that maximizes payment to the class, but if fees are based on "potential" benefits, class counsel has the incentive to inflate the hypothetical number of claims as much as possible so as to ensure itself the maximum baseline from which to draw its fee.

And for this reason that the Advisory Committee Notes counsel that the "fundamental focus is the result actually achieved for class members" and advise "defer[ring] some portion of the fee award until actual payouts to the class are known." Notes of Advisory Committee on 2003 Amendments to Rule 23(h). Even before Rule 23(h), courts deferred or staggered fees just so, to account for success or failure of the claims process. *E.g., Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 380 (D. Mass. 1997); *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1283-84 (S.D. Ohio 1996), *aff'd Bowling v. Pfizer, Inc.*, 102 F.3d 777 (6th Cir. 1996).[3]

Admittedly, some courts that have awarded fees on a percentage-of-recovery basis have made this calculation on the basis of the entire fund, not just the amount of the fund that is claimed by the class. *E.g., Boeing v. Van Gemert*, 444 U.S. 572 (1980).[4]

---

[3] Here, deferring should not be necessary given that actual claims rates will be known more than a month before the fairness hearing, assuming that the parties promptly submit the claims data unto the record.

[4] As a threshold matter, even if *Boeing* retains vitality, it would not render the claims data irrelevant. For example, a court may choose to depart downward from the 25% benchmark, due to the class' apathetic reaction that is demonstrated by the absence of claims. *Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 U.S. Dist. LEXIS 102531, at *12 (N.D. Cal. Nov. 3, 2009). Or alternatively, a trial court can in its discretion determine that "a more reasonable fee results from calculating a percentage of the actual recovery." *Wise v. Popoff*, 835 F. Supp. 977, 982 (E.D. Mich. 1993).

Nonetheless, this Court should find *Boeing* inapplicable for at least two reasons. First, *Boeing* was superseded by the 2003 amendments to Federal Rule of Civil Procedure 23, which created Rule 23(h) and the passage of the Class Action Fairness Act in 2005 (28 U.S.C. §1711 *et seq.*). *See* Samuel Isaacharoff, *The Governance Problem in Aggregate Litigation*, 81 FORDHAM L. REV. 3165, 3171-72 (2013) (describing *Boeing* as marking an "older line of cases" that eventually "prompted legislative rejection of compensating lawyers on the face value of the settlement, regardless of the take-up rate of the benefits by class members"). The new rules reflect common-sense intuitions: attorneys' fees should be tied directly to what clients receive, and permitting a class member to fill out a claim form in order to receive a check simply is not equivalent to sending that class member a check directly.

Speculative, maximized estimates are not the appropriate measure of benefit. *Baby Prods.*, 708 F.3d at 179 n.13 ("[T]he actual benefit provided to the class is an important consideration when determining attorneys' fees."); Federal Judicial Center, *Manual for Complex Litigation* § 21.71 (4th ed. 2004) ("In cases involving a claims procedure…,the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather the fee should be based only on the benefits actually delivered."); *see also Pampers*, 724 F.3d at 721 (rejecting settlement-value "assumptions… premised upon a fictive world"). A class member is not indifferent between a $103.9 million common fund that pays roughly $90 million to the class (the  gross fund less a fair fee request and expenses) and a "$103.9 million" settlement that pays only a small fraction of that to the class, and delays much of that payment for several years. *Baby Products, supra*; *see also Int'l Precious Metals Corp. v. Waters,* 530 U.S. 1223 (2000) (O'Connor, J) (respecting denial of certiorari but noting that fund settlements that allow attorney fees to be based upon the total fund may "potentially

undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class" and, in turn, "could encourage the filing of needless lawsuits").

If this Court determines that *Boeing* is still good law and is applicable here, objectors wishes to preserve that issue for appeal: objectors believe that it has been legislatively superseded and that it should, ideally, be judicially reversed.

## VI.     The preliminary approval order violates Rule 23(h).

Rule 23(h) authorizes the Court to award "reasonable" attorneys' fees only when notice of the fee request is "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h), (h)(1) "Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances." Notes of Advisory Committee on 2003 Amendments to Rule 23. But the preliminary approval order limits class members to objections on or before December 31, and class counsel has given no notice to the class about the basis for their fee request.

It is not sufficient that class members are able to make "generalized arguments about the size of the total fee"; the notice must enable them to determine which attorneys seek what fees for what work. *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010). Moreover, the notice in this case suggests that multiple law firms will receive fees, but it fails to provide even the bare bones of who seeks what, instead suggesting only a lump sum, presumably to be distributed outside the aegis of the Court. This implicit extra-judicial award undermines Rule 23(h)'s policy of "ensur[ing] that the district court, acting as a fiduciary for the class, is presented with adequate, and adequately-tested, information to evaluate the reasonableness of a proposed fee." *Id.*

As the Fifth Circuit recently noted: "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). The district court "must not … delegate that duty to the parties." *Id.* at 228 (internal quotation omitted). The appellants in *High Sulfur* complained that the district court had sealed the fee allocation list, such that they could not compare their fee awards to those of other attorneys. The Fifth Circuit agreed: "One cannot compare apples to oranges without knowing what the oranges are." *High Sulfur*, 517 F.3d at 232.

