# EXHIBIT M

Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA

 2

     IN RE:                    §   MDL NO. 2047

 3   CHINESE-MANUFACTURED       §   SECTION: L

     DRYWALL PRODUCTS           §   JUDGE FALLON

 4   LIABILITY LITIGATION       §   MAG. JUDGE WILKINSON

 5

     * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

 7            ORAL AND VIDEOTAPED DEPOSITION OF

 8                    RONNIE GARCIA

 9              TAKEN ON NOVEMBER 1, 2012

10

     * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12       ORAL AND VIDEOTAPED DEPOSITION of RONNIE GARCIA,

13   produced as a witness at the instance of the Class

14   Counsel, and duly sworn, was taken in the above-styled

15   and numbered cause on the 1st day of November, 2012,

16   from 2:17 p.m. to 5:52 p.m., before SYLVIA KERR, CSR,

17   RPR, CRR in and for the State of Texas, reported by

18   machine shorthand, at the offices of Huseman, Dodson &

19   Hummell, 615 North Upper Broadway, Suite 2000, Corpus

20   Christi, Nueces County, Texas, pursuant to the Federal

21   Rules of Civil Procedure.

22

23

24            GOLKOW TECHNOLOGIES, INC.

          877.370.3377 ph | 917.591.5672 fax

25              deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Well, like I said, you know, if it was out

 2   there, like you said, we try to put, you know, the

 3   cheapest drywall out there.  And if it was part of it,

 4   it goes -- you know, it's -- that's what we try to do.

 5   We order it and let's get it.  You know, get it into

 6   where we need to get to the project and get it up and

 7   taped and floated and painted.

 8      Q.   Okay.  So you used the cheapest drywall, but

 9   you don't know -- you have no idea whether it was

10   Chinese, Mexican, American?  You don't know?

11      A.   No, sir.

12      Q.   Okay.  Thank you.  Do you know what brand of

13   Chinese drywall that you may have installed?  Any sense

14   of that?

15      A.   It's been too long.

16      Q.   Now, specifically with respect to the

17   settlement that you're objecting to, do you remember

18   seeing any sort of advertisements, anything like that

19   about the settlement?

20      A.   No, sir.

21      Q.   How is it that you came to know about the

22   settlement?

23      A.   What's that?

24      Q.   How did you come to learn about the settlement?

25      A.   Another -- a person, another friend of mine
```

Confidential - Subject to Further Confidentiality Review

```
 1    telling me about it.

 2        Q.   Who is the friend?

 3        A.   Bert Chapa.

 4        Q.   Bert.  What was his last name?

 5        A.   Chapa.

 6        Q.   How do you spell that?

 7        A.   C-h-a-p-a.

 8        Q.   Okay.  Now, who is Mr. Chapa?

 9        A.   He's a golf buddy of mine.

10        Q.   Okay.  And what does Mr. Chapa do for a living?

11        A.   He's a legal assistant.

12        Q.   Where?  What firm?

13        A.   What's that?

14        Q.   What firm is he with, do you know?

15        A.   Here in Corpus.

16        Q.   Okay.  But do you know the name of the law

17    firm?

18        A.   It's Batman Law Office.

19        Q.   Okay.  That's Mr. Batman?

20        A.   Yes, sir.

21        Q.   Okay.  And so Mr. Chapa, what does he do

22    specifically at Batman's office?

23        A.   He works for Batman.

24        Q.   Is he a paralegal?  Is he an investigator?  Do

25    you know what his --
```

Confidential - Subject to Further Confidentiality Review

```
1        A.    I think he's an investigator.

2        Q.    Okay.  And you testified that you played golf

3   with Mr. Chapa?

4        A.    I would, golf buddies.

5        Q.    How long have you guys been golf buddies?

6        A.    Ten, 12 years.

7        Q.    And had Mr. Chapa, during that time period,

8   ever asked you about -- or brought to your attention

9   other litigations like this one?

10       A.    No, sir.

11       Q.    Okay.  And backing up to -- when would you tell

12  me that Mr. Chapa -- is that two P's or one P?  I'm

13  sorry.

14       A.    Just one.

15       Q.    Just one P.  Mr. Chapa first told you about the

16  settlement, when was that?

17       A.    I guess about two months ago.

18       Q.    So at some point in September, late August,

19  some time around then?

20       A.    What are we, October?  We're already in

21  November.

22       Q.    November 1, yeah.

23       A.    Yeah, probably late September or beginning

24  of -- something like that.  September.  Yeah, September.

25       Q.    Late September?
```

1    A.    I think it might have been beginning of

2    September because I was up in Dallas and Fort Worth.

3    Q.    Okay.  What did Mr. Chapa tell you about the

4    settlement at that time?

5    A.    He didn't tell me nothing about the settlement.

6    Q.    I thought you had just testified that you first

7    learned of the settlement from Mr. Chapa?

8    A.    Well, not the settlement, but the -- about

9    the -- about what's going on with the Chinese drywall.

10    Q.    What did he tell you what was going on with

11    Chinese drywall?

12    A.    Well, he said if I've ever worked with it, you

13    know, since he knows I work with a lot of drywall.

14    Q.    Okay.  So you told him yes, you might have

15    worked with it, I'm assuming?

16    A.    Yes, sir.

17    Q.    And then what else did he tell you?

18    A.    Well, he told me exactly what you're saying.

19    Hey, where did you see it?  I said, I don't know.  It

20    could have been in a project in Houston, Galveston or

21    Dallas, you know, the same thing, or in Corpus, I said.

22    But I know I've seen it, but I don't really -- you don't

23    really pay attention to stuff like that.  Like I said,

24    you just slap that thing in the wall, you see an emblem,

25    you know, like you see a lot of them.  You know, we just

Confidential - Subject to Further Confidentiality Review

1    did a project -- we're doing a project right now in

2    Portland and, you know, we see it, it's got an emblem

3    that says USG ultra-light.  And, you know, I just put it

4    up and let's go, you know.

5        Q.    Okay.  So Mr. Chapa asked you if you had ever

6    seen Chinese drywall at any work sites; is that correct?

7        A.    Yes, sir.

8        Q.    And you told him yes, is that --

9        A.    Well, I told him I vaguely remember.

10       Q.    You didn't specifically remember it,

11   but you might have seen it, is that what you told

12   him?

13       A.    Yes, I told him I vaguely remember.

14       Q.    And then what did he tell you next?

15       A.    Well, he said there's, you know -- he

16   introduced me to Chris and he told me if I wanted to

17   pursue this.

18       Q.    And when did he introduce you to Chris?

19       A.    In September.

20       Q.    And when you say "Chris," you're talking about

21   Chris Bandas; is that correct?

22       A.    Chris Bandas, yes.

23       Q.    Now, at the time he introduced you to Chris,

24   was that the same day when you retained Mr. Bandas?  Or

25   is it a different time?

Confidential - Subject to Further Confidentiality Review

```
 1       A.   It wasn't the same day.

 2       Q.   Okay.  So where did you meet him?

 3       A.   Who's that?

 4       Q.   Mr. Bandas.

 5       A.   At his office.

 6       Q.   Okay.  So at some point in September you went

 7   into Mr. Bandas' office, correct?

 8       A.   Yes, sir.

 9       Q.   And what was your intention at that time?

10       A.   We just talked about what we were talking about

11   now, about the Chinese drywall.

12       Q.   Did you go into his office with the intention

13   of retaining a lawyer to represent you with potential

14   claims that you might have against distributors and

15   other parties that you purchased drywall from?

16       A.   Yes, sir.

17       Q.   Okay.  And did you ultimately retain

18   Mr. Bandas?

19       A.   Well, I told him -- you know, we talked about

20   it, I told him --

21            MR. HUSEMAN:  Just a minute.  Ronnie, I

22   don't want you talking about any communications you had

23   with Chris.  That's attorney/client privilege and we

24   assert that.  So you can talk to Matthew about things

25   which do not involve any communications between you and
```

Confidential - Subject to Further Confidentiality Review

 1    your lawyer.  Yeah, we've given them copies of the

 2    contracts and all, which will speak for themselves as to

 3    the relationship there.

 4        Q.   (By Mr. Gaughan)  And I guess my last question

 5    was:  Ultimately did you retain Mr. Bandas?

 6        A.   Yes, sir.

 7        Q.   And what's your understanding of the scope of

 8    his representation of you?

 9        A.   It's -- you know, that's how come I retained

10    him, to make sure I'm, you know -- he does what we need

11    to do on this matter.

12        Q.   And when you say "this matter," are you

13    referring to this objection that you're currently --

14    have filed to --

15        A.   Yes, sir.

16        Q.   You don't understand that he's representing

17    you with respect to claims that you may assert

18    against other parties that you think sold drywall,

19    defective drywall to you, do you?

20        A.   Well, like you said, I've used it.  And then

21    you were saying that if I, you know, did it on purpose.

22    You know, I don't feel like I did it on purpose.  I did

23    it because it was the best value out there at the time.

24        Q.   I guess what I'm trying to ask you is:  Do you

25    understand that Mr. Bandas's representation of you is

```
 1   your preparation for today's deposition?

 2        A.   I reviewed it sort of.  I don't understand most

 3   of it.

 4        Q.   Okay.  What is your understanding of the nature

 5   of your objection to the settlement in this case?

 6        A.   The objection?

 7        Q.   Yeah.

 8        A.   Whatever it says here.  It was saying something

 9   about the 32 percent award fees.

10        Q.   And is that why you're objecting to the

11   settlement because there is a 32 percent award of fees?

12        A.   And plus -- I think that's what it is.

13        Q.   Have you actually ever read the settlement?

14        A.   No, sir, just read through here.  I don't know

15   the actual facts about it.

16        Q.   How did you come to -- I'm sorry.

17             MR. LONGER:  He doesn't know the actual

18   facts about it.

19        A.   I just know about Chinese drywall.

20        Q.   Well, how did you come to learn that there was,

21   you know, what you're calling a 32 percent fee provision

22   if you had never actually read the settlement?

23        A.   My attorney is the one that --

24             MR. HUSEMAN:  Okay.  Let's not go into

25   that.
```

Confidential – Subject to Further Confidentiality Review

```
1       A.   -- went through this.

2       Q.   Now, have you ever visited the settlement

3   website, the ChineseDrywallSettlement.com?

4       A.   No, sir.  Is it on here?

5       Q.   On your objection?

6       A.   Yes.

7       Q.   No, it's not on your objection.  So you've

8   never visited that website?

9       A.   No, sir.

10      Q.   Are you familiar with any of what we're calling

11  the participating defendants in this settlement?

12      A.   No, sir.

13      Q.   Do you know whether you have purchased drywall

14  from any of these participating defendants?

15      A.   Can you go through them and let me know which

16  ones they are?

17      Q.   Well, I'm asking you the question, I guess.  Do

18  you know one way or the other whether you purchased

19  drywall from any of these participating defendants?

20      A.   Depends on where they're at.  Whether -- I

21  mean, I know I've installed some.  I must have bought

22  some somewhere.  I don't know if it's Building

23  Specialties or L&W or McCoy's or I don't know which one

24  it was.

25      Q.   So you don't know?
```

Confidential - Subject to Further Confidentiality Review

```
 1      A.   What's that?

 2      Q.   You don't know?

 3      A.   I don't think I would know if Chinese -- you

 4   know, unless it was printed out on my invoices.

 5      Q.   So you're objecting to a settlement and you

 6   don't know whether you purchased drywall from any of the

 7   participating defendants; is that fair to say?

 8      A.   I just know I've seen it.  I installed it at

 9   one point or another.

10      Q.   Okay.  And if we can just take a look at this

11   objection you have here.  I'm looking at page number 2

12   of the objection.  And in the second paragraph there, it

13   mentions that you're not attending the fairness hearing.

14           Can you tell me why you don't intend to attend

15   the fairness hearing?

16      A.   Because counsel said I probably didn't need to

17   attend it.

18      Q.   And are you aware that your counsel is not

19   planning on attending the fairness hearing either?

20      A.   I don't know.  I don't know what Bandas is

21   going to do or if he's not going to show up.

22      Q.   Would you expect your counsel to attend the

23   fairness hearing where you've raised an objection to,

24   you know, the terms of a settlement?

25      A.   If you're asking me, I think I would.
```

```
 1        Q.   Does that cause concern for you that your
 2   lawyer is not intending to attend this fairness hearing?
 3        A.   I'm not a lawyer.  I don't know what -- how --
 4   what goes on in none of this.  That's why I -- you know,
 5   I'm not an attorney.
 6        Q.   You think he should attend, though?
 7        A.   I would think, if he's got some type of
 8   interest with it, he would -- he would be attending.
 9        Q.   Okay.  And if we look at the final paragraph of
10   this second page, it looks like one of the things you're
11   objecting to is the procedures or requirements for
12   objecting.
13             What specifically about those procedures and
14   requirements are you objecting to?
15        A.   Which part of it is?  Where is it at again?
16        Q.   If you look at paragraph 4 on this page.
17        A.   Oh, on page 4?
18        Q.   Page 2.  Page 2.
19        A.   Oh, page 2?  Okay.  Now, what was the question
20   again?
21        Q.   What specific -- why are you objecting to the
22   procedures and requirements for objecting?  What's your
23   understanding of those procedures and requirements?
24        A.   Well, actually, I can't understand what he's
25   trying to say here.
```

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   So you're objecting to the procedures and

 2   requirements, but you don't know what they are; is that

 3   fair to say?

 4       A.   Well, my counsel is the one that put it

 5   together for me.

 6       Q.   And if you turn to the next page, page

 7   number 3.

 8       A.   Page 3.

 9       Q.   That top paragraph, you're also objecting to

10   the class definition.  What's your understanding of what

11   the class definition is in this case?

12       A.   I don't know.  I don't actually know what the

13   definition of this case is.  I just know it's Chinese

14   drywall.

15       Q.   Okay.

16       A.   Other than that, that's the only thing I know.

17       Q.   So there's nothing that you can point to here

18   today that you think is flawed with the class

19   definition?

20       A.   I don't understand it.  Can you explain it to

21   me?

22       Q.   I'm just asking:  Is there anything that you --

23   as you sit here today, you've objected to the class

24   definition.  Is there something you can tell me about

25   the class definition that you find to be flawed?
```

```
 1        A.    Well, the way that he wrote it up here is --

 2    it's over my head on this.

 3        Q.    So you don't know, I guess; is that fair to

 4    say?

 5        A.    I don't know.

 6        Q.    Do you need to take that?

 7        A.    No.  It's my son.  I'll call him later.

 8        Q.    Okay.  If we go down one -- if we go down six

 9    lines in the same paragraph, there's a sentence

10    beginning, "Moreover, the class is defined in terms of"

11    merit-based "criteria."

12             And what is your understanding of what that

13    term means, "merit-based criteria"?

14        A.    Merit-based criteria.  I don't understand that

15    one either.

16        Q.    Okay.  And if we go down three more lines -- I

17    guess two more lines, you see that sentence beginning,

18    "Objection is also made to the class definition in that

19    allowing defendants to be class members creates a

20    conflict of interest"?

21        A.    Now, which one is that again?

22        Q.    The -- I guess if we go eight lines down from

23    the top of the first paragraph, you see a sentence that

24    says, "Objection is also made to the class definition in

25    that allowing defendants to be class members creates a
```

1    conflict of interest and objection is made on" this

2    "basis."  Do you see that?

3         A.   Yes.

4         Q.   Okay.  What's your understanding of the

5    conflict of interest?

6         A.   Conflict of interest.  Well, the conflict of

7    interest is if, you know, Chinese drywall was -- is used

8    in a certain place.

9         Q.   There's a conflict of interest because drywall

10   is used in a certain place?

11        A.   It could have been used in a certain project;

12   you know, homes or commercial or Naval base.

13        Q.   And that's the conflict of interest that you

14   were concerned about when you filed this objection?

15        A.   Or it could be -- it would be a conflict of

16   interest with me if, you know, they come back after me

17   on it.

18        Q.   Okay.  And in the next paragraph -- and I'm not

19   going to read the whole sentence, but you object to the

20   fairness, adequacy and reasonableness of the settlement.

21   Can you describe to me what your objection is there?

22        A.   The only thing that I object on it was the 32

23   percent that's going to be awarded to attorneys' fees.

24        Q.   That's what this whole paragraph to you --

25        A.   That's all I can come up with on that.

```
 1      Q.    Just the award of attorneys' fees?

 2      A.    I don't know what the total amount is.

 3      Q.    I guess if you can turn to page 4.  And I think

 4   this gets into what your understanding of your objection

 5   is, the second paragraph there, the middle paragraph.

 6      A.    Yes.

 7      Q.    Okay.  And if you read that first sentence, can

 8   you tell me what your understanding of what the term

 9   "percentage of recovery basis" is?

10      A.    Understand the "Percentage of recovery basis on

11   the lodestar analysis."  I don't even know what that is.

12      Q.    Okay.  So do you know what percentage of

13   recovery basis is?

14      A.    Not really.

15      Q.    How about lodestar?  You just mentioned you

16   didn't know what that was?

17      A.    I don't know what lodestar is.

18      Q.    So yes, you don't know what it is?

19      A.    No, sir.

20      Q.    And then we also talk about, if you go down to

21   that third line there's a reference to a mega-fund case?

22      A.    Where is that at?

23      Q.    The third line of that paragraph talks about

24   mega-fund case.

25      A.    Yeah, okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you know what -- what's a mega-fund case?

 2   Can you tell me?  Is that a no?

 3        A.   No, sir.

 4        Q.   Okay.  If we move down two lines from there, it

 5   says that "attorneys' fees should not exceed 10 percent

 6   of the common fund."  Do you see that?

 7        A.   Common fund.  Common fund.  Yes.

 8        Q.   So is it your position that attorneys' fees

 9   should not exceed 10 percent of the fund?

10        A.   Yes, sir.

11        Q.   And have you actually -- you haven't actually

12   reviewed the settlement, have you?

13        A.   No, sir.

14        Q.   So if I told you that attorneys' fees, common

15   benefit fees were actually capped at 15 percent, would

16   that make a difference to you in terms of filing this

17   objection?

18        A.   At this time I don't know.  I would have to

19   check with counsel on that.

20        Q.   What's your opinion?

21        A.   What's that?

22        Q.   What's your opinion?  Do you think 15 percent

23   common benefit fees is reasonable?

24        A.   Depends on the amount, the total amount.

25        Q.   Total amount of what?
```

```
 1       A.   Of the funds.

 2       Q.   And would you agree with me there's not much of

 3  a difference between ten and 15 percent?

 4       A.   Well, there is a big difference.  Depends on

 5  what you're talking about.

 6       Q.   But certainly you allege that it was a 32

 7  percent common benefit fee before, correct?

 8       A.   That's what it says here.

 9       Q.   Okay.  So you'd agree at least that 15 percent

10  is much closer to ten percent than 32?

11       A.   Yeah, it would be half the cost, yeah.

12       Q.   And what's your understanding of how much --

13  you know, what the value of -- the total value of the

14  settlement is?

15       A.   Total value depends on what is the total value.

16       Q.   I'm asking you.  What's your understanding of

17  how much the settlement is for?

18       A.   Like I said, I don't know.

19       Q.   So it could be $5 million?  You don't know?

20       A.   It could be 5 million.

21       Q.   If I told you it was 82 million, would that

22  ring a bell in any way for you?

23       A.   I'm trying to figure if it's 80 million at 32

24  percent, that's a lot.  So, you know, you figure, you

25  know, 2 percent of 80 -- what was it, 80 something
```

Confidential - Subject to Further Confidentiality Review

```
 1   million?

 2        Q.   82 million.

 3        A.   Two percent would be good, too, or 5 percent.

 4        Q.   So you're objecting to basically the attorneys'

 5   fees and that's it, correct, with this settlement?

 6        A.   I would think so.

 7        Q.   Okay.  If what you just told me is, in fact,

 8   correct, then the rest of this objection here that's

 9   been filed by counsel that talks about class definition,

10   et cetera, that does not -- that doesn't reflect what

11   you yourself, your actual objection to this settlement

12   is; is that correct?

13        A.   Now, what was the class definition again?

14        Q.   I didn't tell you the class definition.  You

15   don't know the class definition from what I appreciate

16   from your earlier testimony.

17             So what I'm trying to gather is from what

18   you're telling me, your only objection to this

19   settlement is the fees; is that right?

20        A.   That's what we were talking about.

21        Q.   So far as your counsel has raised other

22   issues, you know, procedures, policies, class

23   definition, those sort of things, that's not why you're

24   here today?  That's not why you're objecting to the

25   settlement; is that fair to say?
```

```
 1        A.   Well, the reason I'm here is just to -- you
 2   know, I installed this product and they're saying
 3   they're going to award somebody 32 percent.
 4        Q.   So you're here because of the 32 percent, in
 5   your opinion, and not because of --
 6        A.   Well --
 7        Q.   -- class definition, for instance?
 8        A.   Like I said, I don't know what the class
 9   definition, but I want to know -- see what the other
10   customers or the other clients are going to get other
11   than --
12        Q.   I think you're agreeing with me.
13        A.   Okay.
14        Q.   Are you?  Is that a yes?  Do you agree with me?
15        A.   What's that?  About?
16        Q.   You're objecting to fees?  You're not here
17   because of the class definition?
18        A.   Well, like I said, I'm here to make sure
19   everything is legally, you know, in the -- that the
20   clients are going to get their fair share, you know.
21        Q.   And by that, you mean you're concerned about
22   this -- what you consider to be a 32 percent fee
23   provision, correct?
24        A.   Yes.  Yes, sir.
25        Q.   Okay.  Do you know what class counsel or common
```

Confidential - Subject to Further Confidentiality Review

```
 1   benefit counsel is?

 2        A.   Where is that at?

 3        Q.   I'm just asking, have you ever heard the term

 4   "common benefit counsel"?

 5        A.   No.  I'm not an attorney.  What was that again?

 6   Common what?

 7        Q.   Common benefit counsel.  It's not in this

 8   document, that I know of.

 9             So you don't know what that term means?

10        A.   No.

11        Q.   So I take it you don't appreciate the

12   difference between common benefit counsel and

13   individually retained counsel?

14        A.   It says -- it's unclear.  Common benefit fees.

15   I don't know.

16        Q.   You don't know?

17        A.   No.

18        Q.   And also is it your understanding that Judge

19   Fallon, who is presiding over this MDL litigation, must

20   approve any sort of fees that are ultimately paid to

21   common benefit counsel?

22        A.   I don't know who the judge is.

23        Q.   If I represent to you that Judge Fallon is

24   overseeing MDL 2047 and would ultimately approve any

25   sort of fees that went to common benefit counsel, would
```

1    that change your basis of your objection in any way?

2         A.   It could.

3         Q.   Okay.  So in other words, the settlement has

4    not been approved by the court yet, so 15 percent, 32

5    percent, whatever you think it is, the fee amount, is

6    not etched in stone.  The court must approve it.

7              So does that change your basis for objecting at

8    all?  In other words, it's oversight here by a federal

9    judge who will ultimately decide how much in fees should

10   be awarded to common benefit counsel.

11        A.   Okay.

12        Q.   I mean, don't you think that's adequate

13   safeguards when we're dealing with the difference

14   between 10 percent, which you think is adequate, as

15   opposed to 15 percent, which is in the settlement

16   agreement?

17        A.   Is that in the settlement agreement?  I don't

18   know.

19        Q.   I'll represent to you it is, that common

20   benefit fees are capped at 15 percent.

21        A.   Okay.

22        Q.   So if the settlement agreement caps fees,

23   common benefit fees at 15 percent and you think they

24   should be 10 percent, don't you think that having Judge

25   Fallon in place to approve the fees adequately

Confidential – Subject to Further Confidentiality Review

```
 1    safeguards your concerns about the amount of attorney

 2    fees in this case?

 3         A.   It could be.

 4         Q.   And do you have any sense or knowledge about

 5    the actual efforts that it took class counsel to

 6    negotiate the settlement?

 7         A.   No, sir.

 8         Q.   Time and effort, you have no sense of that?

 9    And if I told you this litigation has been going on

10    since 2009, would that change your opinion about how

11    much compensation class counsel might be entitled to?

12         A.   2009, huh?

13         Q.   What's that?

14         A.   You said 2009?

15         Q.   Yes.

16         A.   Okay.

17         Q.   Would that change your opinion at all about 10

18    percent versus 15 percent?

19         A.   I'd have to get with counsel on that and see

20    what they say.

21         Q.   So you have no opinion yourself --

22         A.   No, sir.

23         Q.   -- as you sit here today?  And do you have any

24    sense of how expensive it is to litigate this case?

25         A.   No, sir.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Are you familiar with the Hague Service

 2   requirements?

 3        A.    No.

 4        Q.    And if I told you that it sometimes costs us

 5   over $100,000 to prepare and serve a complaint in China,

 6   would that shock you?

 7        A.    No, sir.

 8        Q.    You think that's a small chunk of change,

 9   $100,000 to file and serve a complaint?

10        A.    That's a lot.  That's a lot of change.

11        Q.    So you'd agree you have no real sense of, you

12   know, the cost or the scope of this litigation, correct?

13        A.    No, sir.

14        Q.    And actually, I'm going to have you turn a few

15   pages to what's actually Exhibit C to this objection,

16   which is actually your affidavit.

17        A.    What exhibit is that?

18        Q.    It's Exhibit C to this objection.

19        A.    Okay.

20        Q.    And is that your signature down there in the

21   bottom?

22        A.    Yes, sir.

23        Q.    And this is also dated September 28, 2012,

24   correct?

25        A.    Yes, sir.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  If you look at the third paragraph of

 2   this document, which starts with "I am a member of the

 3   class," do you see that paragraph?

 4        A.   Yes, sir.

 5        Q.   If you look at the final sentence, it says

 6   you're not within the exclusions in the class

 7   definition.  What is your appreciation of what those

 8   exclusions are?

 9             MR. HUSEMAN:  Incidentally, Mr. Garcia, I

10   don't want you repeating anything Mr. Bandas told you in

11   your discussions with him in your answer, so exclude

12   that from any answer, please.

13        Q.   (By Mr. Gaughan)  Can you identify any of the

14   exclusions for me?

15        A.   No, sir.

16        Q.   Not one?

17        A.   I don't know what the exclusions are right now.

18        Q.   And if you look to that next paragraph, it

19   says, "Either I personally or through Bay Area

20   Contracting & Construction, Inc. (a company I own)

21   purchased, installed, and used thousands and thousands

22   of sheets of drywall over the last 15 plus years.  Over

23   the years, I...purchased drywall from Lowe's,

24   Home Depot, Builder's Square (now out of business),

25   McCoy's, and a variety of other building supply
```

Confidential – Subject to Further Confidentiality Review

1    companies."  Do you see that?

2        A.    Yes, sir.

3        Q.    Can you give me any sense of where you actually

4    purchased the bulk of your drywall?

5        A.    The bulk?

6        Q.    Yes.

7        A.    That would probably be like Building

8    Specialties and L&W or something like that.  That's part

9    of Building Specialties.  And McCoy's.

10       Q.    Okay.  And I guess what percentage of drywall

11   would you say you purchased from those?  Was that three

12   entities you just identified?  Could you give me a

13   ballpark number there?

14       A.    At least 50 percent.

15       Q.    From those three?

16       A.    (Witness moves his head up and down.)

17       Q.    And then you've identified a couple of others

18   here, including Lowe's and Home Depots.  What percentage

19   of drywall would you buy from Lowe's and Home Depot?

20       A.    The other percentage.

21       Q.    Okay.  And would you say that's approximately

22   half between Lowe's and half between -- or is there some

23   other way you would break it down?

