IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: CERTAINTEED FIBER CEMENT :
SIDING LITIGATION : MDL Docket No. 2270
 :
This document relates to: :
ALL CASES :

O'NEILL, J. March 20, 2014

## MEMORANDUM

This multidistrict litigation arises out of the claims of plaintiffs Steve Clavette, Chad

Epsen, Monique Orieux, Chris Thames, Gwen Weithaus, Steven Wiedmeyer, Richard Tesoriero,

John Robards, Barbara Robards, James Dibley, Patricia Swanson and Koreen Grube against

defendant CertainTeed Corporation related to the alleged premature failure of CertainTeed-made

Weatherboards Fiber Cement Siding, Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling

and 7/16" Trim (collectively, Siding).  While the litigation progressed, the parties conducted

settlement negotiations and I preliminarily approved the parties' settlement on October 3, 2013.

Notice was sent to the members of the settlement class in accordance with the Court-approved

notice plan.  Plaintiffs have now moved for final approval of the settlement and for attorneys'

fees.  After reviewing the parties' submissions and holding a final fairness hearing on February

19, 2014, at which counsel for one group of objectors appeared, I will grant the motions for final

approval and for attorneys' fees.

## BACKGROUND

### I. Nature of the Claims

Plaintiffs claim that the Siding is defective and does not meet the standards represented in

CertainTeed's marketing materials.  Dkt. No. 87-1 at ECF p. 16.  They assert that while

CertainTeed marketed and represented the Siding to be "the finest-performing product of its kind," and "engineered for decades of superior protection, wear and durability," the contrary is true.  Id.  Instead, they claim that the Siding is defectively designed and manufactured in such a way that it prematurely fails, causing damage to underlying structures.  Id.  Deterioration of the Siding allegedly manifests as, inter alia, "cracking, surface crazing or micro-cracking, warping, bowing, product shrinkage and excessive gapping."  Id.  Plaintiffs contend that the Siding must be repaired or replaced sooner than reasonably expected as a result of the alleged defects.  Id.

CertainTeed contends that the Siding is manufactured to meet all ASTM, industry and CertainTeed standards and that, in many cases, problems observed with the Siding are a result of improper installation or storage.  Dkt. No. 86 at ECF p. 2.  Absent settlement of plaintiffs' claims, CertainTeed is prepared to contest liability by showing that its Siding met industry standards, that most homeowners with Siding installed had no problems with the Siding and that installation was often the cause of the failed Siding.  Id.  CertainTeed would assert legal defenses against plaintiffs' claims, including that its 50 year limited warranty for the Siding protects it against plaintiffs' claims.  Id.  CertainTeed also would argue that a class could not be certified.  See Dkt. No. 87-1 at ECF p. 52.

## II.    History of the Litigation

The first class action against CertainTeed relating to the alleged premature failure of its Siding was filed on November 30, 2010.  Dkt. No. 87-2 at ¶ 14.  The U.S. Judicial Panel on Multidistrict Litigation issued an order on August 8, 2011 transferring to this Court all of the subsequent actions concerning the Siding that were filed in federal district courts, finding that seven actions then pending "involve[d] common questions of fact, and that centralization under Section 1407 in the Eastern District of Pennsylvania [would] serve the convenience of the parties

and witnesses and promote the just and efficient conduct of this litigation."[1]  Id. at ¶ 15.

Prior to reaching the proposed settlement of plaintiff's claims, class counsel "investigated the cause of the Siding's alleged failure; the warranties that came with the Siding; the applicable legal standards for product defect cases involving defective construction materials; and relevant class action standards."  Dkt. No. 87-2 at ¶ 18.  "Class Counsel obtained and analyzed documents obtained in discovery, took and defended depositions, retained product defect experts from a national forensic engineering firm, interviewed over 300 witnesses, incurred significant costs relating to the forensic testing and analysis of the Siding and performed numerous on-site property inspections all over the country."  Id. at ¶ 20.  CertainTeed made initial discovery productions to co-lead counsel on March 23 and 24, 2011 and met with class counsel to provide its view of the merits of plaintiffs' claims on March 30, 2011.  Id. at ¶ 22-23.  "The parties began seriously engaging in an [alternative dispute resolution] track in or around June 2011" and continued to exchange discovery thereafter.  Dkt. No. 87-2 at ¶¶ 28-41, 44-45, 47-55, 57-60.  The parties also conducted depositions of some plaintiffs and a Rule 30(b)(6) deposition of CertainTeed.  Id. ¶¶ 56, 61.  On June 26 and 27, 2012, the parties engaged in a two-day in-person mediation session with the Hon. James R. Melinson.  Id. at ¶ 64.  All negotiations were at arm's length.  Id. at ¶ 65.  On August 15, 2013, following another in-person meeting between counsel

---

[1]     Specifically, the Multidistrict Panel consolidated the following cases in this Court for coordinated pretrial treatment:  Robards, v. CertainTeed Corp., No. 3:11-00141 (W.D. Ky.); Tesoriero v. CertainTeed Corp., No. 5:11-00109 (N.D.N.Y.); Clavette v. CertainTeed Corp., No. 2:10-06978 (E.D. Pa.); Orieux v. CertainTeed Corp., No. 2:11-0234 (E.D. Pa.); Epsen v. CertainTeed Corp., No. 11-269 (E.D. Pa.); Wiedmeyer v. CertainTeed Corp., No. 2:11-317 (E.D. Pa.); and Grube v. CertainTeed Corp., No. 2:11-396 (E.D. Wis.).  Following consolidation, four additional cases were transferred to this MDL:  Patota v. CertainTeed Corp., No. 1:11-2701 (N.D. Ga.); Juelich v. Certainteed Corp., No. 4:12-00417 (E.D. Mo.); Hocutt v. CertainTeed Corp, No. 5:12-5010 (W.D. Ark.); and Hardig v. CertainTeed Corp., No. 3:11-00535 (W.D.N.C.).  All cases are now under the caption In Re CertainTeed Fiber Cement Siding Litig., MDL Docket No. 2270.  Dkt. No. 87-2 at ¶ 16-17.  There have been subsequent cases transferred.

for CertainTeed and co-lead counsel, the parties reached the settlement agreement that I

preliminarily approved on October 3, 2013 and that is now before the Court for final approval.

Id. at ¶ 68; see also Dkt. No. 28.

## III.    The Limited Warranty and the Settlement

Siding, when purchased, was subject to a limited warranty.  With the exception of the

first two years following purchase (i.e., the CertainTeed SureStart period), the limited warranty

provided by CertainTeed restricts purchasers of the Siding to recover only the cost of the

affected Siding materials, reduced by a pro rata deduction for usage.  Under the limited warranty,

in the first two years after installation, should the Siding have a manufacturing defect,

CertainTeed provides labor and replacement Siding to building owners to resolve their claim.

Dkt. No. 87-4 at ¶ 3.  After the Siding has been installed for two years, the limited warranty

provides exclusively for replacement Siding.  Id.  It does not provide compensation for any labor

costs.  Id.  The limited warranty is also subject to a proration schedule whereby during years zero

through two, the consumer receives 100% of the original purchase price.  Id. at ¶ 4.  During years

three through fifty, claims are subject to a 2% reduction in purchase price for each year elapsed.

Id.

Ordinarily, to recover under the limited warranty, a property owner completes a claim

form and submits photos of their claimed problem.  Id. at ¶¶ 7-8.  From 1999 through 2013,

CertainTeed's Consumer Services Department for its Siding Products Group processed 19,520

Siding warranty claims.  Id. at ¶ 5.  Prior to the announcement of the settlement, the overall

claims rate for all alleged defects as a percentage of sales of the Siding was 1.7%.  Id.

The settlement now before the Court for consideration "does not extinguish Settlement

Class Members' warranty rights under their Limited Warranties that accompanied their purchase

of the Siding."[2]  Dkt. No. 107-1.  Instead, it provides class members with benefits beyond those

afforded by their existing limited warranties, in essence creating, a super warranty on the limited

warranty by providing for cash payments that not only include material costs, but also include

the costs associated with labor and paint.  See Dkt. No. 30 at ¶ 7.2 ("The value of the Siding with

Qualifying Damage for which the Claimant is Entitled to compensation . . . shall include the Cost

of Siding material, labor and paint.").  Unlike the limited warranty, the settlement also provides

for replacement of an entire wall where more than 5% of the Siding on the wall manifests

qualifying damage.[3]  Dkt. No. 87-4 at ¶ 10.

  After the claims submission period ends and for as long as their limited warranties remain

in effect, settlement class members may still make claims under their limited warranty for any

---

[2] Settlement class members were provided with a clarification with respect to the settlement agreement's effect on the limited warranty through a January 13, 2014 posting on the settlement website.  See Dkt. No. 87-1 at ECF p. 18.  The parties submitted a stipulation on this issue to the Court and the Court entered the stipulation as an Order on January 27, 2014.  Dkt. No. 83.  Class members can view the stipulation on the settlement website.  See Dkt. No. 87-1 at ECF p. 18.

  Also, on February 18, 2014, the parties executed and submitted to the Court Addendum A to the settlement agreement, which provides that plaintiffs and CertainTeed agree as follows:

> The Agreement does not extinguish Settlement Class Members' warranty rights under their Limited Warranties that accompanied their purchase of the Siding.  Following the Claims Submission Period, and for as long as their Limited Warranties remain in effect, all Settlement Class Members can pursue a warranty claim under their Limited Warranties for any portion of their Siding that has not already been subject to relief from CertainTeed or through the Class Action Settlement.

Dkt. No. 107-1.

[3] The settlement agreement does not cover "claims for damage to any interior part of a Settlement Class Member's structure beneath the house wrap (weather barrier) affixed to the structure.  Such claims for interior damage are expressly not released by the terms of this settlement."  Dkt. No. 30 at ¶ 5.6.

portion of their siding that has not already been subject to relief from CertainTeed or through the

settlement.  Dkt. No. 107-1.

## IV.      The Settlement Class and the Settlement Fund

Plaintiffs seek approval of a settlement class that is defined to include:

> All individuals and entities that, as of September 30, 2013, own
> homes, residences, buildings, or other structures located in the
> United States, on which CertainTeed Weatherboards Fiber Cement
> Siding, Lap Siding, Vertical Siding, Shapes, Soffit, Porch Ceiling
> and 7/16" Trim was installed on or before September 30, 2013.

