UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PHILADELPHIA


In Re:                          :
                                :
CERTAINTEED FIBER               :    Case No. 11-MDL-2270
CEMENT SIDING                   :
LITIGATION                      :    Philadelphia, PA
                                :    February 19, 2014
---------------------------:         10:13 a.m.



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE THOMAS N. O'NEILL, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For CertainTeed:            ROBERT L. HICKOK, ESQUIRE
                            3000 Two Logan Square
                            18th and Arch Streets
                            Philadelphia, Pennsylvania  19103

For the Class:              MICHAEL A. McSHANE, ESQUIRE
                            AUDET $ PARTNERS, LLP
                            221 Main Street - Suite 1460
                            San Francisco, California  94105

For the Class:              H. LADDIE MONTAGUE, ESQUIRE
                            SHANON J. CARSON, ESQUIRE
                            BERGER & MONTAGUE PC
                            1622 Locust Street
                            Philadelphia, Pennsylvania  19103

For the Jabrani            GLENN MANOCHI, ESQUIRE
Objectors:                  GARY LIGHTMAN, ESQUIRE
                            LIGHTMAN & MANOCHI
                            1520 Locust Street
                            12th Floor
                            Philadelphia, Pennsylvania  19102


Audio Operator:             CHARLES ERVIN

```
Transcribed by:          DIANA DOMAN TRANSCRIBING
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856)  435-7124
                         Email:   dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                          I N D E X

2    ARGUMENT:                                        PAGE

3    Ref: Comparison of settlement over warranties and

4         approval of settlement as class settlement

5       By Mr. Montague                               4,10

6

7    Ref: Approval of settlement as class settlement

8       By Mr. Montague                               10

9

10   Ref: Why settlement should be approved

11      By Mr. Montague                               12

12   Ref: Girsh Factors

13      By Mr. Montague                               15

14

15   Ref: Agreement with terms stated by Mr. Montague

16      By Mr. Hickok                                 23

17

18   Ref: Objections

19      By Mr. Manochi                                24

20

21   Ref: Ability to pay

22      By Mr. Hickok                                 36

23

24   Ref: Reversion

25      By Mr. Montague                               39

1                    I N D E X  Continued

2

3    Ref: Clarifications

4       By Mr. Lightman                                43

5       By Mr. McShane                                 45

6    Ref: Attorneys fees and expenses

7       By Mr. McShane                                 48

8       By Mr. Montague                                49

9       By Mr. Manochi                                 55

10

11

12

13

14

15

16

17

18

19

20

21

22   *** Transcriber's note -- inaudibles are due to the fact that

23       Judge O'Neill's microphone is off at approximately halfway

24       through hearing

25

1              (The following was heard in open court at 10:13 a.m.)

2              THE COURT:  Good morning, counsel.

3              ALL COUNSEL:  Good morning, Your Honor.

4              THE COURT:  I apologize for keeping you waiting.  I

5    was delayed in arriving at the courthouse this morning.

6              COURTROOM DEPUTY:  You may be seated, everyone.

7              THE COURT:  Mr. Ervin, would you check in the

8    hallways and just call out and make sure there's no one out

9    there who wishes to be in the courtroom for this proceeding?

10        (Pause in proceedings)

11             THE COURT:  Are we ready to proceed?

12             COURTROOM DEPUTY:  Judge O'Neill, I checked the

13   hall; there's no one out there.

14             THE COURT:  Okay, fine.  The first item on the

15   agenda, who will speak for the class counsel?

16             MR. MONTAGUE:  Laddie Montague, Your Honor.

17             THE COURT:  Okay.

18             MR. MONTAGUE:  Ready?

19             THE COURT:  You can either speak better here or

20   whichever.

21             MR. MONTAGUE:  No, this is fine.  Thank you, Your

22   Honor.

23             THE COURT:  Just make sure you're behind that

24   microphone --

25             MR. MONTAGUE:  I will and I --

1          THE COURT:  -- and as you know, you have a deaf

2     Judge --

3          MR. MONTAGUE:  Well, I've got my hearing aid in

4     also, Your Honor --

5          THE COURT:  -- so shout.

6          MR. MONTAGUE:  -- and I'll put on the appropriate

7     glasses.

8          THE COURT:  Okay.

9          MR. MONTAGUE:  As Your Honor knows, I'm sorry that

10    we inundated you with so many papers, but this is a matter of

11    great importance to us.  It's a case that involves a

12    WeatherBoard fiber cement exterior siding, and as you will

13    recall, the people -- there has been an issue of this

14    premature failure of this siding.

15         And there's a warranty that covers it there and we

16    felt that the warranty was not sufficient to cover the damages

17    that were involved and the fact that the siding became

18    defective prematurely, so we have brought a lawsuit involving

19    breach of warranty, breach of merchantability, negligence -- a

20    whole series of claims and over the years, we have finally

21    been able to reach a settlement.

22         I'd like to start because I think it's important,

23    Your Honor, to compare the terms of the settlement with what

24    owners of the homes would get under the warranty, and I'll

25    start with the warranty, which is a two tiered type of

1    warranty.  The first part deals with the first two years after

2    installation and if there's a defect that can be proven by the

3    homeowner or the owner of the structure, CertainTeed agrees to

4    replace, repair or refund those defective boards, the

5    defective siding at full cost.

6            After two years, they agree to either repair,

7    replace or refund for the defective boards, but only the cost

8    of the boards, not cost of labor and not the cost of paint,

9    and after two years there's a proration of the cost based on

10   when the date of installation was.

11           For every year away from the date of installation,

12   there's a two percent reduction in the amount that they will

13   pay.  That's under the warranty.

14           So under our settlement, the claimants receive and

15   the class members who have defects in their boards will

16   receive a lot more, and it's broken down in the following way.

17           If there is five percent or more defective boards on

18   a particular wall of the house, not only will those boards be

19   replaced, but the entire wall will be replaced, and it will

20   not be replaced just for the cost of the boards, but the cost

21   -- it will be compensated for by the boards -- the cost of the

22   boards for labor and for paint, and that --

23           THE COURT:  Labor and --

24           MR. MONTAGUE:  Paint.  Labor and paint.  And that

25   figure is being calculated through a -- I guess it's called a

1    book or a service called RSMeans, which is basically the Blue
2    Book of the construction industry for pricing work and pricing
3    materials and replacement of things and building of things.
4    So that's if there's a five percent -- five percent or more of
5    the boards are defective.  The whole -- on a particular wall,
6    that whole wall gets compensated for.

7         If it's under five percent, then it's just the
8    boards that are defective, plus the boards that are above it
9    and below if that's necessary to make it look proper, and
10   again, that recovery -- that compensation is for not only the
11   -- not only the cost of the boards, but also the cost of labor
12   and paint.

13        So it's a substantial settlement.  It goes back --
14   people can make claims all the way back to 1999 when
15   CertainTeed started manufacturing these products.  It also has
16   a proration provision depending on the date of installation,
17   and I think that's set forth on page 11 of our brief which
18   will set forth the actual proration.

19        So that's basically the difference in the -- in our
20   settlement to the -- the warranty.  In addition, our
21   settlement is open for six years from the time that the
22   settlement becomes final; that is after all the appeals or any
23   appeals would be exhausted and there's no more basis for
24   appeal.

25        The other aspect is if in fact during that six year

1    period, if there is a warranty that is -- I mean if there is a

2    warranty claim that is submitted by a class member and the

3    class member may have for some reason not been aware of this

4    settlement, CertainTeed will submit that warranty claim over

5    to the claims administrator for our settlement and that claim

6    -- that claimant, the person who submitted the warranty will

7    in fact be treated as a claimant under the settlement and be

8    able to get the benefits under the settlement, assuming that

9    his damages qualify.

10          So that in a nutshell is the benefit -- substantial

11   benefit of the settlement over the warranties, and there's a

12   fund of $103 million which was put up and was calculated to

13   cover -- would be adequate to cover that particular -- those

14   particular claims that we expect since it's not a situation

15   where every board that was manufactured by CertainTeed was

16   defective.  But there are -- there's enough to make it a

17   serious issue for enough homeowners.

18          So if I may, I'd now like to turn to the

19   certification of the settlement class --

20          THE COURT:  Well --

21          MR. MONTAGUE:  -- unless you have questions.

22          THE COURT:  -- first tell me how the money is to be

23   paid.

24          MR. MONTAGUE:  The money gets paid in -- in order --

25   there's a -- we wanted to make sure that there were enough

1    monies to cover all of the claims that could be made over the

2    six year period, so when a person -- when a claimant makes a

3    claim and it's approved, then they will get paid 50 percent of

4    the amount of their claim -- what they're due under their

5    claim, which we believe will be more -- that 50 percent will

6    be more than what they would have received under the warranty.

7            The second -- the rest of the 50 percent or the rest

8    of the claim assuming up to 50 percent will be paid at the end

9    of the six year period, and that will ensure that there's

10   enough funds in the -- left over to pay all of the -- the

11   funds that are going to be -- all of the claims that are going

12   to be made over the six year period.