That court also held that it was impermissible for the district court to defer to the allocation proposed by the attorneys themselves. "It is likely that lead counsel may be in a better position than the court to evaluate the contributions of all counsel seeking recovery of fees. But our precedents do not permit courts simply to defer to a fee allocation proposed by a select committee of attorneys, in no small part, because 'counsel have inherent conflicts.' As Judge Ambro of the Third Circuit had noted earlier, 'They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?'" *Id.* at 234-35 (quoting *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005).

Here, not only is there no recommendation for the both the Court and class,[5] there

---

[5] The parties can certainly present a suggested allocation to the class and the Court. But what is not permissible is for the parties to divide up the spoils *ex post*, outside the view of the class and the public, purely according to the whim of class counsel. This way, if an objecting class member thinks X attorney or X firm did a bad job and Y attorney did a particularly good job—maybe they had contacted the attorneys at some point during the proceeding—then they receive notice and can register their objection with the court. That is the proper procedure. Rule 23(h) is the product of the desire for greater oversight,

isn't even an assurance that class counsel will determine a "fair and reasonable" allocation at some time in the future. This Court should not presume that the Third Circuit would create a split with the Fifth and Ninth Circuit's interpretation of 23(h).

This Court must require the parties to give adequate notice to the class about their fee request, and inquire whether there is any fee-division agreement between Lead Class Counsel and ancillary class counsel; if so, it must be revealed both to the Court and to the class. Fed. R. Civ. P. 23(h); *see also* Fed. R. Civ. P. 23(e)(3) (requiring the parties seeking approval to file a statement identifying any agreement made in connection with the proposal).

## VII.   Notice of intent to appear and other reservations of rights.

The objectors hope to appear at the fairness hearing through counsel, and reserve the right to do so. If so, objectors reserve the right to cross-examine any witnesses who testify in support of the settlement. Objectors reserve the right to supplement their objection to address filings made after the objection deadline that introduce new arguments or facts in support of settlement approval that were not previously available on the settlement website. Objectors join any other objection filed in this case to the extent it does not contradict this objection.

The objectors object to any arbitrary provision of the settlement or preliminary approval order that unduly burdens objections beyond what Rule 23(e)(5) requires, including any ambiguous requirement that suggests an objection is invalid if objectors hundreds of miles away from their local counsel must sign legal filings, or requiring objectors in a nationwide class to appear in Philadelphia to participate in a fairness hearing. Objectors have signed declarations that are incorporated in this objection, and have authorized their counsel

---

transparency, and "active judicial involvement" in the awarding of fees and subsequent case law reflects that.

to make arguments on their behalf. Objectors reserve the right to perfect the objection with additional signatures to the extent the parties claim this objection is invalid because of supposedly missing signatures on a separate document, given that such perfection will not prejudice any party.

The objectors reserve the right to object to any *cy pres* proposals for residual settlement funds, and object to the lack of notice or provision for notice for *cy pres* distribution. They reserve the right to move to intervene to preserve their rights to challenge any *cy pres* provision or motion.

Objectors are citizens of Missouri, with no contacts with the state of Pennsylvania. They thus object to the choice-of-law provision (section 16.10) to the extent the parties claim it permits attorneys' fees in excess of what federal law permits or the parties claim the clause permits issuance of a Fed. R. App. Proc. 7 appeal bond that includes attorneys' fees or appellate costs in excess of what the Third Circuit typically awards via Fed. R. App. Proc. 39.

## CONCLUSION

For the foregoing reasons, this settlement should be rejected as unfair and unreasonable and the class cannot be certified. At the very least, the fee request must be reduced and individuated in accordance with Rule 23(h).

Dated:  December 31, 2013

Respectfully submitted,

/s/ Christopher M. Arfaa

Christopher M. Arfaa
Hawke McKeon & Sniscak LLP
100 N. 10th Street
Harrisburg, PA 17101
cmarfaa@hmslegal.com
717-703-0802
717-236-4841 (fax)

Attorney for Objectors Amirali Jabrani, Janet
Jabrani, and Real Homes Inc.

_For Real Homes Inc_
_12/31/13_
Amirali Jabrani
On behalf of himself and Real Homes Inc.

Janet Jabrani
On behalf of herself and Real Homes Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this day I filed the foregoing with the Court through the Court's CM/ECF system, which served all counsel of record, and served true and correct copies upon the Clerk of the Court, class counsel, and defendants' counsel via U.S. first-class mail at the addresses below, per the instructions of the Settlement Notice.

Clerk of the Court
United States District Court for the
Eastern District of Pennsylvania
Byrne Federal Courthouse
601 Market Street
Philadelphia, PA 19106-1797

PEPPER HAMILTON LLP
Robert L. Hickok, Esquire
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19102

AUDET & PARTNERS, LLP
Michael McShane, Esq.
221 Main Street, Suite 1460
San Francisco, CA 94105

BERGER & MONTAGUE, P.C.
H. Laddie Montague, Jr., Esq.
Shanon J. Carson, Esquire
1622 Locust Street
Philadelphia, PA 19103-6365

DATED:  December 31, 2013          /s/ Christopher M. Arfaa
                                   CHRISTOPHER M. ARFAA