24       A.    Well, I mean, it's -- like I said, it could

25   be -- I don't know.  It varies.  Like when we do

Confidential - Subject to Further Confidentiality Review

```
 1    projects out of -- out of Corpus we'd pick them up, you

 2    know, in Home Depot or Lowe's or, you know, Building

 3    Specialties out in that area or what was ever, you know,

 4    say in the area where we're working at.

 5         Q.   Let's throw a number out there.  So you said --

 6    you estimated that you bought between 50 percent of your

 7    dry -- about 50 percent of your drywall either at Lowe's

 8    or Home Depot.  Would you say that you bought --

 9         A.   Maybe 20 and 20 or 10 and 10.

10         Q.   Somewhere around that neighborhood?  Okay.

11    Now, are you aware that your counsel has represented I

12    think one of his -- either his secretary or one of his

13    officer workers in pursuing an objection to a settlement

14    that involved Lowe's Home Centers?

15         A.   No.

16         Q.   Okay.  That's never been brought to your

17    attention in any way?

18         A.   No, sir.

19         Q.   And you yourself, you didn't object to this

20    settlement involving Lowe's, did you?

21         A.   Is this about Lowe's?

22         Q.   This is not about Lowe's, no, sir.

23              So apart from this objection, you didn't --

24    you're not aware of doing any other objection to another

25    drywall settlement, are you?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, sir.

 2        Q.    Okay.  And are you aware that under the

 3   terms of the Lowe's settlement, which has been finally

 4   approved by a court in Muscogee County, Georgia, that

 5   your claims against Lowe's are barred?  Are you aware

 6   of that fact?

 7        A.    No, sir.

 8        Q.    And can you tell me whether any of these

 9   entities that you've identified in paragraph 4 are what

10   we referred to earlier as participating defendants?

11        A.    I don't know.

12        Q.    And if I told you that Home Depot is the only

13   entity here that's actually a participating defendant in

14   this settlement, would that refresh your memory one way

15   or the other?

16        A.    No, sir.

17        Q.    Okay.  And I'll represent to you that Home

18   Depot is -- excuse me -- Home Depot is, in fact, a

19   participating defendant in this settlement, okay?

20              And we've had some discussions with counsel for

21   Home Depot, and one thing that they represented to us is

22   that they never purchased any drywall from a Chinese

23   company and they never, to their knowledge, distributed

24   any Chinese drywall.  Do you have any reason to disagree

25   with those assertions by Home Depot?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't know.  No, I don't have no --

 2        Q.    And as you sit here today, you have no memory

 3   of standing in a Home Depot store and actually

 4   purchasing drywall, do you?

 5        A.    No memory in purchasing drywall?

 6        Q.    Do you remember actually sitting in a Home

 7   Depot and buying Chinese drywall?

 8        A.    I don't -- I mean, I bought drywall.

 9        Q.    But you can't --

10        A.    But I don't know, you know, from where or

11   from -- you're saying if I sat in a Home Depot and

12   purchased Chinese drywall?

13        Q.    I'm saying you testified earlier that you

14   recall seeing Made in China and other markings on --

15        A.    But not -- I didn't say where I got it.  I

16   don't know where.

17        Q.    But I'm asking you:  Do you remember, have a

18   specific memory of actually standing in a Home Depot

19   store and seeing those markings?

20        A.    No, I don't think -- I don't recall.

21        Q.    So you really have no idea whether you bought

22   Chinese drywall from Home Depot, do you?

23        A.    I don't -- like you said, you know, you're

24   saying that they didn't purchase Chinese drywall.

25        Q.    And are you aware of the fact that no homeowner
```

1    in the State of Texas has initiated a lawsuit against

2    Home Depot for the purchase of defective Chinese

3    drywall?

4         A.   Like I said, I'm not aware of it, but like I

5    said, I heard, you know, that there was a complaint

6    about it.  That we went and did some remediation on it

7    and that's how I heard about it, too, what the customers

8    were saying about that.  But it went in one ear and went

9    out the other, you know, until this came up.

10        Q.   And that wasn't about Home Depot, was it?

11        A.   No, not that I recall.

12        Q.   And so you have no basis to refute Home Depot's

13   counsel's representation that Home Depot never

14   distributed or sold Chinese drywall?

15        A.   I mean, I'm not an attorney.  So what are you

16   trying to say?  Can you explain that a little bit

17   better?

18        Q.   Sure.  What I'm trying to ask you is:  You have

19   no personal knowledge that would in any way call into

20   question Home Depot's counsel's representation that Home

21   Depot never sold Chinese drywall?

22        A.   I don't know.  I can't tell you.

23        Q.   You can't -- you have nothing to -- nothing

24   there?

25        A.   No.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.

 2        A.   I don't know if they did or not.  Like I said,

 3   I just purchased drywall.

 4        Q.   Okay.  And do you also own a company called

 5   Corsand General Contractors, LLC?

 6        A.   No.

 7        Q.   And I didn't bring it with me today, but we did

 8   do some research, and it appears actually that you own

 9   the company.  It's got the same property address as your

10   home address.

11        A.   What's it called?

12        Q.   Corsand General Contractors, LLC.  C-o-r --

13        A.   Corsand?

14        Q.   Yeah.

15        A.   Oh, that's -- yeah, I've owned that.  Well,

16   it's not really existing.

17        Q.   What do you mean by that?

18        A.   We just -- we opened it and we shut it down.

19        Q.   Did it ever do any business?

20        A.   Yes, sir.

21        Q.   It did?

22        A.   Yes, sir.

23        Q.   During the time period 2006 through present,

24   did it do any business?

25        A.   2006, we built a couple of houses.
```

```
1        Q.   Well, I mean, you hired Mr. Bandas, so I'm

2   trying to figure out -- you hired him, I'm assuming, to

3   pursue an objection, right?

4        A.   You're saying future lawsuits.  Future lawsuits

5   against?

6        Q.   Well, you haven't filed a lawsuit.

7        A.   I know, but you're saying if I'm going to be

8   filing a future lawsuit against somebody.  I don't know.

9        Q.   Yeah, that's what I'm trying --

10       A.   I don't know who's that somebody yet.

11       Q.   Well, we went through your response to

12   interrogatories where it was talking about your -- you

13   had some sort of fear of future injuries.

14       A.   Oh, okay.

15       Q.   I guess do you intend to file a lawsuit against

16   Home Depot or any other entity in connection with that

17   fear of future injury?

18       A.   I don't know what the correct answer would be

19   on that.  I don't know at this time.

20       Q.   Okay.  So would it be fair to say that you

21   don't currently intend to file a lawsuit?

22       A.   Yes, sir.

23       Q.   If you turn to section 3.2 and just read

24   through that for me real quick.  And that's at the

25   bottom, starting at the bottom of page 1 of this
```

```
 1    agreement.

 2         A.    Okay.

 3         Q.    Now, this section is talking about a possible

 4    incentive award to you of $5,000, correct?

 5         A.    That's what it's saying.

 6         Q.    Now, I want to go back to the time when you

 7    first talked to Bert Chapa.  Was this something that

 8    Mr. Chapa told you about, that you might get a possible

 9    incentive award --

10         A.    No.

11         Q.    -- if you pursued an objection with Mr. Bandas?

12         A.    He didn't say that.

13         Q.    Is this something that you thought you might

14    get when you first filed this objection?  That you

15    might -- hey, if I pursue this objection, I might get

16    $5,000?

17         A.    No, sir.

18         Q.    When did you first become aware of this

19    provision?

20         A.    Right now.  I didn't read -- I didn't read

21    through -- I didn't read through this.

22         Q.    What are you hoping to get out of this

23    objection?

24         A.    What's that?

25         Q.    What are you hoping to get out of this
```

```
 1    objection that you're pursuing?

 2        A.   I hope it's a fair settlement with all the

 3    people in this case.

 4        Q.   Are you expecting to get any sort of money out

 5    of it yourself?

 6        A.   No, sir.

 7        Q.   You have no idea what you'd actually want --

 8    you yourself would actually want other than to see

 9    attorneys make less money?

10        A.   That's true.

11        Q.   So there's nothing other than the attorney fee

12    provision that you actually have an objection to in this

13    settlement; is that right?

14        A.   On this settlement?

15        Q.   Yeah.  You're objecting to a settlement, right?

16        A.   Yes, sir.  It's the attorneys' fees.

17        Q.   You're not hoping to get anything other than to

18    see attorneys make less money?

19        A.   What's that?

20        Q.   I'm trying to figure out why you're objecting

21    to the settlement.  What are you trying to get out of

22    this?  You don't expect to receive any --

23        A.   Well, I just want to make sure I'm not caught

24    in the middle if somebody else comes up and says, you

25    know, you used Chinese drywall in my business up here in
```

1    Houston or Dallas.  At least I'll be waived at that part

2    of it.

3        Q.   So you're just really -- from what I gather

4    from what you just said, you want to get some sort of

5    release?

6        A.   Yes, sir.

7        Q.   You're not hoping to get any sort of benefit

8    under the settlement?

9        A.   No, sir.

10       Q.   Could I have you turn to paragraph 4.  And

11   actually, it looks like there's 4.4 and 4.5 and

12   underneath that we see 4.  It must have been some sort

13   of mix-up of the numbering here.  But do you see where

14   it says "conflicts of interests"?

15       A.   Conflict of interests, okay.  Attorneys have

16   explained to you...

17       Q.   Yeah, please read through that and then let me

18   know when you're finished.

19       A.   Okay.

20       Q.   Do you understand this provision at all?  Let

21   me just start there.

22       A.   Yes and no.

23       Q.   Okay.  I'm just going to have you focus on a

24   little bit of that first sentence there.  And I'll try

25   to break it down so it will be a little bit more

Confidential - Subject to Further Confidentiality Review

```
 1

 2                    CERTIFICATE

 3

 4

 5          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7

            It was requested before
 8   completion of the deposition that the
     witness, RONNIE GARCIA have the
 9   opportunity to read and sign the
     deposition transcript.
10

11

            _____
12          SYLVIA KERR, Texas CSR #4776
            Certified Reporter
13          Notary Public
            Dated:  November 5, 2012
14

15

16          (The foregoing certification
17   of this transcript does not apply to any
18   reproduction of the same by any means,
19   unless under the direct control and/or
20   supervision of the certifying reporter.)
21

22

23

24

25
```

# EXHIBIT N

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Corpus Christi)
## CIVIL DOCKET FOR CASE #: 2:12-mc-00573

Vitela v. Steckler                                    Date Filed: 11/23/2012
Assigned to: Judge Nelva Gonzales Ramos

**Plaintiff**

**Ernest Vitela**                 represented by   **Anthony Field Constant**
                                                   Constant Law Firm
                                                   800 N. Shoreline Blvd.
                                                   Suite 2700 South Tower
                                                   Corpus Christi, TX 78401
                                                   361-698-8000
                                                   Fax: 361-887-8010
                                                   Email: office@constantlawfirm.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Christopher Andres Bandas**
                                                   Bandas Law Firm PC
                                                   500 N Shoreline Blvd
                                                   Ste 1020
                                                   Corpus Christi, TX 78471
                                                   361-698-5200
                                                   Fax: 361-698-5222
                                                   Email: cbandas@bandaslawfirm.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bruce W. Steckler**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/23/2012 | 1 | Motion to Quash Deposition Notice/Other Miscellaneous Relief ( Filing fee $ 46 receipt number 0541-10634630.) filed by Ernest Vitela. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order)(Bandas, Christopher) (Entered: 11/23/2012) |
| 11/25/2012 | 2 | RESPONSE *in Opposition to Motion to Quash*, filed by Bruce W. Steckler. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Steckler, Bruce) (Entered: 11/25/2012) |
| 11/26/2012 | 3 | |

| | | |
|---|---|---|
| | | REPLY *in Support of Motion to Quash or Modify Subpoena*, filed by Ernest Vitela. (Attachments: # 1 Exhibit Exhibit A)(Bandas, Christopher) (Entered: 11/26/2012) |
| 11/26/2012 | 4 | NOTICE of Appearance by Anthony F. Constant on behalf of Ernest Vitela, filed. (Constant, Anthony) (Entered: 11/26/2012) |
| 11/26/2012 | | Minute Entry for proceedings held before Judge Nelva Gonzales Ramos. MOTION HEARING held on 11/26/2012. Aruguments heard re: 1 Motion to Quash Depositions. Court allows deposition to go forward on the three areas previously indentified by MDL Judge. Court limits deposition to 2 hours. Appearances:Bruce Steckler, Leonard Davis, Fred Longer, Arnold Levin. Christopher Andres Bandas, Anthony Field Constant.(Digital # 1:02-1:27) (ERO:G. Rogan), filed.(bcortez, ) (Entered: 11/26/2012) |
| 11/28/2012 | 5 | AO 435 TRANSCRIPT ORDER FORM by Bruce W Steckler. This is to order a transcript of Motion Hearing held on 11/26/2012 before Judge Nelva Gonzales Ramos (Original). Court Reporter/Transcriber: Exceptional Reporting Services, filed. (brngarcia, ) (Entered: 11/28/2012) |
| 11/29/2012 | 6 | TRANSCRIPT re: TELEPHONE CONFERENCE held on 11-26-12 before Judge Nelva Gonzales Ramos. Court Reporter/Transcriber EXCEPTIONAL REPORTING. Release of Transcript Restriction set for 2/27/2013., filed. (esaenz, ) (Entered: 11/29/2012) |
| 11/30/2012 | 7 | Notice of Filing of Official Transcript as to 6 Transcript. Party notified, filed. (vrios, ) (Entered: 11/30/2012) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/12/2014 11:08:28 | | | |
| PACER Login: | lf0044 | Client Code: | cdw |
| Description: | Docket Report | Search Criteria: | 2:12-mc-00573 |
| Billable Pages: | 2 | Cost: | 0.20 |

# EXHIBIT O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


ERNEST VITELA,                )      CASE NO:  2:12-MC-573
                             )
             Plaintiff,      )          CIVIL
                             )
     vs.                     )    Corpus Christi, Texas
                             )
BRUCE W. STECKLER,           )  Monday, November 26, 2012
                             )
             Defendant.      )    (1:02 p.m. to 1:27 p.m.)


TELEPHONE CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:              See next page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

<u>APPEARANCES FOR</u>:


Plaintiff:                          CHRISTOPHER A. BANDAS, ESQ.
                                    Bandas Law Firm
                                    500 N. Shoreline Blvd., Suite 1020
                                    Corpus Christi, TX 78471

                                    ANTHONY F. CONSTANT, ESQ.
                                    Constant Law Firm
                                    800 N. Shoreline Blvd.
                                    Suite 2700 South Tower
                                    Corpus Christi, TX 78401


Defendant:                          BRUCE W. STECKLER, PRO SE

Also present:                       Fred Longer
                                    Arnold Levin
                                    Leonard Davis

3

1        **Corpus Christi, Texas; Monday, November 26, 2012; 1:02 p.m.**

2                              **(Call to Order)**

3              THE COURT:  Good afternoon.  Court calls Cause Number

4    2:12MC573, in re Chinese-Manufactured Products liability

5    litigation.  Do you all want to announce for the record?

6              MR. CONSTANT:  Your Honor, this is Anthony Constant.

7    I represent Ernest Vitela.

8              MR. BANDAS:  Your Honor, this is Chris Bandas, and

9    I'm also counsel for Ernest Vitela.

10             MR. STECKLER:  I'm a member of the Plaintiff's of the

11   hearing today.

12             THE COURT:  I can barely hear you.

13             MR. STECKLER:  I apologize.  I'm a member of the

14   Chinese-Manufactured Drywall MDL 2047, and on the phone with me

15   is Arnold Levin, Fred Longer of lead counsel, and Leonard Davis

16   with liaison counsel's office.

17             THE COURT:  Okay.  And your name again was?

18             MR. STECKLER:  It's Bruce Steckler.

19             THE COURT:  Okay.  So is that all the people who are

20   on the line then?  It appears --

21             MR. CONSTANT:  We believe so, your Honor.

22             MR. STECKLER:  Yes.

23             THE COURT:  Okay.  So then what's before the Court is

24   a Motion to Quash.  Who's going to take the lead, Mr. Constant

25   or Mr. Bandas?

4

1          **MR. CONSTANT:**  Mr. Constant, your Honor, if I may.

2          **THE COURT:**  You can proceed.

3          **MR. CONSTANT:**  Thank you, your Honor.

4          Your Honor, Mr. Vitela is no longer an objector in

5  the case and has withdrawn his objection, and Judge Fallon has

6  recognized that he has withdrawn.  And that information is set

7  out in Pages 5 and 6 of response by class counsel in opposition

8  to the Motion to Quash.

9          Mr. Ernest Vitela is a one-man-band construction

10  company.  He has a construction company but he's it, and he has

11  to work at it every day.  And in construction, you have to be

12  there to make sure things go right.  If you're not, they don't

13  go right.  He is very concerned about having any more of his

14  time taken by having to appear for a deposition, having to

15  prepare for the deposition in a case in which he has no

16  interest and has given up his objection.

17          Judge Fallon has previously set out the scope of

18  discovery to be three items with regard to objectors, and Mr.

19  Vitela is no longer an objector.  But assuming that that's the

20  scope still, even though he's not an objector, it was the

21  alleged standing of Mr. Vitela to object.  That's no longer in

22  the case because he has withdrawn it.

23          Number two was the underlying basis for the

24  objections.  Again, since he's withdrawn his objections, he has

25  none, and that's not relevant to anything in this case.  And

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 46 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 5 of 18

5

1  the third was the objector's relationship with the professional

2  objector counsel, mainly Mr. Bandas, who is the counsel for the

3  objectors, although no longer counsel for Mr. Vitela with

4  regard to the objection since he doesn't have one.  And I just

5  say that because that's what Judge Fallon said.  And it goes on

6  to say that the Plaintiffs believe instigated this objection to

7  the settlement.

8        So the only thing remaining is whether or not the

9  class counsel could have an opportunity to spend time with Mr.

10 Vitela attempting to produce evidence against Mr. Bandas.  None

11 of that has anything to do with the question of the -- whether

12 the settlement should or shouldn't be approved.  It has to do

13 with class counsel's desire to punish Mr. Bandas.  According to

14 class counsel, they have already -- and the information, again,

15 your Honor, that I was just repeating is from their own

16 response in opposition to Motion to Quash, which is on Pages 5

17 and 6 in which they quote Judge Fallon.  But these class

18 counsel say on Page 5 that they've already taken the deposition

19 of two individuals who were objectors represented by Mr. Bandas

20 and discovered that Mr. Bandas had solicited those persons

21 without standing to object to the global settlement and that

22 the solicitation was boosted by proposing in his retainer

23 agreement a $5,000 bounty as incentive to encourage them.

24 Well, if that is true, that certainly is sanctionable conduct

25 not normally in this Court but by the State Bar of Texas, and

6

1    they have already thus produced and gotten the evidence that

2    they would need in order to punish Mr. Bandas.

3            And so what we have before us I think, your Honor, is

4    balancing whether they ought to be given the opportunity to

5    produce that same evidence, which would be simply cumulative,

6    from Mr. Ernest Vitela, assuming that they are going to get

7    such testimony, balancing that against allowing Ernest Vitela

8    to go about his business, continue to earn a living and spend

9    his time doing something productive rather than sitting for

10   this.  A reason to balance it in favor of Ernest and against

11   class counsel is that they've already gotten what they need

12   against Mr. Bandas.  Their object is Mr. Bandas not Ernest

13   Vitela.

14           And when they took the other depositions after the

15   quotes from Judge Fallon back on November 5th, they took the

16   opportunity both with regard to Sal Soto (phonetic) and Roy

17   Garcia to threaten them with taking them before the Judge in

18   New Orleans and asking them whether they're willing to drop

19   their objections in light of class counsel's threat of

20   sanctions against them and those kinds of things, which were

21   quite abusive and which Mr. Soto and Mr. Garcia have filed

22   Motions for Sanctions in front of Judge Fallon against class

23   counsel for that kind of abuse at the deposition.

24           So, your Honor, I would ask the Court to grant our

25   motion so that Mr. Vitela can go along with his business.  And

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 48 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 7 of 18

7

1    the class counsel has already gotten what they need, and

2    there's no need to allow them to attempt to attack Mr. Bandas

3    further through his former client.

4              Thank you, your Honor.  That's all.

5              THE COURT:  All right.  Mr. Steckler?

6         MR. STECKLER:  Yes.

7         MR. LONGER:  Your Honor, if I may, this is Fred

8    Longer.  I would like to argue this motion on behalf of the

9    class counsel.

10             THE COURT:  Okay.  Go ahead.

11        MR. LONGER:  Your Honor, again, it's Fred Longer.  My

12   partner, Arnold Levin, is lead counsel in MDL 2047 on behalf of

13   the Plaintiffs in front of Judge Fallon.

14             We have before Judge Fallon five interrelated class

15   action settlements.  One of the settlements we refer to as the

16   global settlement.  It involves builders, installers, suppliers

17   and their insurers, and it only applies to those participating

18   Defendants in the settlement.  There are other builders,

19   suppliers and sellers who are not participating Defendants and

20   they are not in the class.

21             What -- when we filed the Motion for Preliminary

22   Approval, Judge Fallon granted that and notice went out to the

23   class.  And the opt-out period and objection period for that

24   class action expired on September 28th of this year.  On that

25   date, we learned, and it's in Mr. Vitela's discovery, answers

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 49 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 8 of 18

8

1  to interrogatories, he retained Mr. Bandas on the very last day

2  of the objection and opt-out period, and objections to the

3  class action were filed in only the global class action

4  settlement.

5         We as class counsel were aware of Mr. Bandas by

6  reputation.  Many Courts, and we've cited to a number of them

7  in our response, have found him to be a professional and serial

8  objector to class actions.  And in fact, Judge Fallon has noted

9  and referenced to Mr. Bandas as a professional objector

10  counsel.

11        We sought to take the deposition of Mr. Bandas'

12  clients, who he objected to the settlement.  One of his clients

13  is his office manager, Jan Petrice (phonetic).  And we have

14  been attempting to depose Ms. Petrice, but she has been outside

15  of our ability to obtain a subpoena on her so she has not been

16  deposed as of yet.  But the -- Mrs. Petrice is also one of Mr.

17  Bandas' go-to clients, and she was an objector in an earlier

18  Chinese Drywall settlement involving Lowe's Home Centers.

19  Lowe's Home Centers we understand settled with Ms. Petrice and

20  Mr. Bandas for an undisclosed amount in a confidential

21  settlement to withdraw her objection, and we understand that

22  they, Mr. Bandas and she, have been paid off.  We would like to

23  take discovery of that information because we believe that it

24  is improper and should have been disclosed in this litigation

25  in front of Judge Fallon.

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 50 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 9 of 18

9

1          Mr. Bandas has also presented three other clients.

2     One of them is Mr. Vitela, who I will get to.  The other two

3     are Mr. Soto and Mr. Garcia.  They, too, are builders in the

4     Corpus Christi area, and we were able to obtain their

5     discovery, their depositions I believe on November 8th and --

6     I'm sorry, October 31 and then November 1st.  And there were a

7     number of discovery disputes that occurred during that -- those

8     depositions, and we were asking Judge Fallon to rule on the

9     scope of that discovery.  And the matter came up in advance of

10    the deposition.  Mr. Bandas or his counsel was present.  And

11    the Court ruled, as Mr. Constant said, as to the scope of

12    discovery being related to the nature of the clients'

13    objection, their relationship with their counsel and what their

14    objections were.

15         The depositions went forward after that, and there

16    were again discovery disputes during those depositions when we

17    were inquiring.  And in fact, I was one of the counsel present

18    for Mr. Soto's deposition and Mr. Garcia's deposition early on.

19    And we were asking questions about their relationship with Mr.

20    Bandas when instructions not to answer occurred, and we agreed

21    to disagree.  And the matter was again presented to Judge

22    Fallon, and he heard these matters on November 5.

23         At that time, Mr. Bandas knew that we were also

24    trying to obtain the deposition of Ms. Petrice and Mr. Vitela,

25    and he argued to Judge Fallon that those depositions should not

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 51 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 10 of 18

10

1    be permitted to go forward.  And the Court ruled, and I've

2    provided your Honor in the transcript, which is I believe

3    Exhibit B to the papers that we've submitted and they are

4    quoted on Page 6 of our papers.  And I'm going to read to your

5    Honor what Judge Fallon stated at that time.

6              "With regard to the two depositions of Petrice and

7              Vitela, those are the two people who had objected and

8              withdrew their objections?

9              "MR. BANDAS:  That is correct, your Honor.

10             "THE COURT:  All right.  With regard to those

11             individuals, it's not appropriate to serve them

12             through counsel because he's no longer their counsel.

13             However, they may have some relevant information.  I

14             really don't know at this point.  It may not be

15             admissible but it may be relevant.  So if it's valid

16             service, I expect those people to show up."

17             But -- and then I -- there's an ellipse.

18             "But they should and must appear at depositions that

19             they have received valid service in."

20             Your Honor, contrary to what Mr. Constant mentioned

21   to your Honor, Mr. Vitela filed a Motion to Withdraw his

22   objection as well as his alias company, E&E Construction

23   Company, but Judge Fallon has not granted that motion.  He has

24   granted other motions of other objectors, but he has not

25   granted the motion of either Ms. Petrice or Mr. Vitela and his

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 52 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 11 of 18

11

1  company to withdraw their objections.  And what he has stated

2  and I just read to your Honor is that they may have admissible

3  or they may have relevant information and he will decide

4  whether it's admissible or not.  And the Court, Judge Fallon,

5  has held up in the fairness hearing until December 11 now.  He

6  intends to reconvene the hearing on December 11 and has

7  permitted throughout that time period until that time period

8  for class counsel to put into the record relevant information.

9          We have sought to take Mr. Vitela's deposition.  We

10  have obtained valid service on him now as of November 19th.

11  And we are ready, willing and able to go forward.  We have a

12  court reporter and a videographer in Corpus Christi today.  Mr.

13  Davis, who is also on the telephone, a member of liaison

14  counsel, is in Corpus Christi.  He is ready to go forward

15  today.  And the matter is basically teed up.  Mr. Vitela had a

16  subpoena validly served on him.  We understand this motion has

17  been presented at the last minute, it was filed late on Friday,

18  but we are ready and able to go forward.

19          Judge Fallon has ruled, your Honor, that the matter

20  may be relevant and should go forward, and we ask your Honor to

21  accept Judge Fallon's ruling.  We think that there is a wealth

22  of information that Mr. Vitela can afford to provide in the

23  course of his deposition related to the several matters that

24  are well within the scope of the boundaries that Judge Fallon

25  has set, and we ask that your Court -- that the Court deny the

12

1   motion.   And if there's any questions, I'm willing to -- I'm

2   certainly here and ready to answer anything.

3            THE COURT:  All right.

4            MR. CONSTANT:  Your Honor --

5            THE COURT:  Mr. Constant?

6            MR. CONSTANT:  May I respond?

7            THE COURT:  Yes.

8            MR. CONSTANT:  Your Honor, with regard to whether or

9   not Mr. Vitela is still objecting or is an objector, on Page 6

10  of class counsel's response they quote the Court in which the

11  Court asks Mr. Bandas, "With regard to the deposition of

12  Petrice and Vitela, those are the two people who had objected

13  and withdrew their objections."  Mr. Bandas says, "That is

14  correct, your Honor."  The Court says, "All right.  With regard

15  to those individuals it's not appropriate to serve them through

16  counsel because he's no longer their counsel."

17           The only meaning of that statement could be is that

18  the Court had in fact understood they have withdrawn their

19  objections and the Court had accepted that.  Otherwise, they

20  would still have counsel.  So without -- the vital part of it

21  is that they have withdrawn their objection, they are no longer

22  making objections and therefore the issue about whether they

23  have standing or do not is not at all relevant.  What the basis

24  for the objections was is not at all relevant.  And what we're

25  left with is simply this attack on Mr. Bandas and attempting to

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 54 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 13 of 18

13

1   get information from his client against him, which they claimed

2   to have -- for the purpose of getting sanctions because it has

3   no purpose with regard to the settlement.  And they already

4   have that information, so they state to this Court on Page 5

5   from two witnesses.  And balancing their need to get that

6   versus the imposition upon Ernest and his ability to earn a

7   living, I would ask the Court to vote in favor of Ernest and

8   quash issue of motion -- issue an order quashing these

9   depositions.

10          Thank you, your Honor.

11          **THE COURT:**  All right.  Mr. Longer, do you want to

12  respond to that, that it appears the Court has already -- maybe

13  he hasn't signed off on the Motion to Withdraw the objection

14  but the representation by the Court that those individuals are

15  no longer represented by counsel is an indication that that's

16  in effect what the Court has done?

17          **MR. LONGER:**  Your Honor, I note what Judge Fallon was

18  referring to there and I can tell you again without any doubt

19  in my mind.  Judge Fallon has issued -- I filed a Motion to

20  Withdraw the objections of a number of objectors that in the

21  course of the notice period filed objections and then sought to

22  have them withdrawn, and I filed a motion to have them

23  withdrawn.  The Court issued an order granting that motion.

24          Mrs. Petrice, Mr. Vitela and E&E Construction

25  Company, Mr. Vitela's company, have filed motions to withdraw

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 55 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 14 of 18

14

1   their objections.  No such order has issued by Judge Fallon.

2   He is very meticulous as to his records, and he has not granted

3   that motion.  He has in fact ordered that these depositions go

4   forward because -- well, because he is concerned under Rule

5   23(e) that there are no shenanigans going on here.  And there

6   we believe and we are establishing a record, and in fact,

7   another motion that is outstanding is our Motion for Sanctions

8   against Mr. Bandas.

9        And the Court has allowed us to establish and develop

10  a record.  He has kept the fairness hearing record open, and we

11  are basically directed by Judge Fallon as we appreciate it to

12  develop that record.  And Mr. Vitela, who took the effort to

13  object to the settlement, must have known that he could have

14  been and probably would have been subject to a deposition.  He

15  should be ready, willing and able himself to do so.  The fact

16  that he has moved to withdraw his objection does not mean that

17  it was granted.  A Motion to Withdraw has to be granted, and

18  Judge Fallon did not enter an order.

19       And by the way, your Honor, there was an order that

20  followed the transcript that Mr. Constant just mentioned to

21  you, and that's also attached I believe as Exhibit C to our

22  papers.  And you will see that there is no such reference to

23  him granting the Motions to Withdraw the objections because he

24  has not done so.  It requires Court approval to withdraw

25  objections under Rule 23(e).  Judge Fallon has not done that.

15

1   Mr. Constant is mistaken as to the record in the MDL.  And if

2   there's any questions as to what the status of the MDL record

3   should be, perhaps they should be directed to Judge Fallon.

4   But we are quite sure, your Honor, that Judge Fallon has not

5   granted those motions and he has authorized us to take these

6   depositions in the very sections that Mr. Constant read from

7   the transcript, and they're in our papers.

8            THE COURT:  Okay.  Anything further, counsel?

9            MR. CONSTANT:  No, your Honor.

10           THE COURT:  All right.  Because the Motion to

11  Withdraw is still pending, I think the deposition should go

12  forward.  However, I think we need to get some or at least have

13  some discussion.  There are three areas where the Judge stated

14  those three areas would be relevant, and I'm assuming counsel,

15  Mr. Longer, you all looking to go outside those areas.

16           MR. LONGER:  No.  No, no, ma'am, not at all.

17           THE COURT:  And how much time were you looking at for

18  a deposition?

19           MR. LONGER:  These depositions -- the one I took of

20  Mr. Soto went I believe two-and-a-half hours.  I would think

21  two-and-a-half hours is really all that's necessary.  It might

22  be a little bit more.  It depends on obviously the -- how the

23  witness, you know, answers and responds to questions, but

24  certainly, no more than three hours.

25           THE COURT:  Mr. Constant?

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 57 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 16 of 18

16

1      **MR. CONSTANT:**  Your Honor, I would ask that it at

2  least be limited to the one issue of the relationship with

3  counsel since their status as objectors they have withdrawn,

4  and so the basis -- the reason for it and whether or not they

5  had standing is no longer relevant.  I'm especially concerned

6  about, number two, about trying to have Ernest explain the

7  class action objections.  Ernest is -- I just spoke to him this

8  morning, and he's a very simple gentleman and I have a lot of

9  difficulty.

10     **THE COURT:**  Okay.

11     **MR. CONSTANT:**  But they're not relevant.  I would ask

12  the Court to limit this deposition to the third item, which is

13  the relationship with Mr. Bandas.

14     **THE COURT:**  Okay.  Mr. Longer, the fact that they've

15  -- it hasn't been signed but it is on file, the Motion to

16  Withdraw, why would one and two be relevant?

17     **MR. LONGER:**  Well, the standing to object is

18  critical, your Honor, and Judge Fallon has recognized that.

19  For example, Ms. Petrice, Mr. Bandas' office manager, she was

20  presented to the Court as an objector, and she, as I mentioned

21  to you, also objected to the Lowe's Home Center settlement.

22  And as a result of withdrawing her objection after accepting

23  the payment for her and her counsel to withdraw their

24  objection, that settlement became final.  And as a result of

25  the Lowe's settlement becoming final, she has no right to

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 58 of 126
Case 2:12-mc-00573   Document 6   Filed in TXSD on 11/29/12   Page 17 of 18

17

```
 1   object to the global settlement in the MDL because there was no

 2   claim anymore.