Dkt. No. 30 at ¶ 1.1.bb.[4]  CertainTeed estimates that approximately 300,000 structures are clad

with the Siding.  Dkt. No. 87-4 at ¶ 11; Dkt. No. 87-5 at ¶ 17.  Most of the structures are

residential, approximately two percent are commercial buildings.  Dkt. No. 87-3 at ¶ 9; Dkt. No.

87-5 at ¶ 17.  Settlement class members are geographically dispersed throughout the United

States.  Dkt. No. 87-5 at ¶ 17.

Prior warranty claimants are not excluded from the settlement class.  Rather, settlement

---

[4]      Excluded from the settlement class are the following:

a.      all individuals and entities who timely exercise their rights
under Federal Rule of Civil Procedure 23 to opt out of this
settlement;

b.      all individuals and entities who filed a claim concerning
their Siding in any court of law, if that claim has been
resolved with a final judgment or order, whether or not
favorable to the claimant;

c.      CertainTeed, any entity in which CertainTeed has a
controlling interest, any entity which has a controlling
interest in CertainTeed and CertainTeed's legal
representatives, assigns, and successors; and

d.      the Judge to whom this case is assigned and any member of
the Judge's immediate family.

Dkt. No. 30 at ¶ 1.1.bb.

class members who have already

> resolved through warranty, settlement or adjudication a claim
> against CertainTeed relating to the Siding on a Wall Section that is
> different from the subject of the current claim will be deemed to
> have an Eligible Claim with respect to the Wall Section that was
> not the subject of the prior warranty, settled, or dismissed claim.

Dkt. No. 30 at ¶ 5.4.  Under the terms of the Settlement Agreement,

> [i]f a Claimant still has a valid SureStart warranty, they must first
> make a claim with CertainTeed under that warranty.  The Claimant
> may, after accepting compensation under the SureStart warranty,
> make a claim in this Settlement, but only to recover that amount
> which exceeds what they have already received from CertainTeed.

Dkt. No. 30 at ¶ 5.4.

The settlement agreement provides for a gross, non-reversionary cash Settlement Fund of

$103.9 million, which includes the costs of settlement administration, notice to class members,

service awards to named plaintiffs and attorneys' fees and costs.  See Dkt. No. 30 at ¶¶ 4.1, 4.4;

Dkt. No. 87-2 at ¶ 3.  Under the terms of the settlement agreement, CertainTeed is to make

payments into the settlement fund as follows:  (1)  $2 million was to be paid into the fund within

25 days of the entry of the preliminary approval order; (2) $35 million is to be paid into the fund

within 30 days of the Effective Date; (3) three equal installments totaling $22.3 million are to be

paid every 90 days following the first payment after the Effective Date; (4) four equal

installments totaling $22.3 million are to be paid in Year 2 of the Settlement, made on January 1,

April 1, July 1 and October 1; (5) four equal installments totaling $11.15 million on January 1,

April 1, July 1 and October 1 in Year 3 of the Settlement; and (6) in Year 4 of the Settlement,

four equal installments totaling $11.15 million on January 1, April 1, July 1 and October 1.  Dkt.

No. 30 at ¶ 4.1.  The settlement agreement also provides that if the balance of the Settlement

fund falls at any time below $5 million before CertainTeed makes its last payment into the fund,

"CertainTeed shall, within 14 business days of receiving written notice of the shortfall from Lead Counsel or the Claims Administrator, pay into the Fund an amount equivalent to the total amount paid out of the Fund during the previous three months."  Dkt. No. 30 at ¶ 4.2.

## V.  Compensation Under the Settlement

The amount of each cash payment to be made to claimants under the settlement is based on the amount of Siding eligible for replacement, the cost of removing and replacing damaged Siding (including paint) and the age of the Siding being replaced.  Payments will be calculated using the RS Means cost estimator.  RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country.  Dkt. No. 87-1 at ECF p. 20 n.5.  It has been used in the construction/building industry for almost 40 years.  Id.

Qualifying damage to Siding is defined as shrinkage between the ends of Siding in excess of 3/16", except that for Siding installed abutting windows, doors or trim, shrinkage must exceed 5/16".  Dkt. No. 30 at ¶ 1.1y.  Qualifying damage also includes Siding with warping in excess of 1/2", cracking through the board or delamination.  Id.  Claimants may qualify for a payment under the Settlement as follows:

a.    If Qualifying Damage exists on 5% or greater of either the total number of boards or on boards which represent 5% or more of the total square footage on the affected Wall Section, the Claimant is eligible for compensation for the number of boards on the entire wall section.

b.    If the Claimant does not qualify for compensation for the entire Wall Section pursuant to Section 7.2(a) [of the settlement agreement], compensation will be based on the actual number of boards or panels with Qualifying Damage and will be prorated based on the actual number of boards with Qualifying Damage plus any necessary boards immediately above or below the affected boards.  The proration for the materials will be based on the schedule

under the original warranty.  The remaining costs will
follow the schedule set forth . . . below.

c.      The schedule for valuing the claim is as follows:

| Date of Original Installation | Percent of RS Means at time of Final Approval |
|---|---|
| 2013 | 80% |
| 2012 | 76% |
| 2011 | 72% |
| 2010 | 68% |
| 2009 | 64% |
| 2008 | 60% |
| 2007 | 56% |
| 2006 | 52% |
| 2005 | 48% |
| 2004 | 44% |
| 2003 | 40% |
| 2002 | 36% |
| 2001 | 32% |
| 2000 | 28% |
| 1999 | 24% |

Id. at ¶ 7.2.

Plaintiffs contend that the cost of boards to re-side an average home (all four sides) is

approximately $14,000.  Dkt. No. 87-1 at ECF p. 21.  The average cost of siding a home in the

United States, including materials, labor and other expenses is approximately $500/square, with

a square consisting of 100 square feet of siding that comes in 12 foot lengths ranging in width

from 5 1/4 inches to 12 inches.  Id.  An average home requires about 28 squares.  Id.

Accordingly, plaintiffs offer the following example of a recovery for a Settlement class member:

> if two out of the four sides of an average size home built in 2006
> had qualifying damage in excess of 5%, and each of the sides was
> of equal size, then one-half of the 28 squares, or 14 squares, would
> need to be replaced.  According to the proration schedule in the
> Settlement Agreement, which reflects both a reduction for the
> number of years of service the homeowner received from the
> Siding, and the compromises inherent in the settlement process, the
> claim would be valued at 52% of RS Means, which equals $3,640
> ((14 squares x $500/square) x .52).

Dkt. No. 87-1 at ECF p. 22.

Plaintiffs note that all claims under the settlement will be paid on a two-payment schedule in order to ensure that claimants in year one are not treated differently from those who make claims in subsequent years. Id.; see also Dkt. No. 30 at ¶ 7.3. As soon as the claim is administered, a first payment will be made in the amount of 50% of the claim value. Dkt. No. 30 at ¶ 7.3. If monies remain in the settlement fund at the end of the six year claims submission period, a second payment will be made on a pro rata basis to all claimants who submitted valid claims, unless class counsel seeks Court approval to accelerate payments based on the claims rate. Dkt. No. 87-1 at ECF p. 22. The settlement provides that the claims administrator shall file annual reports of payments made to valid claimants during the prior year. Dkt. No. 30 at ¶ 6.29. The Court will review the annual reports and Co-Lead Class Counsel shall petition the Court for approval to release the second round of payments based on the funds available at or near the end of the Claims Submission Period. Depending on the claims rate, the second payment to claimants may equal the remaining 50% of the "full value of their claim with a reduction for usage." Dkt. No. 30 at ¶ 7.3.

Pursuant to Addendum B to the settlement agreement, executed by the parties and submitted to the Court on February 19, 2014,

> [i]f the Settlement Fund has not been exhausted following the expiration of the Claims Submission Period, the Claims Submission Period will remain open for as long as there are remaining funds. The Claims Administrator will continue to accept claims from Settlement Class Members until the Settlement Fund is exhausted. Settlement Class Members who submit Eligible Claims during this extended period of time will receive a one-time payment for their claim according to the proration schedule in Section 7.2(c) of the Settlement Agreement, up to the point the Settlement Fund is exhausted. The Claims Administrator will pay claims in the order in which they are received after the

> end of the Claims Submission Period, until the Settlement Fund is
> exhausted.

Dkt. No. 109.  All of the settlement fund, less attorneys' fees and costs, service awards and

claims administration costs awarded by the Court, will be paid to settlement class members.  Dkt.

No. 87-1 at ECF p. 22.  No money will be returned to CertainTeed at any time.  Id.[5]

## VI.   Resolution of Claims

The settlement agreement requires class members to submit a claim form containing

information regarding the amount of Siding installed and affected by qualifying damage in order

to calculate the remedy due under the Settlement.  The information sought on the claim form

does not differ significantly from the information sought by CertainTeed's Consumer Services

department through its usual limited warranty claims procedure.  Dkt. No. 87-4 at ¶ 7.  It asks for

information identifying the claimant and establishing the address and ownership of the building

where the Siding is installed.  Id. at ¶ 8.  Because qualifying damage is required to be eligible to

participate in the Settlement, and in order to prevent false claims, the claim form also requires

that settlement class members demonstrate with photographs that their Siding has, in fact,

manifested a defect.  Dkt. No. 30 at ¶ 6.6.  Photographs are required in lieu of the more onerous

---

[5]     Paragraph 4.5 of the settlement agreement provides, in relevant part, that
"unexpended funds shall be returned to CertainTeed."  Dkt. No. 30 at ¶ 4.5.  Addendum B,
submitted by the parties in response to objections to the proposed settlement, ensures that there
will be no unexpended funds following the Court's approval of the settlement.  This addendum
moots the Jabrani objectors' first objection that "there is no provision in the settlement or notice
for what happens to residual funds."  Dkt. No. 50 at ECF p. 6.
        The settlement agreement contemplated that the parties might make modifications to its
original terms, as they have done with Addendum B.  In paragraph 16.1, the parties agreed that
"in the event that the Court should refuse to approve any material part of this Agreement or the
exhibits thereto . . . then the parties may (but are not obligated to) agree in writing to amend this
Agreement and proceed with the Settlement as so amended."  Dkt. No. 30 at ¶ 16.1.  The
agreement also provides that "[a]ny agreement purporting to change or modify the terms of this
Agreement or the exhibits hereto must be in writing, signed by counsel for each of the parties to
this agreement."  Id. at ¶ 16.6.

task of removing the Siding and sending it to CertainTeed.  Dkt. No. 87-4 at ¶ 8.  Photographs are also required under the standard warranty claims process.  Dkt. No. 87-4 at ¶ 8. e.  Because there are several manufacturers of fiber cement siding and homeowners frequently do not know their siding manufacturer's identity the claim form also requests information that will ensure that the complained-of siding is in fact CertainTeed's Siding.  Dkt. No. 87-4 at ¶ 8; Dkt. No. 30 at ¶ 6.5.