13           THE COURT:  But to whom does the defendant pay the

14   money?

15           MR. MONTAGUE:  The defendant pays the money --

16   there's a payment due after the -- a short -- I don't have the

17   exact dates but there's a payment made the first year, there's

18   a $35 million payment that's made initially and then the next

19   year I believe there are three or -- there are three payments

20   of totaling $22 million for the next two years and then

21   there's -- another year there's a payment -- three payments

22   totaling $11 million, and it comes out to $103 million.

23           However, if there -- if at any time there is a

24   shortfall, the defendants will -- there's a formula for them

25   to advance some money earlier than they otherwise would pay.

1  So there's a -- it's a guarantee they're --

2          THE COURT:  Say that again?

3          MR. MONTAGUE:  If there ever was a shortfall because

4  a payment wasn't -- because there's a payment due and there's

5  not enough money in the pot to cover the existing claims,

6  there's a basis -- there's a provision for the defendants to

7  make -- for the defendant CertainTeed to make a quick payment,

8  an earlier payment --

9          THE COURT:  Up to the maximum of 103?

10          MR. MONTAGUE:  I think it's based -- I think the

11  formula says that they can pay up to the amount that was paid

12  out the last quarter.  In other words, the last -- the number

13  of claims that were paid out the last quarter, they can --

14  that will accelerate and they'll pay that in earlier, so

15  there's always a guarantee, and the limit is when you get down

16  to $5 million in the pot.

17          If it's under $5 million in the pot, then they have

18  to make this abbreviated payment which is equal to what the

19  claims were out of in the last quarter, so there's a guarantee

20  that there will always be money in the pot to pay the claims

21  as they accrue -- pay 50 percent of those claims as they

22  accrue.

23          Now, with respect to the approval of the settlement

24  as a class settlement and the class -- I don't think there's

25  much question about the numerosity, Your Honor.  They're

Montague - Argument                              12

1    approximately -- I mean, I don't think I need to go through

2    all these things.  Is there any -- I'd be happy to just skip

3    over this if Your Honor --

4                THE COURT:  If there's an objection as to class

5    certification, you can respond to it then --

6                MR. MONTAGUE:  Okay.

7                THE COURT:  -- but it's certainly numerous with a

8    common question, that's my --

9                MR. MONTAGUE:  Yeah.

10                THE COURT:  -- preliminary conclusion.

11                MR. MONTAGUE:  Yeah.  I would just -- I will say one

12    thing.  If the case were litigated, there would be some

13    individual questions that you would have to consider in the

14    predominance area, but because this is a class settlement -- a

15    settlement class, those issues go away.

16                And what's important I think to the claimants is any

17    of those defenses -- and we'll get into this a little further

18    -- any of those defenses that CertainTeed would raise in

19    litigation are not going to affect the claimants' ability to

20    recover under the settlement.  So, in fact, no one will be

21    burdened with those defendants -- with those defenses, which

22    is again a very important aspect of the settlement.

23                So let me go into the settlement itself and the

24    reasons why it should be approved, and I will basically go

25    through the four points that are raised by the <u>Cendant</u>

1    <u>Corporation</u> case for a presumption of fairness, and then go

2    through the <u>Girsh</u> factors to show that this is a very fine

3    settlement and fair and reasonable and that it should be

4    approved.

5          The four factors for a presumption of fairness are

6    the settlement negotiations occurred at arm's length, and they

7    clearly did that.

8          They've been going on -- they went on for 18 months

9    and after about a year, they went on before Judge -- former

10   Magistrate Judge Melinson as a mediator, and they were

11   eventually resolved, and very hard fought, difficult

12   negotiations.

13         And even after an agreement in principle was

14   reached, it took time to negotiate the final settlement and

15   the terms of the final settlement.  So, it was definitely done

16   at arm's length and vigorously by both sides.

17         Second is the amount of discovery involved.  This

18   was an interesting case because we did a lot of

19   pre-investigation -- pre-filing investigation, both in terms

20   of actually talking to people, finding out about the defects

21   and hiring a forensic engineer who did an investigation and

22   gave us reports -- you know, analyses and opinions, so that we

23   knew we actually had a very good credibility with CertainTeed

24   when we went into the -- when we filed the case because we had

25   this engineering expert background to support our case.

1          We had a substantial amount of continuing

2    documentary discovery throughout the case.  There were several

3    depositions taken.  The experts visited about 12 homes

4    throughout the United States in order to help document their

5    reports and the defects and how they were -- and what their

6    cause was.

7          As I said, we took several depositions so there is a

8    substantial amount of understanding of the case from the

9    beginning and throughout and particularly when the settlement

10   was eventually reached.

11         The third issue is the proponents of the settlement

12   are experienced in similar litigation.  Actually, Your Honor,

13   I'm -- in this case, I'm the least experienced lawyer, not in

14   terms of class, I mean, we're all -- all of the counsel that

15   were heavily involved have been involved in class actions for

16   a long time.

17         But Mr. Levin, Mr. McShane -- their firms and my

18   partner, Shanon Carson, all were involved -- have all been

19   involved in similar cases like the Shingles case that was

20   before Judge Pollak, rest his soul.  Both Mr. Levin and Mr.

21   McShane were in that and Mr. Levin is heavily involved in the

22   Chinese Drywall case, so we learned -- they learned an awful

23   lot from those cases.

24         It's one of the reasons why this case has been

25   prosecuted in such an efficient, effective manner, and a lot

1    of it was because of the expertise that had been built up by

2    the counsel who handled it.

3            The last issue for a presumption of fairness is the

4    reaction of the class, and it's been minuscule.  There are

5    seven outstanding objections.  That comes to -- if you take

6    the number of mailed notices that were delivered, it's about

7    -- it's two-tenths of one percent.

8            If you take a look at the hits that were made on our

9    website -- because we had a website that has all the

10   information on it, there were approximately 64,000 unique hits

11   on our website and if you use that as a base, the number of

12   objections come to one-one-hundredth of a percent.  So there

13   has been an overwhelming acceptance of the settlement and a

14   minimum of objections.

15           There's also been 21 opt outs of which I think there

16   are two cases pending by those opt-outs, but again, that's --

17   for a case of this size, that is an absolute --

18           THE COURT:  Where are those cases pending?  Just as

19   a matter of curiosity, do you know?

20           MR. MONTAGUE:  I think one of them at least is

21   before Your Honor and they're asking to be remanded.  I think

22   there's a battle going on about that.

23           THE COURT:  Oh, is that the one in Colorado?

24           MR. MONTAGUE:  Yes.

25           THE COURT:  Yes.

1          MR. MONTAGUE:  That's Lionshead.  And the other one,

2    I'm not sure.  I just learned about it so I don't know.  So,

3    based on those four points, it is very clear that this

4    settlement deserves a presumption of fairness.

5          Now, let us get to the particular -- the <u>Girsh</u>

6    factors.  The first is the complexity, and I'm not sure I

7    really need to go into that.

8          This is a case which is going to -- if it went to

9    trial it would require a bevy of engineering issues and

10   economist issues, which are being avoided.  There's an array

11   of defenses that would have to be litigated and I'll get into

12   those later.

13         There's certainly issues of causation and damages

14   which are technical, and of course the class certification

15   issue, so the complexity I think is apparent in this case.

16         The expenses will -- if not -- if not settled at

17   this time, would mount substantially because of the expert

18   expenses of their reports, their depositions, their

19   participation at trial, their response to Daubert motions --

20   all those expert activities in this day and age add up to an

21   awful lot of money.

22         There are the other complex litigation issues such

23   as motions -- you know, various motions practice which is

24   being avoided, and of course there's the issue of the class

25   certification.  So the expenses would all increase

1    substantially.

2          And the duration of the case if not settled I would

3    say would be at least another two to four years, by the time

4    we'd complete pretrial proceedings, there could possibly be a

5    23(f) class appeal which would delay things, and then

6    obviously if there's a trial there's post-trial motions and

7    appeals, and so I think two to four years is a reasonable

8    additional time of duration if this case were not settled.

9          I've already gone over the reaction to the class,

10   which is the second Girsh factor so I won't repeat that, and

11   I've basically gone over the third state which is the state of

12   proceedings and amount of discovery completed.  And by the

13   way, Your Honor, to be precise about that, it's set forth in

14   the declaration of Shanon Carson which was filed along with

15   our settlement papers.

16         The next issue is the risks of approving liability

17   and damages and maintaining the class, and I have to say, the

18   one thing that was apparent for every objector is before the

19   Court today and those that weren't are no longer before the

20   Court because they withdrew their objections, not one of them

21   either recognized or addressed the risks of litigation in this

22   case.

23         And, I mean, to me that is a total fallacy and a

24   fatal mistake that each of them made because their objections

25   are in a vacuum without understanding the realities of what

1    this case is and what the risks are.