 3            In addition, the fact that Lowe's was not even a

 4   participating in the -- Defendant in that litigation made her

 5   objection doubly wrong, and the fact that she had no standing

 6   to object is entirely relevant to the Motion for Sanctions that

 7   is before Judge Fallon.  We suspect that Mr. Vitela, like Mr.

 8   Garcia and Soto, had no standing to object, they were retained

 9   at the eleventh hour in this process on the very last --

10            THE COURT:  All right.  Hold on, sir.

11            MR. LONGER:  -- date of the --

12            THE COURT:  I need to move on because --

13            MR. LONGER:  -- period.

14            THE COURT:  Sir, I need to move on.  I've got another

15   hearing at 1:30.

16            Court is allowing the deposition to go forward, will

17   allow it to cover the three areas as stated by the Judge, and

18   Court will limit it to two hours.

19            Anything further, counsel?

20            MR. CONSTANT:  No, your Honor.

21            MR. LONGER:  Thank you, your Honor.

22            THE COURT:  All right.  Thank you.  You're excused.

23            MR. CONSTANT:  Thank you, your Honor.

24        (This proceeding was adjourned at 1:27 p.m.)

25
```

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    November 29, 2012
            Signed                                        Dated



                    *TONI HUDSON, TRANSCRIBER*



EXCEPTIONAL REPORTING SERVICES, INC

# EXHIBIT P

# CLASS ACTION PROFESSIONAL OBJECTORS: WHAT TO DO ABOUT THEM?

### John E. Lopatka[*]

### D. Brooks Smith[**]

## Abstract

*Professional objectors are attorneys who, on behalf of nonnamed class members, file specious objections to class action settlements and threaten to file frivolous appeals of district court approvals merely to extract a payoff. Their behavior amounts to a kind of lawful extortion. By contrast, counsel may submit legitimate objections and appeal in good faith, which is conduct that helps police the settlement process. The policy challenge is to suppress extortionate behavior without deterring beneficial conduct. The solutions that have been tried or proposed are flawed. We propose amendments to the Federal Rules of Appellate Procedure that would, in effect, require objectors to post appeal bonds in amounts greater than most circuit courts believe are now legally permissible.*

| | | |
|---|---|---|
| I. | Introduction | 865 |
| II. | Understanding Professional Objectors | 874 |
| III. | Methods of Suppressing Professional Objectors | 888 |
| | A. Prohibit Appeal | 890 |
| | B. Require Intervention | 894 |
| | C. Impose Sanctions | 896 |
| | D. Expedite Appeals | 901 |
| | E. Use Quick-Pay Provisions | 903 |
| | F. Adopt Inalienability Rule | 906 |
| IV. | Appeal Bonds as the Least Imperfect Approach | 908 |
| | A. Existing Practice | 909 |
| | B. Proposed Approach | 918 |
| | C. Rule Revisions | 927 |
| V. | Conclusion | 929 |

## I. Introduction

When the plaintiffs' lawyers and defense counsel agree to settle a federal class action, subject to approval of the district court, any member of the class may object.[1] If the district court approves the settlement the objector may appeal. Appeals take time, and time is money—class counsel and, often, nonobjecting class members incur costs during the pendency of the appeal because attorneys' fees typically are not payable and settlements are not implemented until the legal process has run its course. The prospect of financial loss

---

    *  A. Robert Noll Distinguished Professor of Law, Pennsylvania State University, Dickinson School of Law.
    **  Judge, United States Court of Appeals for the Third Circuit, and Adjunct Professor of Law, Pennsylvania State University, Dickinson School of Law. We thank Richard Posner and Robert Wood for valuable comments on earlier drafts of this Article.

    1.  Fed. R. Civ. P. 23(e)(1).

caused by delay in implementation of a class settlement has given rise to a cottage industry of so-called professional objectors: attorneys who oppose settlements on behalf of nonnamed class members and threaten to file meritless appeals of the final judgment merely to extract a payoff.[2] Class counsel have a strong incentive to pay them to withdraw their appeal and thereby avoid the cost of delay.[3] That payment represents a kind of tax on class action settlements.[4] In a

---

2.  *In re* Countrywide Fin. Corp. Customer Data Sec. Breach Litig., No. 3:08-MD-01998, 2010 WL 3328249, at *2 (W.D. Ky. Aug. 24, 2010); *see also In re* Cathode Ray Tube (CRT) Antitrust Litig., No. CV-07-5944-SC, 2012 WL 1319881, at *2 (N.D. Cal. Apr. 16, 2012) (describing as "a 'professional' or 'serial' objector" an attorney who "routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain"); *In re* Checking Account Overdraft Litig., No. 09-MD-2036-JLK, 2011 WL 5873389, at *24 n.30 (S.D. Fla. Nov. 22, 2011) (observing that the sole purpose of "professional objectors" is "to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto" and that they "are motivated by things other than a concern for the welfare of the Settlement Class"); Trombley v. Bank of Am. Corp., No. 08-cv-456-JD, 2011 WL 3740488, at *5 (D.R.I. Aug. 24, 2011) (characterizing "professional objectors" as those "who assert meritless objections in large class action settlement proceedings to extort fees or other payments"); *In re* Lawnmower Engine Horsepower Mktg. & Sales Practices Litig., No. MDL 08-1999, 2010 WL 4630846, at *1 (E.D. Wis. Nov. 2, 2010) (describing "professional objectors" as "attorneys who specialize in objecting to large class-action settlements"); Gemelas v. Dannon Co., No. 1:08 CV 236, 2010 WL 3703811, at *2 (N.D. Ohio Aug. 31, 2010) ("[Objector] appears to be making a business of objecting to, and appealing, class action settlements in order to obtain some financial reward."); Snell v. Allianz Life Ins. Co. of N. America, No. Civ. 97-2784 RLE, 2000 WL 1336640, at *9 (D. Minn. Sept. 8, 2000) (describing class counsel's characterization of "professional objectors" as "a pariah to the functionality of class action lawsuits, as they maraud proposed settlements—not to assess their merits on some principled basis—but in order to extort the parties, and particularly the settling defendants, into ransoming a settlement that could otherwise be undermined by a time-consuming appeals process"). One court equivalently characterized professional objectors as attorneys who "have a pattern or practice of objecting to class action settlements for the purpose of securing a settlement from class counsel." *In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010). Professional objectors on occasion may themselves be class members. *See, e.g., In re* Mut. Funds Inv. Litig., No. 04-md-15863, 2011 WL 1102999, at *1 n.1 (D. Md. Mar. 23, 2011) (noting that professional objector "has objected or represented objectors in at least six other class actions"). However, we are aware of no situation in which an attorney has engaged in the kind of repeat behavior that is characteristic of professional objectors without usually representing class members. The definition of professional objectors might be expanded to include attorneys who raise meritless objections to settlements in the district court merely to extort payoffs. *See, e.g.,* Vollmer v. Selden, 350 F.3d 656, 660 (7th Cir. 2003) (suggesting that lawyers who intervene at the district court in a class action settlement process "not to increase the value of the settlement, but in order to get paid to go away," could be called professional objectors). We use a narrower definition. Unless objections are made in the shadow of a threat to appeal, frivolous objections are not likely to impose a substantial social cost. *See infra* notes 67-68 and accompanying text.

3.  Defendants, too, may have an interest in terminating litigation expeditiously, and they may also attempt to thwart professional objectors. But the interests of defendants in expedition are different from those of class counsel, *see infra* notes 99-100 and accompanying text, and we therefore focus on the bargain struck between objectors and class counsel.

4.  Barnes v. FleetBoston Fin. Corp., No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *3 (D. Mass. Aug. 22, 2006) ("[P]rofessional objectors can levy what is effectively a tax on

nutshell, professional objectors profit by extorting payments from class counsel.[5] They "can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements."[6] Not surprisingly, they are unpopular, "perhaps the least popular parties in the history of civil procedure."[7] A judge has observed that "[f]ederal courts are increasingly weary of professional objectors."[8]

   The foundation of this cottage industry is the collective nature of class actions when used to aggregate small claims and the desire to address the divergent interests of claimants and class counsel. When each plaintiff's stake in the outcome of litigation is small, no plaintiff has an appreciable incentive to monitor the conduct of class counsel. Class counsel have an incentive to seek a settlement that maximizes attorneys' fees at the expense of class compensation, and defendants have an incentive to accept such a settlement to end the litigation.[9]

   This well-known dynamic has prompted Congress and the Supreme Court to design procedural measures intended to protect the class from overreaching by its lawyers. First, in the most common form of class action and the one analyzed in this Article,[10] class

---

class action settlements, a tax that has no benefit to anyone other than to the objectors."); *see also In re* Checking Account Overdraft Litig., 2011 WL 5873389, at *24 n.30 (agreeing with the court's characterization in *Barnes*).

   5.  We use the term *extortion* and its cognates in a nontechnical sense to mean "the act of wresting money from a person by threat or misuse of authority." *See* NEW OXFORD AM. DICTIONARY 613 (3d ed. 2010). For an example of this use of the term in the relevant context, see *In re* Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 520 n.12 (W.D. Pa. 2003) (repeating class counsels' characterization of the efforts of professional objectors "as nothing short of 'an attempt at legalized extortion in the guise of an objection' "). *See also In re* Initial Pub. Offering, 728 F. Supp. 2d at 295 ("[P]rofessional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients."). Similarly, we use the term *blackmail* as a synonym, to mean "the act of coercing someone to do something by threat." *See* NEW OXFORD AM. DICTIONARY 176 (3d ed. 2010); *see also Vollmer*, 350 F.3d at 660 ("In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.").

   6.  *Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3.

   7.  Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 472 (2003).

   8.  O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003); *see also* Trombley v. Bank of Am. Corp., No. 08-cv-456-JD, 2011 WL 3740488, at *5 (D.R.I. Aug. 24, 2011) ("Courts have recognized the problems caused by so-called professional objectors . . . .").

   9.  *See, e.g., In re* Pet Foods Prods. Liab. Litig., 629 F.3d 333, 359 (3d Cir. 2010) (Weis, J., concurring in part and dissenting in part) (noting that the court has "observed on a number of occasions" that class action defendants are "interested primarily in 'buying peace' "). *See generally* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 COLUM. L. REV. 370 (2000) [hereinafter Coffee, *Class Action Accountability*]; John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877 (1987).

   10. Although we focus on Rule 23(b)(3) class actions brought to obtain damages, much of our analysis is applicable to the other two types of class actions. *See* FED. R. CIV. P.

members must be informed that they can opt out of the action, potentially twice,[11] thereby avoiding any conclusive effect of a settlement. Second, a district court is obliged to examine the proposed settlement critically, allowing any class member to oppose it,[12] and conduct a hearing,[13] a process intended to provide the court with information and argument relevant to the court's decision. A court may approve the settlement only if it is "fair, reasonable, and adequate."[14] For its part, the Supreme Court has held that an objecting nonnamed class member is a "party" to the action and therefore has a right to appeal a final judgment approving a settlement.[15] It is this broad right of appeal that enables a professional objector to find nonnamed class members willing to lend their names to a dubious objection and a meritless appeal in the expectation that class counsel will pay a handsome sum to make the complainants go away.[16] The professional objector typically does not anticipate prosecuting the appeal to a judicial decision; if class counsel unexpectedly fail to pony up, she can withdraw the appeal.

If the law were unconcerned with the legitimate interests of class members, suppressing professional objectors would be easy. The right to appeal the approval of a settlement could be limited to named parties. But these interests are important, and even if denying

---

23(b)(1)–(2). All that is necessary for a professional objector to engage successfully in extortion is that a class settlement provide for class counsel attorneys' fees that are delayed or placed in jeopardy by an appeal. That condition will almost always be satisfied even if the class receives only injunctive relief.

   11.  If a class is certified under Rule 23(b)(3), the typical method by which plaintiffs aggregate small claims and sue for damages, before a settlement is reached, notice must be provided to class members that they will be excluded from the class upon request. FED. R. CIV. P. 23(c)(2)(B)(v). If the parties reach a settlement after class certification, the court may refuse to approve it unless it affords a new opportunity for class members to request exclusion. FED. R. CIV. P. 23(e)(4). If a class is certified for settlement purposes, therefore, the class members would receive a single notice of their ability to opt out.

   12.  *See* FED. R. CIV. P. 23(e)(5).

   13.  *See* FED. R. CIV. P. 23(e)(2).

   14.  *Id.*

   15.  *See* Devlin v. Scardelletti, 536 U.S. 1, 14 (2002). *Devlin* involved an action brought under Rule 23(b)(1), which does not afford class members the ability to opt out of a settlement. This fact was of some importance to the Court, see *id.* at 10, and therefore one cannot entirely dismiss the possibility that the Court would have denied nonnamed members of a Rule 23(b)(3) class, who do have the ability to opt out, the right to appeal. But the ability to opt out was a subsidiary reason for the Court's result, and therefore the case stands for the proposition that nonnamed members of a class certified under any provision of the Federal Rules who object to a settlement have a right to appeal a judgment approving it.

   16.  *See generally In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) (resisting the term "professional objectors" but finding that "[o]bjectors' counsel have a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class").

nonnamed class members the right to appeal is the best policy, it is not obviously so. Interlopers may object to a settlement because it favors class counsel at the expense of the class, and they may pursue an appeal when the district court mistakenly approves it.[17] Sometimes they are vindicated.[18]

Legitimate objectors are valuable, therefore, though their value should not be overstated. Objectors may not have access to substantially more information than a district court, and to that extent, their contribution to the court's deliberative process would be limited. The approach advocated in this Article would not impede the submission of objections to a district court but would instead potentially inhibit appeals. It may, therefore, result in a higher rate of uncorrected analytical errors by the district court. But it will not reduce the amount of information available to the district court or, in cases that are appealed, the appellate court. Judicial decisions based on incomplete information may very well be incorrect, but any procedural mechanism that restricts appeals by objectors does not reduce the amount of information available to a court.

The ideal approach to class settlement objections would, at zero administrative cost, eliminate all extortionate appeals without deterring any legitimate appeal. Courts and others have proposed a number of methods for dealing with professional objectors, and every one of them is flawed.[19] For example, the law might prohibit nonnamed members of opt-out classes, or even all classes, from appealing an approved settlement, on the grounds that the attendant costs imposed on legitimate objectors are less than the benefit of

---

17. *See In re* Trans Union Corp. Privacy Litig., 629 F.3d 741, 743 (7th Cir. 2011) (noting the important role played by "interlopers who oppose a proposed settlement . . . in preventing cozy deals that favor class lawyers and defendants at the expense of class members"); Vollmer v. Selden, 350 F.3d 656, 660 (7th Cir. 2003) (recognizing that intervention to "rais[e] the value of a class action settlement" is "entirely proper").

18. *See, e.g., In re* Katrina Canal Breaches Litig., 628 F.3d 185, 195 (5th Cir. 2010) (reversing approval of settlement where the record did not demonstrate "that the settlement will benefit the class in any way"); Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir. 2002) (reversing settlement approval where the district "judge did not give the issue of the settlement's adequacy the care that it deserved"); *In re* Telectronics Pacing Sys., Inc., 221 F.3d 870, 873 (6th Cir. 2000) (reversing approval where district court relied on decision subsequently reversed by Supreme Court).

19. Although the problem of professional objectors has not been extensively discussed in the literature, it is noted and explored in some depth in the following: Nicholas Barnhorst, *How Many Kicks At the Cat?: Multiple Settlement Protests By Class Members Who Have Refused to Opt Out*, 38 TEX. TECH L. REV. 107 (2005); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009); Bruce D. Greenberg, *Keeping the Flies out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 ST. JOHN'S L. REV. 949 (2010); Susan P. Koniak & George M. Cohen, *In Hell There Will Be Lawyers Without Clients or Law*, 30 HOFSTRA L. REV. 129, 155 (2001); Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. 97, 120 n.64 (1997); Patrick Woolley, *Rethinking the Adequacy of Adequate Representation*, 75 TEX. L. REV. 571, 618 (1997); and Brunet, *supra* note 7.

suppressing hold-ups.[20] The law could require nonnamed class members to intervene in the action at the district court level as a condition of pursuing an appeal,[21] a position once advanced by the Department of Justice.[22] District courts have allowed class counsel to take, or have themselves initiated, discovery into the behavior of attorneys suspected of being professional objectors, the class status of their clients, and the arrangements between them; courts could impose sanctions if unethical or otherwise improper conduct were found.[23] The appellate court might be required to screen appeals, dismissing quickly those clearly lacking in merit. They might be allowed to impose penalties for groundless objections, perhaps at amounts far larger than are now generally imposed for frivolous appeals.[24] A recent innovation is the use in settlement agreements of "quick-pay" provisions, which require the defendants to pay plaintiffs' attorneys' fees upon approval of the settlement by the district court, regardless of any appeal; the idea is that because plaintiffs' counsel will not incur serious costs of delay during the pendency of an appeal, they will not pay objectors to drop their appeal, and objectors will therefore have no incentive to appeal.[25]

Each of these mechanisms misses the mark because it does not eradicate extortionate behavior, suppresses legitimate behavior, or entails excessive administrative costs. In a recent article, Brian Fitzpatrick proposes an innovative method that he asserts is "a complete solution to the blackmail problem"[26]: an inalienability rule prohibiting objectors from settling their appeals.[27] He argues that if a professional objector cannot sell her right to appeal, the objector will have no incentive to file the appeal, whereas legitimate objectors and their attorneys will not be deterred because their intent is to secure a favorable appellate decision.[28] Though the proposal is creative, we believe that it is flawed. The extortion that is the business of professional objectors can be successfully undertaken before the right vests. Moreover, Fitzpatrick would allow appeals once undertaken to be abandoned, but he would rely on a court of appeals to insure that

---

20. *See, e.g.*, Barnhorst, *supra* note 19, at 109 ("[F]ailure to opt out of a class, either prior to settlement or at the settlement stage, should, in the interests of efficiency and equity, foreclose the opportunity to appeal a district court's settlement approval.").

21. *See* FED. R. CIV. P. 24 (defining the procedural device of intervention).

22. *See* Devlin v. Scardelletti, 536 U.S. 1, 11 (2002).

23. *See, e.g.*, *In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 294-95 (S.D.N.Y. 2010).

24. *See* FED. R. APP. P. 38 (permitting an appellate court to "award just damages and single or double costs" for frivolous appeals).

25. *See* Fitzpatrick, *supra* note 19, at 1641.

26. *Id.* at 1627.

27. *Id.* at 1659.

28. *Id.* at 1662.

the appellant is not being paid off to withdraw the appeal.[29] We are skeptical that appellate courts are institutionally equipped to police what are in substance side payments.

We favor a significant modification of an approach now in use. District courts sometimes impose appeal bonds on objectors,[30] but the amount of the bond is tightly constrained. Some circuits hold that bonds are limited to the relatively trivial costs identified in the Federal Rules of Appellate Procedure and a federal appellate cost statute.[31] Other circuits hold that bonds are constrained by any statute underlying the cause of action. Depending on that statute, courts have held that the bond may or may not reflect the attorneys' fees of class counsel on appeal[32] or the cost of delay in final resolution of the case.[33] One circuit allows bonds that include attorneys' fees if authorized by the underlying statute,[34] but it also allows bonds in

---

29. *Id.* at 1664.

30. *See, e.g.,* FED. R. APP. P. 7 (authorizing district court to require an appellant to file a bond to ensure payment of costs on appeal); *In re* Enfamil Lipil Mktg. & Sales Practices Litig., No. 11-MD-02222, 2012 WL 1189763, at *5 (S.D. Fla. Apr. 9, 2012) (requiring settlement objector to post appeal bond); Gemelas v. Dannon Co., No. 1:08CV236, 2010 WL 3703811, at *3 (N.D. Ohio Aug. 31, 2010) (same); *In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) (same); *In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *2 (D. Nev. Mar. 8, 2010) (same); Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *9-10 (N.D. Cal. Oct. 21, 2008) (same); *In re* AOL Time Warner, Inc., Sec. & "ERISA" Litig., No. 02 Cv. 5575(SWK), 2007 WL 2741033, at *3 (S.D.N.Y. Sept. 20, 2007) (same); Barnes v. FleetBoston Fin. Corp., No. C.A. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *8 (D. Mass. Aug. 22, 2006) (same); *In re* Compact Disc Minimum Advertised Price Antitrust Litig., No. MDL 1361, 2003 WL 22417252, at *2 (D. Me. Oct. 7, 2003) (same).

31. *See* Hirschensohn v. Lawyers Title Ins. Corp., No. 96-7312, 1997 WL 307777, at *1 (3d Cir. June 10, 1997) (holding that appeal bonds are limited to costs specified in Federal Rule of Appellate Procedure 39); *In re* Am. President Lines, Inc., 779 F.2d 714, 716 (D.C. Cir. 1985) (per curiam) ("The costs referred to [in Rule 7] . . . are simply those that may be taxed against an unsuccessful litigant under Federal Appellate Rule 39 . . . .").

32. *See, e.g.,* Azizian v. Federated Dept. Stores, Inc., 499 F.3d 950, 955 (9th Cir. 2007) (holding that the "costs on appeal" that may be included in an appeal bond under Federal Rule of Appellate Procedure 7 include attorneys' fees permitted by the applicable fee-shifting statute); Blessing v. Sirius XM Radio Inc., No. 09 CV 10035(HB), 2011 WL 5873383, at *1-3 (S.D.N.Y. Nov. 22, 2011) (holding that district courts in the Second Circuit may include attorneys' fees in an appeal bond when authorized by the substantive statute but not merely because the court deems the appeal frivolous); Cobell v. Salazar, Civ. No. 96-01285(TFH), 2011 WL 4590776, at *4 (D.D.C. Oct. 5, 2011) (noting that in the D.C. Circuit, an appeal bond is limited to the costs taxable pursuant to Federal Rule of Appellate Procedure 39 "as well as attorneys' fees to the extent an underlying statute deems such fees to be 'costs' "); *In re* Countrywide Fin. Corp. Customer Data Sec. Breach Litig., No. 3:08-MD-01998, 2010 WL 5147222, at *4 (W.D. Ky. Dec. 13, 2010) ("An appeal bond may only include attorneys' fees as costs where an underlying statute in the case contains a fee shifting provision.").

33. *See, e.g., In re* AOL Time Warner, Inc., 2007 WL 2741033, at *4 (holding that "costs incident to delay" may be included in an appeal bond only if included in the definition of "costs" contained in the underlying statute).

34. *See* Int'l Floor Crafts, Inc. v. Dziemit, 420 F. App'x 6, 17 (1st Cir. 2011) (holding that an appeal bond may include attorneys' fees where the underlying statute treats them

amounts unconstrained by rule or statute where the appeal is frivolous.[35] Appeal bonds, therefore, can be insubstantial. District courts should be permitted in all cases to impose appeal bonds on nonnamed class member objectors that reflect the full expected cost of appeal, including attorneys' fees and the cost of delay incurred by class members and their attorneys. A court would presumptively require a bond in the full amount but would have discretion to reduce the amount when it concludes that the appeal is legitimate and the appellant is financially unable to post a bond in the full amount.

We make no claim that our approach is ideal, but we see no perfect approach. Rather, our approach offers the greatest net value among a set of imperfect alternatives. Though bonds correctly set and routinely imposed will predictably deter most frivolous appeals, they may deter legitimate appeals as well. The principal danger, therefore, is that the bond approach to extortionate behavior will produce false positives. A court's discretion to reduce the amount of the bond required of legitimate objectors creates a risk that the court will mistakenly refrain from requiring a full bond from professional objectors, a false negative, but that risk seems small. The real danger is that district courts will be biased in favor of ending the litigation and for that reason impose a bond that will effectively quash legitimate appeals.

That possibility cannot be dismissed, but for several reasons the expected cost of the error may be modest. First, the strongest legitimate appeals will not be deterred by a bond requirement, and given the scope of review, the number of erroneous decisions that would have been corrected on appeal is likely to be small. Second, the experience of one of us (Smith) in the federal judiciary is that district judges are generally conscientious in performing their function, even when being so does not further their narrow self-interest in clearing their dockets. Third, courts now occasionally refuse to require appeal bonds of attorneys believed to be professional objectors because their appeals happen to raise legitimate issues.[36] Finally, experience with existing procedural mechanisms that call upon a district court to assess the propriety of an appeal as a predicate to obtaining

---

as costs and therefore not reaching issue of whether bond may include them where appeal is frivolous).

35. *See* Sckolnick v. Harlow, 820 F.2d 13, 15 (1st Cir. 1987) (holding that an appeal bond could include attorneys' fees where district court found that appeal might be frivolous).

36. *See, e.g., In re* Lawnmower Engine Horsepower Mktg. & Sales Practices Litig., MDL No. 08-1999, 2010 WL 4630846, at *1 (E.D. Wis. Nov. 2, 2010) (refusing to require attorneys assumed to be professional objectors to post appeal bonds where "there are legitimate issues to pursue on appeal").

appellate review is encouraging.[37] Our approach can be likened to one under which objectors are precluded from appealing the approval of a class action settlement unless the district court certifies the case for appellate review. The bond approach is preferable, because it is less radical legally than the certification approach and somewhat less preclusive in effect. The certification alternative, however, resembles the current mechanism for interlocutory appellate review.[38]

Experience with the certification mechanism is instructive. The two certification contexts differ: failure of the court to certify a case at an interlocutory stage merely postpones a party's right of appeal, whereas under the approach pertaining to class action settlements, failure to certify precludes appeal. Nevertheless, many of the incentives that arguably incline a district court to snuff out appeals of class settlements are at work when a court is asked to permit interlocutory appeal in a civil case or issue a certificate of appealability in a habeas case, and district courts do certify these cases. Indeed, similar incentives would seem to incline district courts to refuse to issue certificates of appealability from certain habeas corpus decisions,[39] and courts issue these certificates as well.

The possibility that legitimate appeals will be stifled is, therefore, the principal cost of the proposal. Whatever that cost is, the risk of error is mitigated somewhat by the ability of appellate courts to exercise their mandamus power to override the district court's decision and order the court to reduce a bond.[40] Mandamus is an extraordinary remedy,[41] however, and it therefore only mitigates the risk of overbreadth. Some legitimate appeals would likely be deterred.

Whether professional objectors are truly a problem depends on the value of the activity they disrupt. An irony in condemning their behavior as extortionate is that the conduct of class action lawyers in some cases can also be described as extortionate. A class action can be brought with little hope of success on the merits and merely to extract a settlement from defendants, who have a powerful interest in avoiding the costs of litigation and face even a tiny probability of an enormous judgment.[42] Few would have sympathy for extortionists

---

37.  *See infra* notes 246-50 and accompanying text.

38.  *See* 28 U.S.C. § 1292(b) (2006) (authorizing interlocutory appeal upon certification by district court).

39.  *See* 28 U.S.C. § 2253(c) (2006) (requiring a district or circuit judge to issue a certificate of appealability as a condition of appeal).

40.  *See* 28 U.S.C. § 1651 (2006).

41.  Mallard v. U.S. Dist. Court, 490 U.S. 296, 308-09 (1989) (recognizing that the extraordinary remedy of mandamus may be used by appellate court to address clear abuse of discretion by district court).

42.  *See, e.g.*, Bruce Hay & David Rosenberg, *"Sweetheart" and "Blackmail" Settlements in Class Actions: Reality and Remedy*, 75 NOTRE DAME L. REV. 1377, 1391-92, 1402-04 (2000).

held up by other extortionists, and a public interest justification for incurring any cost to eradicate professional objectors would be hard to find.[43] But surely many class actions serve a valuable function in achieving the economies of scale necessary to bring a civil case against wrongdoers and thereby deter violations of law.[44] Professional objectors are indiscriminate. Those who file frivolous objections tax the extortionate class action as well as the productive one, and it is the tax on the latter that justifies measures to suppress their conduct.

We proceed as follows: In Part II, we outline the problem posed by professional objectors. We explain why professional objectors can succeed in an extortionate strategy and why their conduct is inefficient. In Part III, we analyze several methods that might be used to address their conduct. In Part IV, we survey the law on appeal bonds and detail our proposal. We conclude in Part V.

## II.  UNDERSTANDING PROFESSIONAL OBJECTORS

A "professional objector" can be loosely defined as an attorney who on behalf of one or more nonnamed class members routinely submits unsuccessful objections to settlements and threatens to file insubstantial appeals of settlement approvals merely to obtain payoffs from class counsel.[45] Though the definition is analytically

---

43. *See, e.g.*, *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784-85 (3d Cir. 1995) ("[C]lass actions create the opportunity for a kind of legalized blackmail: a greedy and unscrupulous plaintiff might use the *threat* of a large class action, which can be costly to the defendant, to extract a settlement far in excess of the individual claims' actual worth."); *In re* Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 218 n.52 (D. Me. 2003) ("[T]he class action device promotes the filing of spurious lawsuits forcing defendants to pay only in order to avoid the high expenses of class action litigation.").

44. *See, e.g.*, RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 785 (8th ed. 2011); Joseph A. Grundfest & Michael A. Perino, *The Pentium Papers: A Case Study of Collective Institutional Investor Activism in Litigation*, 38 ARIZ. L. REV. 559, 563 (1996); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1, 8-9 (1991); William B. Rubenstein, *Why Enable Litigation?: A Positive Externalities Theory of the Small Claims Class Action*, 74 UMKC L. REV. 709, 720-25 (2006); Hay & Rosenberg, *supra* note 42, at 1383-89.

45. One district court cited approvingly the following description of the behavior of professional objectors:

> '[T]he unfortunate game is to lodge *pro forma* objections at the trial stage, then negotiate a private resolution in order to drop the invariable notice of appeal. Once the case has progressed beyond the trial court, there is no longer any accountability for side payments to objectors' counsel, and the game is on.'

*In re* Checking Account Overdraft Litig., No. 09-MD-02036-JLK, 2011 WL 5873389, at *24 n.30 (S.D. Fla. Nov. 22, 2011) (quoting declaration of Prof. Samuel Issacharoff). We deliberately exclude from this definition and our analysis counsel for named class members

useful, it is problematic as a legal standard to the extent it depends on motivation.[46] Judges are reluctant to ascribe improper motives to objectors when negative consequences flow from such a determination.[47] Some objective measure of intent is helpful in identifying the kind of objector that should be deterred, and the best one is the objective probability that an objection will ultimately succeed on the merits. Professional objectors typically file objections irrespective of merit and that have a low probability of success, a principle that accords with intuitive notions of extortionate behavior. A lawyer who specializes in disrupting class action settlements may on occasion hit upon a valid objection—one with a high probability of success. Whether the lawyer is called a professional objector is not important. All that is important is that the conduct in the exceptional case not be deterred. That is the policy objective explored in this Article. A critical variable in identifying extortionate conduct, then, is the objective probability of legal success. But that is only one variable.

Broadly speaking, the point of an objection should be to obtain greater compensation for at least some members of the class than the settlement provides. A settlement may be deficient for three principal reasons. First, the total amount of the settlement fund may be inadequate. Second, the attorneys' fees may represent an undue

---

who disagree with a settlement acceptable to other class counsel. Intra-class counsel disputes potentially raise issues that arise in professional objector appeals, but they are more likely to result in legitimate appeals, and they are not the focus of this Article. Indeed, appeals by named class representatives serve as a useful check on settlements that promote the interests of defendants and class counsel at the expense of the class, given that the proposal outlined in this Article may suppress some legitimate appeals by nonnamed class members.

46. Two commentators observe, "While it is possible that the motivations of a particular objector's counsel could be mixed or unclear, most practitioners would agree that the term 'professional objector' is susceptible to the same 'I know it when I see it' standard as Justice Potter Stewart's standard for identifying obscenity." Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Final Approval?*, CLASS ACTION LITIG. REP. (BNA), Aug. 12, 2011 (citing Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)). The authors define professional objectors as "attorneys who solicit members of a class in order to raise objections to a class settlement, in the hopes of extracting a portion of the fee or taking over as class counsel." *Id.*

47. *See, e.g.*, *In re* Lawnmower Engine Horsepower Mktg. & Sales Practices Litig., MDL No. 08-1999, 2010 WL 4630846, at *1 (E.D. Wis. Nov. 2, 2010) (finding that though "the objectors' true motives [might be] to obstruct the settlement in the hopes of 'getting paid to go away,' . . . the evidence in the record does not enable me to find that any objector is pursuing his or her appeal for an improper purpose") (quoting Vollmer v. Selden, 350 F.3d 656, 660-61 (7th Cir. 2003)); *In re* Air Cargo Shipping Servs. Antitrust Litig., No. 06-MD-1775 (JG)(VVP), 2010 WL 1049269, at *3 (E.D.N.Y. Mar. 22, 2010) (concluding that evidence of "bad faith or vexatious conduct" in other similar litigations was insufficient to support a finding of such conduct in instant litigation); Snell v. Allianz Life Ins. Co. of N. Am., No. Civ. 97-2784 RLE, 2000 WL 1336640, at *9-10 (D. Minn. Sept. 8, 2000) (acknowledging concern that objectors' lawyers might be marauding proposed settlements to extort the parties, but finding that the record did not demonstrate "a pressing need for our preservation of the Court processes").

proportion of the fund, so that lower attorneys' fees would result in greater compensation to the class as a whole.[48] Third, some members of the class may deserve a larger share of the fund than the settlement specifies. This last objection raises an intraclass distributional issue, not an issue of total compensation to the class. The monetary value of the objection is the benefit to the complaining group, even if other members of the class would suffer an offsetting loss.[49] An identifiable group within a class has no legal obligation to subsidize other class members. A variant of this objection is that the class contains members with conflicting interests and was therefore improperly defined;[50] properly defined classes would have produced a different settlement, one that favored some group, though the amount of the incremental benefit cannot be estimated in advance of settlement negotiations. This structural objection has the same implication as one that pertains directly to the distribution of the settlement among class members: the settlement reflects a loss to a group within the class. In all three major categories, at least some group within the class would benefit if the objection were sustained.[51]

One way to begin to distinguish between legitimate and extortionate appeals is to compare the appellant's cost of appeal to the expected monetary value of a successful resolution by the

---

48. A settlement might provide for attorneys' fees separate from the fund used to compensate class members. Objectors might sensibly contend, however, that the compensatory fund would have been larger if attorneys' fees had been lower. *But see* Perez v. Asurion Corp., 20 Fla. L. Weekly Fed. D1047, D1050 (S.D. Fla. 2007) (noting that class counsel's fees were not being paid out of funds designated for class recovery and "[t]hus, there is no reduction in the Class members' recovery to pay the lawyers").

49. A subcategory of the third objection is that the settlement provides for excessive incentive awards to class representatives. *See, e.g.*, Dewey v. Volkswagen of America, 728 F. Supp. 2d 546, 577-78 (D.N.J. 2010) (rejecting objection that $10,000 incentive awards were excessive in part because the payments did not diminish the money available to the class). The import of this objection is that nonnamed class members suffer a disadvantage relative to class representatives under the settlement to the extent that total class compensation is fixed.

50. When a class contains members with divergent interests, the class fails the requirement for certification that representative class members "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). *See* Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626-27 (1997) (concluding that certification of a settlement class was improper for want of adequate representation where the interests of those within the class were not aligned). Federal Rule of Civil Procedure 23(c)(5) permits a class to be subdivided into subclasses when a single class contains members with antagonistic interests. *See, e.g.*, *In re* Ins. Brokerage Antitrust Litig., 579 F.3d 241, 271 (3d Cir. 2009).

51. Objectors might make other challenges. For example, they might complain about the disposition of unclaimed funds. If the argument is that unclaimed funds should not revert to the defendants as a way of preserving the deterrent effect of the settlement, the objection would not necessarily imply any monetary benefit for members of the class. For example, a *cy pres* distribution would prevent reversion but would not provide value to the class. By contrast, objectors might seek a residual distribution that did directly benefit the class. Under our definition, the first kind of objection would represent a zero monetary value to the class, and the second would reflect a positive value.

appellate court to the class members on whose behalf the appeal is filed.[52] A legitimate appeal, as we use the term, will always have a positive expected monetary value. For example, an appeal that would cost the appellant $2000 to prosecute and has a 10% probability of resulting in an appellate decision awarding the class an additional $50,000 has a positive expected monetary value of $3000. An extortionate appeal, by contrast, may have either a positive or a negative expected monetary value. Such an appeal may be brought not to obtain a judicial decision but to obtain a payoff, even when the appeal has a positive expected monetary value.[53] A positive expected monetary value, therefore, is a necessary but not sufficient condition of a legitimate appeal, and it is calculated by reference to the value to class members, not the value to their attorney. Professional objectors, like class counsel, pose an agency problem. The lawyer's interests diverge from those of her clients. Successful appeals will likely result in attorneys' fees that are some fraction of the benefits secured for class members. But the legitimacy of the appeal depends upon the benefits that are sought for the principals rather than their agent.

As the above example suggests, an appeal may have a negative expected monetary value—a characteristic of an extortionate appeal—even when the probability of a favorable judicial resolution is positive. The expected monetary value is a net determination that depends on the costs of appeal. Change the costs of appeal in the example to $6000 and the expected monetary value of the appeal is negative $1000. These costs consist of both the direct costs of appeal incurred by the attorney representing objecting class members on appeal and the costs of delay in implementing the settlement incurred by class members who stand to gain by a successful appeal; they do not include the appellate costs of counsel defending the settlement.

To understand the motivation and success of professional objectors, one must focus on their private incentives, not the interests of the class members they represent. In general, professional objectors can succeed because the costs they incur in an appeal are

---

52. The implication of our definition is that an appeal taken in a quixotic but sincere attempt to win a favorable resolution, one that might require a change in the law, for instance, would likely be illegitimate. Such an appeal is not the kind of appeal pursued by professional objectors. But we use the term "legitimate" in this Article only for convenience, and the fact that it does not precisely capture the difference between appeals brought by professional objectors and those brought by others is not important to our analysis. Besides, the number of sincere but illegitimate appeals is likely to be very small.

53. *Cf.* Vollmer v. Selden, 350 F.3d 656, 659-60 (7th Cir. 2003) (noting that a nonfrivolous claim might nevertheless be brought for the extortionate purpose of causing delay "in the hope of getting paid" to go away).

less than the costs class counsel incur.[54] In the typical case, the professional objector threatens to impose a substantial cost on class counsel.[55] Suppose class counsel are concerned only about their compensation and would receive $1 million in fees under the terms of the settlement. An appeal delays implementation of the settlement, including in most cases payment of attorneys' fees. A one-year delay during the pendency of appeal at an interest rate of 5% represents a loss of $50,000 to class counsel. Suppose class counsel incur direct costs of $10,000 in litigating the appeal. Even if the appeal is certain to lose, it will cost class counsel $60,000. Class counsel could pay the professional objector any amount up to $60,000 in exchange for dropping the appeal and be better off—the maximum amount declines as the date of appellate resolution approaches because the cost of delay diminishes. Notice that in this example, the payment does not reduce the compensation received by the class. Paying off the professional objector serves the private interests of class counsel without compromising the interests of the class.

In contrast to the costs that class counsel would incur in an appeal, the professional objector's costs of appeal are relatively low. For one thing, because the objector is not entitled to attorneys' fees under the settlement, the objector does not incur a cost of delayed payment of an obligation. Time in reaching a deal with class counsel imposes merely an opportunity cost in the use of the payoff. For another, the professional objector's appellate litigation fees can be very low. The objector can base objections on grounds routinely asserted in opposition to class settlements based on inherently malleable principles. For example, fees paid to class counsel must be reasonable,[56] but reasonableness is a standard, not a rule, and its

---

54. For expositional clarity and to reflect actual practice, the analysis in this section excludes the interests of defendants. Defendants' interests are more complicated than the interests of class counsel, though defendants have an interest in defending a settlement once it is agreed upon. *See* Karlsgodt & Chohan, *supra* note 46, at 2 ("The problem of dealing with professional objectors is customarily the role of plaintiffs' counsel, although after having agreed to a settlement, the defendant has just as much of an incentive to overcome objections as the plaintiffs' lawyers do.").

55. For illustrative purposes, this Article focuses on the situation in which a single professional objector threatens to appeal the approval of a settlement. In reality, several professional objectors might threaten to appeal. The existence of multiple objectors complicates the bargaining game. The objectors might collude, or each objector might pursue a settlement unilaterally. When objectors act unilaterally, each may attempt to hold out and settle last, for even a single appeal will delay implementation of the class settlement. The existence of multiple objectors acting unilaterally may delay or even thwart a settlement with class counsel, and it may increase the total amount paid to the objectors to withhold or to withdraw their appeals. We do not explore further the implications of multiple objections.

56. *See* FED. R. CIV. P. 23(h) (allowing the court to award "reasonable attorney's fees").

determination is fact specific.[57] A professional objector can almost always assert, ostensibly in good faith, that the attorneys' fees awarded in a settlement are excessive. Because many of the standards for class actions and class settlements are fundamentally general, objections can be taken off the rack or even made out of whole cloth.[58] Likewise, appellate briefs can be assembled from ready-made pieces, with little tailoring.[59] Broad statements about the impermissibility of excessive class counsel fees supported by citations to a few cases can be pasted into nearly any brief challenging a settlement approval.

When the expected monetary value of the appeal to the objector is positive, it is easy to see why the parties would reach a bargain. As noted above, the objector is driven by private interests, not the interests of the class. Suppose the objector would incur direct litigation costs of $5000 in pursuing an appeal that if successful would increase the amount paid to the class by $1,000,000 without reducing attorneys' fees. The objector would not be entitled to all of the attorneys' fees that might be awarded for securing the increment on behalf of the class, for the increment is a joint product of the efforts of class counsel and the objector; the objector would not be able to obtain an increment unless class counsel obtained the base amount, and class counsel are entitled to a share of attorneys' fees

---

57.  *See generally* MindGames, Inc. v. W. Publ'g Co., 218 F.3d 652, 657 (7th Cir. 2000) ("A rule singles out one or a few facts and makes it or them conclusive of legal liability; a standard permits consideration of all or at least most facts that are relevant to the standard's rationale.").

58.  *See, e.g.*, Taubenfeld v. Aon Corp., 415 F.3d 597, 599 (7th Cir. 2005) (noting that an objection failed to "articulate" the objector's argument challenging attorneys' fees and contained "conclusory allegations"); *In re* Mut. Funds Inv. Litig., No. 04-md-15863, 2011 WL 1102999, at *1 n.1, *3 (D. Md. Mar. 23, 2011) (noting that professional objector "raises boilerplate objections related to the adequacy of class compensation, the suitability of the class representative, and the amount of proposed attorneys' fees"); Gemelas v. Dannon Co., No. 1:08 CV 236, 2010 WL 3703811, at *2 (N.D. Ohio Aug. 31, 2010) (noting that objector filed "form objections" in two cases "with only minor changes in the headings and arguments to make them applicable to the defendant" in the second case); *In re* Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 496-97 n.219 (S.D.N.Y. 2009) (noting class counsels' assertion that other courts had criticized the objectors' "canned objections"); *In re* UnitedHealth Group Inc. PSLRA Litig., 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) (describing objector's pleading as "disingenuous" and observing that it "presented no facts, offered no law, and raised no argument upon which the Court relied"); *In re* AOL Time Warner ERISA Litig., No. 02 Cv. 8853(SWK), 2007 WL 4225486, at *3 (S.D.N.Y. Nov. 28, 2007) (observing that objection "contained arguments counterproductive to the resolution of the litigation" and arguments "that were irrelevant or simply incorrect"); *In re* Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 386 (D. Md. 2006) (concluding that a professional objector "provided no coherent explanation for his contention" that class counsels' fees were excessive and that the objection "was not well reasoned and was not helpful").

59.  *Cf. Gemelas*, 2010 WL 3703811, at *2 (referring to objector's appeal as a "form appeal").

awarded for the increment.[60] Nevertheless, the objector would be entitled to some fraction of the increment, and suppose the objector would be awarded 10% of the increment, or $100,000. If the appeal has a 10% chance of success, the expected monetary value of the appeal to the objector is $5000 ((.10 x $100,000) − $5000).[61] In bargaining theory terminology, this is the objector's threat value, or threat point, the payoff the objector would obtain in the noncooperative solution.[62] Assuming class counsel would make any payment to the objector from attorneys' fees and not class compensation, class counsel would also be pursuing solely their private interest. If the net expected cost of the appeal to class counsel is $60,000,[63] representing a negative threat value, a payment to the objector could make both parties better off. Class counsel would be willing to pay any amount up to $60,000, and the objector would be willing to accept any amount over $5000. Just what payment between $5000 and $60,000 class counsel would make, or stated otherwise, just how the parties would divide the cooperative surplus, is the stuff of bargaining theory and is not important for present purposes; one reasonable assumption is that the parties would split the surplus of $55,000, and class counsel would pay the objector $32,500. What is important is that a payoff to avoid or end the appeal is in the mutual economic self-interest of both parties.

But will extortion work when the expected monetary value of the appeal to the objector is negative? If the objector stands to gain nothing from an appeal, her threat to file the appeal may not be credible. Class counsel could simply refuse to pay even if they would incur substantial costs were the objector to appeal, secure in the knowledge that the objector will not, in fact, appeal.

---

60. *See In re* Trans Union Corp. Privacy Litig., 629 F.3d 741, 747 (7th Cir. 2011) (holding that objecting counsel was not entitled to all attorneys' fees awarded for increasing a settlement fund over the amount negotiated by other class counsel).

61. The utility to the objector of the uncertain outcome will depend upon the objector's attitude toward risk. For simplicity, we assume that the objector is risk neutral, so that the objector derives the same utility from an uncertain outcome as from a certain outcome of equal expected monetary value.

62. For introductions to cooperative game theory and bargaining theory as relevant here, see Robert Cooter & Thomas Ulen, Law & Economics 74-76 (6th ed. 2012) and Eric Rasmusen, Games and Information 357-84 (4th ed. 2007).

63. In the scenario posed, the expected monetary value of the appeal to class counsel is the direct cost of the appeal plus the cost of delay minus the expected gain in attorneys' fees that would be awarded class counsel on the incremental settlement amount. This is the threat value of class counsel, and in this example, it is a negative number. Of course, the objector's appeal may challenge the amount of the attorneys' fees stipulated in the settlement or might otherwise attack the settlement in ways that, if successful, would reduce the fees or require additional effort by class counsel for no compensation. In that event, the net expected cost of the appeal would include the value of that expected cost.

A threat to prosecute an appeal with a negative expected monetary value might be credible, however, for two reasons: because the objector will reach a point at which further action is less costly than the expected value of the appeal; or because the objector derives value from creating a reputation through repeated behavior. First, recognize that an appeal may have a negative expected monetary value even if the probability of success in the appellate court is positive. An appeal costs something, even if the brief is cobbled together from stock parts. If the appeal has a very low probability of success or the attorneys' fees the objector would be awarded are insubstantial, the cost of the appeal in the aggregate may exceed the expected return. But in the language of game theory, all that is necessary in a single-game setting to make a threat of appellate litigation credible is that a point will be reached when the objector can withdraw the appeal and the marginal cost of pursuing it is less than its expected monetary value.[64] At that point, the expected monetary value of continuing the appeal is positive. And because the threat is credible at that point, backward induction leads to the conclusion that the threat to appeal at the outset is credible.[65] Normally in appellate litigation, the appellant is required to file a brief within two months or so of filing the notice of appeal. After that point, the objector's cost of appeal is trivial; she may choose not to file a reply brief, and she may not even be required to participate in oral argument if the court chooses to dispense with it. But resolution of the appeal may be months away, and during the interim class counsel will incur delay costs. A deal during this period can make both sides better off.

Moreover, the assumption that the appeal has a positive probability of success implies that the expected cost of the appeal to class counsel may entail more than the direct cost of litigation and the cost of delay pending resolution. If the appeal results in an order that reduces class counsel fees or further delays their receipt, perhaps by requiring the district court to reconsider or restructure the settlement, the benefit to class counsel of terminating the appeal increases, and all else equal, the amount of the payoff to the objector increases.

The above analysis depends on the assumption that the appeal has some positive probability of success. An appeal may have an aggregate expected negative value because it has a zero probability of success, but even then the threat of an appeal can be credible.

---

64. *See* Lucian Arye Bebchuk, *A New Theory Concerning the Credibility and Success of Threats to Sue*, 25 J. LEGAL STUD. 1, 5-7 (1996).

65. *Id.*

Professional objectors file objections serially;[66] in game-theoretic terms, they are repeat players. Taking an action that will impose a net expected cost on the player himself is not irrational when it makes threats in other cases credible, for unless a threat is credible, it can be ignored. This principle applies even if the appellate court imposes sanctions on the objector under Federal Rule of Appellate Procedure 38 for filing a frivolous appeal, and the assumption that the appeal objectively has a zero probability of success surely implies that the appeal is frivolous.[67] The effect of sanctions is to raise the expected cost of the appeal to the objector, but it does not change the rationality of incurring a cost. In effect, the professional objector invests in creating a reputation, thereby rendering her threats credible. Knowing that pursuit of an appeal with a zero probability of success is nevertheless rational, class counsel may deem the threat to appeal credible and pay off the objector so long as the appeal would impose costs on class counsel. The objector's threat may be credible even if the objector never actually pursues an appeal.

By contrast, a threat to file a specious objection—or a threat not to withdraw one—that is not backed up by an explicit or implicit threat to file an appeal has little extortionate value. Class counsel are not entitled to fees at least until a settlement is approved. They will usually incur no cost of delay if the objection is presented to or remains before the district court. They may incur a marginal cost of responding to the objection if the objection raises issues that class counsel would not otherwise have addressed, but this cost is likely to be modest when the issues are legally trivial. And the essence of extortionate conduct as it relates to professional objectors is that their objections are legally insubstantial.

Notice, however, that a well-founded objection by itself may have bargaining value, but a bargain that keeps such an objection from the court achieves a socially harmful result. A district court in protecting the interests of the class has an obligation to consider all issues that bear upon the fairness of the settlement, even if an issue has not

---

66. *See, e.g., In re* Mut. Funds Inv. Litig., No. 04-md-15863, 2011 WL 1102999, at *1 n.1 (D. Md. Mar. 23, 2011) (noting that objector's attorney "is a frequent and professional objector"); *In re* Compact Disc Minimum Advertised Price Antitrust Litig., No. MDL 1361, 2003 WL 22417252, at *2 n.3 (D. Me. Oct. 7, 2003) (noting that a settlement objector proposing to file a possibly frivolous appeal "appears to be a repeat objector in class action cases"). Indeed, courts sometimes use the term "serial objectors" as synonymous with professional objectors. *See, e.g., In re* Charles Schwab Corp. Sec. Litig., No. C 08—01510 WHA, 2011 WL 633308, at *2 (N.D. Cal. Feb. 11, 2011); Gemelas v. Dannon Co., No. 1:08 CV 236, 2010 WL 3703811, at *1 (N.D. Ohio Aug. 31, 2010); *In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 294 (S.D.N.Y. 2010).

67. *See, e.g.,* Premier Pork, L.L.C. v. Westin Packaged Meats, Inc., 406 F. App'x 613, 618 (3d Cir. 2011) (citing Quiroga v. Hasbro, Inc., 943 F.2d 346, 347 (3d Cir. 1991)) ("An appeal is frivolous if, applying an objective standard, it is wholly without merit.").

been raised by an objector.[68] But as a practical matter, the court might not see a particular issue unless it is pointed out by an objector. Indeed, a vexing problem posed by class action settlements is that, though the judge must approve them, the lawyers control her access to the information needed to determine their reasonableness.[69] Class counsel might incur a substantial expected loss if an objector raises an otherwise overlooked issue, and that loss would create a bargaining space. The difference between the issue that underlies the extortion of the professional objector and the issue that may induce class counsel to bribe an objector is that the former has little legal merit and the latter substantial merit.

Interestingly, a threat not to withdraw an objection already filed has much less value, because the court will have already been alerted to the issue and is apt to consider it even if the objection is withdrawn; assuming the threat to maintain the objection is not coupled with the implicit expectation of appeal, class counsel have little to gain from paying to have it withdrawn. But in the circumstance of the latent issue, the issue is by hypothesis legally important. It should be considered. One could call a threat to notify the court of an unobserved and legally important weakness in a settlement a kind of blackmail, but it is not the kind that should be deterred. Rather, an agreement to pay off the potential objector in such circumstances would represent punishable collusion.[70] To recap, professional objectors may engage in significant socially harmful extortion at the objection stage, but only if the prospect of an appeal lies in the background.

The upshot of this analysis is that a strategy of extortion—a strategy of threatening to appeal the approval of a class action settlement solely for the purpose of inducing class counsel to make a payment to avoid the appeal—is economically rational. It can be effective, and it can be profitable. This does not mean that every appeal is so motivated. An interloper may object to a settlement to

---

68. *See generally* Norman v. McKee, 290 F. Supp. 29, 32 (N.D. Cal. 1968) (noting that the absence or silence of class members toward a settlement does not relieve the judge of her duty to protect the class), *aff'd*, 431 F.2d 769 (9th Cir. 1970); 4 ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 11:48, at 151 (4th ed. 2002) ("Despite a lack of opposition, the court should not lose sight of its responsibility to analyze independently and intelligently the settlement.").

69. *See* POSNER, *supra* note 44, at 786.

70. *See* Vollmer v. Selden, 350 F.3d 656, 660 (7th Cir. 2003) ("While the parties to a class action start out in an adversarial posture, once they reach the settlement stage, incentives have shifted and there is the danger of collusion."); *In re* Gen. Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 778 (3d Cir. 1995) (noting the dangers of "collusive settlements that primarily serve the interests of defendants—by granting expansive protection from law suits—and of plaintiffs' counsel—by generating large fees gladly paid by defendants as a quid pro quo for finally disposing of many troublesome claims").

increase the value to the class,[71] and she might appeal because the district court errs in approving it. Indeed, an objector who provides some value to the class is entitled to compensation.[72] It does mean, however, that economic theory supports the popular perception that some attorneys challenging class action settlements are professional objectors pursuing a strategy of extortion. The legal prerequisite for the strategy is *Devlin v. Scardelletti*.[73] In that case, a nonnamed member of a class certified under Federal Rule of Civil Procedure 23(b)(1), who had refused to become a named representative, formally moved to intervene in the action some two weeks after class counsel and defendants filed a motion for preliminary approval of a settlement.[74] The district court denied the motion to intervene as untimely, but it considered the individual's objections anyway and approved the settlement.[75] The objector appealed the denial of intervention and the settlement approval.[76] The Supreme Court granted certiorari "to resolve a disagreement among the circuits as to whether nonnamed class members who fail to properly intervene may bring an appeal of the approval of a settlement."[77]

---

71. For example, one court explained:

> There are two ways . . . an intervenor might get paid. An intervenor might get paid by raising the value of a class action settlement and receiving a percentage of the increase in value or a fixed-payment for having improved the settlement; on the other hand, he might intervene and cause expensive delay in the hope of getting paid to go away. The former purpose for intervening would be entirely proper, while the latter would not.

*Vollmer*, 350 F.3d at 660; *see also In re* Indep. Energy Holdings PLC Sec. Litig., No. 00 Civ. 6689(SAS), 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003) (citing White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974)) ("[O]bjectors have a valuable and important role to perform in policing class action settlements.").

72. *See, e.g.*, *White*, 500 F.2d at 828; *In re* AOL Time Warner ERISA Litig., No. 02 Cv. 8853(SWK), 2007 WL 4225486, at *2 (S.D.N.Y. Nov. 28, 2007); Perez v. Asurion Corp., No. 06-20734-CIV, 2007 WL 2591180, at *8 n.5 (S.D. Fla. Sept. 6, 2007) (awarding objectors' counsel expenses and fees for attendance at fairness hearing even though court did not find papers he filed "to be particularly helpful or to have conferred a benefit on the Class" but found that attendance "provided a safety check for the parties and the Court"). One court, though denying a fee award to objectors who "contributed nothing," explained: "Objectors may add value to the [settlement] process by: (1) transforming the fairness hearing into a truly adversarial proceeding; (2) supplying the Court with both precedent and argument to gauge the reasonableness of the settlement and lead counsel's fee request; and (3) preventing collusion between lead plaintiff and defendants." *In re* UnitedHealth Group Inc. PSLRA Litig., 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) (citing *In re* Cardinal Health, Inc. Sec. Litig., 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008)).

73. 536 U.S. 1 (2002).

74. *See id.* at 5.

75. *Id.*

76. *Id.* at 6.

77. *Id.*