If a claimant does not establish an eligible claim, the settlement agreement requires the claims administrator to send a letter to the claimant including "the reason why the Claimant has not shown an Eligible Claim."  Dkt. No. 30 at ¶ 6.12.  Claimants have two opportunities to remedy any deficiencies in their claim.  Id. at ¶ 6.13.  If a claim is denied, the claimant has a right to appeal the denial to an independent claims reviewer.  Dkt. No. 30 at ¶ 6.18.[6]

Settlement class members may file a claim form within six years of the Settlement's effective date, unless the Settlement Fund has not been exhausted following the expiration of the Claims Submission Period, in which case, the Claims Submission Period will remain open for as long as there are remaining funds.  See Dkt. No. 30 at ¶ 1.1.i; Dkt. No. 109.  Claim forms may be obtained by calling a toll-free number or downloaded online at the settlement website[7].  Id. at ECF p. 24.  The website will be available for the duration of the six year claims submission period.  Id.

## VII.   Named Plaintiffs

Plaintiffs move to have named plaintiffs Steve Clavette, Chad Epsen, Monique Orieux, Chris Thames, Gwen Weithaus, Steven Wiedmeyer, Richard Tesoriero, John Robards, Barbara

---

[6]   The appeals procedure available to claimants moots the Jabrani objectors' second objection that "[i]f the administrator decides to refuse to pay class members, class members have no recourse."  Dkt. No. 50 at ECF p. 6.

[7]   www.certainteedfibercementsettlement.com

Robards, James Dibley, Patricia Swanson and Koreen Grube finally appointed as class representatives.  Dkt. No. 87 at ECF p. 2.  They have also requested service awards in the total amount of $65,000 as follows:  (1) service awards of $2,500 per household awarded to named plaintiffs and class representatives Steve Clavette, Chad Epsen, Monique Orieux, Chris Thames, Gwen Weithaus, Steven Wiedmeyer, Richard Tesoriero, John Robards, Barbara Robards and Koreen Grube; (2) a service award of $2,500 to settlement class member Canal Park Lodge, LLC, who contributed to this litigation similarly as the named plaintiffs; and (3) service awards of $2,500 per household to plaintiffs Steve and Karyn Hardig; Salvatore and Brooke Bongiorno; William and Tina Brantly; Kirby and Jennifer Dean; Evan and Monica Epp; Christopher and Kelly Everetts; Mary Kathleen Harrison; Jim and Karen Macmonagle; Stephen and Laura McNally; Thomas and Cassandra Aiosa; Annie Cheung; Chester and Eva Tai; Lethanial and Melissa Saunders; Michael and Stephanie Sherman; and Sherman Green, all of whom were plaintiffs in this MDL.  Dkt. No. 87-1 at ECF p. 24-25.  Paragraph 4.4 of the settlement agreement provides that incentive fees to the named plaintiffs shall be paid out of the settlement fund.  Dkt. No. 30 at ¶ 4.4.

VII.    **Claims Administrator**

Plaintiffs also seek final appointment of Analytics (formerly BMC Group) as the claims administrator.  They seek approval of payments from the settlement fund to the claims administrator, whose fees for notice and claims administration totaled $1,369,695.42 as of January 29, 2014.  $1,318,153 of that amount has already been paid.  The claims administrator estimates that fees through the completion of claims processing will not exceed an additional $571,468.00.  Id. at ECF p. 25.  Paragraph 4.4 of the settlement agreement provides that, inter alia, "the Settlement Fund Shall be used by the Claims Administrator to pay the approved costs

of notice, claims administration, including the Claims Administrator and the Independent

Reviewer."  Dkt. No. 30 at ¶ 4.4.

## IX.    Class Counsel

Plaintiffs move for the appointment of Michael McShane of Audet & Partners, LLP and

J. Laddie Montague, Jr. and Shanon J. Carson of Berger and Montague, P.C. as co-lead counsel

for the settlement class.  Dkt. No. 87 at ECF p. 2.  Class counsel have petitioned the Court for

attorneys' fees payable from the settlement fund in the amount of $18,500,000.00 and costs in

the amount of $304, 996.65.  Id.[8]  Paragraph 4.4 of the settlement agreement provides that

attorneys' fees and costs are to be paid from the Settlement Fund.  Dkt. No. 30 at ¶ 4.4.

## X.    Notice

Also consistent with the Court's preliminary approval Order, the claims administrator

provided notice to the settlement class via:  (1) direct mailed notice to known class members

with pending, open and rejected warranty claims (when addresses were known and available);

(2) paid notice placements appearing regional editions of Parade Magazine and USA Weekend

as well as in hard copy and electronic trade publications; (3) paid television advertising targeting

potential class members; (4) paid internet advertising targeting potential class members; (5)

nationwide press release via PR Newswire's US1 distribution to more than 5,815 traditional

media outlets (print, TV and radio) and 5,400 websites and online databases; and (6) a dedicated

case website).  Dkt. No. 87-5 at ¶ 10.

Plaintiffs assert that the efforts undertaken to notify potential class members of their

rights under the Settlement reached approximately 82% of likely class members an average of

2.5 times each nationwide.  Id. at ¶ 75.  The notice plan began on October 23, 2013 and

---

[8]    Plaintiffs' fee approval motion is discussed in further detail below.

-14-

continued via print, the internet and television, giving class members time to see the notice and

respond accordingly prior to the deadline for exclusion and objections on December 31, 2013.

Id.

A short form notice was used in print ads and internet media.

> [P]rint advertisements explained:  (1) the type of Siding and dates
> covered by the class action; (2) the terms of the Settlement; (3) the
> legal rights of Settlement Class Members, including the right to
> request exclusion, object, and appear at the hearing; (4) the intent
> of class Counsel to petition for attorneys' fees and costs; and (5)
> the details for contacting the Claims Administrator and the website
> and toll-free phone number for obtaining additional information.

Dkt. No. 87-1 at ECF p. 66.  A long form notice was mailed to each settlement class member

with a valid mailing address who had pending, open or rejected warranty claims.  Id. at ECF p.

65.  The long form notice addressed:

> (1) subject-matter of the class action; including type of Siding and
> purchase dates covered by the class action[;] (2) explanation of
> how to submit a claim; (3) explanation of legal rights and choices
> available to Settlement Class Members, including the right to
> request exclusion, object, appear at the hearing, and send in a
> Claim Form; (4) explanation of benefits of settlement; (5) contact
> information for Class Counsel; (6) date, time and place of the final
> fairness hearing before the Court; (7) procedures and deadlines for
> objecting to the Settlement Agreement; (8) binding effect of the
> Settlement; and (9) notice that attorneys' fees and costs would be
> requested and incentive payments requested for the Named
> Plaintiffs.

Id. at ECF p. 66.

## XI.    Response of Settlement Class Members

To date, 790 class members have already submitted claim forms that have been reviewed

by the claims administrator.  Id. at ¶ 68.  The parties received twenty-three requests for exclusion

from the Settlement (opt-outs), two of whom have withdrawn their requests for exclusion.  Dkt.

No. 105.[9]

The parties initially received twenty-five objections to the Settlement, just a fraction of 1% of the potential class of 300,000 members.  Dkt. No. 87-3 at ¶ 4.  Eighteen of these objectors have since authorized the withdrawal of their objections to the settlement.  Dkt. No. 103 at ECF p. 4.  One objector has partially withdrawn its objection.  On March 19, 2014, I approved the withdrawal or partial withdrawal of these objections in accordance with Rule 23(e)(5) of the Federal Rules of Civil Procedure.  Dkt. No. 116.  Only seven objections remain following the final approval hearing.  See Dkt. Nos. 36, 38 (partial objection) 45, 50, 56, 62, 66; see also Dkt. No. 103 at ECF p. 4.  The remaining objections are directed at the amount of the settlement, the

_____

[9]     The persons who submitted requests for exclusion that have not been withdrawn are:

1.     Alderbrook Homeowners Association
2.     Chad and Tamra Baribeau
3.     Ryan and Kate Bruce
4.     Burlingame Ranch I Condominium Association, Inc.
5.     Richard E. Denney
6.     Richard and Donna Foerster
7.     Nicholas and Kylie Hughes
8.     Las Brisas Broadway, LLC and Las Brisas Forrest Palms LLC
9.     Thomas J. LaTour
10.    Ronald and Carol Maryott and the Ronald F. Maryott Bypass Trust
11.    Madison Valley Medical Center
12.    Fred and Kathleen Mayfield
13.    Oak Trail Homeowners Association
14.    Phi Beta Phi Sorority
15.    Raymond and Sharon Olson
16.    Roy Orr
17.    Glenn Schmolze
18.    Spectrum Acquisition Partners
19.    William and Sara Townsend
20.    Vail Lionshead Condominium Association, A/K/A Lodge at Lionshead Phase I Condominium Association and Lionshead Condominium Association Phase II, A/K/A Lodge at Lionshead Phase II Condominium Association
21.    Village Palos Verdes Homeowners Association

Dkt. No. 105.

plan of allocation including the proration schedule and the damages calculation method, the

rights of settlement class members to make claims, the scope of the release and the rights of

assignors, co-owners and prior claimants and the requested attorneys' fees.  See Dkt. Nos. 36,

38, 45, 50, 56, 62, 66.  Of the remaining seven sets of objectors, six are pro se and did not appear

at the final approval hearing.  Only the objection of Amirali and Janet Jabrani and Real Homes,

Inc., Dkt. No. 50, was raised by their counsel on their behalf at the final approval hearing.[10]

## DISCUSSION

### I.      Motion for Final Approval

#### A.      Class Certification

Class actions may be certified for settlement purposes only, but must meet the same

requirements under Rule 23 as classes certified for purposes of litigation.  In re Gen. Motors

Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 778  (3d Cir. 1995).

Accordingly, "[s]ettlement classes must satisfy the Rule 23(a) requirements of numerosity,

commonality, typicality, and adequacy of representation, as well as the relevant 23(b)

requirements, usually (as in this case) the (b)(3) superiority and predominance standards."  Id.