2              CertainTeed has raised a litany of issues which

3    could threaten the case.  I mean, no one knows how they would

4    all turn out, but I will go through them.  First they say that

5    the siding met industry and ASTM standards and therefore it

6    was fine.

7              Secondly, they say that our claims for negligence at

8    least are barred by the Economic Loss Doctrine, they say that

9    the limited warranty under contract is the exclusive remedy.

10   They say that improper installation and storage could be the

11   cause of the failure of the boards that are being claimed as

12   damaged.

13             They say that any defects were limited

14   geographically and time wise so it's not a full -- it doesn't

15   go across the class completely, and I have to say that our

16   experience to date has confirmed that.

17             They would -- they say that -- they claim that we

18   would have to show that each -- that the manufacturing defect

19   caused each type of damage that is being claimed, whether it

20   be the boards shrinking or whether they be warped or cracking

21   or something like that.  They have to show that the defect in

22   manufacturing caused each one of those.

23             They would also for our claims impose the statute of

24   limitations under the various state laws and that's another

25   issue that they would raise, that there are different state's

1    laws that have to apply.  And of course they would have an

2    opposition to how we prove our damages.  So there are a

3    tremendous amount of risks involved and I think as Judge

4    Pollak said in the <u>Shingles</u> case -- it was a very simplistic

5    statement, as he always made, "Victory for the class is not

6    assured."  I think that's very appropriate.

7         The next thing is the risk of establishing damages,

8    and frankly I don't want to give a lot of emphasis to that

9    because we are lucky to have this RSMeans -- I call it a Blue

10   Book but it's whatever book that is used which can actually

11   measure the cost of things, so I think there are always risks

12   for damages, but this is not something that seems to be

13   insurmountable.

14        Next is the risk of maintaining class through trial

15   and appeal, and that is always a risk, particularly in this

16   day and age, Your Honor, when the recent case law has made

17   class certification so much harder than it was five, ten, even

18   three years ago with the Supreme Court rulings and various

19   other rulings that have come down.

20        It's a very tough issue for plaintiffs in this day

21   and age.  And as I said before, there are certain issues which

22   would be raised that could be a threat to class certification

23   if litigated, which this settlement obviates and eliminates.

24        So, I think there would be a tremendous risk to the

25   plaintiffs of having this case certified as a class through

1    trial.  Not that it wouldn't be, but there's certainly a

2    substantial risk.

3         The ability of CertainTeed to withstand a greater

4    judgment, Your Honor, that really didn't come into the

5    negotiations so I don't want to make that really a factor one

6    way or the other.  It was never an issue.

7         The range of reasonableness in light of the best

8    possible recovery and attendant risks of litigation, I think

9    understanding, number one, that this is an all cash

10   settlement, there's no reversion to CertainTeed at all, all of

11   the monies go to the class and the awards that this Court is

12   going to make.

13        And there is no cy pres provision.  All of the

14   monies will be distributed and we are going to hand up today,

15   Your Honor, an addendum to the settlement agreement which

16   will, if there's money left over at the end of the six year

17   period after all of the claimants are paid up what they're

18   owed from their claims, the remaining money will remain

19   available for future claimants until it runs out.

20        So, we are going to hand up an addendum to Your

21   Honor which we'll -- the parties have agreed to, so there is

22   an assurance that all of the funds will be used to pay the

23   class.

24        If the -- it's hard to say what is the best result

25   that we could have, I guess we would have to say, one, the

1    class would be certified, there would be a finding that the

2    common manufacturing defects caused each of the injuries that

3    were to the -- to the boards that were -- that are being

4    claimed and that the compensation for those boards would be at

5    least what this RSMeans calculation would yield.

6            And I think the settlement itself compared to that,

7    Your Honor, comes very close to achieving that, if it doesn't

8    not only achieve that and perhaps more.

9            And our expectation is that all of the claims --

10   there's a good chance that all of the claims will be paid in

11   full.  In other words, that the first 50 percent payment there

12   will also be a second 50 percent payment or very close to it.

13           And as I said before, I believe that the first 50

14   percent payment will exceed what the claimant would receive

15   under the warranty and that is because (a), that what's being

16   paid for is more, it includes not only the material, but the

17   cost -- the labor and the paint cost, and also it includes

18   more boards -- substantially more boards with respect to a

19   particular wall.

20           CertainTeed on the other hand thinks that the best

21   result would be that no one could get anything other than what

22   is -- they're entitled to under the warranty, so I think the

23   upshot of all of this is, (one), there is definitely a

24   presumption of fairness, and (two), the Girsh factors clearly

25   support this settlement.

1          I would like to point out a couple things because I

2     found them quite important, and that is that this settlement,

3     the way it's structured, is very friendly to the claimants,

4     it's not one that makes life difficult.  There's been some

5     objections that the claim form is difficult and things like

6     that.

7          The claim form is no different than what --

8     basically what they would have to prove under the warranty.

9     And, it's important that we have a process where we can guard

10    against fraud and improper claims because, you know, without

11    this process, people could file claims where they don't

12    actually have CertainTeed boards.

13         So, it's important that we have a process where we

14    can be careful that the claimant is actually entitled to what

15    they are claiming, and while that does require some onus on

16    the claimant, it's important for the fairness of the

17    settlement.

18         But there are a couple aspects that I would like to

19    point out.  First we sent -- if you remember at the beginning

20    I mentioned that there was this -- this first two year

21    warranty where they get full costs and so forth, but again,

22    just for the boards what were damaged, if in fact someone has

23    made a -- has a claim and they fall under that first two year

24    period, they can recover under the Sure Shot -- what's called

25    a Sure -- what's it called, I forget the name of it --

1          UNIDENTIFIED SPEAKER:  SureStart.

2          MR. MONTAGUE:  SureStart, it's a SureStart

3    protection.  But they can still file a claim and if they would

4    get a greater amount under the claim and our settlement, they

5    can -- they can recover under the settlement but of course it

6    would have to be a setoff of what they get from the SureStart

7    protection warranty, so that's a very important aspect that

8    benefits folks.

9          There is a provision that allows two opportunities

10   to the claimant to -- guarantees the claimant two

11   opportunities to correct its claim if it's rejected for any

12   reason because of technical reasons or it doesn't have enough

13   information.

14         It's not going to be rejected outright, they're

15   going to get two opportunities to correct it.  In line with

16   that, if someone files a claim for particular boards and it's

17   rejected because they're not damaged enough, within a year

18   after that rejection they can resubmit their claim for those

19   boards because maybe in another year they've been damaged more

20   or their condition is worse.

21         So because they've been rejected at point A doesn't

22   mean they can't re-file after a year or earlier actually under

23   certain circumstances if at point B they have the actual

24   damage manifest itself to a greater degree.

25         And of course if their claim is rejected they have

1    the right to appeal that to an independent reviewer who is

2    selected by class counsel so I think there are an awful lot of

3    protections and safeguards which encourage people to file

4    claims and encourage them to get them submitted properly and

5    paid.

6             So that is basically in a nutshell why the

7    settlement should be approved.  The Girsh factors are

8    accepted, the presumption is accepted, the friendliness of the

9    case is -- the friendly nature towards claimants is very

10   important and of course the amount of the funds which all go

11   for class purposes and no revision or no cy pres is more than

12   adequate.

13            Does Your Honor has any questions at this point?

14            THE COURT:  Not at present.  Thank you.

15            Mr. Hickok.  Mr. Hickok?  When I made up the agenda,

16   I'm afraid that I inadvertently omitted you to give you space,

17   so I'll be glad to hear you should you wish to say anything.

18   Sorry about that.

19            MR. HICKOK:  No problem, Your Honor.  Good morning,

20   it's good to see you.  Just very briefly, we agree with Mr.

21   Montague's description of the settlement.  It provides

22   significant enhancements to the warranty that would otherwise

23   be available to class members.

24            As he said, it was negotiated at arm's length.  We

25   raised significant defenses in the case and we were prepared

1    to litigate the case if we were not able to reach a settlement

2    based on arm's length negotiations.  Retired Magistrate Judge

3    Melinson was very helpful in presiding over a mediation that

4    enabled the parties to make substantial progress in what was

5    ultimately negotiated.

6              Here we agree that under the <u>Cendant</u> factors the

7    settlement is entitled to a presumption of fairness and we

8    agree that under the <u>Girsh vs. Jepson</u> factors the settlement

9    is fair, reasonable and adequate and should be approved by the

10   Court.  If Your Honor has any questions I'd be happy to

11   address them.

12             THE COURT:  All right, thank you.

13             MR. HICKOK:  Thank you, Your Honor.

14             THE COURT:  Very well.  Mr. Lightman?

15             MR. LIGHTMAN:  Good morning, Your Honor.  Mr.

16   Manochi will make the presentation on behalf of the Jabrani

17   objectors.

18             THE COURT:  Very well.

19             MR. MANOCHI:  May I approach, Your Honor?

20             THE COURT:  Of course.

21             MR. MANOCHI:  Thank you.

22             THE COURT:  I don't remember that you've been before

23   me before so I'll warn you, you have a deaf Judge so don't be

24   afraid to shout.