The Court reasoned that the issue did not turn on standing.[78] As a member of the class, the petitioner had constitutional standing, and an appeal did not raise concerns normally addressed as a matter of prudential standing.[79] Rather, the issue was whether such a class member is a "party" within the meaning of the principle "that 'only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment.' "[80] The Court held that such a class member is a party.[81] What the Court found "most important" was that nonnamed class members are "bound by the settlement."[82] The Court explained, "It is this feature of class action litigation that requires that class members be allowed to appeal the approval of a settlement when they have objected at the fairness hearing."[83] Because the case involved an action brought under Rule 23(b)(1), class members did not have the right to opt out of the settlement; by contrast, members of a Rule 23(b)(3) class, which is the kind of action this Article addresses, do have that right.[84] The Court observed:

> Particularly in light of the fact that petitioner had no ability to opt out of the settlement, appealing the approval of the settlement is petitioner's only means of protecting himself from being bound by a disposition of his rights he finds unacceptable and that a reviewing court might find legally inadequate.[85]

Curiously, the Court was apparently aware that objectors sometimes file extortionate objections, for Justice Scalia alluded to the practice in his dissent.[86] But the Court did not acknowledge the effect of its decision on the practice, view the practice as problematic, or believe that any exacerbating effect on the problem justified a different result. Even Justice Scalia seemed to be only partially aware of the nature of the problem, because his preferred resolution of the case would not have effectively prevented professional objector extortion.[87]

That an objector is recognized as a party with a concomitant right to appeal is critical for the objector to pursue a strategy of extortion.

---

78.  *Id.* at 6-7.
79.  *Id.*
80.  *Id.* at 7 (quoting Marino v. Ortiz, 484 U.S. 301, 304 (1988) (per curiam)).
81.  *Id.* at 10.
82.  *Id.*
83.  *Id.*
84.  *See generally* Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2558-59 (2011) (noting the difference between "mandatory" classes certified under  Rules 23(b)(1) and (2) and opt-out classes certified under Rule 23(b)(3)).
85.  *Devlin*, 536 U.S. at 10-11 (citation omitted).
86.  *See id.* at 22 n.5 (Scalia, J., dissenting) (quoting Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942, 973-74 n. 18 (E.D. Tex. 2000)) (internal quotation marks omitted) ("noting 'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests' ").
87.  *See infra* notes 129-31 and accompanying text.

In theory, however, the right to appeal is otherwise limited in a way that defeats the strategy. The objection that serves as a necessary predicate for an appeal is subject to Federal Rule of Civil Procedure 11, which provides that the attorney submitting any paper to the court certifies that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."[88] A court may impose sanctions for violation of Rule 11. Extortion could comfortably be described as an improper purpose.[89] But even if Rule 11 represents a legal constraint on the behavior of professional objectors, its positive impact depends on its application: an attorney or the court must initiate a Rule 11 proceeding; the judge must find impropriety; and the judge must impose a sanction that is an effective deterrent. Professional objectors have an incentive, and usually the ability, to couch the objection in ways that disguise their motivation. Moreover, they may be undaunted by the prospect of modest sanctions, particularly given the probability that not all instances of extortionate objections will be found improper. And class counsel may prefer to make the payment than incur the cost of seeking Rule 11 sanctions.

If an extortionate demand does not violate any procedural rule, nothing in the Federal Rules now would prohibit class counsel from acceding to it so long as the payment does not come from funds that would otherwise be distributed to the class. A class member may appeal the approval of a settlement only if she objected to the settlement.[90] Class counsel, therefore, could eliminate an appeal by paying the objector to withdraw an objection prior to the Rule 23 hearing, which the court must conduct to determine whether the proposed settlement is "fair, reasonable, and adequate."[91] Further, the parties seeking approval must identify "any agreement made in connection with the proposal,"[92] and an agreement to pay off an objector would qualify. But the fairness standard relates to the interests of class members, not their lawyers, and the agreement-disclosure requirement is an adjunct to the court's fairness determination. An agreement to withdraw the objection in exchange for a payment that merely reduces class counsels' fees and does not reduce compensation would not adversely affect the class.

---

88. FED. R. CIV. P. 11.

89. *See, e.g.*, Vollmer v. Selden, 350 F.3d 656, 659-60 (7th Cir. 2003) (observing that attorneys intervening to object to a settlement in the hope of causing expensive delay and getting paid to go away would be an improper purpose that would justify sanctions).

90. *See Devlin*, 536 U.S. at 10 (noting that nonnamed class members are parties to the case and thus have the right to appeal "when they have objected at the fairness hearing").

91. FED. R. CIV. P. 23(e)(2).

92. FED. R. CIV. P. 23(e)(3).

If the agreement did reduce class compensation, it would implicate fairness. But eliminating the delay that would attend an appeal likely would benefit the class by speeding up execution of the settlement. If simply avoiding the harm an extortionate demand threatens to impose is not a cognizable benefit to the class, class counsel can tweak the settlement in a way that ostensibly provides some cognizable benefits to class members. In that case, the agreement to pay off the objector does not appear to be merely capitulation to an extortionate demand. Rule 23 also specifically requires the court's approval for the withdrawal of any objection.[93] But again, the point of this requirement is to ensure that the settlement is fair to the class. The court has an independent responsibility to consider any issue that bears upon the fairness of a settlement, whether the issue is raised in an objection or not.[94] A court would have to consider the merits of the objection even if it permitted withdrawal. As long as the payoff and the attendant agreement to withdraw the objection either did not injure the class or arguably resulted in net gains to members of the class, the court could not sensibly refuse to approve the withdrawal. Alternatively, class counsel and the professional objector might strike a deal under which the objector does not withdraw her objection but does not appeal the settlement approval. In that event, nothing in Rule 23 would even apply.

The fact that extortionate behavior is legally possible and economically rational does not mean that it is socially harmful. The welfare effects depend on the impact it has on resources and productive behavior. Imagine that lawyers bring a class action with a 2% probability of a $1 billion judgment, hoping to induce the defendant to pay a settlement with a substantial component devoted to attorneys' fees. The defendant, especially if it is risk averse, may prefer to settle the case rather than risk its reputation or even its corporate existence.[95] If a professional objector comes forward threatening to appeal the settlement, any payoff to the objector will represent a private tax on the extortionate class action. Such a tax will make objecting less profitable, and because the activity is socially undesirable, the objector's conduct may reduce the quantity of extortionate class actions at the margin.

---

93.  *See* FED. R. CIV. P. 23(e)(5) ("Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.").

94.  *See supra* note 68.

95.  *See, e.g.*, CE Design Ltd. v. King Architectural Metals, Inc., 637 F.3d 721, 723 (7th Cir. 2011) ("Certification as a class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit.").

If all class actions were extortionate, professional objectors would be of little concern. Assuming their effect on class actions is disproportionate to their own costs, they would produce net positive value. But not all class actions are extortionate. The class action procedure may be indispensable in holding actors accountable for legal wrongs, where individual claims are too small to justify litigation.[96] And though the relative proportions of valuable and extortionate class actions cannot be estimated with any confidence, presumably the proportion of valuable ones is substantial. The strategy of extortionate appeals or threats of appeals by professional objectors is invariant to the nature of the underlying class action. The strategy imposes a tax on valuable and extortionate class actions alike.

The tax on valuable class actions has undesirable consequences. Imagine that pirates are known to hijack ships off the coast of Somalia, holding crews for ransom. A boater might respond by navigating around the affected waters or by canceling the cruise. Either response represents a social cost. Class action lawyers are boaters. At the margin, productive class actions might not be brought, and if they are brought, they may be litigated and settled in ways that are needlessly costly, only to reduce the risk of hold-up.

If feasible, the law might prevent professional objectors from extorting payoffs in valuable class actions but not in extortionate class actions. But there is no obvious way to do so, and the second best policy response is to prevent professional objector extortion entirely. The reason is not so much based on an empirical hunch that the value of desirable class actions outweighs the value of extortionate ones. Rather, extortionate class actions can be addressed in ways that are more direct and more effective than by exposing them to pirates.

## III. Methods of Suppressing Professional Objectors

The practical policy objective is not to confine professional objectors to the realm of extortionate class actions, but to suppress them altogether. But a real policy challenge exists in devising a method to deter extortion without deterring legitimate appeals. Agency problems plague class action litigation. The principals are the members of the class, but their stakes in the outcome of the litigation are usually too small to give them an incentive to monitor the decisions of class counsel. Class counsel have fiduciary obligations to the class,[97] but they have an economic interest in maximizing their

---

96. *See, e.g.,* Posner, *supra* note 44, at 785; Hay & Rosenberg, *supra* note 42, at 1383-89; Macey & Miller, *supra* note 44, at 8-9.

97. *See* Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class.").

fees.[98] They benefit as the proportion devoted to attorneys' fees of any given settlement grows. Defendants are indifferent to the division of settlement proceeds between class members and class counsel. Their interest is simply in minimizing the expected cost of the total settlement.[99]

Defendants, in fact, prefer a settlement that maximizes class counsel's share of the settlement fund. Suppose class counsel would be willing to settle a class action if they receive $5 million in fees, and they are indifferent to whether the class receives $10 million or $20 million. The defendant much prefers a total settlement of $15 million, representing a share for class counsel of 33%, to a total settlement of $25 million, representing a share for class counsel of 20%. The interests of defendants and class counsel to this extent align, and they are adverse to the interest of class members.[100]

Because of the potential that a settlement will short-change the class, the district court has an obligation to protect the interests of class members. Some circuit courts have observed that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members."[101] The district court must determine that the settlement is "fair, reasonable, and adequate,"[102] and in making that determination it must find that any attorneys' fees provided for in the settlement are reasonable.[103] The court must take into account

---

98.  *See, e.g.*, Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279 (7th Cir. 2002) (noting a district court's "duty to protect the members of a class in class action litigation from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class"); David L. Shapiro, *Class Actions: The Class as Party and Client*, 73 NOTRE DAME L. REV. 913, 958-60 (1998); Coffee, *Class Action Accountability*, *supra* note 9, at 384-93.

99.  *See, e.g.*, *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 819-20 (3d Cir. 1995) ("[T]his court has recognized that 'a defendant is interested only in disposing of the total claim asserted against it; . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.' "(quoting Prandini v. Nat'l Tea Co., 557 F.2d 1015, 1020 (3d Cir. 1977))).

100.  *See* Hay & Rosenberg, *supra* note 42, at 1390-91.

101.  Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975); *see also* Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279-80 (7th Cir. 2002) ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."); *In re* Cendant Corp. Litig., 264 F.3d 201, 231 (3d Cir. 2001); *In re Gen. Motors*, 55 F.3d at 785; Grant v. Bethlehem Steel Corp., 823 F.2d 20, 22 (2d Cir. 1987); Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983); Piambino v. Bailey, 610 F.2d 1306, 1327-30 (5th Cir. 1980).

102.  FED. R. CIV. P. 23(e)(2).

103.  *See* FED. R. CIV. P. 23(h); *see also* FED. R. CIV. P. 23(h) advisory committee notes to 2003 Amendments, ¶ 3 ("Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee."); *In re* Katrina Canal Breaches Litig., 628 F.3d 185, 196 (5th Cir. 2010) ("We have repeatedly held that a district court abuses its discretion if it approves a class action settlement without determining that any attorneys' fees claimed as part of the settlement are reasonable and

any issues bearing upon the fairness of the settlement.[104] In theory, then, class members are protected by the district court, regardless of whether anyone objects to the settlement. In practice, though, the district court may not have the information necessary to recognize an infirmity in the settlement, and that information may be provided by objectors.[105]

The structure of class action litigation, therefore, imposes fiduciary obligations on class counsel to protect the interests of the entire class. Because their economic self-interest diverges from the interests of class members, however, the district court is given a supervisory responsibility to ensure that class counsel discharge their obligations and, ultimately, that any settlement serves the interests of the class. But the court may need independently provided information to discharge its responsibility, and that information may come from objectors. Further, even an informed, well-meaning judge will make mistakes, and the method of error correction used in the United States legal system (and many others) is the appeals process. The policy objective, therefore, is to obtain the benefits of legitimate objections and appeals while avoiding the costs of extortionate ones. The optimal approach is that which produces the greatest net value. A number of methods are possible.

### A.  Prohibit Appeal

If the right to appeal class action settlements were limited to named parties, professional objectors would virtually disappear. Objectors might still challenge settlements in fairness hearings solely to be paid off, but the licit extortion value of such a challenge would be minimal. The rule, however, would have an adverse impact on legitimate objectors: they would lose access to the appellate process as an error correction device. Access to that process is particularly valuable when class members have no other way to escape the effects of an erroneous judgment. *Devlin*, for example, was a case brought under Rule 23(b)(1), and under that provision, nonnamed class members are bound by the settlement and have no ability to opt out

---

that the settlement itself is reasonable in light of those fees."); Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 849 (5th Cir. 1998); *Piambino*, 610 F.2d at 1328.

104.  *See, e.g., Reynolds*, 288 F.3d at 279-80 (noting that district courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" and reversing approval because "the judge did not give the issue of the settlement's adequacy the care it deserved").

105.  Courts will typically consider the merits of objections even if they believe the objections are lodged by professional objectors. *See, e.g., In re* Checking Account Overdraft Litig., No. 09-MD-02036-JKL, 2011 WL 5873389, at *24 n.30 (S.D. Fla. Nov. 22, 2011) (noting that the court had considered the objections of professional objectors on the merits and rejected them).

of it.[106] One could argue that the right to appeal need not be recognized in Rule 23(b)(3) cases because in these, nonnamed class members have another method of avoiding the effects of an erroneous judgment: they can opt out.[107] They may opt out of the class when they receive notice of the class action, and even if they first receive notice of class certification before a tentative settlement is reached, they will receive a second notice afterward and may be given another chance to opt out of the action. *Devlin*, in fact, could be read to support this view. The Court emphasized that what was "most important" to its decision was that nonnamed class members would be "bound by the settlement."[108] They had "no ability to opt out of the settlement," and so "appealing the approval of the settlement is petitioner's *only* means of protecting himself from being bound by a disposition of his rights he finds unacceptable and that a reviewing court might find legally inadequate."[109] This is the "feature of class action litigation that requires that class members be allowed to appeal the approval of a settlement."[110] One court has so read *Devlin* and has held that under similar state class action rules the right of nonnamed class members to appeal settlements is confined to those in mandatory classes.[111]

Most courts that have addressed the question, however, have read *Devlin* to extend to all class actions,[112] and we believe that recognizing a right to appeal in opt-out cases is the correct approach. As a legal matter, the logic of *Devlin* leads to the recognition of a broad right, even if some language in the opinion suggests a narrow holding.[113] The decision is based on the principle that an objecting

---

106. *See supra* text accompanying note 84.

107. *See, e.g.*, Barnhorst, *supra* note 19, at 109 ("[F]ailure to opt out of a class, either prior to settlement or at the settlement stage, should, in the interests of efficiency and equity, foreclose the opportunity to appeal a district court's settlement approval.").

108. Devlin v. Scardelletti, 536 U.S. 1, 10 (2002). For this reason, objectors who claim they were wrongly excluded from a class are not parties to the action and may not appeal. *See* AAL High Yield Bond Fund v. Deloitte & Touche LLP, 361 F.3d 1305, 1309-10 (11th Cir. 2004).

109. *Devlin*, 536 U.S. at 10-11 (emphasis added).

110. *Id.* at 10.

111. *See* Ballard v. Advance America, 79 S.W.3d 835, 837 (Ark. 2002); *see also In re* Gen. Am. Life Ins. Co. Sales Practices Litig., 302 F.3d 799, 800 (8th Cir. 2002) (questioning "whether *Devlin*'s holding applies to opt-out class actions certified under Rule 23(b)(3)" and opining that "the limited reading of *Devlin* has considerable merit").

112. *See, e.g.*, Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 39-40 (1st Cir. 2009) ("[T]he weight of authority holds that *Devlin* applies to all class actions."); Fidel v. Farley, 534 F.3d 508, 512-13 (6th Cir. 2008); Churchill Village, L.L.C. v. Gen. Elec., 361 F.3d 566, 572 (9th Cir. 2004).

113. Another way in which *Devlin* might be given narrow scope is to focus on the Court's language that "petitioner will only be allowed to appeal that aspect of the District Court's order that affects him—the District Court's decision to disregard his objections." *Devlin*, 536 U.S. at 9. One court relied on this passage to conclude that an objector was permitted to appeal only to the extent the judgment approving the settlement "affects him

member of a class must have a realistic opportunity to avoid the binding effect of a settlement, at least until the settlement has been reviewed by an appellate court. Opting out of a class action is usually not a viable alternative to class resolution of a claim, because the claimant will not typically have a practical opportunity to pursue the claim outside of the certified class.[114] The realistic choices the disgruntled class member faces ordinarily are either to accept a settlement that has not been ratified by the appellate court or to forgo her claim. If absent members of a non-opt-out class have a right to appeal, so must those of an opt-out class.

The economic logic of class action appeals leads to the same conclusion. A rule that prohibited appeals by nonnamed members of opt-out classes would virtually eliminate professional objectors, but it would also insulate settlements agreeable to counsel for all named parties and the district court from appellate review. Importantly, this does not mean that a settlement is insulated from objection, legitimate or otherwise. Legitimate objections brought before the district court may be critical in providing the court information needed to assess the adequacy of the settlement. A bar to appeal would not impede them in any way, though for that matter a right of appeal does not increase the information brought forward by objectors. Appellate courts review the legal significance of information.

Rather, the relevant social loss is the cost of error in district court approvals that would be reversed on appeal. That error cost is a function of the stakes in the litigation, and they will vary greatly. But it is also a function of the district court's error rate and the appellate court's reversal rate, and something can be said about them. The appellate process is premised on the assumption that appellate court decisions are more accurate than district court decisions, in part because appellate decisions are the product of multiple judges whereas lower court decisions represent a single judge's decision, and in part because appellate courts are perceived to

---

personally" and not "on behalf of the entire [c]lass." Allapattah Servs., Inc. v. Exxon Corp., No. 91-0986-CIV, 2006 WL 1132371, at *17 n.13, 18 (S.D. Fla. Apr. 7, 2006). The court seemed to believe that such a rule would foreclose the possibility of a decision on appeal that affected more than the individual interests of the objector. But objections if successful on appeal would typically result in a benefit to at least a group of class members including the objector, and so the appeal would necessarily be undertaken on behalf of multiple class members, with a resolution affecting potentially the entire class. As another court observed, "[W]e can see no practical way to separate Objectors' individual interests from those of the other class members." Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1183 n.1 (10th Cir. 2002).

114. One alternative to class litigation that might prove viable is an action in small claims court, an alternative that has achieved some recent success. *See* Carolyn Whetzel & Jessie Kokrda Kamens, *Opt Out's Use of Social Media Against Honda in Small Claim Win Possible "Game Changer,"* CLASS ACTION LITIG. REP. (Feb. 10, 2012).

be of higher decisionmaking quality than trial courts. Indeed, an economic justification of the appellate process is that maintaining disparate quality between court levels is a more efficient method of achieving a desired level of accuracy than investing in higher quality at the lower court level.[115] District courts, therefore, are expected to make mistakes, and that is true for class action settlement approvals as well as for every other kind of decision they make. Further, appellate courts are expected to make fewer mistakes, correcting some of the mistakes made below and not reversing too many decisions that were correct. What some believe, however, is that the error rate for district court approval of settlement agreements is higher than the average for all of their decisions, because district judges are biased in favor of ending litigation; we return to this issue later.[116] For now, we assume that district courts err in approving settlements more frequently than they err in other decisions, using as a definition of error a deviation from the objectively correct result, or the result that would be reached with perfect information.

The error correction rate, or reversal rate, is a function of the appellate court's scope of review. As appellate review becomes more deferential, the reversal rate declines, and review of class action settlements are highly deferential. As a technical matter, settlement approvals are subject to the abuse-of-discretion standard, and that standard accords substantial deference to the district court.[117] An appellate court may well conclude that it would not have approved the settlement but that the district court did not abuse its discretion in approving it. Further, many of the issues that might be raised in an appeal of a settlement, such as the effort of class counsel as it affects the magnitude of attorneys' fees, are the kind of issues that district courts have a comparative advantage in resolving, which is, of course, why the law imposes a deferential standard of review. Appellate courts are understandably reluctant to overturn decisions that the district court was in a better position to make. Finally, courts recognize a strong public interest in settling class action litigation,[118] a recognition that cuts in favor of deferential review. For

---

115. *See* Steven Shavell, *The Appeals Process As a Means of Error Correction*, 24 J. LEGAL STUD. 379, 387 (1995).

116. *See infra* note 238 and accompanying text.

117. *See, e.g., In re* Pet Food Prods. Liability Litig., 629 F.3d 333, 341 (3d Cir. 2010) (quoting *In re* Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004) (citation omitted)) ("We review the decision of the District Court to . . . approve [a] settlement under an abuse of discretion standard. An abuse of discretion may be found where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.").

118. *See, e.g., id.* at 351 ("We reaffirm the 'overriding public interest in settling class action litigation.' " (quoting *In re Warfarin Sodium*, 391 F.3d at 535)).

all of these reasons, a modest number of errors made by district courts in approving settlements are likely to be corrected on appeal.

The implication of this analysis is that prohibiting appeals by nonrepresentatives of settlements in opt-out cases would probably not impose especially high social costs resulting from erroneous approvals. Nevertheless, we prefer an appeal bond procedure because it is likely to result in marginally lower social costs yet suppress extortionate conduct nearly as effectively while imposing modest additional administrative costs.

## B.   *Require Intervention*

The United States in *Devlin* argued that nonnamed class members should be required to intervene in the district court to have the right to appeal a judgment approving a settlement.[119] Justice Scalia, for himself and two other members of the Court, agreed.[120] Justice Scalia was primarily concerned with maintaining what he believed to be a clear and settled rule that a nonnamed member of a class in a class action is not a " 'party' to the judgment approving the class settlement."[121] But he agreed with the government that requiring objectors to intervene before appealing would also "enable district courts 'to perform an important screening function.' "[122] The government and dissenting justices recognized that class members objecting to a settlement would almost always be entitled to intervene as of right under Federal Rule of Civil Procedure 24, even after the class judgment has been entered.[123] Given that right, the Court reasoned, little would be gained by requiring intervention.[124] The government and the dissenting justices argued that district judges could deny intervention and thus preclude appeal of the settlement judgment in a few situations, three of which are potentially relevant to the conduct of professional objectors: (1) "where the objector is not actually a member of the settlement class or is otherwise not entitled to relief from the settlement"; (2) where

---

119.   *See Devlin*, 536 U.S. at 11.

120.   *See id.* at 23 (Scalia, J., dissenting).

121.   *Id.* at 15. Justice Scalia observed that "avoiding the reduction to indeterminacy of the hitherto clear rule regarding who is a party is 'value' enough" to require intervention to appeal. *Id.* at 21.

122.   *Id.* (quoting Brief for United States et al. as Amici Curiae Supporting Respondents at 21, Devlin v. Scardelletti, 536 U.S. 1 (2002) (No. 01-417)).

123.   *See Devlin*, 536 U.S. at 12 (majority opinion), 20 (Scalia, J., dissenting).

124.   *See id.* at 12-13 (majority opinion).

an objector seeks to appeal even though her objection was successful; and (3) where the objection at the fairness hearing was untimely.[125]

As we have explained, what is critical in pursuing an extortionate strategy is that the professional objector delay implementation of the settlement for the pendency of an appeal. A professional objector can pursue such a strategy even if she does not represent a class member entitled to relief, represents a class member whose objection has been sustained and addressed in the settlement, or filed an untimely objection, so long as she can file an appeal however groundless and interrupt the execution of the settlement.

The Court believed that the situations in which an intervention requirement would screen out appeals would arise infrequently.[126] The Court thought that individuals who are not entitled to relief but object anyway are irrational and remain irrational if they appeal; individuals who successfully object are rational and are unlikely to appeal irrationally.[127] The infrequent instances of irrational appeals, the Court concluded, can be addressed at the appellate level.[128]

Justice Scalia disputed the Court's "sunny surmise that the appeals will be few."[129] He recognized that an objection and appeal might be irrational in substance even though the conduct of making the objection and filing the appeal is rational, citing a case involving professional objectors.[130] Justice Scalia seemed to understand, therefore, that the strategy of extortion is viable and that one cannot assume that it will be pursued infrequently. But requiring intervention will not effectively squelch it. Professional objectors can locate actual class members, file meritless and unsuccessful objections on their behalf, request intervention as of right, and appeal the judgment approving the settlement. That path of extortion is not unlikely; indeed, it seems to be the common path traveled by professional objectors.[131] Justice Scalia, having astutely recognized the potential for extortion, advocates a rule that would do little to prevent it, though perhaps more than does the approach adopted by the Court. In the end, requiring intervention as a prerequisite to

---

125.  *Id.* at 13. The government and the dissenting justices also noted that the screening function would be valuable where there is a need to consolidate duplicative appeals. *See id.*; *id.* at 21 (Scalia, J., dissenting).

126.  *See id.* at 13-14 (majority opinion).

127.  *See id.* at 13.

128.  *Id.*

129.  *See id.* at 22 n.5 (Scalia, J., dissenting).

130.  *See id.*

131.  Moreover, if an objector were denied intervention, she might appeal that decision. The intervention requirement would be useless in deterring extortion unless implementation of the settlement goes forward while the appeal is pending or the appeal can be resolved quickly.

appeal would not stifle legitimate objectors, but it would not effectively stifle professional objectors either.

## C. Impose Sanctions

One approach to professional objectors is to impose sanctions on them for extortionate behavior.[132] Because the kind of extortion that is most dangerous involves a meritless objection followed by a groundless appeal, the district court or the appellate court could potentially impose sanctions or instigate the imposition of sanctions by other legal authorities. Sanctions would have to be calibrated to deter objectionable conduct without deterring desirable conduct.[133] And discovery, either initiated by a court or opposing attorneys, might be necessary to determine whether improper conduct occurred.[134] Though courts have imposed sanctions on professional objectors, they have not done so often, despite frequently identifying professional objectors as the source of objections. There are good reasons for the infrequency of sanction orders, and the sanction approach is not likely to be effective.

To begin with, a district court could impose or instigate the imposition of sanctions for conduct leading up to the filing of an objection. For example, the district court might find, likely after

---

132. *See, e.g.*, Brown v. Am. Home Prods. Corp. (*In re* Diet Drugs Prods. Liab. Litig.), No. CIV.A. 99-20593, 2000 WL 1665134, at *5 (E.D. Pa. Nov. 6, 2000) (suggesting that the imposition of sanctions by the appellate court for the filing of a frivolous appeal is an adequate remedy for an appeal filed solely as an attempt to leverage a settlement).