##### 1.      Rule 23(a):  Numerosity, Commonality, Typicality, Adequacy of Representation

Rule 23(a) states that:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable, (2) there

---

[10]      On February 17, 2014, the Jabrani objectors filed a motion for leave to file
supplemental objections.  Dkt. No. 106.  I denied the motion on March 19, 2014.  Dkt. No. 117.
      It is also worth noting that when asked at their depositions whether they had ever
reviewed the settlement agreement or calculated how much they would receive from the
settlement, both Amirali and Janet Jabrani testified that they had not.  Dkt. No. 103 at ECF p. 13,
citing Dkt. No. 103-1 at 56:6-18; 64:12-16 (A. Jabrani Dep.), and Dkt. No. 103-1 at 14:2-11 (J.
Jabrani Dep.).

> are questions of law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of the claims or
> defenses of the class, and (4) the representative parties will fairly
> and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "Rule 23(a) ensures that the named plaintiffs are appropriate

representatives of the class whose claims they wish to litigate" and "effectively limit[s] the class

claims to those fairly encompassed by the named plaintiff's claims."  Wal-Mart Stores, Inc. v.

Dukes, 131 S. Ct. 2541, 2550 (2011), citing Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147,

156 (1982).

### a.    Numerosity

The numerosity requirement is met when "the class is so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A "class does not need a magic number of

claimants" nor must the"[plaintiffs] allege the exact number or identity of the class members."

Cohen v. Chi. Title Ins. Co., 242 F.R.D. 295, 300 (E.D. Pa. 2007).  While there is no precise

number of putative class members that will ensure the numerosity requirement is met, a potential

class exceeding forty members is generally considered sufficient.  See Stewart v. Abraham, 275

F.3d 220, 226-27 (3d Cir. 2001) (finding that the threshold is approximately 40 class members).

Plaintiffs seek certification of a class of all persons and entities who own approximately

300,000 structures in the United States on which CertainTeed Siding was installed before

September 30, 2013.  Dkt. No. 87-4 at ¶ 11; Dkt. No. 87-5 at ¶ 17.  They readily meet the

numerosity requirement.

### b.    Commonality

Rule 23(a)(2) "provides that a proposed class must share a common question of law or

fact."  Sullivan v. DB Invs., Inc., 667 F. 3d 273, 311 (3d Cir. 2011).  "Commonality requires the

plaintiff to demonstrate that the class members have suffered the same injury."  Wal-Mart, 131 S.

Ct. at 2551 (citations and internal quotation omitted).  That is "[t]heir claims must depend upon a common contention . . . .  That common contention, moreover must be capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Id.

The common questions here are whether the Siding was prone to fail before the expiration of its warranted life and whether that failure was caused by a manufacturing or design defect.  These questions are capable of resolution on a class-wide basis.  Plaintiffs' claims arise from the same theories of breach of warranty, strict liability, negligence and other torts.  "The fact that the settlement agreement covers only very particular forms of damage confirms the existence of factual and legal commonality among the claims."  In re CertainTeed Corp. Roofing Shingle Prod. Liability Litig., 269 F.R.D. 468, 478 (E.D. Pa. 2010) (hereafter CertainTeed Roofing).  In light of the common questions central to this litigation, Rule 23(a)(2)'s commonality requirement has been met.

### c.        Typicality

Typicality requires the Court to assess "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentee's interests will be fairly represented."  Baby Neal v. Casey, 43 F.3d 48, 57 (3d Cir. 1994).  "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir. 1992) (citations and internal quotations omitted).  "The heart of this requirement is that the plaintiff and each member of the represented group

have an interest in prevailing on similar legal claims." Seidman v. Am. Mobile Sys., Inc., 157

F.R.D. 354, 360 (E.D. Pa. 1984).

     The second consolidated amended complaint alleges that CertainTeed's conduct in

designing, manufacturing, promoting and selling the Siding gives rise to a prima facie case of

liability to all persons who, like the named plaintiffs, experienced failure of the Siding prior to

the expiration of its warranted life.  Dkt. No. 13.  In order to prevail, the named plaintiffs and

each class member will be required to make the same factual presentation and legal argument

with respect to the common questions of liability.  Individual variations among the settlement

class members here do not render the named plaintiffs' claims atypical of those of the settlement

class, as each of their claims are predicated upon their being able to establish the premature

failure of their Siding.  Even if CertainTeed were to assert as a defense that poor installation

caused or contributed to problems with the Siding, there is a common issue regarding the

existence of the claimed defects.  See, e.g., CertainTeed Roofing, 269 F.R.D. at 478 (finding

typicality requirement was satisfied and holding that "[t]he named plaintiffs, like the remainder

of the class, claim to have suffered from defective CertainTeed shingles").

     A finding of typicality in this products liability case is not defeated by individual

variations among class representatives and class members concerning matters like the amount of

their damaged Siding because these variations are not relevant to the "factual and legal issues of

a defendant's liability [which] do not differ dramatically from one plaintiff to the next." Sterling

v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988); see also In re Orthopedic Bone

Screw Products Liab. Litig., 176 F.R.D. 158, 175 (E.D. Pa. 1997) ("[T]he fact that individual

class members may recover varying amounts from the settlement fund [as a result of

issues such as the extent of each class members' damages] does not defeat typicality."). Rule 23(a)(2)'s typicality requirement has been met.

### d.   Adequacy of Representation

The Court must be satisfied that: (a) the interests of the named representatives are not antagonistic to those of other class members; and (b) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation on behalf of the settlement class members. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004); Gen. Motors, 55 F.3d at 800-01 (3d Cir. 1995).

### i.   Class Representatives

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23 (a)(4). It insures "[t]hat the representatives . . . will competently, responsibly and vigorously prosecute the suit." Bogosian v. Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir. 1977), cert. den. 434 U.S. 1086 (1978). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." Larson v. AT&T Mobility LLC, 687 F.3d 109 n.35 132 (3d Cir. 2012), quoting Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 626 (6th Cir. 2007). I find that the named plaintiffs and settlement class members share an equal interest in demonstrating defects in the Siding and obtaining appropriate compensation from CertainTeed.

The Jabrani objectors complain of intra-class conflicts between settlement class members with existing qualifying damage and those who may incur qualifying damage in the future. Dkt. No. 50 at ECF p. 18-19. "An intra-class conflict will not necessarily prevent certification if the

settlement agreement contains sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict." Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 185 (3d Cir. 2012), citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 627 (1997).  I find that, as structured, the settlement allows for compensation both to settlement class members with present qualifying damage and those with latent damage. Claimants with current damage "also have an incentive to protect the ability of class members to make claims for future damage." Dewey, 681 F.3d at 186.  "[T]he settlement is structured to ensure that even [claimants with present damage] have an incentive to protect the rights of all members of the class to make future claims, and thus to align the interests of the representative plaintiffs with those of the class." Id.  For example, as plaintiffs contend, "[a] Claimant with Qualifying Damage on two of four wall sections may make a claim and seek recovery now for that damage, but is not precluded from submitting a claim for the remaining wall sections if such damage manifests at a future date." Dkt. No. 87-1 at ECF p. 40.  Cf. CertainTeed Roofing, 269 F.R.D. at 492 (approving a roofing shingle settlement with a similar claims period and proration schedule).  Accordingly, the class representatives will adequately represent the interests of the class under Rule 23(a)(4) because they can make the same claims as class members with latent claims.

### ii.       Class Counsel

Rule 23(g) of the Federal Rules of Civil Procedure requires consideration of four factors when analyzing the adequacy of class counsel:  "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation" and "the types of claims asserted in the action," "counsel's knowledge of the applicable law," and the "resources that counsel will commit to representing the class."

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv); see also In re Imprelis Herbicide Mktg, Sales Practices and Prods. Liab. Litig., --- F.R.D. ---- (2013), No. 11-md-02284, 2013 WL 5655478, at *5 (E.D. Pa. Oct. 17, 2013) ("The Court analyzes the capabilities and performance of Settlement Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g).").

Class counsel have prosecuted this litigation, by, inter alia, obtaining and analyzing documents obtained in discovery, taking and defending depositions, retaining product defect experts and incurring costs related to forensic testing and analysis of the Siding, interviewing over 300 witnesses and performing numerous on-site property inspections. Dkt. No. 87-2 at ¶ 20. They have experience in litigating mass tort class actions and product liability cases, have been lead counsel in other class action cases and possess the skill, experience and qualifications necessary to conduct the litigation on behalf of the settlement class members. See Dkt. No. 87-2; Dkt. No. 87-3. In particular, certain of the class counsel in this action previously represented a class in the settlement of similar claims against CertainTeed relating to CertainTeed-manufactured roofing shingles. See CertainTeed Roofing, 269 F.R.D. at 479 (finding that "[C]lass counsel . . . [were] more than qualified to represent the putative class members."). Class counsel fairly and adequately represent the interests of the class for purposes of certifying a settlement class.

### 2.    Rule 23(b):  Maintainability of the Class Action

In addition to satisfying all of the criteria of Rule 23(a), a party seeking class certification must also satisfy one of the requirements of Rule 23(b). Gen. Motors, 55 F.3d at 778. Plaintiffs assert that the settlement class qualifies for certification under Rule 23(b)(3), which permits class action lawsuits when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

a.      **Predominance**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem</u>, 521 U.S. at 594 (1997). "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." <u>In re Processed Egg Prods. Antitrust Litig.</u>, 284 F.R.D. 249, 263 (E.D. Pa. 2012), <u>citing</u> <u>Sullivan</u>, 667 F.3d at 297. The standard for predominance is "even more demanding" than Rule 23(a) commonality. <u>Comcast v. Behrend</u>, 133 S. Ct. 1426, 1432 (2013).

The settlement class members' claims are founded upon common legal theories related to the central issue of law and fact that dominates this litigation – whether or not the Siding is defective. Once that issue is determined on a class-wide basis, what remain for determination are matters such as the size of each affected wall and the age of the Siding. The use of an objective, class-wide formula in the settlement agreement to allocate the recovery sufficiently addresses any individualized questions relating to damages. <u>See</u> <u>Hall v. Best Buy Co., Inc.</u>, 274 F.R.D. 154, 166-67 (E.D. Pa. 2011) ("[W]here common liability issues that are susceptible to class-wide proof constitute a significant part of the case, predominance may be satisfied even where damages must still be proven by individually. This is particularly so where damages can be determined by formula, statistical analysis, or other easy or essentially mechanical methods.") (citation and internal quotation omitted). This is not a case where, in the settlement context, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." <u>Comcast</u>, 133 S. Ct. at 1433. If, on the other hand, this matter were litigated, there

-24-

would likely be individual questions raised by CertainTeed's defenses to the class members' claims.