25             MR. MANOCHI:  I don't -- I don't have a problem,

1   Your Honor, as long as you shout back at me because I'm

2   starting to have that same problem.

3            THE COURT:  Okay.

4            MR. MANOCHI:  All right, thank you.

5            THE COURT:  Get right behind that mic.

6            MR. MANOCHI:  Good morning, Your Honor.  My name is

7   Glenn Manochi from the law firm of Lightman & Manochi and

8   we're here today on behalf of the Jabrani objectors.  We have

9   a set of papers that have been on file with the Court and we

10  would --

11           THE COURT:  I've read your papers.

12           MR. MANOCHI:  Thank you.  And what I wanted to do

13  was take a few moments in my 15 minutes to highlight some of

14  the issues that I think still remain, even after the

15  presentation that has been made by --

16           THE COURT:  If you go over a few minutes, I'm not

17  going to cut you out.

18           MR. MANOCHI:  Okay, thank you.  I appreciate that

19  latitude.  I think primarily the biggest issue that we have is

20  although class counsel today mentioned a number of factors

21  that need to be determined in order to approve the settlement,

22  there's another one that was raised by In Re: Baby Products

23  Antitrust Litigation which was decided a year ago today, that

24  this Court has an additional duty which is to actually

25  determine what the actual value of this -- this settlement is

1    going to be.

2              And the Third Circuit instructs the District Court

3    to actually not just rely on what attorneys are saying, but to

4    actually hear some sort of evidentiary proof that establishes

5    what the basis is and what the settlement size is going to be.

6              I think if we kind of go through the papers that

7    have been submitted, I think they fall woefully short of the

8    obligation which if you'll -- Your Honor will understand kind

9    of comes in a little bit later with regard to the size of the

10   attorney's fees award that Your Honor is being asked to make

11   today.

12             I think the first one is -- although class counsel

13   says this is a $103.9 million settlement, if I'm reading the

14   settlement agreement right, there's $2 million that has been

15   deposited so far.

16             There's another 35 million that comes in 30 days or

17   60 days after the effective date, and then there is a year one

18   which is 23 million, a year two which is another 23 million, a

19   year three is 11.15 million, and then in year four another

20   11.15 million and those are put in in periods of time over

21   that.

22             The concern that we have is that there's no proof

23   before this Court made by anybody that CertainTeed for

24   instance has the financial wherewithal to actually make those

25   payments, and we're concerned with timing.

1      And we can discuss that a little bit in terms of

2   attorney's fees and when those will be awarded, but our

3   primary concern is that there's no evidence in front of this

4   Court that CertainTeed has the ability to make the payments

5   that they say they do.

6      We would have liked to have seen some sort of

7   affidavit by the financial CFO of the company for instance or

8   maybe -- maybe having them post some sort of letter of credit

9   that actually locks in that the money that everybody says is

10   going to come in today we have -- it is actually going to be

11   there four years from now when they have the obligation to do

12   that.

13      You know, we're concerned with issues like

14   bankruptcy for instance, which could eliminate the settlement

15   altogether.  There's no proof there and we think that while

16   based on Baby Products, there has to be a little bit more than

17   just counsel standing here today without any underlying

18   declarations of any expert that says -- or anybody from

19   CertainTeed that says we got the money.

20      The other aspect of this which we haven't seen is

21   there's this notion here -- and everybody in this room will

22   freely admit that there was and has been already a limited

23   warranty in place -- that's going to continue in place kind of

24   running parallel with the settlement agreement.  Based on

25   statements that have been made, we don't think that the size

1   of the settlement fund can really be determined to be $103.9

2   million simply because there is a value that has already been

3   out there with the limited warranty program.

4           There's been no showing whatsoever outside of a --

5   of one paragraph that I think that Mr. McShane has in his

6   moving declaration that says well, it's $3.8 million, there's

7   no basis for how he arrives at that and given the amount of

8   discovery that class counsel says has occurred.

9           And if you actually read their moving papers,

10  they've had absolute access to all the warranty claims that

11  have been filed -- the 19,520 warranty claims that CertainTeed

12  has made during the nine or ten or 11 years that are -- that

13  it had been going on, so we think that there's clearly the

14  ability to come up with a dollar number other than relying on

15  what a statement is that counsel made.

16          So we don't think this is a $103.9 million

17  settlement, we think that there's got to be some sort of proof

18  that's presented to this Court to actually take out the

19  incremental value of the limited warranty which existed before

20  the first lawsuit in this case was ever filed.

21          The next aspect of the settlement that is troubling

22  is again, the lack of proof to actually show what is the fair

23  range of what the actual claims warranties are going to be

24  that are going to come under this settlement agreement.

25          Again, I would point out to the fact that, you know,

1   Mr. Cole, who was the warranty manager, has provided to class

2   counsel all the information with regard to existing warranty

3   claims.  We have also class counsel in their moving papers

4   also say that they have received from CertainTeed a list of

5   every warranty claim that's been filed for the last ten years

6   from -- I think maybe from 2001 through 2012, roughly

7   speaking.

8              We're troubled here that given all this information,

9   there's no way and nobody who's actually set forth any

10  evidence to determine what the range of the size of the

11  settlement is going to be -- you know, there's issues with

12  regard to that not everybody is going to have qualifying

13  damage under this settlement.

14             There's issues with regard to well, how many walls

15  of the buildings are going to be replaced.  All of that can be

16  determined we believe on information that's already there, yet

17  no effort has been made by class counsel to carry what we

18  believe is their burden under Baby Products to actually show

19  this Court what the actual range of the settlement is going to

20  be.

21             We're also troubled -- well, not troubled, but we

22  don't -- we have this notion here too, is that in Cole's

23  affidavit that was submitted in support of the final moving --

24  he is again the warranty manager for CertainTeed -- he says in

25  document number 87-4 that his team has processed during the

1    limited warranty time -- limited warranty program, 19,250

2    claims.  And then he goes on to say -- which was necessary for

3    the purposes of the notice, that there were 3,755 names

4    generated with open, pending or rejected claims, okay?

5           And there's also a statement in his affidavit that

6    says the rest of them had been resolved.  So my math basically

7    says that there's 15,495 claims that have already been

8    resolved, so I'm not sure and I'm not sure anyone in this room

9    here sitting today is sure as to how many of those should be

10   subtracted from the actual projected value of what this

11   settlement is going to be because the settlement agreement

12   provides that once you've made your claim and resolved it, you

13   don't have the ability to do anything else with regard to the

14   settlement agreement that's here.

15          So there's this issue of close to 15,500 claims that

16   shouldn't be included in any estimate of what the value of

17   this settlement is going to be because they've already been

18   resolved.

19          THE COURT:  Well, I don't quite understand that.  In

20   other words, if -- and I'll ask Mr. Hickok to respond to this,

21   but if in fact CertainTeed is going to pay $103 million, then

22   that's the value of the settlement however it's distributed

23   among claimants.

24          MR. MANOCHI:  Right, but I think the issue here,

25   Your Honor, is the fact that what happens if everybody's claim

1    gets paid 100 percent, okay?  And let me just do a little math

2    for you because I think that may help you.  Their papers are

3    saying that a relative -- there's approximately 300,000

4    structures out there with CertainTeed cement board siding.

5    Their claims rate is one percent, according to Mr. McShane.

6         You then take what they've said in their notice

7    papers.  If every single house has qualifying damage, the

8    entire amount, the papers using -- the papers say that using

9    the RSMeans test, to re-clad every house on average will be

10   $14,000, okay?  And we're assuming that means the siding and

11   includes -- and assuming that means the labor.

12        If you do the math of 3,000 times 14,000, that's the

13   total universe.  If everybody files a claim based on the

14   expected claims rate, there's $42 million, so that's the total

15   settlement and that's -- and that's not including -- that's

16   including 100 percent of the homes all have qualifying damage.

17        THE COURT:  So they're going to get additional money

18   maybe they don't deserve, but they're going to get it.  So

19   their members --

20        MR. MANOCHI:  Well, I --

21        THE COURT:  -- of the class and they're going to get

22   the money.

23        MR. MANOCHI:  Then I guess what we need to look at

24   is to look at the actual language that's going to be set forth

25   with regard to the reversion area interest because I hear

1   that, but settlement agreement --

2              THE COURT:  Well --

3              MR. MANOCHI:  -- itself does not --

4              THE COURT:  Well --

5              MR. MANOCHI:  -- contain any language of what

6   happens if everybody gets paid off.

7              THE COURT:  Well, you have what amounts to a

8   judicial admission in open Court.  That's legally binding on

9   every party that's represented in this courtroom.

10             MR. MANOCHI:  Okay, well I see that, Your Honor.  I

11  think that that raises a whole other set of problems as to

12  whether or not the notice that was sent out originally is

13  adequate based on the fact that there's no language in the

14  settlement agreement that everybody had the right to look at

15  and comment on that says it's reversionary.