133. Sanctions are typically thought of as monetary penalties or professional disciplinary actions, but they can more broadly be understood in this context as any penalty imposed by a court. In this sense, a sanction might be to deem a frivolous objection waived or withdrawn. Unless such a sanction were considered unappealable, it would not do much to curtail extortionate objections. In one case, the parties requested the court to impose objection procedures that entailed the following: setting a deadline for written notice of objection and requiring that the notice include proof of class membership, specific objections, and grounds for objection; precluding those who do not provide such a notice from appearing at the settlement hearing and deeming their objections waived; and permitting class or defense counsel to conduct discovery related to the objection. *See* Trombley v. Bank of Am. Corp., No. 08-cv-456-JD, 2011 WL 3740488, at *5 (D.R.I. Aug. 24, 2011). The court set a deadline and required written submissions, but it did not order that noncompliant objections be deemed waived or permit discovery. *See id.* at *5-6. The court suggested that the sanction for noncompliance would be that the court would not consider the objection. *See id.* at *6.

134. *See, e.g.*, *In re* Cathode Ray Tube (CRT) Antitrust Litig., No. CV-07-5944-SC, 2012 WL 1319881, at *3 (N.D. Cal. Apr. 16, 2012) (granting class counsel's motion to compel discovery from class member objector to explore inter alia his relationship with a reputed professional objector); *In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 294-95 (S.D.N.Y. 2010) (noting that court ordered objectors' attorneys to answer questions seeking to determine whether they have a "practice of objecting to class action settlements for the purpose of securing a settlement from class counsel"). *Cf. Trombley*, 2011 WL 3740488, at *5-6 (noting that class and defense counsel requested that they be "entitled to depose the objector and to seek discovery related to the objection" but denying the request).

discovery, that an attorney violated ethical obligations by soliciting class members to object to a settlement[135] or entering into fee arrangements with them,[136] and it might impose sanctions or refer the attorney to disciplinary authorities.[137] The court might identify ethical violations in the overtures a professional objector makes to class counsel, such as a suggestion that the objector will withdraw an appeal in exchange for a donation to a charity in which the objector is financially interested.[138] But professional objectors need not engage in unethical conduct of this sort. Alternatively, the court might impose sanctions for the act of filing or the content of an objection. For example, the judge might find that the professional objector purported to represent a class member who was not in fact a member of the class, a possibility recognized in *Devlin*.[139] In such a case, the court might impose sanctions for violation of Rule 11, for the court might deem the objection to have been filed for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"[140] or to contain an implicit or explicit "factual contention[]"—that the identified objector is a member of the class—lacking "evidentiary support."[141] Once again, however, professional objectors need not represent phantom class members.

Similarly, the court might find that a meritless objection filed on behalf of an actual class member violates Rule 11. A court may impose sanctions for a frivolous filing or for a nonfrivolous filing

---

135.  *See* MODEL RULES OF PROF'L CONDUCT R. 7.3 (2006).

136.  *See* MODEL RULES OF PROF'L CONDUCT R. 1.5 (2007).

137.  District courts have two primary statutory bases for the imposition of sanctions, Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. The latter provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927 (2006). The purpose of Rule 11 sanctions is unquestionably to deter misconduct, whereas the purpose of § 1927 sanctions may be both deterrence and compensation. *See* Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 247 (1st Cir. 2010). District courts also have inherent equitable powers to impose sanctions for vexatious conduct. *See* Hall v. Cole, 412 U.S. 1, 4-5 (1973) ("[I]t is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " (quoting 6 J. MOORE, FEDERAL PRACTICE ¶ 54.77(2), at 1709 (2d ed. 1972))). For expositional simplicity, we focus on Rule 11, but the specific source of sanctions imposed on professional objectors is not especially important.

138.  *See, e.g.*, *In re Initial Pub. Offering*, 728 F. Supp. 2d at 294 (noting that in an unrelated case, a pro se objector "created a nonprofit organization and entered into a stipulation pursuant to which he withdrew his objection to a $3.2 billion class settlement in exchange for a $300,000 donation to his organization, plus an additional $40,000 payment to himself and his then-counsel").

139.  *See* Devlin v. Scardelletti, 536 U.S. 1, 13 (2002) (recognizing possibility that appeal is brought on behalf of someone who is not a member of the settlement class but finding it insufficient to require nonnamed class members to intervene as a precondition to appeal).

140.  F. R. CIV. P. 11(b)(1).

141.  F. R. CIV. P. 11(b)(3).

made for an improper purpose, such as extortion.[142] Courts have been reluctant to conclude that objections are so devoid of merit as to be frivolous, given that boilerplate arguments asserting deficiencies in a class action settlement based on elastic legal standards cannot typically be dismissed out of hand.[143] Courts are often willing to assert that objectors are professionals, but ascribing extortionate motives to them when motive is insusceptible of conclusive proof is another matter.[144] Judges tend to be circumspect, and they shy away from impugning motives and imposing consequences without substantial evidence. If they impose sanctions without firm support, they risk reversal,[145] albeit under a deferential standard of review.[146]

To the extent the infrequency of sanctions imposed by district courts is a product of unduly strict requirements embodied in Rule 11, those requirements could be loosened, and sanctions might become an effective deterrent. But there is a structural reason why district courts are not likely to suppress extortion through sanctions, however direct that method might seem. The district court's obligations to the class push the court to consider all objections to a settlement, whether substantial or baseless. The issue of whether objectors engaged in sanctionable conduct is a collateral matter that will complicate and likely prolong the litigation. From the standpoint of the judge, class counsel and defendants receive what they want, an approved settlement. They apparently have little to gain from an order imposing sanctions, and yet that order will take the court's

---

142.  *See* Vollmer v. Selden, 350 F.3d 656, 659-61 (7th Cir. 2003).

143.  *See, e.g.,* Blessing v. Sirius XM Radio Inc., No. 09 CV 10035(HB), 2011 WL 5873383, at *3 (S.D.N.Y. Nov. 22, 2011) (refusing to find conduct of attorneys to have been undertaken in bad faith or vexatious and observing that "[m]erely characterizing some of the attorneys as 'professional objectors' without specifying what, exactly, they have done that is either in bad faith or vexatious, is not enough"); Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *8 n.3 (N.D. Cal. Oct. 21, 2008) ("While the Court reaches no conclusion as to frivolousness and bad faith . . . , the Court would be hard pressed to say that all of the objections were patently frivolous.").

144.  Sometimes courts are even reluctant to use the term "professional objector." In *In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *1-2 (D. Nev. Mar. 8, 2010), the court refused to adopt class counsel's "pejorative characterization" of objectors' attorneys as " 'professional objectors' who have a long record of extorting payment from class counsel by filing frivolous appeals." But it nevertheless found that objectors' attorneys "have a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class" and that the appeals taken in the instant case "are frivolous and are tantamount to a stay of the [j]udgment" approving the settlement. *Id.*

145.  *See Vollmer,* 350 F.3d at 663 (vacating the imposition of Rule 11 sanctions on purported professional objectors where record did not demonstrate that objections were frivolous or filed for extortionate purpose).

146.  *See* Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ("[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination.").

time and effort. Of course, extortionate behavior can interrupt implementation of the settlement, injuring the class, class counsel, and the defendants. Further, extortionate behavior in a case imposes a negative externality, making extortion more likely in other cases and undermining the integrity of the legal system. A court could find that the internal and external benefits of pursuing the collateral matter of the professional objector's behavior are worth the costs. But our experience suggests that courts generally take a narrow view of the interests at stake, and they are not likely to embrace an aggressive role in policing the conduct of professional objectors. If district courts do not now consistently use sanctions to deter objectionable behavior, it is difficult to imagine what mechanism could be used to induce them to act differently.

Appellate courts can impose sanctions for frivolous appeals,[147] and an "appeal is frivolous if, applying an objective standard, is wholly without merit."[148] The hallmark of a professional objector's appeal is its lack of substantive merit. Nevertheless, courts are circumspect in declaring appeals frivolous.[149] One court explained that circumspection is appropriate "so that novel theories will not be chilled and litigants advancing any claim or defense which has colorable support under existing law or reasonable extensions thereof will not be deterred."[150] Given the nature of the legal standards at issue in class action settlements, circumspect appellate courts will hesitate to conclude that, objectively speaking, a professional objector's arguments lack colorable support, regardless of the objector's extortionate motive. Moreover, professional objectors can withdraw their appeals before resolution. Though appellate courts

---

147.  *See* FED. R. APP. P. 38.

148.  Premier Pork, L.L.C. v. Westin Packaged Meats, Inc., 406 F. App'x 613, 618 (3d Cir. 2011). *See also* Golden v. Helen Sigman & Assocs., 611 F.3d 356, 366-67 (7th Cir. 2010) ("We have held that an appeal qualifies as frivolous if either 'the result is obvious' or 'the appellant's argument is wholly without merit.' " (quoting Wiese v. Cmty. Bank of Cent. Wis., 552 F.3d 584, 591 (7th Cir. 2009))); NLRB v. Unbelievable, Inc., 71 F.3d 1434, 1441 (9th Cir. 1995) (same); Bonfiglio v. Nugent, 986 F.2d 1391, 1393 (11th Cir. 1993) (stating that an appeal is frivolous if it is "utterly devoid of merit"); Braley v. Campbell, 832 F.2d 1504, 1510 (10th Cir. 1987) ("An appeal is frivolous when the result is obvious, or the appellant's arguments of error are wholly without merit.") (internal quotation marks omitted).

149.  *See, e.g.*, *Premier Pork*, 406 F. App'x at 618 ("[W]e . . . exercise caution in classifying appeals as frivolous . . . ."); Sheldon v. Khanal, 396 F. App'x 737, 740 (2d Cir. 2010) (holding that conduct in an appeal had not "yet reached the sanctionable level" even though conduct during the course of the "litigation has been, on the whole, highly troubling" and the institution of a new suit during the pendency of the appeal was "particularly questionable"); *Golden*, 611 F.3d at 367 (declining to impose sanctions even though appellant "raised a good number of frivolous points on appeal" where he also raised "a number of issues that could not be dismissed out of hand" and describing its decision as "a closer call than it should be").

150.  Hilmon Co. (V.I.) v. Hyatt Int'l, 899 F.2d 250, 253 (3d Cir. 1990).

presumably would retain jurisdiction to impose sanctions under Appellate Rule 38,[151] it is nearly inconceivable that they would pursue sanctions sua sponte. They are busy, and most likely no judge would even have been assigned the appeal at the time it was withdrawn.[152] Class counsel who paid professional objectors to withdraw would not seek sanctions, and those who successfully resisted attempted extortion would be sorely tempted to drop the matter as well.

Assuming that district or appellate courts would impose sanctions, they would have to determine the magnitude. That is not an easy task. An optimal sanction will deter extortionate behavior without deterring desirable behavior. Rule 11 limits a sanction "to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."[153] That constraint would appear loose enough to allow a district court to impose an adequate sanction to deter extortionate behavior, but it does not provide a guide for determining the sanction within the upper bound. A district court would have to set a sanction bearing some relationship to the objectionable conduct that occurred in proceedings before the district court, though it can be set high enough to deter repetition or similar conduct by others. But a critical aspect of professional objector activity is the appeal, and a sanction focused on conduct prior to the appeal would almost certainly be inadequate. Expanding the focus of conduct would require a rule change.

Federal Appellate Rule 38 permits a court of appeal to "award just damages and single or double costs to the appellee" as a sanction for a frivolous appeal.[154] At a minimum, an appropriate sanction would have to take into account the probability that any sanction would be imposed. Professional objectors may withdraw their appeals, and as explained above, appellate courts are not likely to impose sanctions in those cases. An appropriate adjustment is to multiply the damages caused by the objector by the reciprocal of the probability that a sanction will be imposed, sometimes called the enforcement error.[155] That may result in a very high number, and appellate courts might be unwilling to impose such a sanction. That hesitancy, indeed, may

---

151. *See Cooter & Gell,* 496 U.S. at 398 (holding that voluntary dismissal of a complaint does not divest the district court of jurisdiction to impose sanctions under Rule 11).

152. This fact distinguishes a district court after a complaint is withdrawn from an appellate court after an appeal is withdrawn. A district judge is invested in a case to an extent that an appellate judge is not.

153. FED. R. CIV. P. 11(c)(4).

154. FED. R. APP. P. 38.

155. *See generally* COOTER & ULEN, *supra* note 62, at 260; POSNER, *supra* note 44, at 277.

be economically justified, for the possibility that the court will mistake a legitimate but groundless appeal for the frivolous appeal of a professional objector implies that the sanction will deter desirable behavior. The appropriate sanction could be reduced by increasing the probability of imposition, and that might be accomplished by allowing the district court to impose a sanction calculated to include the damages caused by an appeal. The sanctionable conduct would then include the act of filing an appeal, which requires the filing of a notice of appeal in the district court, and district courts could theoretically impose sanctions in all cases, lowering the damage multiple to one. But district courts are not now permitted to impose sanctions under Rule 11 for conduct relating directly to an appeal,[156] and anyway, they are not likely to impose sanctions in all cases for the reasons discussed above. More importantly, as repeat players, professional objectors may invest in creating a reputation. A sanction calculated on the basis of damages caused in an individual case adjusted to account for enforcement error might not deter the conduct. The sanction affects the size of the investment, but the investment may nevertheless be rational.

In any event, an appropriate sanction would relate to the damages done by the objectionable behavior. That benchmark is also the correct one in setting an appeal bond, a topic we explore below. At heart, the difference between an optimal sanction for a frivolous appeal in this context and the requirement of an optimal appeal bond is the difference between an ex post incentive and an ex ante one. Both will be based on the costs imposed on others by the appeal. The ex ante incentive is preferable, however, because it is cheaper to administer.

In theory, therefore, sanctions could be set that adequately deter extortionate behavior and do not deter legitimate objections. But a sanction approach would involve high administrative costs, if it could be implemented at all.

## D.  Expedite Appeals

Nearly every federal appellate court has procedures to expedite appeals, by permitting motions for summary disposition and expedited review.[157] Because the cost of extortionate behavior is a

---

156. *See Cooter & Gell*, 496 U.S. at 405-09 (holding that a district court may not, pursuant to Rule 11, order an appellant to reimburse the appellee for attorneys' fees incurred on appeal).

157. *See* 1ST CIR. R. 27.0(c) (summary disposition); 2D CIR. R. 27.1(d) (emergency motions); 3D CIR. R. 4.1 (motions to expedite); 3D CIR. R. 27.4 (motion for summary action); 4TH CIR. R. 27(f) (motions for summary disposition); 5TH CIR. R. 27.5 (motions to expedite appeal); 6TH CIR. R. 27(e) (motion to expedite appeal); 7TH CIR. I.O.P. 1(c)(7) (recognizing motion to expedite briefing); 9TH CIR. R. 3-6 (summary disposition of civil appeals); 9TH

function of delay in implementing the settlement, speeding up the resolution of a professional objector's appeal is a possible solution.[158] But in most cases, quick appellate resolution is impractical, and in many it is unwise.

Summary disposition is appropriate when the papers filed in the appellate court clearly show that no substantial legal question is presented.[159] Normally the standard can be satisfied only when the appeal can be resolved by the straightforward application of a specific, unambiguous legal standard. Some appeals by professional objectors might satisfy the standard for summary disposition. For example, if the briefs demonstrate that the professional objector is appealing on behalf of a person who is not a member of the class, summary disposition is appropriate, for the court may easily determine that the objector's client is not a party to the action. But most appeals, even if frivolous, will not be so easily resolved. The underlying legal standard is spongy, such as that attorneys' fees must be reasonable, and the application of the standard requires judgment. True, the appellate court's obligation is merely to determine whether the district judge abused her discretion in determining that the fee award is reasonable, and that determination may be easier to make than the initial determination of reasonableness. But even taking into account the scope of review, few appeals will present no substantial legal question.

Expedited proceedings are designed for matters of such importance that they deserve to be resolved before other pending appeals. There must be an "exceptional reason that warrants expedition."[160] However significant the problem of professional objector extortion may be, one can hardly say that the stakes involved trump those presented by the range of other cases resolved

---

CIR. R. 27-3(b) (urgent motions); 10TH CIR. R. 27.2 (summary disposition); 11TH CIR. R. 27-1(d)(9) (motion to expedite appeals); D.C. CIR. R. 27(f) (requests for expeditious consideration); D.C. CIR. R. 27(g) (dispositive motions).

158.   *See, e.g.*, Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950, 961 (9th Cir. 2007) (suggesting that appellate courts can deter frivolous appeals by disposing of them at the outset through a screening process or by granting an appellee's motion to dismiss); *In re* Am. President Lines, Inc., 779 F.2d 714, 717 (D.C. Cir. 1985) ("The traditional countermeasure for an appeal thought to be frivolous is a motion in the appellate court to dismiss . . . ."); Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *9 (N.D. Cal. Oct. 21, 2008) (noting that settling parties can respond to a frivolous appeal by moving "to dismiss or expedite the appeal"); Brown v. Am. Home Prods. Corp. (*In re* Diet Drugs Prods. Liab. Litig.), No. CIV.A. 99-20593, 2000 WL 1665134, at *5 (E.D. Pa. Nov. 6, 2000) (observing that "an immediate motion to dismiss filed in the court of appeals" is one method that can adequately protect an appellee against frivolous appeals).

159.   *See, e.g.*, 1ST CIR. R. 27.0(c) ("At any time . . . the court may dismiss the appeal . . . if it shall clearly appear that no substantial question is presented."); 3D CIR. R. 27.4(a) ("A party may move for summary action affirming . . . a judgment . . . alleging that no substantial question is presented . . . .").

160.   3D CIR. R. 4.1.

Case 2:11-md-02270-TON   Document 103-2   Filed 02/13/14   Page 99 of 126

by federal appellate courts. To resolve professional objector appeals out of turn would reduce social welfare by delaying the resolution of more pressing cases, even recognizing that the time needed to dispose of the appeal would be relatively short. Indeed, to give priority to frivolous appeals would be ironic.

## E.  Use Quick-Pay Provisions

A recent initiative in the campaign against professional objectors is the use of quick-pay provisions in class action settlement agreements.[161] These provisions stipulate that class counsel will receive attorneys' fees when the settlement is approved by the district court, subject to refund if the settlement is later set aside.[162] In conventional class action settlements by contrast, defendants are not obligated to pay attorneys' fees until approval of the settlement is final, which means the time at which all appeals have been resolved or the opportunity to appeal has passed. The logic of quick-pay provisions is that class counsel do not incur a cost of delay during the pendency of appeal. As a result, the scope of extortion is minimal—class counsel stand to lose only their direct litigation costs if professional objectors appeal. These provisions are reportedly being used with increasing frequency, predominantly in securities cases.[163]

Quick-pay provisions are only a partial solution to the professional objector problem. First, many defendants will likely reject them out of hand. To convince corporate executives to pay substantial amounts to class counsel, albeit subject to refund, without buying peace promises to be a hard sell.

Second, the provisions reduce the cost of extortion but do not eliminate it. Consider the nature of the bargain between class counsel and defendants. A quick-pay provision requires the defendant to pay attorneys' fees, which may represent a significant part of the total settlement, earlier than she would have to do under conventional settlements. Assume that class counsel are interested solely in their attorneys' fees, and suppose first that the parties use a conventional settlement. Imagine that it provides for attorneys' fees of $10,000 and the district court's judgment is entered at year zero. If no appeal is taken, class counsel will earn interest at a rate of 10%, or $1000, by year one, for a total payoff of $11,000 at year one. If an appeal is taken and ultimately rejected at year one, class counsel will receive $10,000 at that time, thus losing the $1000 in interest they would have earned absent an appeal. In the simple case, where the

---

161.  *See* Fitzpatrick, *supra* note 19, at 1640-41.
162.  *See id.* at 1641.
163.  *See id.* at 1642-46.

appeal is certain to lose and appellate litigation costs are assumed to be zero, it is this $1000 that creates an opportunity for the professional objector to extort by threatening to appeal. The bargaining space is $1000. Imagine that the parties split the cooperative surplus and class counsel pay the objector $500 at year zero not to appeal. The defendant therefore pays attorneys' fees of $10,000 at year zero, and class counsel receive a net of $9500 at that time and begin implicitly earning interest on that amount; by year one, class counsel would have $10,450—less than $11,000 but more than $10,000. If the professional objector appeals, however, the defendant would effectively earn the interest of $1,000 on the attorneys' fees between year zero and year one, because the defendant would not be obligated to pay $10,000 until year one. From the standpoint of the defendant, the appeal is a fortunate contingency, and the defendant stands to gain $1000 from it. As the probability of that contingency increases, its expected monetary value approaches $1000.

Under a quick-pay provision, however, the defendant gives up the expected gain.[164] A rational, risk-neutral defendant would reduce the amount she is willing to pay by the expected gain from delay in her payment obligation. A quick-pay provision might be thought to create competition between the professional objector and the defendant to extract the cooperative surplus available when the objector threatens to appeal. If class counsel and the defendants use a quick-pay provision, the professional objector receives no share of the surplus; if class counsel and the professional objector strike a deal under a conventional settlement agreement, the defendants receive no share of the bargaining surplus. Competition between the professional objector and the defendants in theory could drive the amount demanded by class counsel's bargaining partner to zero.

Competition, especially between two parties, is often imperfect, however, and more important, the sequence of events impedes competition. A professional objector is not likely to surface until after a settlement is tentatively approved by the district court. That settlement agreement will contain the quick-pay provision. When class counsel and defendants are negotiating a class settlement, the defendants are not competing with professional objectors. Rather, class counsel and the defendants at best anticipate the risk of a

---

164. In the simple case used for illustrative purposes, the expected gain is bounded by the date of the appellate court's decision (or a short time thereafter as stipulated in a conventional settlement agreement), because the appeal is assumed to be groundless. If there is some probability that the appeal would succeed, however, the delay and hence the expected gain from delay may increase as a function of the time required to conduct any subsequent proceedings mandated by the appellate court.

professional objector filing an objection and taking an appeal. Suppose class counsel assess the risk at 50% and expect to strike the deal described above under which class counsel pay the objector $500 not to appeal, receiving a net of $9500. The expected value to class counsel of eliminating the possibility of the objection is $250. The defendants earn no interest if an objector arises and is paid off, and they earn no interest if no objector arises and they are obligated to pay attorneys' fees at year zero. The bargaining space is therefore $250, and if class counsel and the defendants split this surplus, the defendants would be willing to pay and class counsel would be willing to accept $9875 in attorneys' fees with a quick-pay provision.

Moreover, the simple case analyzed above assumes a zero probability that the appeal will succeed. But suppose the probability is positive, though small. Under a quick-pay provision, the defendant incurs a risk that if the judgment is eventually overturned, she will not recover the amounts paid in attorneys' fees despite class counsel's refund obligations, for class counsel may have become insolvent. Further, the defendant incurs a risk of litigation to recover the funds even when class counsel remain solvent. A rational defendant would demand a discount to incur these risks, even if they are small, and the discount will exceed the expected monetary value of the loss if she is risk averse.

The analysis above assumes a simple model. In a more complicated model, appellate litigation costs are positive and the defendants derive an expected benefit from resolving the class action at the time of the final judgment, even though they would gain interest on attorneys' fees during delay incident to appeal. Stated otherwise, a more complicated model can demonstrate that defendants prefer an immediate settlement to a later one, even though they lose the expected benefit of retaining the settlement funds for some period of time.

A more fundamental objection to quick-pay provisions is that they assume wholly self-interested class counsel. Suppose a settlement provides for an immediate payment of attorneys' fees at year zero, but a professional objector threatens to delay the class distribution of $50,000 until year one by filing a baseless appeal. The logic of quick-pay provisions is that class counsel are immune to extortion because they will suffer no loss from delay, and so extortion will fail. But if class counsel take their fiduciary obligations to the class seriously, they will identify with the loss the class would suffer and act in the best interests of the class. A loss of $5000 in interest imposed on the class is a loss imposed on class counsel, and class counsel may feel compelled to sacrifice some of their fees to avoid the injury to the class. Indeed, quick-pay provisions can be criticized to the extent they

exacerbate agency problems by separating the interests of class counsel from the interests of the class. Though as a practical matter class counsel and the class do have divergent interests and class counsel may well be motivated primarily by their narrow self interest, class counsel are not likely to be indifferent to the interests of the class, and for that reason quick-pay provisions do not eliminate the possibility of extortion.

Experience teaches that quick-pay provisions are sometimes used, indicating that they are valuable to both class counsel and defendants in addressing professional objectors. But these provisions do not eliminate extortion. Professional objectors continue to impose a tax on class action settlements, even if the tax is paid to defendants, and even if that tax is lower than it would be if a conventional settlement were used and the tax were paid to the objectors. In the end, quick-pay provisions do not pose a risk of deterring legitimate appeals. But they also do not eliminate extortion. They may be simply unacceptable to defendants' managers, and if they are used, they may merely reduce the level of extortionate taxation and change the distribution of revenue.

### F.   Adopt Inalienability Rule

Professor Fitzpatrick proposes a creative approach to professional objectors: adopt an inalienability rule prohibiting objectors from settling their appeals.[165] He reasons that "[i]f objectors were prohibited from selling their right to appeal to class counsel, then objectors who wished to appeal solely to extract rents from class counsel eager to avoid delay, risk, and litigation costs would not bother filing appeals at all."[166] Therefore, he contends, an inalienability rule will entirely eliminate extortionate appeals, but it will not deter any legitimate appeals, for legitimate objectors intend to pursue their appeals to judicial resolution and will not view the inability to sell their appeal as a burden.[167] The rule "may be the optimal solution to the problem of objector blackmail."[168]

The flaw in this approach is that it does not prevent professional objectors from extorting payments before the inalienability rule attaches. Extortionate behavior in this context involves a sequence of two acts: submitting an objection and filing an appeal. The inalienability rule cannot sensibly vest until after the settlement is

---

165.   *See* Fitzpatrick, *supra* note 19, at 1659-66.
166.   *Id.* at 1662.
167.   *See id.*
168.   *Id.* at 1664.

approved and notice of appeal is filed.[169] But the professional objector can offer not to file a notice of appeal in exchange for some payment. Extortion is no less effective if perpetrated before an appeal is filed than afterward. Indeed, the maximum amount that can be extorted declines over time after an appeal is filed. Fitzpatrick apparently is aware of the issue, observing in a footnote that "[i]t is important to note that an inalienability rule should not simply push back the period in which side settlements are negotiated to the thirty days during which an objector must file a notice of appeal."[170] Actually, the potential period of negotiation is not limited to that thirty-day period, for a professional objector could propose a deal under which she withholds an appeal even before she files an objection; the parties simply anticipate that unless she is paid off the objector will file a fruitless objection and appeal the settlement approval, and they bargain accordingly. But having recognized the problem that an inalienability rule might be circumvented by negotiating a deal before the right vests, Fitzpatrick offers no solution. He simply points out that an inalienability rule would not prevent *legitimate* objectors from selling their right to appeal before they file a notice of appeal.[171] An admission that a rule does not prevent casual extortion is not an explanation as to how it prevents professional extortion.

An inalienability rule, moreover, could prevent socially valuable agreements between class counsel and legitimate objectors settling objections after notice of appeal is filed. Fitzpatrick would respond to this risk by allowing appeal settlement agreements if they involve a modification of the approved class settlement agreement and the modified agreement is approved by the district court.[172] The district court, he argues, "could filter merely cosmetic modifications from those in which other class members shared equally in the benefits sought by the settling objector."[173] Further, an objector would be free to withdraw an appeal and receive nothing in return, subject to some verification, such as a sworn certification that the professional objector received no consideration.[174]

---