### b. Superiority

Superiority requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998). I must consider "(1) class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the likely difficulties in managing a class action." Esslinger v. HSBC Bank Nevada, N.A., No. 10-3213, 2012 WL 5866074, at *5 (E.D. Pa. Nov. 20, 2012), citing Fed. R. Civ. P. 23(b)(3).

The settlement agreement renders this class action superior to other potential avenues of recovery for plaintiffs and the settlement class members. It provides persons with smaller claims who would otherwise be economically precluded from doing so with the opportunity to assert their rights, preserves the due process rights of each individual plaintiff in seeking compensatory damages and permits class members who remain interested in pursuing their own litigation with the right to opt-out. Indeed there have been twenty-one opt-outs to the litigation. Dkt. No. 105. At the same time, the settlement agreement serves to promote judicial economy through the efficient and consistent resolution of multiple claims in a single action. I find that the superiority requirement is satisfied in this case.

Because I find that the requirements of Rule 23(a) and 23(b)(3) have been satisfied, I will certify the settlement class.

**C.**      **Notice to the Class**

In a Rule 23(b)(3) class, notice of the class action must meet the requirements of both

Rule 23(c)(2) and Rule 23(e).  <u>CertainTeed Roofing</u>, 269 F.R.D. at 480.  "Rule 23(c) describes

the notice to class members when a court certifies a class, while Rule 23(e) describes the notice

required for settlement." <u>Grunewald v. Kasperbauer</u>, 235 F.R.D. 599, 609 (E.D. Pa. 2006).  Rule

23(c)(2) requires the court to direct the "best notice that is practicable under the circumstances."

Notice must be written in "plain, easily understood language" and be clear and "concise."  Fed.

R. Civ. P. 23(c)(2)(B).  Notice must also explain:

> (i) the nature of the action; (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses; (iv) that a class member
> may enter an appearance through an attorney if the member so
> desires; (v) that the court will exclude from the class any member
> who requests exclusion; (vi) the time and manner for requesting
> exclusion; (vii) the binding effect of a class judgment on members
> under Rule 23(c)(3).

<u>Id.</u>  Rule 23(e), "designed to summarize the litigation and the settlement and to apprise class

members of the right and opportunity to inspect the complete settlement documents, papers, and

pleadings filed in the litigation," provides a second set of requirements.  <u>Gates v. Rohm & Haas</u>

<u>Co.</u>, 248 F.R.D. 434, 445 (E.D. Pa. 2008).  Under Rule 23(e) prior to approving a settlement, the

Court must "direct notice in a reasonable manner to all class members who would be bound by

the proposal."  Fed. R. Civ. P. 23(e)(1).  "A court must determine that notice was appropriate

before evaluating the merits of the settlement itself."  <u>In re Am. Investors Life Ins. Co. Annuity</u>

<u>Mktg. and Sales Practices Litig.</u>, 263 F.R.D. 226, 237 (E.D. Pa. 2009).

As is further set forth above, notice of the settlement was provided to class members and

interested parties by U.S. mail, electronic mail, publication by newspaper, radio, television and

internet.  Dkt. No. 87-5 at ¶¶ 9, 28-57.  In their proposed supplemental objections, the Jabrani

objectors argue that class members were not given sufficient notice of the parties' January 24, 2013 stipulation that the settlement agreement was not intended to extinguish class members' pre-existing rights under the limited warranties for their Siding.  Dkt. No. 106 at ECF p. 2; see also Dkt. No. 83 (stipulation).  Although the stipulation post-dated the long and short form notices regarding the proposed settlement provided by U.S. mail, electronic mail, newspaper, radio and television, and its substance was not contained therein, it was posted to the settlement website prior to the final approval hearing.  The Jabrani objectors argue that "to the extent that Class Counsel then made changes to the settlement website, any such changes also were made after-the-fact and were not disclosed to class members reasonably in advance of the objection deadline."  Dkt. No. 106 at ECF p. 2 (emphasis omitted).

      I disagree with the Jabrani objectors' concerns regarding adequacy of notice.  Indeed, it was due to the notice of the proposed settlement provided to the class that an objector was able to lodge his concern regarding the implications of the settlement for the class members' rights under their limited warranties.  See Dkt. No. 65 at ECF p. 3 (now-withdrawn objection of Gary Juelich, asserting that "[t]he Settlement eliminates Settlement Class Members' express 50-Year Warranties for which they have already paid substantial sums").  Class counsel were then able to address this concern through the stipulation they entered into prior to the final approval hearing, Dkt. No. 83, and with the subsequent execution of Addendum A to the settlement agreement. Dkt. No. 107.  "Minor modifications may be necessary to a settlement agreement (indeed may be favorable to the class), and additional class notice is not always required because, e.g., of the cost of notice that would take recovered money from the class."  In re Remeron End-Payor Antitrust Litig., No. 02-2007, 2005 WL 2230314, at *19 (D.N.J. Sept. 13, 2005), citing In re Prudential Ins. Co. of Am. Sales Practice Litig., 962 F. Supp. 450, 473 n.10 (D.N.J. 1997) ("Class members

need not be informed of the [amendment to the settlement agreement] because the [settlement] is only more valuable with these changes").  I find that the information provided to the class prior to final approval of the settlement satisfies the requirements of Rule 23(c)(2) and Rule 23(e).

## D.    Final Approval of Settlement

Having determined that the proposed class may properly be certified and that notice to the proposed class was appropriate, I must determine whether the proposed settlement should be approved.  To do so, I must evaluate the fairness of the proposed settlement under Rule 23(e) of the Federal Rules of Civil Procedure, which provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  In other words, "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is 'fair, reasonable and adequate.'"  Prudential, 148 F.3d at 316, quoting Gen. Motors, 55 F.3d at 785.  In making my "independent, scrupulous analysis of the settlement terms," I bear in mind the "overriding public interest in settling class action litigation."  In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 351 (3d Cir. 2010) (citations and internal quotations omitted).

The Court of Appeals for the Third Circuit has identified nine factors to consider in evaluating the fairness, adequacy and reasonableness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses

omitted).  When appropriate, the Court should also consider other factors, including:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential, 148 F.3d at 323.  "[D]istrict courts must make findings as to each of the Girsh

factors, and the Prudential factors where appropriate," and "cannot substitute the parties'

assurances or conclusory statements for [their] independent analysis of the settlement terms."

Pet Food, 629 F.3d at 349-51.

        While the proponents of the proposed settlement bear the burden of establishing that it is

fair, adequate and reasonable, Gen. Motors, 55 F.3d at 785, "[o]bjectors bear the burden of

proving any assertions they raise challenging the reasonableness of [the] class action settlement."

In re Netflix Privacy Litig., 5:11-CV-00379 EJD, 2013 WL 1120801, at *11 (N.D. Cal. Mar. 18,

2013); cf. Fussell v. Wilkinson, No. 1:03-CV-704, 2005 WL 3132321, at *3 (S.D. Ohio Nov. 22,

2005) ("Objectors . . . have the burden of persuading this Court that the proposed settlement is

unreasonable."); Newberg on Class Actions § 11:42 (4th ed.) ("Although theoretically the

original settling parties may be said to have the burden of establishing the fairness of the

settlement in relation to third-party objectors, the invocation of these concepts does not really

add to the ordinary obligation of the settling parties to furnish adequate information for the

purpose of enabling the court independently to reach its own determination of reasonableness

and fairness.").

The parties contend that the settlement agreement is entitled to a presumption of fairness. A proposed settlement agreement is entitled to a presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001). "The presumption of fairness may attach even where a class is certified for settlement purposes only, as long as the requirement of adequate representation has been satisfied." CertainTeed Roofing, 269 F.R.D. at 484, citing Warfarin, 391 F.3d at 535. For the reasons set forth below I find both that the settlement agreement is entitled to a presumption of fairness and that it is fair, reasonable and adequate under Rule 23.

### 1.    Complexity Expense and Likely Duration of the Litigation

Approval of the settlement will guarantee a cash payment to class members with qualifying damage. Alternatively, if the parties were to continue to litigate this case, further proceedings would be complex, expensive and lengthy, with contested issues of law and fact regarding whether the Siding was defective and CertainTeed's defenses to plaintiff's claims. That a settlement would eliminate delay and expenses and provide immediate benefit to the class militates in favor of approval. See, e.g. In re Janney Montgomery Scott LLC Fin. Consultant Litig., No. 06-3202, 2009 WL 2137224, at *8 (E.D. Pa. July 16, 2009) (finding the first factor weighed in favor of settlement where "settlement allows both the class and Defendant to avoid the obstacles presented by protracted litigation" and "[c]onsiderable time, money and resources will be saved by approving the settlement").

## 2.      Reaction of the Class to the Settlement

The second factor "attempts to gauge whether members of the class support the settlement." Prudential, 148 F.3d at 318.  Out of a settlement class of approximately 300,000, only seven objections remain and there are only twenty-one opt-outs from the settlement.  Even if fewer than all of the class members submit claims, effectively reducing the number of class members who will benefit from the settlement, the number of objectors and opt-outs "is extremely low and is well in line with other cases in this circuit in which this factor was counted in favor of settlement approval." Imprelis, 2013 WL 5655478, at *9 (approving a settlement with twenty-four objections, 581 opt-outs from a potential class of 68,892 members) (citations omitted); see also In re Am. Bus. Fin. Servs. Inc., No. 05-232, 2008 WL 4974782, at *6-7 (approving a settlement with thirty-two written objections, seven objections voiced at the final hearing and eighty opt-outs from a class of 29,000 members).  Moreover, the remaining objectors' objections to the settlement, analyzed for their merits elsewhere in this opinion, are not sufficient to warrant a finding that the settlement is not reasonable.  I find that this factor weighs in favor of approval.