16             THE COURT:  Well --

17             MR. MANOCHI:  It's non-reversionary.

18             THE COURT:  -- was it your client or someone else's

19  that objected without even reading the settlement agreement?

20             MR. MANOCHI:  Well, that's why they -- that's why

21  they hire counsel, Your Honor.

22             THE COURT:  Well, you object without even knowing

23  what you're objecting to.

24             MR. MANOCHI:  Again, Your Honor, we're here to

25  represent the class and we're here with a set of objections

1    that we believe apply to all class members.

2              THE COURT:  Well --

3              MR. MANOCHI:  But I appreciate that comment, Your

4    Honor.

5              THE COURT:  Not really.  It's like the English

6    barrister who says with great respect, my lord, when he means

7    exactly the opposite.  Okay, go ahead.

8              MR. MANOCHI:  Thank you, Your Honor.  I harassed

9    you, you got me.  I'm sorry.  Okay, I understand the comment

10   too that the fund is non-reversionary.

11             Again, I certainly -- I think and I would hope that

12   Your Honor would require that something be put forth, either

13   on the record or more importantly on the docket so people who

14   have the ability to look at this case in the future and look

15   at the settlement in the future will be able to actually

16   understand --

17             THE COURT:  It is on the record right here in open

18   Court.

19             MR. MANOCHI:  I know, but the problem is I don't

20   know if it -- I think there needs to be some further notice

21   than here in requiring class members to go -- if they do read

22   the settlement agreement, to determine whether or not this is

23   reversionary or not.

24             I think that a person's determination on whether

25   they want to proceed, I think that becomes an important aspect

1   that needs to be somehow out there to modify the settlement

2   agreement as it exists because you're going to have people

3   over the next six years who are going to be able to say -- who

4   look at what we think is not going to be a complete record in

5   terms of determining how it is and what rights they actually

6   have under the settlement agreement.

7          And, you know, we also have the same comment with

8   regard to the existence of the warranty which the Juelich

9   objectors had -- said well wait a minute, it's not really

10  clear, it's not clear in there whether the limited warranty

11  that existed before continues on.

12         Now there's been two filings that have also been set

13  forth in the docket that I think need to be somehow related

14  with some certain -- certain sense of adequate notice to the

15  class members so they actually understand what their -- their

16  rights are given these -- the amendments subsequent to the

17  notice that was sent to them.

18         THE COURT:  I think you have a message coming up.

19         MR. MANOCHI:  Excuse me?

20         THE COURT:  I think you have a message coming up.

21         UNIDENTIFIED SPEAKER:  Sorry, Your Honor.

22         MR. MANOCHI:  Okay, I guess the one comment I have

23  with regard to at least what we think is the value of the

24  settlement if everybody gets paid off, there's still we think

25  even after the attorneys are paid off, there's going to be $40

Manochi - Argument                                    36

1   million left over.  Am I -- am I hearing it right, Your Honor,

2   that the class action counsel and CertainTeed today are

3   agreeing that even if there's more money than pays off 100

4   percent of all claims for everything, do the class members who

5   participate get that money?

6             THE COURT:  I will ask counsel to respond to that.

7             MR. MANOCHI:  And if that is the case, then I

8   absolutely think that you have to re-notice the settlement

9   here because that is an entirely different thing.

10            I mean, if they're saying that, there should be

11  notice that goes out to class members that says what you will

12  get depending on the claims more than -- you may get more than

13  you're ever entitled to even if this was -- even if you agreed

14  to the settlement terms.  But I'll leave that to Your Honor to

15  determine.

16            We also have -- and I don't know if this is the

17  appropriate part of the presentation, Your Honor, to determine

18  the attorney's fees aspect of the case --

19            THE COURT:  That's a later item in the agenda.

20            MR. MANOCHI:  Okay, then I will withhold my

21  comments.  I understand I'll have a right at that point.

22            THE COURT:  Right.

23            MR. MANOCHI:  Thank you, Your Honor.

24            THE COURT:  Yes, absolutely.

25            MR. MANOCHI:  And we also incorporate based on our

1    papers the inter-class conflicts that were raised in our --

2    the intra-class conflicts that were raised in our objections

3    with regard to that and we rely on the paper there.  And then

4    we'd also ask -- we'd also ask based on the motion that we

5    filed late Monday evening that the Court grant our motion for

6    leave to file supplemental objections and that they be entered

7    as of the record so that we can rely on those as well.

8              THE COURT:  All right, fine, file supplemental

9    objections, but they have to come in very quickly and they --

10             MR. MANOCHI:  Say again?

11             THE COURT:  They have to come in very quickly.

12             MR. MANOCHI:  They're in there, they've been signed.

13   If you look at I think Docket Number 106 or --

14             THE COURT:  Oh, they're already in?

15             MR. MANOCHI:  They're in, they've been signed.

16   They're attached to our motion for leave to file.

17             THE COURT:  Okay, I'll consider them filed.

18             MR. MANOCHI:  If you could look at those we would

19   greatly appreciate that and we thank you for your time, Your

20   Honor.

21             THE COURT:  Thank you.  Mr. Montague, before you get

22   up I'd like to hear from Mr. Hickok about CertainTeed's

23   financial ability over a period of six years to make this

24   payment.

25             MR. HICKOK:  Yes, Your Honor, as Mr. Montague

1    explained, the payment obligation is over a period of four

2    years with a --

3              THE COURT:  Four years.

4              MR. HICKOK:  Four years, with a $35 million payment

5    due upon the effective date of the settlement, so essentially

6    one third of it will be paid immediately.  CertainTeed is a

7    company that's been in business for over 100 years, it's got

8    more than 6,000 employees.

9              It's part of the company Saint-Gobain, a French

10   multi-national corporation.  It is pure speculation to say

11   that CertainTeed does not have the financial ability to make

12   this settlement.  There's absolutely no basis to say that

13   other than pure speculation.

14             The company has been running its existing warranty

15   program for this product for a period of at least 13 years

16   without issue, and it's really a straw man that's been raised

17   without any substantiation whatsoever.

18             Your Honor, with respect to the issue of a reversion

19   under the settlement, there is no reversion under the

20   settlement.  Under the terms of the settlement, it's very

21   clear that CertainTeed is obligated to make these payments

22   over a period of four years.

23             There is nothing that speaks to any money at any

24   time being reverted to CertainTeed and in every settlement

25   that I have ever seen that has a reversionary feature to it,

1   there is expressed language setting forth what that

2   reversionary feature is.  There is no such language in this

3   settlement and the obligation to pay is stated expressly the

4   obligation to pay over a period of four years of 103.9

5   million.

6           It could not be clearer in my view that there is no

7   reversion to this settlement.  As you've noted, we've stated

8   it in open Court that there is no reversion to the settlement

9   and again, I believe that is a straw issue that has been

10  raised here.

11          Your Honor, with respect to the amount of any monies

12  being left over, I believe the Plaintiff Steering Committee

13  will address that, but as Mr. Montague said earlier, to the

14  extent that there is additional money beyond what would be

15  paid to claimants who claim during the six year claims period,

16  that money will be paid to any additional claimants who come

17  forward thereafter.

18          And again, it's speculative that there would be, you

19  know, huge amounts of money that go unpaid here, but it's

20  clear that that money does not revert to CertainTeed in any

21  way and it's clear that that money will be paid to claimants

22  as long as that money lasts for the benefit of the class.

23          If Your Honor has any other questions, I'd be

24  happy --

25          THE COURT:  Mr. Montague you say is going to address

1    that point?

2              MR. HICKOK:  Yes, Your Honor.

3              THE COURT:  Fine.  Thank you, Mr. Hickok.

4              Mr. Montague?

5              MR. MONTAGUE:  Thank you, Your Honor.  I was

6    listening to Mr. Manochi's objections and I don't understand

7    why he's --

8              THE COURT:  Yell into that microphone.

9              MR. MONTAGUE:  I'm sorry, I was listening to Mr.

10   Manochi's objections and I really couldn't understand why he's

11   objecting.  He says there's going to be money left over.  It

12   reminds me of what Senator Lieberman said when he was running

13   for Vice President and he said what am I going to do if the

14   inauguration is on the Sabbath, him being an Orthodox Jew, and

15   his mother said you should have such a problem.

16             You know, I think that's really -- this is an

17   unusual issue.  If there is money left over -- and we've

18   addressed that, and I will read that if I may into the record,

19   Your Honor, the addendum that we are handing up today which

20   has been signed by the class counsel and by CertainTeed's

21   counsel.

22             "Plaintiffs and CertainTeed hereby agree to the

23   following addendum to the corrected agreement of compromise

24   and settlement.  If the settlement fund has not been exhausted

25   following the expiration of the claims submission period, the

1  claims submission period will remain open for as long as there

2  are remaining funds," that is that six year period will

3  remain open. "The claims administrator will continue to

4  accept claims from settlement class members until the

5  settlement fund is exhausted."