169. If a firm rule of inalienability vested at the time an objection is filed, every unsuccessful objector would be required to appeal. Such a rule would hardly increase social welfare. The rule would have to provide for a method by which the obligation to appeal could be compromised after it vested, much as Fitzpatrick now proposes for compromise during the pendency of appeal, *see id.* at 1665, but that method involves high judicial supervision costs. In any event, even a rule developed along these lines would fail to address the fundamental problem, for professional objectors and class counsel could strike a bargain before an objection is filed.

170. *Id.* at 1664 n.155.

171. *See id.*

172. *See id.* at 1665.

173. *Id.*

174. *See id.*

But this system begs to be circumvented. Given that the district judge has already approved the class settlement agreement, she would be hard pressed to reject any modification that increased the net recovery of the class. Just what justification the court would have to reject the modification on the ground that class members did not "share equally" with the objector is hard to see. At a minimum, the court would have a powerful incentive to approve the modification even if the objector received a larger payoff than the marginal benefit received by the class. The point of professional objector extortion is to hold up class counsel, not the class, and so a deal with class counsel would predictably take the form of a payment by class counsel from their fees. Absent a modification requirement, an agreement to withdraw an appeal might involve class counsel paying the objector $1000 from their attorneys' fees, thus earning $1000 less than anticipated under the class settlement; with a modification requirement, the agreement might involve changing the class settlement agreement in a way that increases its value to the class by $100, class counsel paying the objector $1000, and class counsel ending up with $1100 less than provided for in the original class settlement. Whose interests would the district court be protecting by rejecting the modification on the ground that it is "cosmetic"? The class is better off, the defendants are not harmed, and the objector and class counsel support the change. Moreover, the possibility that the professional objector and class counsel will reach a deal under which the objector ostensibly receives nothing to give up her appeal, which entirely negates the modification requirement, cannot be casually dismissed by requiring a verification mechanism. Professional objectors as a group are ethically challenged, and to assume that they would not skirt or flout a certification requirement or other verification device is heroic. Courts have not been aggressive in policing the practices of professional objectors, and they are not likely to be any more enthusiastic in enforcing ethical requirements surrounding a verification device.

In the end, an inalienability rule will not prevent professional objector extortion, though it will not deter legitimate appeals. It may be structured not to discourage legitimate objectors from settling their complaints during the pendency of appeal, but if it is, it will inevitably create an opening for extortionate conduct by professional objectors.

## IV. Appeal Bonds as the Least Imperfect Approach

Taking into account the desirable suppression of extortionate appeals, the undesirable chilling of legitimate appeals, and the administrative costs of any remedy, the approaches to the problem of

professional objectors outlined above are all more or less imperfect. The approach we favor is also imperfect, but it offers the greatest net benefits, and we therefore believe that it is the optimal one. We would presumptively require that any objecting nonnamed member of a Rule 23(b)(3) class post as a condition of appeal a bond calibrated to deter extortion. District courts have occasionally imposed an appeal bond requirement on class action objectors.[175] But courts have disagreed on the legal constraints that affect the availability and magnitude of appeal bonds, and most courts have concluded that the amount of the bond is seriously constrained, undermining its capacity to curb extortionate behavior.[176]

## A. Existing Practice

Rule 7 of the Federal Rules of Appellate Procedure provides that a "district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal."[177] The rule is permissive, allowing but not compelling a district court to require a bond. Accordingly, the court must first decide whether to exercise its discretion. If the court requires a bond, it then must decide the bond's amount. Both decisions depend on the purpose of a bond, which according to Rule 7 is "to ensure payment of costs on appeal."[178] A bond set at "costs on appeal" would perfectly "ensure payment" of those costs, and a bond set at any greater amount would not be "necessary" to the extent of the excess, and hence, would be unauthorized.[179] Conversely, a bond of a lesser amount may be all that is necessary to "ensure payment of costs on appeal," and indeed any security may be unnecessary.[180] Consequently, the decision whether to require a bond pursuant to Rule 7 and the decision as to the amount of any bond required turn on the meaning of "costs on appeal."

Federal Rule of Appellate Procedure 39, entitled "Costs," contains five subdivisions.[181] Subdivision (a) specifies the parties against whom costs should normally be assessed.[182] Thus, for example, if an appeal is dismissed or a judgment is affirmed, costs are usually taxed

---

175. *See* cases cited *supra* note 30.
176. *See infra* notes 195-214 and accompanying text.
177. FED. R. APP. P. 7.
178. *Id.*
179. *Id.*
180. *Id.*
181. FED. R. APP. P. 39.
182. FED. R. APP. P. 39(a). Another subdivision provides that costs for or against the United States may be assessed under Rule 39(a) only if authorized by law. FED. R. APP. P. 39(b). Another requires each court of appeals to fix the maximum rate for taxing the cost of producing copies and limits the rate so fixed. FED. R. APP. P. 39(c). Still another specifies a process to be used when a party wants costs taxed. FED. R. APP. P. 39(d).

against the appellant;[183] if a judgment is reversed, costs are taxed by the court of appeals against the appellee.[184] Subdivision (e) provides, "The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule."[185] The subdivision lists the following costs: "(1) the preparation and transmission of the record; (2) the reporter's transcript, if needed to determine the appeal; (3) premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and (4) the fee for filing the notice of appeal."[186] Further, 28 U.S.C. § 1920 provides that a "judge or clerk of any court of the United States may tax as costs" certain items: "(1) [f]ees of the clerk and marshal; (2) [f]ees for printed or electronically recorded transcripts . . . ; (3) [f]ees and disbursements for printing and witnesses; (4) [f]ees for exemplification and the costs of making copies . . . ; (5) [d]ocket fees . . . ; [and] (6) [c]ompensation of court appointed experts" and costs associated with interpreters.[187] Because an appellate court is a "court of the United States," the above items constitute "costs" on appeal. One interpretation of Rule 7 is that the "costs on appeal" referenced there are the "costs on appeal" identified in Rule 39(e) and § 1920.[188] But an interpretation of Rule 39(e) is that the rule merely lists the "costs on appeal" that are taxable "under *this* rule," meaning Rule 39, and so it does not circumscribe the "costs on appeal" that an appeal bond may secure under Rule 7.[189] Thus all it does is specify, for instance, the costs that may be taxed against the appellant under Rule 39(a)(2) if a judgment is affirmed.

In most cases, plaintiffs and defendants are adversaries in both the district and appellate court; either plaintiffs or defendants seek in the appellate court to set aside the judgment below, and the other side seeks to uphold it. But when an objector appeals the settlement of a plaintiff's class action, she seeks to set aside the judgment, and

---

183.   *See* Fed. R. App. P. 39(a)(1); Fed. R. App. P. 39(a)(2).

184.   Fed. R. App. P. 39(a)(3).

185.   Fed. R. App. P. 39(e).

186.   Fed. R. App. P. 39(e)(1)–(4).

187.   28 U.S.C. § 1920 (2006 & Supp. II 2008).

188.   *See, e.g., In re* Am. President Lines, Inc., 779 F.2d 714, 716 (D.C. Cir. 1985) (per curiam) ("The costs referred to [in Rule 7] . . . are simply those that may be taxed against an unsuccessful litigant under Federal Appellate Rule 39 . . . ."). There is no question that a court may include both "the costs listed in Appellate Rule 39(e) and 28 U.S.C. § 1920 when calculating the amount of an appeal bond." *In re* AOL Time Warner, Inc., Sec. & "ERISA" Litig., No. 02 Cv. 5575(SWK), 2007 WL 2741033, at *4 (S.D.N.Y. Sept. 20, 2007).

189.   *See, e.g.,* Sams v. Hoechst Aktiengesellschaft (*In re* Cardizem CD Antitrust Litig.), 391 F.3d 812, 817 (6th Cir. 2004) ("[Rule 39] merely lists which costs of appeal can be 'taxed' by the district court if it chooses to order one party to pay costs to the other."). The Advisory Committee note does make clear, however, that the costs described in Rule 39(e) are at least some of the costs of appeal that can be included in a Rule 7 bond. *See* Fed. R. App. P. 39(e) advisory committee's note (1967 Adoption).

both class counsel and the defendants seek to uphold it. Courts have had no trouble recognizing that the objector is a plaintiff and, at least since *Devlin*, a party to the lawsuit. But the objector on appeal is in an adversarial relationship with both the defendants and the majority of plaintiffs. The fact that her interests are antagonistic to those of other plaintiffs does not change her status as a plaintiff, and courts that have required objectors to file appeal bonds under Rule 7 calculate the amount of the bond as if the objector is an ordinary plaintiff.[190] But, as we are about to explain, appellate courts have split on whether such a bond may include costs in addition to those specified in Rule 39.

Although the Supreme Court has not resolved the Rule 7 issue, it decided in *Marek v. Chesny* that "costs" as used in Federal Rule of Civil Procedure 68 means "all costs properly awardable under the relevant substantive statute or other authority."[191] Rule 68 provides that the offeree must "pay the costs incurred" after rejecting an offer essentially if the judgment the offeree finally obtains is less than the offer, but it does not define "costs."[192] The Court held that a plaintiff in a civil rights case brought under 42 U.S.C. § 1983 may not recover attorneys' fees she incurred after rejecting a settlement offer when she ultimately recovers a judgment less than the offer.[193] Section 1988 of the statute provides that a prevailing party in a § 1983 action may be awarded attorneys' fees "as part of the costs."[194] Because the underlying statute defines attorneys' fees as costs, the attorneys' fees incurred after an offer is rejected are part of the costs that cannot be recovered by the offeree under Rule 68.

A majority of circuit courts that have addressed the Rule 7 issue have relied on the logic of *Marek* to hold that the term "costs on appeal" includes all expenses defined as costs by an applicable substantive statute. For example, in *Azizian v. Federated Department Stores, Inc.*, the Ninth Circuit held that "the term 'costs on appeal' in Rule 7 includes all expenses defined as 'costs' by an applicable fee-shifting statute."[195] The court reasoned that Rule 7 does not define costs, just as Rule 68 does not define costs, and *Marek*'s inference that the drafters of Rule 68 therefore intended to include all costs

---

190. However, when a court is permitted to include in an appeal bond costs that can be assessed to a party under a substantive statute and the statute permits the court to tax a litigant the costs incurred by her opponent in connection with a meritless "suit or . . . defense," the statute may not authorize the court to tax an objector because the objection is not a suit or defense. *See In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 295-96 (S.D.N.Y. 2010). To this extent, the objector would not be treated as an ordinary plaintiff.

191. Marek v. Chesny, 473 U.S. 1, 9 (1985).

192. FED. R. CIV. P. 68.

193. *Marek*, 473 U.S. at 9-12.

194. 42 U.S.C. § 1988 (2006).

195. 499 F.3d 950, 958 (9th Cir. 2007).

authorized by the underlying statute applies in parallel fashion to Rule 7.[196] The court also reasoned that, just as *Marek* relied in part on the absence of congressional expressions to the contrary in reaching its interpretation of Rule 68, Rule 39 "does not contain any 'expression[] to the contrary.' "[197] Invoking *Marek*'s admonition "that we must take fee-shifting statutes at their word,"[198] the court rejected the argument that relying on underlying statutes to provide the definition of Rule 7 bond costs places too much weight on possibly inadvertent differences in wording.[199] The Second Circuit in *Adsani v. Miller* similarly held that Rule 7 costs include those defined by the underlying statute, "read[ing] *Marek* to support the view that Rule 39 does not exhaustively define 'costs.' "[200] The Eleventh Circuit[201] and the Sixth Circuit[202] reached the same conclusion. The implication of this position is that if the underlying statute symmetrically requires the losing party to pay the attorneys' fees of the winning party, then an appeal bond may include appellate attorneys' fees of class counsel and defense counsel when a class settlement is appealed;[203] if the statute asymmetrically requires only that a losing defendant pay the attorneys' fees of a winning plaintiff, then an appeal bond required of an objector may not include appellate attorneys' fees of the parties seeking to preserve the settlement.[204]

By contrast, the Third Circuit in *Hirschensohn v. Lawyers Title Insurance Corp.* held that Rule 7 costs are only those that may be

---

196. *See id.* at 958.

197. *Id.* (quoting Marek v. Chesny, 473 U.S. 1, 9 (1985)).

198. *Id.* at 959 (citing Marek v. Chesny, 473 U.S. 1, 9 (1985)). The court also observed that "allowing district courts to include appellate attorneys' fees in estimating and ordering security for statutorily authorized costs under Rule 7 comports with their role in taxing the full range of costs of appeal." *Id.*

199. *Id.* at 958-59.

200. 139 F.3d 67, 74 (2d Cir. 1998).

201. *See* Pedraza v. United Guar. Corp., 313 F.3d 1323, 1333 (11th Cir. 2002) ("[B]oth *Marek* and *Adsani*'s persuasive application of that decision lead us to conclude that the meaning of 'costs,' as used in Rule 7, should be derived from the definition of costs contained in the statutory fee shifting provision that attends the plaintiff's underlying cause of action.").

202. *See* Sams v. Hoechst Aktiengesellschaft (*In re* Cardizem CD Antitrust Litig.), 391 F.3d 812, 817 (6th Cir. 2004) ("We adopt the reasoning of the Second and Eleventh Circuits and apply *Marek* to its interpretation of 'costs' under [Rule] 7.").

203. One court held that if a statute permits a court symmetrically to order a party to pay her opponent's attorneys' fees if the party's suit or defense is without merit, it is not a fee-shifting statute, but rather a statute that permits sanctions for frivolous filings and as such does not authorize the inclusion of attorneys' fees in the Rule 7 bond. *See In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 296 (S.D.N.Y. 2010).

204. *See, e.g., In re* Air Cargo Shipping Servs. Antitrust Litig., No. 06-MD-1775 (JG)(VVP), 2010 WL 1049269, at *2 (E.D.N.Y. Mar. 22, 2010) (holding that appeal bond could not include class counsels' attorneys' fees because Clayton Act allows successful antitrust plaintiffs to recover fees, not the "prevailing party").

taxed against an unsuccessful litigant under Rule 39.[205] Because attorneys' fees are not specified in Rule 39, they cannot be included in a Rule 7 bond even though they are authorized by an underlying statute. The court distinguished *Marek* on the ground that "Rule 68 . . . does not define costs, [but] Rule 39 does so in some detail."[206] Similarly, the District of Columbia Circuit in *In re American President Lines, Inc.*, a case decided only a few months after *Marek*, held that the costs referred to in Rule 7 are simply those identified in Rule 39.[207] The court did not discuss *Marek*.[208] In a later case, however, the court did treat attorneys' fees authorized by an underlying statute as costs under Rule 39, and in that case it did cite *Marek*.[209]

Without squarely addressing the issue, the First Circuit in *Sckolnick v. Harlow* affirmed a district court order requiring an appeal bond that included attorneys' fees because "the appeal might be frivolous and . . . an award of sanctions against [the] plaintiff on appeal was a real possibility."[210] The implication of the decision is that costs under Rule 7 are not limited to the costs specified in Rule 39, but the additional costs need not be authorized by, and are not limited to, those identified in an underlying statute. Narrowly read, the case stands for the proposition that only attorneys' fees may be added to Rule 39 costs regardless of whether the fees are authorized by a substantive statute and then only if the district court concludes that the appeal is frivolous,[211] though a broader reading would expand the permissible costs beyond attorneys' fees.[212] Interestingly, though the Ninth Circuit in *Azizian* held that a Rule 7 bond may include attorneys' fees, it held that a district court may not rely upon

---

205.  No. 96-7312, 1997 WL 307777, at *1 (3d Cir. June 10, 1997).

206.  *Hirschensohn*, 1997 WL 307777, at *2.

207.  779 F.2d 714, 716 (D.C. Cir. 1985) (per curiam).

208.  A district judge in the Seventh Circuit noted that the circuits are split and that the Seventh Circuit has not taken a position on the issue, but concluded that he need not predict the circuit's position because attorneys' fees were not available under the applicable statute. Walton v. City of Carmel, No. 1:05-cv-902-RLY-TAB, 2008 WL 2397683, at *3-4 (S.D. Ind. June 10, 2008).

209.  *See* Montgomery & Assocs. v. Commodity Futures Trading Comm'n, 816 F.2d 783, 784 (D.C. Cir. 1987) (holding that attorneys' fees authorized by an underlying statute were costs recoverable under Rule 39 and therefore an application for them was subject to the time limits specified by Rule 39).

210.  820 F.2d 13, 15 (1st Cir. 1987).

211.  *See* Int'l Floor Crafts, Inc. v. Adams, 656 F. Supp. 2d 240, 241-42 (D. Mass. 2009) (noting that the First Circuit has not decided whether attorneys' fees available under a substantive statute may be included in an appeal bond but requiring appellant to post a bond that apparently reflects attorneys' fees because her appeal "bears the indicia of frivolousness").

212.  *See, e.g.*, *In re* Compact Disc Minimum Advertised Price Antitrust Litig., No. MDL 1361, 2003 WL 22417252, at *1 (D. Me. Oct. 7, 2003) (holding that *Skolnick* authorizes the inclusion in a Rule 7 bond of attorneys' fees as well as the costs of delay and disruption of settlement administration caused by a frivolous appeal).

the court's assessment that an appeal would be frivolous and therefore include those fees in a Rule 7 bond.[213] In any event, the First Circuit later held that a Rule 7 bond may include attorneys' fees if they are defined as costs by the underlying statute, but it found no need to reconsider its position in *Sckolnick* that frivolity is an independent basis for including attorneys' fees in an appeal bond.[214]

Most of the cases addressing the proper scope of a Rule 7 bond do so in the context of a request that a bond include appellate attorneys' fees. These fees, as well as the costs identified in Rule 39, are part of the costs that an extortionate appeal of a class settlement threaten to impose. Another important kind of cost is the cost of delay in implementing the settlement, especially the implicit interest lost on the settlement funds while the appeal is pending.[215] Delay costs certainly cannot be included in an appeal bond in circuits that read Rule 7 to be limited by Rule 39, for Rule 39 says nothing about these costs.[216] In circuits that look to the underlying statute, delay costs could logically be included in an appeal bond if the underlying statute authorizes the relevant party to recover such costs, just as the bond may include attorneys' fees if the statute authorizes their recovery.[217] In these circuits, some courts have held that if delay costs are not authorized by the underlying statute, they cannot be included;[218] other courts have held that delay costs can be included

---

213. Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950, 960 (9th Cir. 2007).

214. *See* Int'l Floor Crafts, Inc. v. Dziemit, 420 F. App'x 6, 17 (1st Cir. 2011).

215. *See, e.g.*, Cobell v. Salazar, No. Civ.A.96-01285(TFH), 2011 WL 4590776, at *1 (D.D.C. Oct. 5, 2011) (noting plaintiffs' request that an appeal bond include over $3.1 million "for post-judgment interest"). Though delay costs usually relate to the time-use value of the settlement fund, they can include marginal costs incurred in the administration of the fund as a result of delay. *See, e.g., id.* (noting plaintiffs' request that an appeal bond include nearly $2.6 million "for the 'increased cost of settlement administration' "); *In re Compact Disc*, 2003 WL 22417252, at *1 (noting plaintiffs' allegations of the settlement disruption costs that appeal would cause); *In re* NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 124, 128 (S.D.N.Y. 1999) (reciting plaintiffs' description of the administrative costs incurred when the processing of claims is interrupted and restarted).

216. *See, e.g.*, Brown v. Am. Home Prods. Corp. (*In re* Diet Drugs Prods. Liab. Litig.), No. Civ.A. 99-20593, 2000 WL 1665134, at *4 (E.D. Pa. Nov. 6, 2000) (concluding that delay damages in the Third Circuit could be included only in a supersedeas bond and finding that class counsel could request only a cost bond under Rule 7).

217. *See, e.g., In re* Initial Pub. Offering Sec. Litig., 728 F. Supp. 2d 289, 296 (S.D.N.Y. 2010) (implying that appeal bond could include delay costs if authorized by underlying statute but finding that relevant statute did not authorize them); *In re* AOL Time Warner, Inc., Sec. & "ERISA" Litig., No. 02 Cv. 5575(SWK), 2007 WL 2741033, at *4 (S.D.N.Y. Sept. 20, 2007) (same).

218. *See, e.g., Cobell*, 2011 WL 4590776, at *4 (rejecting request that delay costs be included in appeal bond where underlying statute did not treat delay costs or attorneys' fees as recoverable costs); *In re Initial Pub. Offering*, 728 F. Supp. 2d at 296-97; Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *8-9 (N.D. Cal. Oct. 21, 2008); *In re AOL Time Warner*, 2007 WL 2741033, at *4.

anyway.[219] Of course in the First Circuit, where a Rule 7 bond may include costs incurred because of a frivolous appeal, the costs of delay might qualify.[220]

Courts that have resisted the inclusion of delay costs in Rule 7 bonds emphasize the difference between Rule 7 bonds and supersedeas bonds.[221] A supersedeas bond is filed by the losing party usually in the trial court and stays the execution of a judgment pending appeal. Under Federal Rule of Civil Procedure 62(d), the stay automatically takes effect when the district court approves the bond.[222] A motion for a stay and approval of a supersedeas bond may also be made in the appellate court pursuant to Appellate Rule 8 if moving first in the district court is impractical or the district court denied the relief.[223] A supersedeas bond ordinarily must be in the full amount of the judgment and may include " 'damages for delay' and . . . interest on the appeal."[224] Some courts apparently reason that if delay damages are an element of supersedeas bonds, they cannot be included in Rule 7 bonds, sometimes called "cost bonds,"[225] which serve a different purpose; professional objectors do not seek to post supersedeas bonds.[226]

---

219.  *See, e.g., In re* Checking Account Overdraft Litig., No. 1.09-MD-02036-JLK, 2012 WL 456691, at *3 (S.D. Fla. Feb. 14, 2012) (including in a bond interest to account for "delay of distribution of funds to the class"); Allapattah Servs., Inc. v. Exxon Corp., No. 91-0986-CIV, 2006 WL 1132371, at *18 (S.D. Fla. Apr. 7, 2006) (including in a bond "interest that the entire class will lose as a result of the appeal" apparently without explicit statutory authority); *In re NASDAQ*, 187 F.R.D. at 128-29.

220.  *See* Barnes v. FleetBoston Fin. Corp., No. C.A. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *2 (D. Mass. Aug. 22, 2006) (noting that "First Circuit case law indicates that 'costs,' as contemplated in Rule 7, include the costs attendant to the delay associated with an appeal" and including interest on a settlement for the expected duration of an appeal where appeal was taken by professional objectors); *In re Compact Disc*, 2003 WL 22417252, at *1 (holding that *Skolnick* authorizes the inclusion in a Rule 7 bond of "damages resulting from delay or disruption of settlement administration caused by a frivolous appeal").

221.  There is no question that a Rule 7 bond differs from a supersedeas bond. *See, e.g.*, Adsani v. Miller, 139 F.3d 67, 70 n.2 (2d Cir. 1998) (emphasizing that a supersedeas bond and a Rule 7 bond "should not be confused"); *In re Compact Disc*, 2003 WL 22417252, at *1 ("[A Rule 7] bond is to be distinguished from a *supersedeas* bond. . . ."); 16A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3953, at 573 (4th ed. 2008) ("Rule 7 concerns giving a bond or other security for costs on appeal in a civil case. It should not be confused with a supersedeas bond, which sometimes must be filed to obtain a stay of execution of a judgment pending the appeal.").

222.  FED. R. CIV. P. 62(d).

223.  FED. R. APP. P. 8(a)(2).

224.  Omaha Hotel Co. v. Kountze, 107 U.S. 378, 388 (1883). *See also In re NASDAQ*, 187 F.R.D. at 128 (relying on *Omaha Hotel* for the proposition that damages for delay may be included in a Rule 7 bond).

225.  *See Adsani*, 139 F.3d at 70 n.2 (noting confusion in terminology and suggesting that Rule 7 bond, "cost bond," and "appeal bond" are synonyms and distinguishable from "supersedeas bond").

226.  *See, e.g., In re* Enfamil Lipil Mktg. & Sales Practices Litig., No. 11-MD-02222, 2012 WL 1189763, at *3 (S.D. Fla. Apr. 9, 2012) (holding that delay costs could not be

Of course, an appeal by a class settlement objector does not fit the mold for which appellate supersedeas bonds were designed. The objector is not liable under the district court's judgment, and she is not attempting to overturn a judgment against her in the appellate court. In the usual situation, a defendant found liable below is attempting to delay the execution of the judgment, and a supersedeas bond is useful primarily to secure the judgment, lest circumstances change during the pendency of the appeal that prevent the plaintiff from collecting. Absent a stay of execution, the plaintiff could immediately collect on the judgment, and the supersedeas bond is required as a kind of quid pro quo for the stay.[227] By contrast, the delay in execution of a judgment approving a class settlement does not arise because of entry of a judicial stay. After all, the defendants have agreed to their liability under the settlement. Rather, the delay during the pendency of the appeal arises because of the terms of the settlement. The costs of delay during the pendency of appeal arise for very different reasons in the supersedeas bond case and the class settlement objection case, but the costs themselves are comparable.[228] The idea that delay costs should be taken into account somehow in cases where supersedeas bonds are irrelevant is easy to understand, and the ready mechanism is the Rule 7 bond, even if that bond was not intended to be used for that purpose.

Whatever elements may be included in a Rule 7 bond, courts have considered the question of whether to require a bond to be separate

included in a bond sought only under Rule 7 where the settlement imposed delay costs on the defendant); *In re* AOL Time Warner, Inc., Sec. & "ERISA" Litig., No. 02 Cv. 5575(SWK), 2007 WL 2741033, at *4 n.4 (S.D.N.Y. Sept. 20, 2007); Brown v. Am. Home Prods. Corp. (*In re* Diet Drugs Prods. Liab. Litig.), No. CIV.A. 99-20593, 2000 WL 1665134, at *4 (E.D. Pa. Nov. 6, 2000). Not relying on the relationship to supersedeas bonds, one district court reasoned that delay damages fall within the purview of 28 U.S.C. § 1912, which allows an appellate court to award "the prevailing party just damages for his delay, and single or double costs." The statute thus distinguishes between "damages" and "costs," and Rule 7 contemplates only cost bonds. Section 1912 is often cited in tandem with Federal Appellate Rule 38, and a Rule 7 bond does not encompass damages and penalties awardable under Rule 38. *See* Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *8 (N.D. Cal. Oct. 21, 2008).

227. One court explained, "It appears that a 'supersedeas bond' is retrospective covering sums related to the merits of the underlying judgment (and stay of its execution), whereas a 'cost bond' is prospective relating to the potential expenses of litigating an appeal." *Adsani*, 139 F.3d at 70 n.2. To the extent that a supersedeas bond can include the costs of delay during the pendency of the appeal, however, it has a prospective component.

228. As one court aptly observed, frivolous appeals of a judgment approving a class settlement are "tantamount to a stay" of the judgment. *In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *2 (D. Nev. Mar. 8, 2010). *See also In re* Checking Account Overdraft Litig., No. 1.09-MD-02036-JLK, 2012 WL 456691, at *2 (S.D. Fla. Feb. 14, 2012) (noting that the filing of an appeal by professional objectors "prevents distribution of the Settlement proceeds [and] is an actual stay of Judgment," making a Rule 8 bond appropriate).

from the question of the amount of the bond,[229] though the need for a bond is surely a function of the maximum amount of a bond. A standard formulation is that in deciding whether to impose a Rule 7 bond, "courts typically consider[:] (1) the appellant's financial ability to post a bond; (2) the risk that the appellant would not pay appellee's costs if the appeal is unsuccessful[;] (3) the merits of the appeal[;] and (4) whether the appellant has shown any bad faith or vexatious conduct."[230] The first two considerations are related, for the risk of nonpayment is a function of the individual's wealth, and wealth determines the person's ability to post a bond. An inquiry into the merits of the appeal is an inquiry into the probability that the appeal will fail, which when multiplied by the costs that can be assessed to a losing appellant equals the expected assessed costs of the appeal. The probability of failure must be greater than fifty percent, otherwise the district court would have reached the opposite result.[231] As the probability of failure increases, the expected costs increase, and an extortionate appeal is assumed to be one with a high probability of failure. If an inquiry into bad faith or vexatious conduct has independent significance, it cannot mean merely that an appeal has a low probability of success. In addition, in a circuit that prohibits a district court from setting a Rule 7 bond to take into account its judgment that an appeal is frivolous within the meaning of Appellate Rule 38, the fourth consideration must relate to conduct elsewhere in the litigation.

Courts have held that failure to post an appeal bond that a district court orders is not a jurisdictional defect; rather, an appellate court has discretion to dismiss an appeal when a bond is not posted or to consider the merits of the appeal.[232] Federal Rule of Appellate

---

229. *See, e.g.*, *In re AOL Time Warner*, 2007 WL 2741033, at *3 ("The question of whether to impose an appeal bond is distinct from the issue of what costs the bond can and should cover.").

230. Gemelas v. Dannon Co., No. 1:08 CV 236, 2010 WL 3703811, at *1 (N.D. Ohio Aug. 31, 2010). *See also* Blessing v. Sirius XM Radio Inc., No. 09 CV 10035(HB), 2011 WL 5873383, at *2 (S.D.N.Y. Nov. 22, 2011) (identifying same considerations); *In re* Countrywide Fin. Corp. Customer Data Sec. Breach Litig., No. 3:08-MD-01998, 2010 WL 5147222, at *3-4 (W.D. Ky. Dec. 13, 2010) (identifying same considerations); Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *6 (N.D. Cal. Oct. 21, 2008) (identifying same considerations); Chiaverini, Inc. v. Frenchie's Fine Jewelry, Coins & Stamps, Inc., No. 04-CV-74891-DT, 2008 WL 2415340, at *1 (E.D. Mich. June 12, 2008) (identifying same considerations); Baker v. Urban Outfitters, Inc., No. 01 CV. 5440 LAP, 2006 WL 3635392, at *1 (S.D.N.Y. Dec. 12, 2006) (identifying same considerations).

231. *Cf. Blessing*, 2011 WL 5873383, at *3 ("Naturally, this appeal in my view lacks merit, a factor weighing in favor of requiring a bond.").

232. *See, e.g.*, Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950, 961-62 (9th Cir. 2007) (noting that "it is within [the appellate court's] sound discretion to dismiss the appeal" when an appellant has failed to pay an appeal bond and finding dismissal inappropriate); Sams v. Hoechst Aktiengesellschaft (*In re* Cardizem CD Antitrust Litig.), 391 F.3d 812, 815-16 (6th Cir. 2004) (observing that "[a]lthough failure to execute a bond

Procedure 3(a)(2) supports this view, stating that "[a]n appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including the dismissal of the appeal."[233]