## 3.      Stage of the Proceedings and Amount of Discovery Completed

Approval of a settlement is favored where "[t]he parties arrived at an arms-length settlement . . . [with] a clear view of the strengths and weaknesses of their case." Bonett v. Educ. Debt Servs., No. 01-6528, 2003 WL 21658267, at *6 (E.D. Pa. May 9, 2003) (citation and internal quotation omitted).  "[P]ost-discovery settlements are more likely to reflect the true value of the claim and be fair." Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1314 (3d Cir. 1993).  As is detailed above, the parties engaged in an active pre-mediation exchange of information before reaching a settlement.  The proceedings and discovery undertaken provided counsel for the

parties with an adequate appreciation of the merits of the case before negotiating the settlement.

I find that the third Girsh factor favors approval of the settlement.

### 4.-6.  Risks of Establishing Liability, Proving Damages and Maintaining the Class Action Through Trial

Factors four through six – the risks of establishing liability, the risks of establishing

damages, and the risks of maintaining the class action through trial – require the Court to "survey

the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of

success against the benefits of an immediate settlement."  Warfarin, 391 F.3d at 537.  Plaintiffs

assert that even though they believe they would ultimately prevail at trial, "complex litigation

against large companies with able defense counsel has inherent risks."  Dkt. No. 87-1 at ECF p.

52.  They contend that if the litigation were to proceed to trial, CertainTeed would assert "that

Plaintiffs' claims are:  1) barred by the economic loss doctrine; 2) limited or excluded by

CertainTeed's limited warranties; and 3) caused by acts, omissions and/or conduct of third

parties" including "poor installation or storage for which CertainTeed bears no responsibility."

Id.

With respect to the risk of establishing liability, the Court should "examine what the

potential rewards (or downside) of the litigation might have been had class counsel elected to

litigate the claims rather than settle them."  Gen. Motors, 55 F.3d at 814.  As in the similar

multidistrict litigation regarding CertainTeed-made roofing shingles, here "[p]laintiffs' claims

present difficult questions of liability, both because of the defenses available to CertainTeed, and

because of the potential differences presented by each individual claim."  CertainTeed Roofing,

269 F.R.D. at 487.  This factor supports approval of the settlement.

With respect to damages, "what must be assessed is the 'expected value of litigating the

action rather than settling it at the current time.'"  CertainTeed Roofing, 269 F.R.D. at 488,

-32-

quoting Gen. Motors, 55 F.3d at 816.  If liability were to be established, "[t]he damages computation would be relatively simple," as "CertainTeed's warranty program already provides a system for computing damages."  CertainTeed Roofing, 269 F.R.D. at 488.  I find that this factor is neutral.

The risk of maintaining the class action through trial is measured by considering "the likelihood of obtaining and keeping a class certified if the action were to proceed to trial." Warfarin, 391 F.3d at 537.  Absent settlement, CertainTeed would contest certification of a class arguing, inter alia, that a class action is not manageable.  The settlement eliminates the risk that certification of the class would be denied as a result of individual defenses or damage issues.  I find that this factor supports approval of the settlement.

### 7.	Ability of CertainTeed to Withstand a Greater Judgment

No party has provided the Court with specific information concerning CertainTeed's ability to pay a larger sum.  "In such a setting, it is open to the court to find that this factor is neutral."  CertainTeed Roofing, 269 F.R.D. at 489.  Even if CertainTeed could pay more, it does not mean that it is obligated to pay any more than it has agreed to pay into the settlement fund based on the theories of liability that existed when the parties reached their agreement on the size of the settlement fund.  See Warfarin, 391 F.3d at 537-38.  Given the absence of information now before me with respect to this factor, I find that it neither favors nor disfavors settlement.

### 8. & 9.	Reasonableness of the Settlement Fund Compared to the Best Possible Recovery and in Light of the Risks of Continued Litigation.

The final elements "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  Warfarin, 391 F.3d at 538.  The best possible

recovery in this case would provide immediate compensation for the entire cost of replacing

class members' damaged Siding, including materials, labor and paint, with no proration for past

use.  On the other side of the coin, if CertainTeed were to prevail at trial, class members would

only be able to recover under their existing warranties.  Here, the settlement provides instead that

CertainTeed will pay $103.9 million in cash plus any interest accrued to resolve the claims of

plaintiffs and the settlement class in a series of installments.

Although many of the remaining objectors express complaints that the settlement does

not offer them sufficient monetary compensation, including for costs associated with necessary

reinstallation of underlying house wrap or repainting of unaffected Siding to match any Siding

replaced under the settlement, see Dkt. Nos. 36, 45, 50, 56, 62, 66, their objections do not take

into account the risks and costs that would ensue with further litigation of their claims.  "The

value of the settlement to each class member represents a reasonable discount from the best

possible judgment if they were to prevail after a trial."  Am. Bus. Fin. Servs., 2008 WL 4974782,

at *9.  "[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty

and resolution."  Gen. Motors, 55 F.3d at 806.

Likewise, the objection that the settlement agreement is not punitive, Dkt. No. 36 at ECF

p. 2, fails to take into account that settlements are inherently voluntary agreements between the

parties that reflect a compromise and that defendants are unlikely to agree to settlements that are

punitive.  Settlements may be fair, reasonable and adequate without being punitive.

Further, despite certain objectors' objections to the award of prorated compensation, see,

e.g. Dkt. No. 56, 62, 66, prorating compensation for labor and replacement siding according to

the year when the Siding was installed correlates compensation amounts under the settlement

with actual damages and ensures that class members do not receive windfall profits at a

detriment to other members of the class.  See CertainTeed Roofing, 269 F.R.D. at 490 ("Both the

agreement and the warranty program prorate compensation to take into account the use of the

shingles that claimants have already enjoyed.  Proration is typical for warranty payments.")

(citation omitted).  RS Means is a reasonable, objective method to calculate claim value.

 J. Michael Scott objects to the staged payment of claims from the settlement fund,

arguing that because the initial payment constitutes only 50% of the calculated compensation,

class members will suffer undue hardship in having "to come up with adequate funds for repair,

especially after calculating for depreciation" and asks instead for the initial payment to be 75%

of the calculated compensation.  Dkt. No. 62 at ECF p. 2.  I find that the compromise of a staged

payment reasonably balances individual class members' desire for immediate payment with the

need to preserve sufficient monies in the settlement fund to ensure that later claimants also

receive compensation for damage to their Siding.  Immediate and "full compensation is not a

prerequisite for a fair settlement. . . . While each individual class member has a desire for greater

relief, the Court's inquiry turns on whether the terms of the settlement are fair, reasonable and

adequate, and not whether each class member gets everything he or she desires."  Alin v. Honda

Motor Co., Ltd., No. 08-4825, 2012 WL 8751045, at *14 (D.N.J. Apr. 13, 2012).  I will overrule

any objections concerning the two-payment claims process.

 The Jabrani objectors contend that "the $103.9 million valuation of the settlement is

illusory" and further that "class counsel cannot take credit for giving the class what they already

had."  Dkt. No. 50 at ECF p. 12.  I disagree with their contentions.  Under the settlement,

claimants with qualifying damage will receive a substantial percentage of the value of their claim

and, depending on the amount of funds remaining at the end of the initial six year claims

submission period, may receive up to 100% of their damages.  All class members who make

claims during the initial six year claims period and have qualifying damage will receive compensation toward labor for the replacement of their siding, even if the siding incurs damage beyond the first two years of the applicable limited warranty.  Also, claimants with damage to 5% or more of a wall side will received prorated compensation to replace the entire wall, not just damaged boards.[11]

At the final approval hearing, counsel for the Jabrani objectors also expressed concern that there is insufficient proof regarding CertainTeed's financial wherewithal to make the required scheduled payments into the settlement fund.  The Jabrani objectors have not, however, provided the Court with any reason to disbelieve the representations of counsel for CertainTeed that CertainTeed will have the ability to fulfill its scheduled payment obligations under the agreement.

Ultimately, the settlement agreement provides more compensation in most cases than class members would receive under CertainTeed's warranty program.  Factoring in the risks the parties would face if the plaintiffs' claims were to proceed to trial, I find that the eighth and ninth Girsh factors weigh in favor of settlement.

Because I conclude that application of the Girsh factors results in a conclusion that the settlement is fair, reasonable and adequate under Rule 23(e), I will approve the settlement.

---

[11]     The Jabrani objectors also object on the basis that class members with latent damage may be precluded from making claims even though "it is unlikely the settlement fund will be exhausted."  Dkt. No. 50 at ECF p. 18-19.  Indeed, they contend that it is "likely there will be tens of millions of dollars left over."  Id.  This objection is rendered moot by the addition of Addendum B to the settlement agreement, which provides that "[t]he Claims Administrator will continue to accept claims from Settlement Class Members until the Settlement Fund is exhausted."  Dkt. No. 107.  Accordingly, even late claimants will not be precluded from making claims if monies remain in the settlement fund after the second distribution is made to claimants.

## II.   Motion for Attorneys' Fees

### A.   Appointment of Class Counsel

Before awarding attorneys' fees and having granted final certification of the settlement

class I "must appoint class counsel." Fed. R. Civ. P. 23(g)(1); see also Sheinberg v. Sorensen,

606 F.3d 130, 132 (3d Cir. 2010) ("[U]nder the plain language of the rule, a district court's

decision to certify a class must precede the appointment of class counsel."). Plaintiffs move for

final appointment of Michael McShane of Audet & Partners, LLP and J. Laddie Montague, Jr.

and Shanon J. Carson of Berger and Montague, P.C. as co-lead counsel for the settlement class.

In appointing class counsel, I

> must consider:  (i) the work counsel has done in identifying
> or investigating potential claims in the action; (ii) counsel's
> experience in handling class actions, other complex
> litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and (iv) the
> resources that counsel will commit to representing the
> class.

Fed. R. Civ. P. 23(g)(1)(A).  As is further set forth above, counsel have capably pursued this

litigation on behalf of the class and negotiated the settlement on behalf of plaintiffs.  Their work

on the claims in this case has involved the expenditure of a substantial amount of time and

resources.  I conclude that counsel's work on this case and their prior experience suffice to show

that these firms are qualified to fairly and adequately represent the interests of the settlement

class.  See Dkt. No. 87-2; Dkt. No. 87-3.

### B.   Attorneys' Fees

Co-lead counsel, on behalf of all plaintiffs' counsel who filed one or more cases that were

transferred to this court by the judicial panel on multi-district litigation, have petitioned the court

for attorneys' fees payable from the settlement fund in the amount of $18,500,000 (17.8% of the

settlement fund).  Dkt. No. 89-1 at ECF p 12.  "An award of attorneys' fees is a discretionary

matter, considering the unique factors of the case."  Imprelis, 2013 WL 5655478, at *13.