6        "Settlement class members who submit eligible claims

7  during this extended period of time will receive a one time

8  payment for their claim according to the proration schedule in

9  section 7.2C of the settlement agreement up to the point the

10  settlement fund is exhausted."

11        "The claimant's administrator will pay claims in the

12  order in which they are received after the end of the claims

13  submission period until the settlement fund is exhausted."

14        The question of what happens if CertainTeed goes

15  bankrupt, a highly speculate thing.  If CertainTeed goes

16  bankrupt, Your Honor, this litigation is not worth what's in

17  the warranty so it's a meaningless question and in particular,

18  it's so speculative in light of the strong financial position

19  of CertainTeed, its history and its association with

20  Saint-Gobain.

21        Then Mr. Manochi is certainly anxious to spend more

22  of the class's money by asking for more notice, which every

23  class member already has notice of the website so anything put

24  on the website they will have notice of.  It's routine once

25  there's a website established and the class has had notice of

1    it that changes can be made on the website and that

2    constitutes notice, so I don't see his objection there as

3    anything other than spending more money --

4               THE COURT:  This will be put on the website?

5               MR. MONTAGUE:  Excuse me?

6               THE COURT:  This will be put on the website?

7               MR. MONTAGUE:  Absolutely, absolutely it will be put

8    on the website.  So as are all of the -- I believe if I'm not

9    mistaken that all of the filings in this case are on the

10   website so everything is open.

11          There's nothing hidden and the class has full notice

12   of everything and the opportunity to find out anything they

13   want.  And of course there also are telephone numbers on the

14   website so anyone can call and ask a specific question.

15          The last thing I just want to address, and Mr. Levin

16   probably will get into this -- may get into this somewhat, but

17   this conflict that was raised by -- not by these folks but by

18   another group of objectors who have withdrawn their

19   objections, and Mr. Levin will address the issue of why they

20   should not have the opportunity to take advantage of those

21   objections.

22          But I'd like to answer it anyway because I'd like

23   the Court to know about it.  There's a case in the Third

24   Circuit called D-E-W-E-Y, Dewey vs. Volkswagen, 681 F.3d 170

25   at pages 185 and 186, it's a Third Circuit case in 2012.  And

1    basically what it says is where the class representatives have

2    the same interests because they can make additional claims as

3    people who may have delayed claims, there's no conflict of

4    interest.

5            Here's what we have here.  We have three different

6    situations.  We have people that have damage of five percent

7    or greater of the wall, less than five percent of the wall, or

8    have no damage at all.

9            Well, the class members may have damage -- their

10   entire home or their entire structure is not damaged so they

11   still have -- even if they make a claim for an entire wall for

12   five percent damage or more of an entire wall, they still have

13   an interest to make sure that if they have damage to another

14   wall that is less than five percent or if they have no claim

15   at all, how their interests will be handled.

16           So, their interests are identical to the absent

17   class members regardless of what category they fall into.

18           So unless all of the walls of a class representative

19   are defective, every class member -- every class

20   representative and class member are potentially eligible under

21   the settlement for either the -- one of the three categories

22   where they can file a claim under the plus-five percent, the

23   less than five percent, or they have no damage at all until

24   after the settlement ends -- the settlement period ends and

25   then they still have their claims under the warranty.

1          Everybody is in the same position.  Everybody had

2    the same interest to protect where they might be at any

3    particular point in time so their -- under the Dewey case,

4    it's very clear there is no conflict of interest whatsoever.

5    Did you follow that?  Thank you.

6              THE COURT:  Thank you.

7              MR. MONTAGUE:  Thank you.

8              MR. LIGHTMAN:  May it please the Court, may I just

9    request two points of clarification for the record?  It's Gary

10   Lightman on behalf of Jabrani people.  Point number one would

11   be with respect to this reversionary fund.

12         The way the settlement has been explained in notice

13   to the class and this morning, if there's an excess fund at

14   the end of the six year period, their proposed solution as I

15   understand from this addendum that's being handed up is

16   they're going to extend the claims period and people can

17   object beyond the required claims submission period and --

18             THE COURT:  People can't (phonetic) object.

19             MR. LIGHTMAN:  People can -- excuse me, submit

20   claims after the six year period and the claims administrator

21   will continue to honor these claims.  Under their own

22   paperwork though they expect 3,000 claims at an average of

23   14,000 per claim which they calculate to be $42 million to be

24   paid out under the settlement if the expected number of claims

25   -- the 3,000 claimants make claims, which means they're going

1    to put 103 million in escrow or into the settlement pot, they

2    expect to pay approximately $42 million which leaves $61

3    million in this pot, and let's even give them the benefit of

4    the doubt and double the claims so that instead of $42 million

5    being paid out $84 million is being paid out.

6              There is still between $20 million and $60 million

7    in this pot that they propose to resolve by extending the

8    claim periods for anybody else who wants to make a claim.   In

9    practical effect, if people don't make a claim within the

10   first years, they're not likely to get a bunch more claims

11   after the six year period.

12             And what if no one else makes a claim?   What happens

13   to the money?   It sits in this pot forever so another six

14   years go by and you have the original 3,000 claimants they

15   expect to make claims during the six year period, and let's

16   give them the benefit of the doubt, another 3,000 come forward

17   in year seven --

18             THE COURT:   The basis of your objection was it

19   wasn't clear that it would not go back to CertainTeed, okay?

20   It's now clear, if it wasn't before, that it does not go back

21   to CertainTeed.

22             MR. LIGHTMAN:   From the representations made on the

23   record, I would agree with Your Honor.   Then my followup

24   question based upon what happened this morning is what happens

25   to the fund?   After 12 years when no objectors are left, what

1  happens to the $20 or $60 million or whatever million is left

2  in there?  It shouldn't just sit in the pot.  There should be

3  a provision made for the class that's settling their claims to

4  benefit from that instead of it just sitting there.

5          That's my first objection is even after all

6  objections are done, there's still this pot.  What happens to

7  it?  And I don't think that's been addressed.

8          My second point of clarification that I would ask

9  that the class action counsel address is they said that all

10 claimants except for seven including the Juelich claimants

11 have withdrawn their claims.

12         We've tried to get in touch with counsel for Juelich

13 to find out what's been promised to them or what led to the

14 withdraw of the claim, I respectfully submit that Rule

15 23(e)(5) requires the Court's approval to withdraw an

16 objection to a class action settlement once made.

17         I would like the class action counsel to state for

18 the record with respect to Juelich in particular and the other

19 objectors who withdraw their claims whether or not there was

20 -- what led to the withdraw of those claims.  They would be

21 the two points of clarification I would ask that the class

22 action counsel make for the record.  Thank you, Your Honor.

23         MR. MCSHANE:  Good morning, Your Honor, Michael

24 McShane for plaintiffs.

25         THE COURT:  Yes.

1          MR. MCSHANE:  With regard to the Juelich objectors,

2    I still personally --

3          THE COURT:  End of the mic.

4          MR. MCSHANE:  Can you hear me?  With Mr. Steward,

5    who's Mr. Juelich's attorney, and he withdrew the objections.

6    That was his intent.  That's why he filed a document called

7    notice of withdraw of the rejections.  Mr. Juelich was not

8    offered or given any special compensation for doing so.  He is

9    just a class member at this particular point.

10          With regard to this issue of a reversionary fund --

11    or excuse me, leftover money -- a potential cy pres, Your

12    Honor, I can assure you that it is very unlikely that there

13    will be any money left over.  I don't know where the objector

14    counsels came up with the 1 percent, but it's not from us.

15    They're making this up.

16          If you look at the notice where we do an example of

17    a potential claim, that is what we think the potential amount

18    of money will be paid to each class member on average and over

19    time, we think that will exhaust the fund.

20          Now, it's a conservative estimate so I do believe

21    rather than receiving 50 percent of the value or the cost of

22    re-siding their home, I think it's going to be closer probably

23    to 75 percent.  But I would be shocked if there's any money

24    left over.  This illusory objection, this what if there's

25    money left over as if we have to try to come up with what's

1  going to happen for six years from now, I've never seen it

2  before, Your Honor.

3          We came up with a plan of distribution and entered

4  into a settlement because we think this is enough money to

5  fairly compensate the class members.

6          In my declaration I go through some of my

7  experiences in other cases and I've been doing this for 25

8  years, and our estimate of the claims rate and the cost to pay

9  the claims as they come in, again, in our view, will

10 thoroughly exhaust the fund, will in all most likely pay them

11 the amount we estimate in the notice and most likely pay them

12 even more.

13         If there's money left over at the end, then we'll

14 keep the claims period open, sure, why wouldn't we?  We can

15 just keep money out.  But this -- this notion that there's $40

16 million left over out of a $100 million fund, Your Honor,

17 there's no basis for that.  That's all I have, Your Honor.