## B.  Proposed Approach

The above survey of existing law discloses three basic approaches to appeal bonds: (1) a bond may include only costs identified in Rule 39 and 28 U.S.C. § 1920; (2) a bond may include these costs and any costs to which the appellee would be entitled under an applicable substantive statute; and (3) a bond may include all costs imposed by a frivolous appeal. The first approach has the strongest legal foundation. The most natural reading of the rules of appellate procedure tie the costs that can be included in an appeal bond required under Rule 7 to the costs that can be taxed under Rule 39, and § 1920 costs can be included by authority of that statute. But appeal bonds are most tightly constrained under this approach, and as we explain below, the best method of addressing professional objector extortion is through appeal bonds that include the full costs of the appeal imposed on others, including appellate attorneys' fees and delay damages. The second approach offers greater promise, but bonds of the necessary magnitude are not consistently available under even this approach, for it is dependent on a wide array of substantive statutes with different cost-shifting provisions, many of which do not contemplate the imposition of full costs on a class settlement objector.[234] The third approach might permit the systematic requirement of adequate bonds, but it has been adopted by only one circuit, its contours are hazy, and it has the least satisfying basis in existing law. We therefore propose a change in the law as outlined below. We begin by laying out the elements of an effective method of using appeal bonds to suppress professional objectors, then provide refinements designed to avoid deterring legitimate appeals. Finally, we offer specific proposed rule amendments to implement our approach.

An appeal bond mechanism that effectively deters extortion will have three components: (1) a nonnamed class settlement objector is

---

for costs on appeal has been generally considered as not being jurisdictional . . . failure to execute such a bond unless exempted by law, is grounds for dismissal of the appeal" and finding dismissal appropriate (quoting Powers v. Citizens Union Nat'l Bank & Trust Co., 329 F.2d 507, 508-09 (6th Cir. 1964))).

233.  FED. R. APP. P. 3(a)(2).

234.  *Cf.* Marek v. Chesny, 473 U.S. 1, 43-51 (1985) (Brennan, J., dissenting) (describing variations in more than 100 fee-shifting statutes).

liable for the full costs of an appeal imposed on others, including all delay costs incurred by the class and class counsel and appellate attorneys' fees; (2) the objector must post a bond for the full costs of appeal; and (3) the appellate court cannot hear an appeal on the merits of the settlement or the bond requirement unless the bond is posted. The first two components are complements. A bond secures the amount for which the individual posting the bond will be liable in the event liability attaches. A bond is needed in the case of a class settlement objector regardless of the individual's perceived ability to pay the liability in part to avoid the cost of mistaken ability to pay and in part to avoid the cost of collection. That collection cost would itself be a source of potential extortion, albeit a limited one. The costs of appeal accumulate during the pendency of appeal. If the objector withdraws the appeal at some time after she files it, she would be liable for all costs incurred by others up to that time. This amount would be paid to the class and class counsel from the appeal bond.

The magnitude of the proposed liability and bond requires some elaboration. The object of an appeal bond is to make class counsel indifferent between defending an appeal and facing no appeal. Stated otherwise, if an appeal will impose no cost on class counsel, the payoff to class counsel in the noncooperative solution is zero. There is no cooperative surplus in a single-period game, and class counsel will not be willing to pay anything to rid themselves of an appeal that will cost them nothing. Assume for now that an appeal has no chance of success. If class counsel define their interests narrowly, without regard to the welfare of the class, liability and a bond set at appellate attorneys' fees plus interest on the attorneys' fees specified in the settlement render class counsel impervious to extortion. A bond routinely set in this amount would probably be sufficient to eliminate most professional objector extortion. But delay will impose costs on the class, certainly in the form of lost interest and perhaps in the form of higher settlement administration costs.[235] Class counsel who

---

235. If a settlement does not become effective until any appeals are concluded, an appeal imposes a delay cost on the class and class counsel in the form of lost interest, and it presumably imposes some lesser cost on the defendants, because the defendants do not buy peace as quickly as they otherwise would but do obtain interest on the settlement during the pendency of the appeal. If the parties anticipate the possibility of an appeal, they may take account of the expected cost of the delay in the settlement amount. The settlement amount would then represent a sharing of the loss caused by the appeal that reflects the disparate impact of delay. Class counsel and the defendants cannot eliminate the cost of an extortionate appeal by private agreement; they can merely allocate the loss between them. If the class is then compensated by the appellant for the full cost of delay, the class will be overcompensated. But the cost imposed on the appellant does not over-deter, because the excess compensation corresponds to the uncompensated loss incurred by the defendants. If class counsel and the defendants anticipate that the class will be fully compensated for any delay by the appellant, then the settlement amount would not reflect any sharing of the loss from delay by the defendants. The Fifth Circuit's assertion in this

perceive their interests to be coincident with those of the class they represent will incur the cost imposed on the class and to that extent a bond based solely on attorneys' fees will not adequately deter extortion, even when an appeal has no chance of success. Moreover, basing a bond on attorneys' fees alone might suggest that the law condones lawyers disregarding the interests of their clients in class litigation, a suggestion that might exacerbate agency problems in this context. To thwart extortion, therefore, the liability and bond should be set at the full cost of appeals imposed on others. This amount will include any appellate attorneys' fees incurred by defense counsel, for as long as an appeal would impose any costs on others, there is room for extortion.

An extortionate appeal, however, is likely to have some probability of success. For this reason, even if the full direct costs of appeal are shifted ex ante to the professional objector through an appeal bond, an appeal will probably impose some expected cost on class counsel; and in a repeated-game setting, professional objectors may be able to extort a settlement even if the expected monetary value of the appeal to the objector is more than the expected monetary value to class counsel. But the expected cost of a successful appeal is difficult to estimate. If the appeal succeeds, at a minimum, the direct costs of appeal will not be shifted to the objector. The appeal might result in a mere redistribution of the settlement fund among class members. It might result in an increase in the settlement fund. Attorneys' fees for past work might be unaffected, and class counsel might be compensated for additional work necessary to revise the settlement. But the appeal might instead result in a reduction in class counsel compensation, either by reducing attorneys' fees for completed work or by requiring class counsel to perform unpaid work, and class counsel will perceive their own reduced compensation as a cost of the appeal even if it is offset exactly by an increase in class compensation.

The implication of an appeal having some probability of success is that the imposition of the full direct costs of appeal on a losing

---

regard in *Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295, 299 (5th Cir. 2007) (per curiam), is perplexing. The court concluded that because the "settlement agreement makes no provision for the payment of pre-judgment interest," the parties "agreed that the financial time-value of the benefits to be paid under the settlement is not to be awarded to the plaintiffs," and the interest on the settlement during the pendency of the appeal was not a "cost" incurred by the class. The fact that a settlement agreement does not provide that the class will be paid interest during the pendency of an appeal on its face suggests that an appeal does injure the class, rather than that it does not. Perhaps the court means that the parties contemplated appellate delay in setting the settlement amount, so that the class was compensated ex ante. But contemplation of appellate delay means only that the cost of delay was allocated between the parties, and the defendants may have agreed to shoulder some of it. To refuse to impose the cost of delay on the appellant in such circumstances externalizes the cost to the class and the defendants in some proportions.

objector coupled with an appeal bond will not entirely eliminate the possibility of extortion. It will, however, substantially reduce its scope and probability. The expected cost of the appeal to class counsel will be a fraction of what it would otherwise be, and the expected cost of appeal is the upper bound on what class counsel would be willing to pay to avoid an appeal. It establishes the limit on what the objector can gain from extortion. Further, as the expected cost of the appeal to the objector increases, the threat that the objector would incur the cost as an investment in reputation becomes less credible.

The third component of an effective bond mechanism is that unless the objector posts the bond required by the district court, the appellate court cannot hear an appeal from a nonnamed class member objector on the merits of the settlement or on any aspect of the bond itself. If a professional objector can have any appeal relating to the class settlement considered by the appellate court without posting a bond, the bond requirement is toothless. The strategic importance of an appeal to the objector is that it postpones the date on which all litigation relating to the settlement is concluded, for the conventional settlement does not permit implementation until that date. If the appellate court hears an appeal challenging the imposition of a bond requirement or the amount of the bond set when the bond has not been filed, the objector has accomplished her strategic objective just as surely as if the court considers the merits of the settlement challenge without the posting of a bond. Anything other than the appellate court's summary dismissal of an appeal for failure to post a bond opens the way for extortion, because otherwise the objector could threaten to prolong the litigation by filing an appeal, whether she is willing to wait for a resolution or plans to withdraw the appeal prior to resolution.

Although implementing a restriction on hearing appeals absent the posting of a bond would require a change in federal practice, the change is not as radical as it might first appear. A major justification for hearing appeals now absent the filing of a required bond is the uncertainty in the law regarding the costs that may be included in a Rule 7 bond.[236] The first two components of a bond mechanism sketched above would eliminate most of that uncertainty. What would remain is uncertainty about the measurement of the full costs of appeal imposed on others. An objector would generally not be able to have an appellate court review the amount of the bond without posting the bond. This is not a trivial constraint, but it serves a vital purpose, and for reasons explored below the error costs should not be

---

236. For example, in one case the court considered an appeal even though the objector had not posted a required bond in part because the objector argued, correctly in the court's view, that the amount of the bond was legally erroneous. *Azizian*, 499 F.3d at 962.

high. An alternative would be to allow the appellate court routinely to consider on an expedited basis an appeal limited to the bond requirement or its amount. But the opportunity cost of considering bond appeals out of turn is unacceptably high, just as is the opportunity cost of considering the merits of the settlement challenge out of turn.

A bond mechanism containing the components described above would, therefore, greatly reduce though not eliminate the prospect of extortionate appeals, and it would do so at low administrative costs. A district court would have to determine the full costs of appeal, but in most cases the calculation could be made based on the terms of the settlement, readily available data on prevailing interest rates and average duration of appeals in the relevant circuit, estimates of appellate attorneys' fees, and evidence of marginal settlement administration costs. But requiring objectors to post properly calculated appeal bonds has the potential to deter legitimate appeals. To minimize this cost, we would permit the district court to reduce the amount of the bond to as low as the costs now set out in Federal Appellate Rule 39 and § 1920 when the judge determines that (1) the appeal is legitimate and (2) a bond for the full amount would effectively block the appeal. Correspondingly, if the appeal fails, the objector would be liable only to the extent of the bond required. We would implement this approach by establishing a presumption that a full appeal bond with an associated liability will be imposed in every case, allowing evidence of the appeal's legitimacy and the objector's limited financial wherewithal to rebut the presumption.

A reduction in the presumptive bond amount would require the necessary finding on both legitimacy and financial resources. Allowing a reduction merely because of the appellant's inability to pay would have the effect of facilitating extortion by poor professional objectors, or at least encouraging prosperous objectors to hide their wealth. The legitimacy requirement is designed to screen out extortionate appeals, and the limited financial capacity requirement is designed to reduce the cost of errors in finding legitimacy by imposing the full bond requirement on all appellants able to satisfy it. The principal evidence on the legitimacy of the appeal would be the district court's assessment of the probability of success. A legitimate appeal could certainly have a probability of success less than fifty percent—if the judge estimated the probability at above fifty percent, the judge would have erred in approving the settlement by her own assessment. As the court's estimate of the appeal's probability drops toward zero, the conclusion that the appeal is illegitimate becomes more likely. In determining legitimacy, the court would also be allowed to consider the quality of the briefs filed

and argument made by the objector in the district court, the behavior of the objector in the litigation, and the conduct of the objector in other cases. All of this bears upon the legitimacy of the appeal, an inquiry intended to identify appeals filed for the purpose of extortion.

Allowing an objector to avoid the normal bond requirement creates a risk that the district court will mistakenly allow professional objectors to appeal without posting the bond that is set to quash extortion. This is an error of underinclusion, but it is a manageable risk. The greater concern is that district courts will impose prohibitive appeal bonds on legitimate objectors, an error of overinclusion. Some argue that a large appeal bond required of any objector will deter the appeal, thus insulating the district court's decision from review,[237] and courts will have a tendency to impose the bond requirement even on legitimate objectors to avoid appellate scrutiny of their decisions.[238]

Recognize first that a large appeal bond will not always deter an appeal. The objector may post the bond. The expected liability embodied in a bond is a function of the probability of the appeal's success. The more likely the appeal is to succeed, the less likely the appellant will be held liable for appellate costs, and the more likely the party will post the bond and appeal. Professional objectors are likely to be deterred by the bond requirement, because they realize that they have little chance of success on appeal. But if a district court mistakenly believes that an appeal is illegitimate because it has a low chance of success, the objector may post the bond because of her assessment that the appeal has a much greater probability of success.

A district court might want to suppress appeals of class settlement approvals for two reasons. First—no judge wants to be reversed—reversal typically represents a criticism of the judge's work, and even constructive criticism may be unwelcome. Second, the reversal of a settlement approval will usually mean more work for the court, work that may be particularly onerous. District courts are busy, and class action litigation is often especially time consuming. If approval of a class settlement ends the litigation, the court can go on to other cases, but if the judgment is reversed, the court will be thrown back into the case. A judge need not consciously decide to impose a bond on a legitimate objector to thwart an appeal and thereby reduce the

---

237. *See, e.g.*, Vaughn v. Am. Honda Motor Co., 507 F.3d 295, 300 (5th Cir. 2007) (per curiam) (noting that the imposition of a large appeal bond may "insulate a district court's judgment in approving a class settlement from appellate review").

238. *See, e.g.*, Fitzpatrick, *supra* note 19, at 1656 ("[P]ermitting district courts to order large Rule 7 bonds effectively allows them to decide whether their own rulings can be challenged on appeal, and it is easy to [see] why they might over use this authority.").

chance of reversal. The judge may simply have a tendency to construe ambiguous evidence in a way that justifies the imposition of a bond.

A judge's interest in suppressing class settlement appeals is clear, but the strength of the tendency to pursue that interest by unduly burdening legitimate objectors with large bond obligations is not. We have no empirical proof that judges would be unbiased in appeal bond determinations, but there is some reason for optimism. The personal observations of one of the authors (Smith), who has spent nearly twenty-five years in the federal judiciary on both the district and circuit court levels, suggest that judges routinely try to do the right thing. This is no more than anecdotal evidence, and it goes more to negating the possibility that judges would deliberately impose appeal bond requirements on legitimate objectors to impede appeals than to negating the possibility that self-interest would infect the judges' analysis. But judges are not oblivious to the benefits they might derive from an appeal bond that quashes an appeal, and that recognition may induce judges committed to reaching the correct result to examine their bond decisions carefully, question their motivation, and err on the side of the objector. Indeed, the tendency to give the objector the benefit of the doubt and thereby facilitate extortionate appeals is one reason we propose establishing a presumption that a bond for the full costs of appeal will be imposed on all nonnamed class member objectors.

Further, district courts have resisted requests by class counsel to impose appeal bond requirements on settlement objectors within the limits recognized by circuit law in circumstances that easily could have justified their imposition.[239] In one case in the First Circuit, for example, class counsel requested an appeal bond of $350,300, and the court recognized that the attorney for the appellant had filed a "groundless objection," appeared to be "a repeat objector in class action cases," was proposing to file an appeal that " 'might be frivolous,' " and faced "a real possibility" of sanctions on appeal.[240] Circuit law permitted appeal bonds in an unlimited amount for

---

239. Of course the refusal to order a bond in the amount requested by class counsel when the court believes that the amount requested includes legally impermissible costs does not indicate that courts exercise discretion to maximize their own utility; they do not perceive that they have discretion. *See, e.g.,* Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 4680033, at *5, *8-10 (N.D. Cal. Oct. 21, 2008) (refusing a request to order a bond of more than $380,000 that included delay costs and setting the bond instead at $5,000 where the court concluded that delay costs may not be included in a bond); *In re* AOL Time Warner, Inc., Sec. & "ERISA" Litig., No. 02 Cv. 5575(SWK), 2007 WL 2741033, at *4 (S.D.N.Y. Sept. 20, 2007) (refusing a request to include in a bond the costs of delay in administering a settlement where such costs were not authorized by law).

240. *In re* Compact Disc Minimum Advertised Price Antitrust Litig., No. MDL 1361, 2003 WL 22417252, at *1, *2 & n.3 (D. Maine Oct. 7, 2003).

frivolous appeals.[241] But the court ordered a bond of $35,000, explaining, "I am . . . mindful of the fact that objectors sometimes serve a useful role in helping police class action settlements . . . . To pose too high a hurdle for objectors, therefore, could create a general deterrent that might well not comport with public policy."[242] In another case, the court refused to require objectors to file any appeal bond, despite evidence that "the objectors are represented by counsel who specialize in objecting to class-action settlements" and had been found to have "objected in bad faith" in other cases.[243] The court observed that "there are legitimate issues to pursue on appeal, and for that reason I cannot say that the appeals are meritless."[244] The court concluded, "[A]lthough it is possible that the objectors' true motives are to obstruct the settlement in the hopes of 'getting paid to go away,' the evidence in the record does not enable me to find that any objector is pursuing his or her appeal for an improper purpose."[245]

Again, this evidence is no more than suggestive. An empirical study we leave for another day would begin by comparing the number of cases in which an appeal bond request was denied with the number in which it was granted. But the evidence at least demonstrates that judges sometimes refuse to exercise their discretion to erect a bond barrier to appeal despite their knowledge that an appeal carries a risk of reversal with its attendant costs for the court.

Finally, district courts now are called upon to certify cases for appellate review, and they do so despite recognizing that they could reduce the probability of reversal and reduce the chances of adding to their workload by denying certification. Under 28 U.S.C. § 1292(b), a district court may certify for interlocutory appeal an order that involves "a controlling question of law as to which there is substantial ground for difference of opinion."[246] The court must also believe that an immediate appeal "may materially advance the ultimate termination of the litigation,"[247] and so certification ostensibly represents an act that would at worst leave the court's workload unaffected and at best reduce it. But certification

---

241.  *See* Sckolnick v. Harlow, 820 F.2d 13, 15 (1st Cir. 1987) (per curiam).

242.  *See In re Compact Disc*, 2003 WL 22417252, at *2.

243.  *In re* Lawnmower Engine Horsepower Mktg. & Sales Practices Litig., MDL No. 08-1999, 2010 WL 4630846, at *1 (E.D. Wis. Nov. 2, 2010).

244.  *Id.*

245.  *Id.* (citation omitted). *See also In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *1, *2 (D. Nev. Mar. 8, 2010) (rejecting request to order multiple objectors to post appeal bonds ranging from $608,000 to $2,286,000 where the appeals "are frivolous and are tantamount to a stay" of the judgment approving the settlement and instead setting the bond for each at $500,000).

246.  28 U.S.C. § 1292(b) (2006).

247.  *Id.*

nevertheless is an invitation by the district court for the appellate court to reverse its decision, and in some circumstances reversal will predictably prolong the litigation. For example, the court may recognize that absent interlocutory appeal its order permitting the litigation to continue will induce the parties to settle quickly, whereas interlocutory appeal will prolong the litigation for at least the duration of the appeal. Despite the potential adverse consequences for the district court, courts do certify cases for interlocutory review.[248] Similarly, under 28 U.S.C. § 2253(c), an appeal may not be taken from the final order in habeas corpus proceedings unless a circuit or district court judge issues a "certificate of appealability"; the judge may not issue the certificate unless the applicant has made a substantial showing of the denial of a constitutional right. The mechanism is designed to screen out frivolous appeals.[249] An appeal creates an opportunity for the reviewing court to reverse the district court, and reversal has the potential to increase the district court's workload. Yet district courts grant these certificates.[250]

One can think about an appeal bond mechanism as tantamount to a relaxed certification procedure. If an appeal bond precludes appeal, imposing it would have the same effect as would refusal to grant an appeal certification necessary for appellate review. And one alternative to a bond mechanism would be a requirement that nonnamed class member objectors obtain from the district court a certificate allowing appeal as a condition of appealing. Both a bond mechanism and a certification procedure would vest primary authority in the district court to police appeals. That is where the authority must be vested if extortionate appeals are to be effectively suppressed. Though that authority can be misused, the risk that district judges will misuse that power is less serious than the risk that professional objectors will continue to exploit their ability to hijack class actions. But a bond mechanism is not in fact binary, and a certification procedure is. A bond can be paid, and a court can

---

248. *See* 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3929, at 363 (2d ed. 1996) (reporting that in the early years of the statute appellate courts received applications in about 100 cases per year); Michael E. Solimine, *Revitalizing Interlocutory Appeals in the Federal Courts*, 58 GEO. WASH. L. REV. 1165, 1174-76 (1990) (reporting numbers of cases certified for interlocutory appeal by district courts).

249. *See, e.g.*, Sengenberger v. Townsend, 473 F.3d 914, 915 (9th Cir. 2006) (describing the certificate of appealability requirement as "a mechanism . . . to monitor and preclude the taking of frivolous appeals"); 16AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3968.1, at 76-77 (4th ed. 2008) ("Courts have noted that the COA requirement serves to protect the government from having to defend against frivolous appeals.").

250. *See* Nancy J. King et al., *Final Technical Report: Habeas Litigation in U.S. District Courts* 53 (2007) (reporting data on certificates of appealability in habeas cases granted by federal district courts), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/219559.pdf.

calibrate the amount of the bond to the harm that an appeal will do. Also, the proposed bond mechanism is only an extension of time honored appeal bond requirements. A certification procedure that by its terms permits a district court to insulate its decision from appellate review is not a mere extension of existing certification procedures, but a fundamentally different procedural device. The bond mechanism is preferable to a certification procedure even if the two devices would usually achieve the same ends because it is more supple and less radical.

Although district courts can generally be trusted to implement appropriately the appeal bond mechanism described above, courts undeniably would have substantial power. To prevent instances of serious abuse, appellate courts could exercise their mandamus power under the All Writs Act[251] to override the district court's decision by ordering the court to rescind or lower a bond. Such an order, where the bond is prohibitive and unjustified by the circumstances, would surely be in aid of the appellate court's jurisdiction.[252] This is no more than a last resort, for the appellate court can exercise its authority only to remedy clear abuses of discretion by a lower court.[253] But it should be no more than that, because if a writ of mandamus were a commonplace remedy, professional objectors could routinely seek it in the appellate court thereby bypassing the bond device, which would then fail to suppress extortion.[254] A mandamus proceeding "must be given preference over ordinary civil cases,"[255] and the extraordinary showing necessary for a writ of mandamus would allow the appellate court to dismiss on motion unexceptional petitions by professional objectors, blunting any value the petition would have as a basis of extortion.

## C. Rule Revisions

Implementing the appeal bond approach described above would require changes in the law, but they would not be difficult to make.

---

251.  28 U.S.C. § 1651 (2006).

252.  *See* WRIGHT, *supra* note 248, § 3932, at 473 ("The most fundamental condition imposed on issuance of the extraordinary writs by the courts of appeals is that they be in aid of jurisdiction.").

253.  *See* Mallard v. U.S. Dist. Court, 490 U.S. 296, 308-09 (1989) (recognizing that extraordinary remedy of mandamus may be used by appellate court to address clear abuse of discretion by district court); *see also* MICHAEL E. TIGAR & JANE B. TIGAR, FEDERAL APPEALS: JURISDICTION AND PRACTICE § 3.02, at 188 (3d ed. 1999) (noting that the Supreme Court has often stated that mandamus is an "extraordinary remedy").

254.  *Cf. In re* Catawba Indian Tribe of S.C., 973 F.2d 1133, 1135 (4th Cir. 1992) ("The very power of the writ of mandamus demands that its availability be limited to narrow circumstances lest it quickly become a shortcut by which disappointed litigants might circumvent the requirements of appellate procedure mandated by Congress.").

255.  FED. R. APP. P. 21(b)(6).

The necessary revisions could be accomplished in a number of ways, but the simplest approach would be to amend the Federal Rules of Appellate Procedure. Here, we set out three changes that would establish an effective bond mechanism. Our interest is in the substance of the proposed provisions, not the precise language; more elegant and technically precise amendments are no doubt possible.

- **Amend Federal Rule of Appellate Procedure 39 to add the following subdivision (f)**: "Notwithstanding other subdivisions of this rule, whenever a nonnamed member of a class certified under Federal Rule of Civil Procedure 23 appeals a judgment approving a settlement of the class action and the judgment is affirmed, the appellate court will tax the appellant the full costs of appeal imposed on others, including all costs of delay, attorney's fees incurred as a result of the appeal, and costs described in subdivision (e) and 28 U.S.C. § 1920, unless the court finds that appellant raised substantial issues of law and did not appeal primarily to obtain a payment for withdrawing the appeal.  If the court so finds, it will tax appellant the costs specified in subdivision (e) and 28 U.S.C. § 1920."

- **Amend Federal Rule of Appellate Procedure 7 to add the following subdivision**:  "Whenever a nonnamed member of a class certified under Federal Rule of Civil Procedure 23 appeals a judgment approving a settlement of the class action, the district court will require the appellant to file a bond in the amount of the expected costs specified in Rule 39(f) unless the court finds that (1) appellant raises substantial issues of law and does not appeal primarily to obtain a payment for withdrawing the appeal and (2) appellant would be financially unable to file a bond in that amount.  If the court so finds, the court will impose a bond in whatever amount it deems necessary to protect the interests of the class, but in no event will the bond be less than the costs specified in Rule 39(e) and 28 U.S.C. § 1920."

- **Amend Federal Rule of Appellate Procedure 3 to add the following subdivision**:  "A court of appeals may not hear an appeal brought by a nonnamed member of a class certified under Federal Rule of Procedure 23 seeking review of a judgment approving a settlement of the class action, an order under Rule 7 requiring the appellant to file a bond, or the amount of such a bond unless the appellant has filed any bond required by the district court under Rule 7."

## V. CONCLUSION

The business of professional objectors is to make insubstantial objections to class settlements on behalf of nonnamed class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose. Any payment represents a tax on class settlements, a tax that is imposed indiscriminately on class settlements and burdens the productive use of class litigation.

Class settlements, however, can be cozy deals that benefit class counsel and defendants at the expense of class members, and appellate review can be an important method of protecting the interests of the class. The policy objective is to suppress extortionate appeals without deterring valuable appeals, and to achieve the result at tolerable administrative costs. It is difficult to achieve. Various approaches have been tried or proposed, and none is perfect. We propose a system under which the district court that approves a settlement would presumptively impose an appeal bond requirement on nonnamed class member objectors for the full costs of appeal, including appellate attorneys' fees and delay costs, and such an appellant would be liable for those costs in the event the appeal fails. The presumption could be rebutted and the bond reduced by demonstrating to the district court's satisfaction that the appeal is legitimate and that the appellant is financially unable to post the full bond. The appellate court would generally be prohibited from considering an appeal unless the bond is posted.

Our approach is not perfect. It may not suppress all extortionate appeals, and it may suppress some legitimate ones. But we believe it offers greater promise of maximizing net benefits than any other approach. What is abundantly clear is that no method yet implemented has squelched this kind of extortion. Professional objectors continue to ply their trade. The time is right for a new approach, however imperfect.

930     *FLORIDA STATE UNIVERSITY LAW REVIEW*     [Vol. 39:865