"Class counsel in a class action who recovers a common fund for the benefit of persons

other than himself or a client is entitled to a fair and reasonable award of attorneys' fees from the

fund as a whole."  In re Am. Investors Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,

263 F.R.D. 226, 234 (E.D. Pa. 2009), citing Boeing Co. v. Van Gemert, 444 U.S. 472, 278

(1980).  Application of the common fund doctrine "prevent[s] . . . inequity by assessing

attorney's fees against the entire fund, thus spreading fees proportionately among those

benefitted by the suit."  Boeing, 44 U.S. at 478.  The Court of Appeals for the Third Circuit

generally favors the percentage-of-recovery method for fee calculation in common fund cases.

See, e.g. In re Diet Drugs, 582 F.3d 524, 540 (3d Cir. 2009) (citation omitted) ("In common fund

cases such as this one, the percentage-of-recovery method is generally favored.").  The lodestar

method is more commonly applied in statutory fee-shifting cases.  See Gen. Motors, 55 F.3d at

821.

**A.    Analysis Under the Percentage-of-Recovery Method**

Applying the percentage-of-recovery method, class counsel request fees totaling 17.8%

of the common fund:  $18.5 million of the $103.9 million settlement fund.  In determining a

reasonable fee award in common fund cases the Court of Appeals requires consideration of the

following factors:

> (1) the size of the fund created and the number of persons
> benefitted; (2) the presence or absence of substantial objections by
> members of the class to the settlement terms and/or fees requested
> by counsel; (3) the skill and efficiency of the attorneys involved;
> (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by
> plaintiffs' counsel; (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  The Court should

also consider:

> (1) the value of benefits accruing to class members attributable to
> the efforts of class counsel as opposed to the efforts of other
> groups, such as government agencies conducting investigations,
> . . . (2) the percentage fee that would have been negotiated had the
> case been subject to a private contingent fee agreement at the time
> counsel was retained . . . ; and (3) any "innovative" terms of
> settlement . . . .

In re AT & T Corp., 455 F.3d 160, 165-66 (3d Cir. 2006), citing Prudential, 148 F.3d at 338-342.

These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may

outweigh the rest."  Gunter, 223 F.3d at 195 n.1.  District courts must "engage in robust

assessments of the fee award reasonableness factors when evaluating a fee request."  In re Rite

Aid Corp. Sec. Litig., 396 F.3d 294, 302 (3d Cir. 2005).  After such an assessment, I find that

these factors weigh in favor of approving the attorneys' fee petition in this case.

### 1.      Size of the Fund and the Number of Beneficiaries

The value of the benefit obtained for the class is an important factor in determining

whether the requested fee is reasonable.  See Hensley v. Eckerhart, 461 U.S. 424, 436 (1983);

see also In re Baby Products Antitrust Litig., 708 F.3d 163, 178 (3d Cir. 2013) (holding that the

Court should consider counsel's responsibility to seek an award that adequately prioritizes a

direct benefit to the class).  The Settlement Agreement establishes a common fund of $103.9

million and notice has been disseminated to a potential class of 300,000 members.  Plaintiffs

contend that

> [t]he size of the settlement was driven by the long-developing
> proof of liability, including consideration of both the strengths and
> weaknesses of the plaintiff's claims, the difficulties and risks
> associated with the class certification process, and the calculation
> of damages, including the consideration of the impact of
> CertainTeed's Limited Warranty that limited its liability and the

> often substantial unimpaired usage of the product by Class
> Members.

Dkt. No. 89-1 at ECF p. 31.  Looking to CertainTeed's historical warranty claims data, plaintiffs estimate that under the existing limited warranty CertainTeed would have paid only approximately $3.8 million to class members during the claims submission period established under the settlement.  Dkt. No. 89-1 at ECF p. 33.  Removing this amount from the gross settlement amount would still leave a settlement valued at $100.1 million.[12]  The settlement provides class members with a right to obtain a significant recovery in the event their Siding sustains qualifying damage, providing compensation that exceeds the limited benefits of their existing limited warranty including through payments covering the costs of labor and paint.  In light of the risks faced in this litigation, counsels' efforts have resulted in a substantial recovery on behalf of the class members.  I find that this factor favors the requested fee award.

### 2.      Presence or Absence of Substantial Objections by Class Members

Initially, only twenty-five objections to the settlement were received.  Dkt. No. 87-3 at ¶ 4.  Only seven objections to the settlement remain following the final approval hearing.  See Dkt. No. 103 at ECF p. 4.  Of the remaining objections, only the Jabrani objectors have objected specifically to the attorneys' fees requested.  The absence of substantial objections is evidence that the class is satisfied with the requested fee award and supports its approval.  See In re Cendant, 232 F. Supp. 2d at 337 (citation omitted) (determining this factor weighed in favor of approving fees where six of the 200,000 shareholders noticed objected to fees); In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305 (3d Cir. 2005) (finding in support of approving the requested fees where there were two objectors out of 300,000 class members).

---

[12]      Class counsel's requested $18.5 million fee would be approximately 18.48% of this reduced amount.

The Jabrani objectors contend that the class did not receive adequate notice of the request for attorneys' fees.  See Dkt. No. 50 at ECF p. 25 (asserting that the class did not receive notice "about the basis for [class counsel's] fee request" before the deadline for objections to the settlement); Dkt. No. 106-3 (same).  Rule 23(h)(1) of the Federal Rules of Civil Procedure provides that "[a] claim for an award must be made by motion under Rule 54(d)(2), . . . at a time the court sets.  Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."  In support of their argument, the Jabrani objectors cite to In re Mercury Interactive Corp. Securities Litigation, 618 F.3d 988, 993 (9th Cir. 2010), which held that Rule 23(h) "requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed."  To date, however, the Court of Appeals for the Third Circuit has not interpreted Rule 23(h) to include a requirement that applications for attorneys' fees in class action settlements must precede the objection deadline.

I find that even though the motion for final approval of attorneys' fees was filed after the deadline for objections, class members were provided with reasonable notice of class counsel's fee request and that the notice given was sufficient to satisfy the requirements of due process.  In their motion for preliminary approval of the settlement, class counsel notified the Court of their intention to "petition the Court for reasonable attorneys' fees payable from the Settlement Fund in an amount not to exceed $18,500,000 (17.9% of the Settlement Fund), and costs not to exceed $500,000."  Dkt. No. 25-1 at ECF p. 15.

> In its ensuing fee motion, class counsel requested fees and costs in the precise amounts specified in the settlement notice and divulged additional information regarding counsel's billing rates, hours worked, and tasks performed.  Any objectors then had [three weeks from the January 29, 2014 filing of the motion for fees] to crystallize their objections and request further information before

-41-

attending the fairness hearing.

Cassese v. Williams, 503 F. App'x 55, 58 (2d Cir. 2012) cert. denied, 133 S. Ct. 2023, 185 L. Ed. 2d 886 (U.S. 2013). The Jabrani objectors had a full and fair opportunity to argue their objections about the specifics of the fee petition at the fairness hearing.

The Jabrani objectors contend that "the Court should limit counsel's fee award to a reasonable percentage of the amounts actually claimed . . . ." Dkt. No. 50 at ECF p. 19. In support of their objection they assert that the Notes of the Advisory Committee on the 2003 Amendments to Rule 23(h) "counsel that the 'fundamental focus is the result actually achieved for class members'" and advise 'defer[ring] some portion of the fee award until actual payouts to the class are known.'" Dkt. No. 50 at ECF p. 23, citing Notes of Advisory Committee on 2003 Amendments to Rule 23(h). This objection lacks merit in light of the addition of Addendum B to the settlement agreement, which provides that "[t]he Claims Administrator will continue to accept claims from Settlement Class Members until the Settlement Fund is exhausted." Dkt. No. 107. Any contention by the Jabrani objectors that there will not be enough claims made to deplete the settlement fund is mere speculation. See, e.g. Dkt. No. 50 at ECF p. 15 ("there will be tens of millions of dollars unaccounted for in this settlement in 2019"). Ultimately, members of the class will receive the full benefit of the entire settlement fund.

The Jabrani objectors also object to the fairness of an immediate award of attorneys' fees when "the class will not receive the vast majority of its benefits until 2019." Dkt. No. 106-3 at ECF p. 11. The Jabrani objectors have given the Court no reason beyond speculation to disbelieve CertainTeed's assertions that it has access to sufficient funds to permit it to fulfill its obligations to pay into the settlement fund and I find there is no reason to delay the award of attorneys' fees until after the settlement fund is fully financed.

Because the only objections to the fee award are not sufficient to warrant a finding that the requested fee is not reasonable, I find that this factor weighs in favor of approval of the fee award.

### 3.      Skill and Efficiency of the Attorneys Involved

In evaluating the skill and efficiency of the attorneys involved, courts have looked to "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."  In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 194 (E.D. Pa. 2000).  Class counsel include skilled attorneys with experience in class actions, as illustrated by the exhibits accompanying the fee application.  Dkt. No 89-2; Dkt. No. 89-3.  Moreover, defendants were represented by attorneys with experience in complex litigation, including asbestos litigation defense.  This factor also favors approval of the fee award.

### 4.      Complexity and Duration of the Litigation

Plaintiffs' case involves complex claims and defenses that have been litigated since 2011.  Class counsel "reviewed thousands of pages of documents, conducted site inspections of class representatives' and class members' homes, conducted depositions, and retained leading building product experts to test and analyze the Siding."  Dkt. No. 89-1 at ECF p. 37.  Class counsel have also participated in mediation sessions and submitted filings to the Court.  Absent settlement, litigation would likely continue for some time and would require both plaintiffs and defendants to incur considerable expert witness fees and other expenses.  I find that the complexity and duration of the litigation weigh in favor of the requested award of fees.

### 5.      Risk of Nonpayment

As plaintiffs assert, "[t]his case was not remotely a 'slam-dunk' with regard to liability." Dkt. No. 89-1 at ECF p. 39.  Class counsel, whose fee is contingent on a favorable outcome, have prosecuted this complex case for three years without any guarantee of payment.  Inherent in the prosecution of plaintiffs' claims were:  the risk that CertainTeed would prevail in shifting responsibility for any damage to the Siding to class members, installers or other third parties; the risk that CertainTeed could limit the defects in the Siding to a particular plant or a particular period in time; and the risk that CertainTeed would prevail on its challenges to class certification. Class counsel were by no means guaranteed payment when they accepted the responsibility of pursuing this litigation on a contingent fee basis.  "Any contingency fee [arrangement] includes a risk of no payment."  O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 309 (E.D. Pa. 2003).  This factor weighs in favor of the Court's award of attorneys' fees.