18             THE COURT:  All right, (inaudible).

19             UNIDENTIFIED SPEAKER:  Your Honor, I hope you don't

20 have difficulty with me with my voice today.  If you do, tell

21 me to sit down because it's all in the brief probably anyway.

22 Your Honor, what we have seen witnessed today is a scenario

23 that is playing out throughout the Courts of the United States

24 in Federal and State Courts.

25             THE COURT:  Well, if this is about the (inaudible)

1   lawyer, I simply want to concentrate on the -- on the

2   substance of the objections that were made.

3           UNIDENTIFIED SPEAKER:  Then I will sit down and you

4   won't have to listen to my raspy voice.  Thank you, Your

5   Honor.

6           THE COURT:  I have no motion for sanctions pending

7   before me and I will tell you frankly I hope that I will not

8   have one (inaudible).

9           UNIDENTIFIED SPEAKER:  You will not.

10          THE COURT:  We'll take a short recess.

11      (Recess, 11:23 a.m. until 11:35 a.m.)

12          COURTROOM DEPUTY:  You may be seated, everyone.

13          THE COURT:  All right, number four on the agenda,

14   claims motion for attorney's fees and expenses.

15          MR. MCSHANE:  Michael McShane, Your Honor.  Mr.

16   Montague is going to handle the attorney's fees motion, but

17   one other matter regarding the objections.  There is a motion

18   included in their latest supplement regarding the Juelich

19   objections and they're based --

20          THE COURT:  Regarding?  Regarding what?

21          MR. MCSHANE:  The Juelich objections that were

22   withdrawn.

23          THE COURT:  Yes.

24          MR. MCSHANE:  And they're asking the Court to allow

25   them to adopt them and the reason for that is they like some

1   of those objections and they want to see what will go stick at

2   the Third Circuit.  Your Honor, I've never heard of being able

3   to adopt or withdraw an objection.  They had their chance and

4   we think that motion ought to be denied, Your Honor.

5              THE COURT:  All right, I'll reserve -- if I've said

6   the opposite before, I'll withdraw it.  I'll reserve judgment

7   on that motion.

8              MR. MCSHANE:  Thank you, Your Honor.

9              MR. MONTAGUE:  Good morning, again, Your Honor.

10  This is always hard in a sense because we are asking for a lot

11  of money.  I think that in this case though it is aptly

12  deserved.  The real test -- the test is, Your Honor, these

13  eight or nine factors that are known as the Gunter factors

14  from the Gunter case, 223 F.3d at 195, and most of those I've

15  already covered so I'm just going to mention them but I'm not

16  going to repeat what I already said because I don't think it's

17  necessary.

18             Number one is the size of the fund and the number of

19  persons benefitted.  I don't think I need to respond to that

20  any further.  The number of objectors to the settlement and

21  the fees, I've set that out in the record and I don't need to

22  respond.  The attorneys' skill and efficiency, I mentioned

23  that before.  I would like to mention it again because it is

24  very germane to this particular petition for fees.

25             As I said, a group of the attorneys here were

1    involved in the <u>Shingles</u> case before Judge Pollak and they

2    have a great expertise in this area and as a result of that we

3    were able to make a lot of efficiencies and economies that

4    other -- other lawyers would not have made, and plus we had a

5    very good understanding of how these types of cases work and

6    how CertainTeed works and as a result of that, we were able to

7    accomplish a lot more in a quicker time without wasting a lot

8    of time.

9          And in other cases, because more time is put in, I

10   don't mean to say that it's wasted, but our time here, we were

11   able to target it more so than in other cases because of the

12   experience of counsel and I think that is something that we

13   should not be penalized for but should -- it deserves

14   applause.  And I would ask Your Honor to consider that in

15   making the award.

16         And again what I mentioned, one of the things that I

17   think was really key here was our being able to obtain before

18   filing the case a forensic engineer and in doing some research

19   beforehand and getting some preliminary opinions because when

20   we filed the case and we met with CertainTeed and the first

21   time that we raised the issue of settlement, we had -- we had

22   credibility because of this.

23         And, we were able to proceed and we both litigated

24   and negotiated at the same time and it took a long time.  The

25   complexity and duration of the litigation I've gone over

1   earlier and I won't repeat that.

2          The risk of non-payment is the next factor and

3   obviously, all of counsel have this case on a contingent

4   basis, we've advanced the costs and if we did not win the case

5   we would not get paid so there was a -- and I've gone over

6   what the various risks of litigation were and there was a

7   substantial issue as to whether or not we would win the case

8   and therefore we had a substantial risk of non-payment.

9          The next issue is the amount of time devoted and

10  that again shows the economy.  I think it's pretty amazing of

11  the amount of time that we devoted on this given the results

12  and all we accomplished and that time is set forth in the

13  petition and it's 12,656 hours and for a Lodestar of

14  $6,000,882 roughly.

15         And I think what we've asked for, Your Honor, is a

16  fee that would be awarded on the percentage basis which was I

17  think 17 -- I should know it by heart but I don't -- 17.8

18  percent and it would result in a fee of $18.5 million for all

19  the counsel in the case.

20         We tried to look -- the next issue is the award of

21  similar cases -- in similar cases and I tried -- we found

22  three cases of fairly recent vintage that had settlement --

23  class action settlements that were within the range of our

24  settlement and what the awards were, and I'll go over those.

25         The first was the Rite Aid case which was 146 F.

1   Supp.  2d at 706 and that was a settlement of $193 million and

2   the award there was 25 percent and the multiple was between

3   4.5 and 8.5, and I wasn't quite sure how they arrived at that

4   but that's what the multiple was stated as.

5          The second case was the Ikon case in 194 F.R.D. 166

6   at 195, which was an $11 million settlement and it was an

7   award of 30 percent with a multiple of 2.7.  The third case

8   was the Linerboard case which is reported in 2004 Westlaw

9   1221350 which was a $200 million settlement.

10         It had a percentage fee of 30 percent awarded and a

11  multiple of two -- six -- I'm sorry, of 2.66, so our fee, what

12  we've requested is less than 18 percent and I believe that the

13  multiple comes out to be approximately 2.6 based on what we

14  have expended up to the time of the petition that we submitted

15  -- the petition.

16         However, as we pointed out, Your Honor, our role has

17  not -- will continue.  We have to monitor this and participate

18  in the claims administration process, this hearing and

19  whatever follows and we are not planning to seek any further

20  fees after this award, so this award covers everything until

21  the end.

22         Then there are the Prudential factors set forth in

23  the Prudential case in the Third Circuit, 148 F. 3d at 33, 338

24  and 340.  The value of the benefits due to the attorney's

25  efforts as opposed to the efforts of other groups, there were

1    no other groups, no other efforts this settlement is entirely

2    product of our petitioning attorney's efforts.

3              Secondly is the private contingent fee negotiated

4    would be -- I think that the standard is anywhere's between

5    33-and-a-third and 40 percent in most cases where there is a

6    private contingent fee, so this is well within that range.

7              And the third issue to look at under Prudential is

8    innovative terms, and I think this settlement reflects several

9    of those.  One is the fact that if over five percent of the --

10   of a wall is damaged -- has a qualifying damage to it, the

11   entire wall gets replaced.  That is very innovative.

12             Secondly, I mentioned at the end of the settlement

13   approval argument all of the various friendly items that are

14   involved in this settlement -- the friendly terms which help

15   class members and encourage class members to file claims, even

16   if they're rejected in the first instance.

17             And the third issue is the fact that we got cash

18   rather than product or something else because cash -- cash is

19   cash and if this -- if this product were done by on product,

20   it obviously -- what CertainTeed sells -- the price of a

21   product that CertainTeed sells is a lot more than it costs

22   CertainTeed to replace.

23             So in fact, the fact that this is a cash settlement

24   gives it more value.  It also gives the class members the

25   flexibility to replace -- to replace the damaged product or

1      its walls with anything else, any other product that it wants.

2      So, I think these issues are -- make this a very, very

3      attractive settlement and the terms are -- I think are --

4      several of them are quite imaginative.

5           So I want to get back for a second to the multiple,

6      Your Honor, because I know that's something that sometimes

7      people like to attack, but again, I want to stress the

8      cooperation and the efficiency of plaintiff's counsel.

9           If we had not worked cooperatively with

10     CertainTeed's counsel -- and I'm sure that Your Honor must

11     have noticed that we really -- we never had to appear before

12     you with the discovery issue or any other issue with the case

13     until we got to the preliminary approval stage.

14          That was all done because of the professionalism and

15     the cooperation of counsel, between the parties and also our

16     foresight to start the settlement negotiations early on in the

17     case, even while we we're litigating.

18          So I say it took about an 18 month period from the

19     time they started to the time we reached an agreement.  But

20     all that time we were litigating too, but everybody had the

21     foresight to start that process early on.

22          So if we hadn't done that, if we hadn't had that

23     cooperation and hadn't started that process early, then our

24     Lodestar would have been higher, or if we hadn't had the

25     organization and the sufficient -- and the cooperation that

1    we've had amongst the plaintiff's counsel, our Lodestar would

2    have been a lot higher.