### 6.    Amount of Time Class Counsel Devoted to the Case

Class counsel have spent over 12,656 hours in prosecuting this case on behalf of the settlement class.  Dkt. No. 89-2 at ECF p. 7.  Time was spent investigating class' claims, filing the complaint, litigating a motion to dismiss, consulting with expert witnesses and  participating in mediation sessions.  Such time, which was reasonably spent to prepare for this complex class action, weighs in favor of the requested fee award.

### 7.    Awards in Similar Cases

The requested fee award amounts to 17.8% of the settlement fund.  This percentage clearly falls within the range of approved fee amounts in other class actions.  See, e.g., In re Linerboard Antitrust Litig., Nos. 98-5055, 99-1000, 99-1341, 2004 WL 1221350, at *14 (E.D. Pa. June 2, 2004) (citing a Federal Judicial Center study that found that the median attorneys' fee award in federal class actions was between 27% and 30%); In re Ikon Office Solutions, Inc. Sec.

Litig., 194 F.R.D. 166 (E.D. Pa. 2000) (approving a fee award equaling 30% of a $111 million common fund); In re Ins. Brokerage Antitrust Litig., 282 F.R.D. 92, 123 (D.N.J. 2012) (awarding fees to class counsel equivalent to 23% of a $62 million settlement fund); In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999) (awarding fees representing 27.5% of a $116 million common fund); Kurzweil v. Philip Morris Cos., Inc., No. 94 CIV. 2373, 1999 WL 1076105, at *1-3 (S.D.N.Y. Nov. 30, 1999) (granting a fee award equivalent to 30% of a $123 million common fund).  I find that the fee awards made in other cases resulting in similarly sized common fund settlements support an award of the requested fee.

### 8.      Value of Benefits Attributable to Class Counsel

Class Counsels' relevant experience, including their experience in the CertainTeed roofing shingle litigation allowed them to more effectively and efficiently litigate and negotiate the resolution of this case.  "There is no contention, by objectors or otherwise, that the settlement could be attributed to work done by other groups, such as government agencies."  Esslinger v. HSBC Bank Nevada, No. 10-3213, 2012 WL 5866074, at *14 (E.D. Pa. Nov. 20, 2012).  Rather, class counsel's independent investigation led to the filing of this litigation and ultimately to the creation of the settlement fund for the class.  This factor supports the requested attorneys' fees.

### 9.      Fee That Would Have Been Negotiated in Contingent Fee Arrangement

"[T]he goal of the fee setting process is to 'determine what the lawyer would have received if he were selling his service in the market rather than being paid by Court Order.'"  Linerboard, 2004 WL 1221350, at *15, quoting In re Cont'l Ill. Secs. Litig., 962 F.2d 566, 572 (7th Cir. 1992).  "In private contingency fee cases, lawyers routinely negotiate agreements for between 30% and 40% [ ] of the recovery."  Esslinger, 2012 WL 5866074, at *14, citing In re Ins. Brokerage Antitrust Litig., 282 F.R.D. 92, 123 (D.N.J. 2012); Ikon, 194 F.R.D. at 194.  The

requested fee is below this range and this factor weighs in favor of the Court's award of attorneys' fees.

### 10.      Any Innovative Terms of Settlement

Class counsel contends that the settlement agreement is innovative in that it provides class members "with a right to obtain significant monetary recovery" and "[p]rovides a substantial cash settlement to eligible Claimants."  Dkt. No. 89-1 at ECF p. 44.  They also contend the settlement is innovative because it provides a six year "super-enhanced warranty" and "[p]rovides compensation that far exceeds the limited materials only benefit of CertainTeed's Limited Warranty by including the cost of installation and paint, but leaves the warranty intact after the Claims Submission Period ends."  Id.  While I agree that the terms of the settlement support the aforementioned benefits, class counsel do not elaborate on how these terms are particularly innovative.  I find that this factor neither weighs in favor of or against the proposed fee request.

### B.      Lodestar Cross-Check

Analysis of the factors set forth above supports granting the proposed fee award of $18,500,000.  The Court of Appeals has "suggested that district courts cross-check the percentage award at which they arrive against the 'lodestar' award method."  Gunter, 223 F.3d at 195 n.1.  A lodestar award "is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys"  Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 216 (E.D. Pa. 2011) (internal quotation omitted).  "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need

not review actual billing records."  In re Rite Aid, 396 F.3d at 306-07 (footnote omitted), citing

Prudential, 148 F.3d at 342.

Class counsel claim to have devoted over 12,656 hours to litigating and settling this

action not including time still to be spent in implementing the settlement.  Dkt. No. 89-2 at ECF

p. 7.  I find that the hours spent are reasonable given the complexity of this matter.  Further, in

addition to the time and expense incurred to date, co-lead counsel will be obligated to monitor

the claims process for at least the next six years.  Under the terms of the settlement agreement,

when a claim is finally rejected, co-lead counsel are obligated to review the claim file and the

propriety of the rejection.  Dkt. No. 30 at ¶¶ 6.18-6.23.  Co-lead counsel may then be required to

become involved with the appeal process available to class members, including the presentation

of any disputes to a special master.  Based on their experience in similar cases, co-lead counsel

predict that "it is likely that the attorney and paralegal time spent during the next six years will

be in excess of an additional one million dollars in lodestar."  Dkt. No. 89-1 at ECF p. 47; see

also Dkt. No. 89-2 at ECF p. 5, ¶ 15.

Considering the time spent and applying hourly rates at or below the usual and customary

hourly rates charged for other similar matters, class counsel have calculated the lodestar to be

$6,882,060.30.  Dkt. No. 89-2 at ECF p. 7.  This is less than the fee they have requested.  Using a

lodestar of $6,882,060.30, the requested award of $18,500,000 in attorneys' fees yields an

approximate multiplier of 2.6.  The Court of Appeals has recognized that multipliers "ranging

from one to four are frequently awarded in common fund cases when the lodestar method is

applied."  In re Prudential, 148 F.3d at 341; see also AT & T Corp., 455 F.3d 160, 173 (3d Cir.

2006) (finding that 1.28 and 2.99 were acceptable multipliers).  Given the facts of this case and

the absence of substantial objections to the amount of the requested fees, I find that a lodestar

multiplier of 2.6 is acceptable and does not require that I reduce the amount of the requested attorneys' fee award. Accordingly, I will award class counsel the requested $18,500,000 in attorneys' fees.

## III.   Representative Plaintiffs and Service Awards

Absent objections to plaintiffs' motion for final approval of the appointment of named plaintiffs Steve Clavette, Chad Epsen, Monique Orieux, Chris Thames, Gwen Weithaus, Steven Wiedmeyer, Richard Tesoriero, John Robards, Barbara Robards, James Dibley, Patricia Swanson and Koreen Grube as class representatives, I will grant plaintiffs' motion. Plaintiffs have also requested service awards in the total amount of $65,000 as follows: (1) service awards of $2,500 per household awarded to the aforementioned class representatives; (2) a service award of $2,500 to settlement class member Canal Park Lodge, LLC, who contributed to this litigation similarly as the named plaintiffs; and (3) service awards of $2,500 per household to plaintiffs Steve and Karyn Hardig; Salvatore and Brooke Bongiorno; William and Tina Brantly; Kirby and Jennifer Dean; Evan and Monica Epp; Christopher and Kelly Everetts; Mary Kathleen Harrison; Jim and Karen Macmonagle; Stephen and Laura McNally; Thomas and Cassandra Aiosa; Annie Cheung; Chester and Eva Tai; Lethanial and Melissa Saunders; Michael and Stephanie Sherman; and Sherman Green, all of whom were plaintiffs in this MDL. Dkt. No. 87-1 at ECF p. 24-25.

No objections to the requested awards were received and the total amount requested is a modest sum relative to the $103.9 million overall settlement fund. The approval of contribution or incentive awards is common, especially when the settlement establishes a common fund. See Sullivan v. DB Investments, Inc., 667 F. 3d 273, 333 n.65 (3d Cir. 2011). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of

contributing to the enforcement of mandatory laws." Id.  I find that it is appropriate to pay the requested service awards.

## III.    Expenses

### A.    Claims Administrator

Absent objections to the appointment of Analytics (formerly BMC Group) as the claims administrator I will finally approve its appointment.  In their memorandum of law in support of their motion for final approval of the settlement, plaintiffs also seek approval of payments from the settlement fund to Analytics, whose fees for notice and claims administration totaled $1,369,695.42 as of January 29, 2014.  Dkt. No. 87-1 at ECF p. 25.  $1,318,153 of that amount has already been paid to Analytics, id., in accordance with paragraph 4.4 of the settlement agreement which provides, inter alia, that "[t]he Settlement Fund shall be used by the Claims Administrator to pay the approved costs of notice, claims administration, including the Claims Administration and the Independent Reviewer."  Dkt. No. 30 at ¶ 4.4.  Analytics estimates that fees through the completion of claims processing will not exceed an additional $571,468.00.  Dkt. No. 87-1 at ECF p. 25, citing Dkt. No. 87-5 at ¶ 79.  I will approve the requested payments to the claims administrator.

### B.    Other Expenses

Paragraph 4.4 of the settlement agreement provides for the payment of costs out of the settlement fund, Dkt. No. 30 at ¶ 4.4, and plaintiffs move for payment from the settlement fund of counsels' out of pocket expenses in in the amount of $304,996.65.  Dkt. No. 89-1 at ECF p. 12-13.  "[C]ounsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."  In re Cendant Corp. Derivative Action Litig., 232 F. Supp. 2d 327, 343 (D.N.J. 2002)

(quotation omitted).  The expenses submitted by plaintiffs' counsel have been documented.  <u>See</u>

Dkt. No. 89-2, Ex. A.  They reflect expenditures for purposes of prosecuting this action,

including photocopying, mediation costs, court filing fees, hearing transcripts, expert fees, online

research, messenger service, postage, express mail, telephone expenses, transportation, travel and

other incidental expenses.  The amount of expenses incurred is reasonable given the complexity

and duration of this action.  Further, no objections have been received regarding the requested

reimbursement of litigation expenses from the settlement fund.  I find that it is appropriate to

reimburse plaintiffs' counsel for their litigation expenses

      An appropriate Order follows.