3           So I don't think we should be penalized for all

4    things that that we've done that resulted in the Lodestar

5    being lower and I think that the 2.6 multiplier in this case

6    is certainly a good cross check for the 18 -- the 17.8 percent

7    fee that we're asking, so we ask Your Honor if you would be

8    kind enough to award that to all of the class counsel.  That

9    takes care of that.

10           We also have a petition out for an incentive fee for

11   the named plaintiffs and I think that was basically addressed

12   earlier so --

13           THE COURT:  (Inaudible).

14           MR. MONTAGUE:  Okay, thank you very much.

15           MR. MANOCHI:  Thank you, Your Honor.  There's two

16   basic points I would like to raise with regard to the

17   attorney's fees.  The first point is again, I keep coming back

18   to Baby Products just in the sense that there's relevant

19   language there and I think it's relevant for the purposes of

20   determining attorneys fees as well.

21           Our arguments before were really based on the size

22   of the fund and I want to make sure the Court understands

23   because I don't think that class counsel understood, we're not

24   -- we're not objecting and weren't objecting to whether or not

25   CertainTeed's big enough or tall enough to fund the thing.

1          We're objecting because there is a burden on them to

2    provide evidence of that to meet the requirements under <u>Baby</u>

3    <u>Products</u> so whether or not they have or they haven't is a

4    matter of evidentiary proof.  We don't believe it's there.

5          THE COURT:  Evidence of?

6          MR. MANOCHI:  It's a matter of evidentiary proof of

7    some sort.

8          THE COURT:  Of what?

9          MR. MANOCHI:  Of -- well, there's certain burdens

10   that we believe --

11         THE COURT:  Of what?

12         MR. MANOCHI:  Of --

13         THE COURT:  Evidentiary proof of what?

14         MR. MANOCHI:  Well, that they have the financial

15   wherewithal.

16         THE COURT:  Well, why isn't -- if you're objecting,

17   why isn't it incumbent on you to come forth with at least some

18   proof that creates doubt in my mind that the defendant has the

19   ability to make these payments?

20         MR. MANOCHI:  Because I think the burden is on the

21   movants to establish that this is fair.  They have negotiated

22   an agreement that says over four years these are the payments

23   that are going to be had.

24         We would expect some sort of even elemental proof of

25   some sort that there's the financial wherewithal.  And

1    granted, our objection continues to be that the attorney's

2    standing up here and saying these guys have 6,000 employees

3    and they're a subsidiary of a French company I don't think

4    meets that burden.  But --

5              THE COURT:  Your objection is merely speculative,

6    isn't it?

7              MR. MANOCHI:  Well again, it's a burden of proof.

8    They have -- you know, if they're saying these monies are

9    going to come in and it's $103 million fund, we believe that

10   they have the burden to show that that money --

11             THE COURT:  Now you're conceding it is a $103

12   million fund.

13             MR. MANOCHI:  Excuse me?

14             THE COURT:  Now you're conceding it is a $103

15   million fund.

16             MR. MANOCHI:  Well, for the purposes of the argument

17   here today, you know, and based on the fact that they

18   submitted a non-reversionary supplement, that that's what

19   they're showing today.  And all I'm saying is that I think the

20   proof -- the burden of proof is on them to show it, not on us

21   to disprove it.

22             THE COURT:  Well, the burden of proof is on them to

23   show what's the fairer settlement.

24             MR. MANOCHI:  And I think one of those elements is

25   is the money going to be there in four years and I think that

1   that's what our objection is, not for us to say it's not going

2   to be there in four years, but they're the ones that have the

3   financial ability to determine where this is.

4          In any event -- may I continue?

5          THE COURT:  Yes, please.

6          MR. MANOCHI:  Thank you.  In any event, it's again

7   we come back to In Re: Baby Products which if I might be able

8   to quote, Your Honor, there's an additional element in

9   addition to what class counsel has indicated today, which is

10  that in addition -- addition to the Girsh and Prudential

11  factors, there's an additional requirement -- additional

12  inquiry as to a thorough analysis of the settlement terms to

13  the degree of the direct benefit provided to the class, and

14  there's a number of factors that Your Honor can consider.

15         And that Court -- the Third Circuit goes on to say

16  that "the inquiry needs to be as much as possible practical

17  and not in the abstract," and then it -- and it requires that

18  if there's not the proof in front of the Court, that the Court

19  should require the parties to put that forth.  And it all ties

20  into the award of the attorney's fees.

21         Again, our objection is that we don't understand or

22  don't or don't know and there's no proof of any sort in front

23  of this Court as to what the actual value of the claim is

24  going -- actual value of the settlement is going to be, and

25  it's -- if they're saying it's $109 million, again, we believe

1    there has to be some sort of to carry the burden of proof

2    under <u>In Re: Baby Products</u>, that they show through some sort

3    of actuarial or factual or some sort of showing, some sort of

4    evidentiary showing what the estimated range of the settlement

5    is going to be.

6            THE COURT:  Well, I just heard a representation in

7    this Court to which you would just agree, that CertainTeed is

8    going to pay.  You're saying they have the burden to show, I

9    understand your oral argument there to show that CertainTeed

10   has the ability to pay it.  But I think it's beyond question

11   that CertainTeed has agreed to pay $103 million.  So that's --

12           MR. MANOCHI:  If that is what Your Honor is

13   determining based on the -- on the representations --

14           THE COURT:  Well, that's what you just said

15   yourself.

16           MR. MANOCHI:  Based on what I've heard in the

17   courtroom and based on what they're telling us.

18           THE COURT:  Well, that's a judicial concession.

19   It's binding on (inaudible).

20           MR. MANOCHI:  Hm-hmm, okay and if that is the case,

21   if that is the case that they are -- they are intending to pay

22   the $109 million then --

23           THE COURT:  They're bound by what they've said in

24   this courtroom.

25           MR. MANOCHI:  Okay.  If I might move on then, Your

1    Honor?

2              THE COURT:  Very well.

3              MR. MANOCHI:  I also think that based on the fact

4    that there -- we have no idea of what the range is and when

5    it's going to get paid, I do believe that the payment of the

6    attorney's fees should track the payments that are being made

7    to the class.

8              In other words, to the extent that counsel today is

9    expecting $18.5 million and the ability to pay that all at

10   once to them with not waiting as class members have to wait

11   for six years for a portion -- for whatever remains under the

12   fund --

13             THE COURT:  Well, why isn't this like a structured

14   settlement in the (inaudible)?  Under Pennsylvania law, a

15   structured settlement in a personal injury case, the lawyer

16   gets his feet up front.  Why isn't this the same thing?

17             MR. MANOCHI:  Well, it's a determination of fairness

18   on your part, Your Honor.  If you believe that that's fair

19   based on the submissions that are in front of you, then that

20   is fair.  I --

21             THE COURT:  Well, they've already done the work.

22             MR. MANOCHI:  Again, we have -- our objection is

23   that we don't know what the size and the total and when those

24   monies are coming in.  Again, it gets back down to the

25   evidence of what happens, for instance, if for some reason

1   CertainTeed can't make the payments.

2            THE COURT:  Yes, but that's pure speculation on your

3   part and it all comes down to your argument that they have to

4   prove that CertainTeed has the ability to make these payments

5   which they have legally obligated themselves to make.

6            MR. MANOCHI:  Right.  But again, we're going out

7   four years and a lot can happen in four years.

8            THE COURT:  That's the whole basis really of your

9   position since you (inaudible).

10            MR. MANOCHI:  Well, to the extent that we don't

11   believe that counsel is getting paid before the class members

12   is fair, that's part of that argument, you're right, Your

13   Honor.

14            THE COURT:  Well, it seems to me it's like a

15   structured settlement (inaudible).  You're at a disadvantage

16   because I'm the lawyer who 35 years ago defended the lawyer

17   who established that proposition in the Superior Court.

18            MR. MANOCHI:  Your Honor, then I've met my match,

19   Your Honor.

20            THE COURT:  No, you haven't.

21            MR. MANOCHI:  Thank you.  I appreciate your time.

22            THE COURT:  I will consider your arguments.  Thank

23   you.  All right, anything else?

24            MR. MONTAGUE:  Nothing more, Your Honor.

25            THE COURT:  Anything else from anybody?  All those

1   silent people down there, if anybody wants a chance?

2          Okay, thank you very much.  We will take this matter

3   under advisement.  Thank you all very much.  That was helpful.

4          (Proceedings concluded, 11:57 a.m.)

5

6                C E R T I F I C A T I O N

7

8

9          I, Diane Gallagher, court-approved transcriber,

10  certify that the foregoing is a correct transcript from the

11  official electronic sound recording of the proceedings in the

12  above-entitled matter.

13

14

15

16  _____   _____

17  DIANE GALLAGHER                    DATE

18  DIANA DOMAN TRANSCRIBING